IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Leonard Gipson, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 18 cv 5120 |
| -vs- | ) | |
| | ) | Judge Seeger |
| CITY OF CHICAGO, Former | ) | |
| CHICAGO POLICE SERGEANT | ) | *(Jury Demand)* |
| RONALD WATTS, Former | ) | |
| OFFICER KALLATT | ) | |
| MOHAMMED, SERGEANT ALVIN | ) | |
| JONES, OFFICER ELSWORTH | ) | |
| SMITH JR.. OFFICER DOUGLAS | ) | |
| NICHOLS JR., OFFICER BRIAN | ) | |
| BOLTON, OFFICER MANUEL | ) | |
| LEANO, OFFICER KENNETH | ) | |
| YOUNG, OFFICER DARREL | ) | |
| EDWARDS, OFFICER MATTHEW | ) | |
| CADMAN, MICHAEL | ) | |
| SPAARGAREN, OFFICER | ) | |
| GEORGE SUMMERS, OFFICER | ) | |
| CALVIN RIDGELL, OFFICER | ) | |
| ROBERT GONZALEZ, OFFICER | ) | |
| LAMONICA LEWIS, PHILIP | ) | |
| CLINE, DEBRA KIRBY, KAREN | ) | |
| ROWAN, and any other yet- | ) | |
| unidentified officers of the Chicago | ) | |
| Police Department, | ) | |
| | ) | |
| *Defendants.* | ) | |

## AMENDED COMPLAINT

Plaintiff, Leonard Gipson, by his attorneys, Loevy & Loevy, hereby

complains against the Defendants, City of Chicago, former Chicago Police

Sergeant Ronald Watts, former Chicago Police Officer Kallatt Mohammed,

Sergeant Alvin Jones, Officer Elsworth J. Smith, Jr., Officer Douglas Nichols,

Officer Brian Bolton, Officer Manuel Leano, Officer Kenneth Young, Officer Darrel Edwards, Officer Matthew Cadman, Officer Michael Spaargaren, Officer Gerome Summers, Officer Calvin Ridgell, Officer Robert Gonzalez, Officer Lamonica Lewis, Philip Cline, Debra Kirby, Karen Rowan, and other as-yet-unidentified officers of the Chicago Police Department, and states as follows:

## Introduction

1. Leonard Gipson was convicted and incarcerated for alleged crimes he did not commit.

2. The crimes that never happened; they were completely fabricated by Chicago police officers.

3. Mr. Gipson was arrested on three separate occasions: on January 4, 2003, May 8, 2003, and August 28, 2007. All the arrests were at the Ida B. Wells housing complex, a location that was heavily policed by corrupt Chicago police officers.

4. The corrupt officers sought bribes, planted drugs, and accused residents and visitors, including Mr. Gipson, of possessing drugs they did not have.

5. The type of encounters these police officers had with Mr. Gipson was unfortunately quite common, and the consequences were dire: false accusations, criminal proceedings, incarcerations, and subsequent felony record.

6. The first time Mr. Gipson was falsely arrested, Mr. Gipson filed a complaint with the Officer of Professional Standards. As a consequence of filing this complaint, the Defendants framed him for a second case.

7. After his first false arrest, Mr. Gipson also challenged his arrest at a pre-trial motion hearing. Testimony at that hearing cast significant doubt on the testifying officers' credibility. The court, however, found no reason to doubt the officers and denied the motion.

8. Realizing that he faced no chance of winning at trial, Mr. Gipson eventually pled guilty to his first two false arrests from 2003, and later to a third from 2007.

9. After Mr. Gipson had been framed and completed all three of his sentences, Defendants Watts and Mohammed were caught on tape engaging in the exact type of misconduct that Mr. Gipson had alleged against them.

10. The federal government charged Watts and Mohammed criminally, and the disgraced officers pled guilty and served time in federal prison.

11. Since then, evidence has come to light showing that Watts and his police team members engaged in an ongoing pattern of criminal misconduct against public housing residents and visitors and that Chicago Police Department officials knew about that pattern dating at least as far back as 2004.

12.     For example, on or after November 16, 2017, following the decision of the Cook County State's Attorney Office (CCSAO) to vacate the convictions of 15 individuals—including Mr. Gipson's three convictions—Defendants Jones, Smith, Jr., Nichols, Bolton, Leano, Young, Edwards, Summers, Ridgell, Gonzalez, Cadman and Lewis, along with other members of Watts's crew, were placed on desk duty.

13.     In addition, the CSSAO will no longer call Defendants Jones, Smith, Jr., Nichols, Bolton, Leano, Young, Edwards, Summers, Ridgell, Gonzalez, and Lewis as witnesses "due to concerns about [their] credibility and alleged involvement in the misconduct of Sergeant Watts."

14.     Through this lawsuit, Mr. Gipson seeks accountability and compensation for being deprived of his liberty as a result of Defendants' misconduct.

## Jurisdiction and Venue

15.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

16.     This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant City of Chicago is a municipal corporation

4

located here. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

The Parties

18.     Leonard Gipson is a 37-year old man who currently lives in Chicago, Illinois.

19.     At all times relevant to this complaint, Defendants Ronald Watts, Alvin Jones, Elsworth Smith, Jr., Kallatt Mohammed, Douglas Nichols, Brian Bolton, Manuel Leano, Kenneth Young, Darrel Edwards, Matthew Cadman, Michael Spaargaren, George Summers, Calvin Ridgell, Robert Gonzalez, and Lamonica Lewis, were Chicago police officers employed by the City of Chicago and acting within the scope of their employment and under the color of law. Collectively, these individual Defendants are referred to as "Defendant Officers."

20.     At all relevant times, Defendant Watts was a leader of the Second District Tactical Team that worked the Ida B. Wells housing complex.

21.     At all times relevant, Defendants Mohammed, Jones, Smith, Jr., Nichols, Bolton, Leano, Young, Edwards, Summers, Ridgell, Gonzalez, and Lewis worked on Watts' tactical team.

22.     At all relevant times, Defendant Phillip J. Cline was the Superintendent of the Chicago Police Department.

23.     At all relevant times, Defendants Karen Rowan and Debra Kirby were Assistant Deputy Superintendents of the Chicago Police

5

Department, acting as the head of its Internal Affairs Division. Collectively, these Defendants, and Defendant Cline, are referred to as "Defendant Supervisory Officers."

24. The Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois. The City operates the Chicago Police Department ("CPD"). The City is responsible for the policies, practices, and customs of the City and CPD.

## Factual Background

25. Mr. Gipson's girlfriend lived at Ida B. Wells during the 2000s, and Mr. Gipson would frequently go there to visit her.

26. At the time, the complex was actively patrolled by a tactical team of CPD officers, led by Defendant Watts.

27. Watts and his tactical team members were well-known to Mr. Gipson and the residents of Ida B. Wells. They maintained a visible presence, and they had a reputation in the community of harassing black men and women.

## Defendant Officers Fabricate Drug Cases

28. The Watts team's pattern of harassment continued with Mr. Gipson.

29. Prior to January 2003, Watts solicited Mr. Gipson for guns and money.

30.     Watts told Mr. Gipson that if he paid him or gave him guns, Watts would leave him alone, but if Mr. Gipson refused, Watts would arrest him every time he saw him.

31.     Mr. Gipson refused Watts' extortion, and Watts carried through his threats.

### Mr. Gipson is framed on January 4, 2003

32.     On the morning of January 4, 2003, Mr. Gipson left his girlfriend's apartment in Ida B. Wells and got into his car.

33.     As he began to drive, Defendants Jones and Watts pulled Mr. Gipson over.

34.     Mr. Gipson did not have any drugs or anything illegal on him or in his vehicle.

35.     After approaching the car, the Defendants did not ask Mr. Gipson any questions, but instead took him out of the car, handcuffed him, and put him into the backseat of their unmarked car.

36.     Once inside the car, Watts told Mr. Gipson that he had been previously warned and Watts was going to frame him.

37.     The officers took Mr. Gipson to 527 E. Browning (the "527 Building") at Ida B. Wells.

38.     Once inside the 527 Building, Watts, Jones, and Mr. Gipson were joined by Defendants Mohammed, Gonzalez, Leano and several other officers already in the lobby.

39.     In the building, Watts shook down Mr. Gipson for money; Gipson refused.

40.     Defendant Officers continued to detain him until eventually Watts pulled a bag of drugs out of his pocket and planted the drugs on him.

41.     Mr. Gipson was falsely arrested, taken to Area Police Headquarters at 51st and Wentworth, and eventually charged with drug crimes.

## Mr. Gipson's OPS Complaint Is Ignored

42.     Shortly after his release on bond, Mr. Gipson called OPS to file a complaint about his interactions with Watts' team and his false arrest.

43.     Mr. Gipson specifically told OPS about Watts' threats and the January false arrest.

44.     OPS failed to accurately report the details of Mr. Gipson's complaint and then failed to adequately investigate the complaint.

## Mr. Gipson is framed again on May 8, 2003

45.     In retaliation for Mr. Gipson's OPS complaint, on May 8, 2003, Watts sought Gipson out and fabricated a drug case against him a second time.

46.     On this occasion, Mr. Gipson was outside 575 E. Browning ("575 Building").

47.     Mr. Gipson did not have drugs or anything illegal on him and was not doing any illegal at the time.

48. Nevertheless, Watts and Defendants Jones, Mohammed, Summers, Cadman, Edwards, Gonzalez, and others approached Mr. Gipson, handcuffed him, arrested him, and took him to 51st and Wentworth.

49. Watts then taunted Mr. Gipson by telling him that he would not be able to get bond for this arrest.

50. Watts was correct, as Mr. Gipson was not able to bond out and therefore spent substantial time in jail.

### Mr. Gipson litigates a pre-trial motion hearing

51. On the basis of false reports that the Defendant Officers prepared, Mr. Gipson was prosecuted for two separate drug crimes.

52. Mr. Gipson's filed a motion to suppress the evidence related to his January 2003 arrest.

53. At the hearing on the motion, Defendant Summers falsely testified that he witnessed Mr. Gipson sell drugs.

54. Mr. Gipson testified that Watts and other Defendant Officers fabricated the drug crime and framed him.

55. Mr. Gipson's girlfriend, Nicole Parker, testified at the hearing and corroborated Mr. Gipson's allegations.

56. Roscoe Bryson, a janitor in the building, also testified, explaining that the allegations of the Officers relating to what their eyewitness account was impossible because there were barriers up on that date that would not have allowed the officers to see what they claimed to see.

57. The presiding judge believed the testimony of the officers; the judge, however, noted that if there were documentation to corroborate the testimony of Mr. Bryson, his decision would have been different.

58. Upon information and belief, the Defendant City was in possession of documents that corroborated Mr. Gipson's allegations that it withheld from Mr. Gipson and his attorney.

59. After the unsuccessful OPS complaint and pre-trial hearing, Mr. Gipson realized he stood no chance of succeeding at trial on either of the cases.

60. Mr. Gipson also knew he risked significant time in prison if he went to trial on either case and lost.

61. Given such risks, even though Mr. Gipson was innocent, when the State offered him a plea deal for Cook County Department of Corrections boot camp to both charges, Mr. Gipson took it.

62. Defendant Officers never disclosed to the prosecutors that they had fabricated evidence and falsified a police report related to Mr. Gipson's arrest.

63. Defendant Officers never disclosed to the prosecutors any of their misconduct described herein.

64. If the prosecutors had known that Defendant Officers fabricated evidence, lied under oath, and committed the other misconduct described

10

herein, they would not have pursued the prosecution of Mr. Gipson, and his unlawful deprivation of liberty would not have been continued.

65. Given that the entirety of the State's cases against Mr. Gipson rested on Defendant Officers' fabrication of evidence–the planted drugs–and the credibility of Defendant Officers, the exculpatory evidence described in the preceding paragraphs would have been material to Mr. Gipson's defense of his criminal charges.

## Mr. Gipson is framed on August 28, 2007

66. On August 28, 2007, while leaving his girlfriend's apartment, Mr. Gipson encountered Watts and his team in the lobby of the 527 Browning building.

67. Mr. Gipson did not have drugs or anything illegal on him.

68. Watts stopped Mr. Gipson and demanded money.

69. Mr. Gipson refused to give Watts money.

70. Watts told Ridgell to detain Mr. Gipson, which he did.

71. Multiple officers, including Defendant Lewis, circled around Mr. Gipson. Watts then approached Mr. Gipson, pulled a bag of drugs out his own pocket, and told Mr. Gipson that he was putting the drugs on him.

## Mr. Gipson's Prosecution on the 2007 Arrest

72. The Defendant Officers prepared false and fabricated police reports related to this arrest.

11

73. On the basis of false reports, Mr. Gipson again was prosecuted for drug crimes.

74. Even though Mr. Gipson was innocent, knowing that he risked significant time in prison if he went to trial and lost—and that his previous attempts to expose the corruption years ago were ignored—Mr. Gipson accepted a plea deal.

75. Mr. Gipson was sentenced to four years in prison.

76. Defendant Officers never disclosed to the prosecutors that they had fabricated evidence and falsified a police report related to Mr. Gipson's arrest.

77. Defendant Officers never disclosed to the prosecutors any of their misconduct described herein. If the prosecutors had known that Defendant Officers fabricated evidence, lied under oath, and committed the other misconduct described herein, they would not have pursued the prosecution of Mr. Gipson, and his unlawful deprivation of liberty would not have been continued.

78. Given that the entirety of the State's case against Mr. Gipson rested on Defendant Officers' fabrication of evidence–the planted drugs–and the credibility of Defendant Officers, the exculpatory evidence described in the preceding paragraphs would have been material to Mr. Gipson's defense of his criminal charges.

### Defendant Watts and His Team Engaged in a Pattern of Misconduct for at Least a Decade, All Facilitated by the City's Code of Silence

79. It was no secret within CPD that Watts and his crew engaged in the type of misconduct of which Mr. Gipson accused them.

80. Government officials, including those with the City of Chicago, knew about Watts and his crew's alleged misconduct as early as 1999.

81. By 2004, an FBI investigation of Watts and his crew was underway. The FBI investigation took place with the knowledge and occasional participation of the Chicago Police Department's Internal Affairs Division (IAD).

82. Because IAD was kept abreast of the FBI investigation, by 2004, City officials—including but not limited to the head of IAD and CPD Superintendent Philip J. Cline—were aware of credible allegations that Watts and his team were extorting and soliciting bribes from drug dealers.

83. According to another source who was interviewed, Watts used a drug dealer named "Big Shorty" to run drugs at the Ida B. Wells complex. Big Shorty would sell the drugs, turning profits over to Watts in exchange for Watts's protection. According to the source, Watts also used drug dealers as phony informants to obtain illegitimate search warrants and Watts also offered to let arrestees go if they provided him with weapons.

84. Targets of the FBI investigation extended beyond Watts to members of Watts's tactical team, such as Defendants Jones, Mohammed, Smith, Bolton, Nichols, Leano, Young, Gonzalez, and Lewis.

85. By 2010, the FBI investigation generated evidence showing that Watts engaged in systemic extortion of drug dealers, theft, the possession and distribution of drugs for money, planting drugs on subjects, and paying informants with drugs.

86. Investigators also determined that Watts and his subordinates had engaged in these activities for the prior ten years.

### Watts and Mohammed Are Charged With Federal Crimes

87. In 2012, after at least a decade of engaging in criminal misconduct, Defendants Watts and Mohammed were caught red-handed, shaking down a person they thought was a drug courier, but who was actually an agent for the FBI.

88. The United States government subsequently charged Watts and Mohammed with federal crimes.

89. Watts and Mohammed each pled guilty to federal criminal charges and were sentenced to terms of imprisonment. *See United States v. Watts*, No. 12-CR-87-1 (N.D. Ill.); *United States v. Mohammed*, No. 12-CR-87-2 (N.D. Ill.).

90. In its sentencing memorandum in the Watts case, the Government explained that "[f]or years," "the defendant [Watts] used his badge and his position as a sergeant with the Chicago Police Department to shield his own criminal activity from law enforcement scrutiny." His crimes

14

included "stealing drug money and extorting protection payments" from the individuals he was sworn to protect and serve.

91.     The government revealed that, for years, Defendants Watts and Mohammed extorted tens of thousands of dollars of bribes from individuals at the Ida B. Wells public housing complex on numerous occasions as part of their duties with the CPD.

92.     During the sentencing hearing, the Government urged Judge Sharon Johnson Coleman to "consider the other criminal conduct that the defendant [Watts] engaged in throughout the course of his career as a police officer," specifically noting that during the federal investigation Watts "did other things such as putting a false case on the confidential source that was involved in our investigation. Had him arrested on drug charges. And the source … felt he had no chance of successfully fighting that case so he pled guilty to a crime he didn't commit." The federal prosecutor wondered aloud "how many times [Watts] might have done something similar when the government was not involved."

93.     Following the federal indictments of Watts and Mohammed, City officials made efforts to downplay magnitude of Watts's criminal enterprise.

94.     Notwithstanding the evidence that investigators had amassed over the years pointing to a wide, decade long criminal enterprise, CPD Superintendent Garry McCarthy publicly stated, "There is nobody involved

15

other than the two officers who were arrested." As described in more detail below, that statement was not true.

## The City's "Code of Silence"

95.    While the federal government was investigating Watts and his crew, a "code of silence" existed within the Chicago Police Department.

96.    Under this code, police officers are expected to conceal each other's misconduct, in contravention of their sworn duties, and penalties for breaking the code of silence within the CPD are severe.

97.    As one CPD officer has explained, "[The Chicago Police Academy told officers] over and over again we do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

98.    Pursuant to this "code of silence," each of the Defendant Officers concealed from Mr. Gipson information that Watts and his team members were in fact engaged in a wide-ranging pattern of misconduct. Had this information been disclosed to Mr. Gipson, he would have used it to impeach the officers' accounts, which would have changed the outcome of the criminal proceedings instituted against him.

16

99.     Also, consistent with this "code of silence," the few people who stood up to Watts and his crew and/or attempted to report his misconduct were either ignored or punished, and Watts and his crew continued to engage in misconduct with impunity.

### Careers of CPD Officers Daniel Echeverria and Shannon Spaulding Are Nearly Ruined

100.    In 2006, two Chicago police officers, Daniel Echeverria and Shannon Spaulding learned credible information from arrestees that Watts and his crew were engaged in illegal drug activity.

101.    Officer Echeverria took the allegation seriously and he reported it to a CPD supervisor. The supervisor made clear that he was not interested in learning about the allegation, and he directed Echeverria not to document the allegations.

102.    Echeverria and Spaulding subsequently reported the allegations about Watts and his crew to the FBI. Soon thereafter, Echeverria and Spaulding began cooperating with the FBI, actively assisting the FBI's investigation of Watts and his crew.

103.    When their cooperation became known to officers within their CPD chain of command, Spaulding and Echeverria were labeled "rats" within the Department, their lives were threatened, and they endured all manner of professional retaliation by members of the CPD.

104. Spaulding and Echeverria subsequently sued the City for the retaliation they suffered for blowing the whistle on Watts and his crew. On the eve of trial in that case, the City settled for $2 million.

### CPD Officer Michael Spaargaren's Life Is Threatened

105. Sometime in the mid-2000s, a CPD officer named Michael Spaargaren was assigned to work with Watts in public housing.

106. Spaargaren observed Watts did not inventory drugs and money that the officers seized during arrests, and Spaargaren confronted Watts about the misconduct.

107. In response, Watts threatened to put a false case against Spaargaren and made veiled threats to kill him.

108. A CPD Lieutenant in the chain of command—James Spratte—subsequently warned Spaargaren to keep his mouth shut or his life would be in danger.

109. Fearful for his life, Spaargaren opted to take a one-and-a-half-year leave of absence from CPD rather than to continue to work under Watts.

### Citizen Complaints Go Nowhere

110. Defendants Watts, Mohammed, and other members of Watts's tactical team had accumulated dozens of citizen complaints concerning violations of their civil rights over the years, beginning well before the misconduct Defendants committed against Mr. Gipson, and yet the City did nothing to stop the misconduct.

111. On information and belief, complaints that the City bothered to investigate largely boiled down a he-said-she-said between the officer and the citizen, and the City's policy to resolve those disputes in the officers' favor, no matter how many citizens came forward with the same type of complaint.

## The City Turns a Blind Eye to the Clear Pattern of Alleged Misconduct that Emerged from Watts and His Crew

112. Despite all of the evidence that was amassed over the years of a pattern and practice of criminal misconduct by Defendant Officers, on information and belief, the City never undertook its own investigation of the clear pattern that emerged.

113. As City officials were aware, the purpose of the FBI investigation was to investigate and prosecute criminal activity, not to impose discipline and control of the City's Police Department.

114. Nothing about the FBI investigation relieved the City of its fundamental responsibility to supervise, discipline, and control its officers. Nevertheless, the City completely abdicated this responsibility, allowing the widespread misconduct to continue undeterred throughout the FBI's criminal investigation of Watts and his crew.

115. During the FBI investigation, which spanned at least eight years, City officials had reason to believe that Watts and his crew were committing ongoing criminal activity on the streets—extorting drug dealers and framing citizens of crimes they did not commit—yet City officials took no steps to prevent these abuses from occurring.

19

116. Instead, City officials let officers on Watts's crew continue to pursue criminal charges against citizens like Mr. Gipson, and to testify falsely against citizens like Mr. Gipson.

117. Even worse, City officials withheld information they had about the officers' pattern of transgressions, information that citizens like Mr. Gipson could have used to impeach the corrupt officers and defend against the bogus criminal charges placed upon them.

### Mr. Gipson's Exoneration

118. After Defendant Watts and his crew's corruption came to light, on September 12, 2017, Mr. Gipson joined a group of similarly-situated innocent victims and, together, filed a Consolidated Petition for Relief From Judgment and To Vacate Convictions Pursuant to 735 ILCS 5/2-1401 ("Consolidated Petition").

119. On November 16, 2017, upon the State's motion, Judge LeRoy K. Martin, Jr. vacated all of the 18 convictions, including Mr. Gipson's, and the State *nolle prossed* all charges related to the convictions.

120. In commenting on the extraordinary decision to agree to vacate all of the convictions, head of Cook County State's Attorney's Office's Conviction Integrity Unit Mark Rotert stated that "In these cases, we concluded, unfortunately, that police were not being truthful and we couldn't have confidence in the integrity of their reports and their testimony."

121. As a result, the CCSAO will no longer call certain member of Watts's crew, including Defendants Jones, Nichols, Bolton, Leano, Young,

Edwards, Summers, Ridgell, Gonzalez, and Lewis, as witnesses in any pending or future matters because of their credibility concerns and alleged involvement in misconduct.

122. In addition, shortly after, Superintendent Johnson placed Defendants Jones, Smith, Nichols, Bolton, Leano, Young, Cadman, Edwards, Summers, Ridgell, Gonzalez, and Lewis, as, along with other members of Watts's crew, on desk duty.

123. On February 13, 2018, Mr. Gipson received a certificate of innocence for his 2007 conviction.

124. On March 15, 2018, Mr. Gipson received two certificates of innocence for his 2003 convictions.

## Mr. Gipson's Damages

125. Mr. Gipson lost years of his life to wrongful imprisonment and was subjected to police harassment and unfair criminal proceedings before he was finally exonerated.

126. The emotional pain and suffering caused by being wrongfully incarcerated has been significant. As only a young man, Mr. Gipson was deprived of the everyday pleasures of basic human life; his freedom was taken from him. Since then, Mr. Gipson has had to live with a felony record he did not deserve.

127. As a result of the foregoing, Mr. Gipson has suffered severe emotional damages, all proximately caused by Defendants' misconduct.

## Count I: 42 U.S.C. § 1983 – Due Process

128. Each paragraph of this Complaint is incorporated as if restated fully herein.

129. In the manner described more fully above, Defendant Officers, while acting as investigators, individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process and a fair trial.

130. In the manner described more fully above, Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, as well as knowingly fabricated false evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

131. Likewise, in the manner described more fully above, Defendants Philip J. Cline, Karen Rowan, Debra Kirby, and other as-yet-unidentified CPD supervisors, had knowledge of a pattern of misconduct by Watts and his team. These Defendant Supervisory Officers knew of a substantial risk that Watts and his team would violate the rights of Mr. Gipson and other residents and visitors of the Ida B. Wells complex, and they deliberately chose a course of action that allowed those abuses to continue, thereby condoning those abuses.

132. The constitutional injuries complained of herein were proximately caused by the intentional misconduct of Defendant Supervisory Officers, or were proximately caused when Defendant Supervisory Officers were deliberately, recklessly indifferent to their subordinates' misconduct,

22

knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

133. In addition, Defendant Supervisory Officers themselves concealed exculpatory evidence from Mr. Gipson, specifically information about Watts's and his team's pattern of misconduct. In this way, Defendant Supervisory Officers violated Mr. Gipson's due process right to a fair trial deliberately and with reckless disregard to Mr. Gipson's rights.

134. Defendants' misconduct directly resulted in the unjust criminal convictions of Plaintiff, thereby denying his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

135. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Mr. Gipson's clear innocence.

136. Defendants' actions were taken under color of law and within the scope of their employment.

137. The City of Chicago is also directly liable for the injuries described in this Count because the City and CPD maintained official policies and customs that were the moving force behind the violation of Plaintiff's rights and also because the actions of the final policymaking officials for

23

Defendant City of Chicago and CPD were the moving force behind the violation of Plaintiff's rights.

138. At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago maintained a system that violated the due process rights of criminal defendants like Mr. Gipson by concealing exculpatory evidence of Chicago police officers' patterns of misconduct.

139. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago had notice of a widespread practice by its officers and agents under which criminal suspects, such as Mr. Gipson, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

140. As a matter of both policy and practice, Defendant City directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise, control, and discipline its police officers, such that its failure to do so manifests deliberate indifference. Defendant City's actions lead police officers in the City of Chicago to believe that their actions will never be scrutinized and, in

that way, directly encourage further abuses such as those that Mr. Gipson endured.

141. The above-described widespread practices, which were so well-settled as to constitute the *de facto* policy of the City of Chicago, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. These widespread practices were allowed to flourish because Defendant City and the CPD declined to implement sufficient policies or training, even though the need for such policies and training was obvious. Defendant City and the CPD also declined to implement any legitimate mechanism for oversight or punishment of officers, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

142. Furthermore, the misconduct described in this Complaint was undertaken pursuant to the policy and practices of Defendant City in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago and the CPD, or were actually committed by persons with such final policymaking authority.

143. Indeed, municipal policymakers have long been aware of Defendant City's policy and practice of failing to properly train, monitor, investigate, and discipline misconduct by its police officers, but have failed to take action to remedy the problem.

25

144.    For example, at a City Council hearing on September 28, 1999, in response to two high-profile unjustified police shootings, Superintendent Terry Hillard noted the need for better in-service training on the use of force, early detection of potential problem officers, and officer accountability for the use of force.

145.    In June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

146.    In 2001, the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the CPD lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct. The JCGC findings were presented to Mayor Daley, Superintendent Hillard, and the Chicago Police Board.

147.    Despite the municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate, discipline, and control its police officers, nothing was done to remedy these problems.

148. As a result, the CPD has continued to respond to complaint of police misconduct inadequately and with undue delay, and to recommend discipline in a disproportionately small number of cases.

149. Indeed, by its own admissions, more than 99% of the time when a citizen complains that his or her civil rights were violated by police officers, the City sides with the police officer and concludes that no violation occurred.

150. Notably, Defendants Watts and his team are not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

151. For instance, in 2001, Chicago police officer Joseph Miedzianowski was convicted on federal crime charges, including racketeering and drug conspiracy. The jury found that Miedzianowski engaged in corruption for much of his 22-year police career, using street informants to shake down drug dealers and sell drugs.

152. Miedzianowski, like Defendant Officers in this case, had accumulated dozens of complaints over the years, which Defendant city routinely deemed unfounded or not sustained.

153. Likewise, in 2011, Chicago police officer Jerome Finnigan was convicted and sentenced on federal criminal charges, including a charge of attempting to hire someone to kill a police officer who Finnigan believed would be a witness against him on his own corruption charges in state court.

154. Finnigan was part of a group of officers in Defendant City's Special Operations Section who carried out robberies, home invasions, unlawful searches and seizures, and other crimes.

155. Finnigan and his crew engaged in their misconduct at about the same time that Mr. Gipson was targeted by Defendant Watts and his crew.

156. Finnigan, like Defendant Officers in this case, had accumulated dozens of citizen complaints over the years, which Defendant City routinely deemed unfounded or not sustained.

157. At his sentencing hearing in 2011, Finnigan stated, "You know, my bosses knew what I was doing out there, and it went on and on. And this wasn't the exception to the rule. This was the rule."

158. In the case of *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill), a federal jury found that, as of 1994, the CPD maintained a code of silence that facilitated misconduct committed by Miedzianowski.

159. Likewise, in the case of *Obrycka v. City of Chicago et al.*, No. 07 CV 2372 (N.D. Ill.), a jury found that as of February 2007 "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

160. The same constitutionally-defective oversight system in place during the time periods at issue in the *Klipfel* case and in the *Obrycka* case were also in place in 2003-2007, when Mr. Gipson suffered the abuse described above.

28

161. The same code of silence in place at the CPD during the time periods at issue in the *Klipfel* case and in the *Obrycka* case were also in place in 2006, when Mr. Gipson suffered the abuse describe above.

162. Indeed, the problems found to exist by the jury in *Klipfel* and *Obrycka* continue to this day. In December 2015, Mayor Rahm Emanuel acknowledged that a "code of silence" exists within the Chicago Police Department that encourages cover-ups of police misconduct, and that the City's attempts to deal with police abuse and corruption have never been adequate.

163. The policies, practices, and customs set forth above were the moving force behind the constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

164. Defendant City's investigation of complaints is characterized by unreasonably long delays, despite the relatively straight-forward nature of many misconduct claims.

165. Although Defendant City has long been aware that its supervision, training, and discipline of police officers is entirely inadequate, it has not enacted any substantive measures to address that deficiency.

166. Instead, Defendant City continues to inadequately investigate citizen complaints and take action against officers when necessary. It has also failed to modify its officer training programs to reduce misconduct

29

against Chicago residents or to implement a system to identify and track repeat offenders, districts, or units.

167. Plaintiff's injuries were caused by officers, agents, and employees of Defendant City of Chicago and the CPD, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### Count II: 42 U.S.C. § 1983 –Malicious Prosecution and Unlawful Pretrial Detention

168. Each paragraph of this Complaint is incorporated as if restated fully herein.

169. In the manner described more fully above, Defendants, while acting as investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

170. In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

171. The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

172. Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of liberty.

173. In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through Defendants' fabrication and suppression of evidence.

174. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's clear innocence.

175. The Defendants' actions were taken under color of law and within the scope of their employment.

176. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

177. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

### Count III: 42 U.S.C. § 1983 – First Amendment

178. Each paragraph of this Complaint is incorporated as if restated fully herein.

179. In the manner described more fully above, Defendant Officers violated Plaintiff's rights as secured by the First Amendment of the U.S. Constitution. Plaintiff's complaints about the Defendant Officers' misconduct constituted protected speech and expression under the First Amendment. Plaintiff's complaints were also protected under the Petition Clause of the First Amendment: he was petitioning the government for redress of grievances.

180. In the manner described more fully above, Defendant Officers' actions caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in protected activity.

181. Plaintiff's protected First Amendment activity was at least a motivating factor in Defendant Officers' decision to take retaliatory action. The Defendant Officers arrested Mr. Gipson a second time to punish him for exercising his first amendment rights following his January 2003 arrest, thus violating of Mr. Gipson's protected First Amendment activity.

182. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's clear innocence.

183. The Defendants' actions were taken under color of law and within the scope of their employment.

184. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count IV: 42 U.S.C. § 1983 – Failure to Intervene

185. Each paragraph of this Complaint is incorporated as if restated fully herein.

186. In the manner described more fully above, during the constitutional violations described herein, Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

187. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

188. The Defendants' actions were taken under color of law and within the scope of their employment.

189. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

33

190. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

## Count V: 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

191. Each paragraph of this Complaint is incorporated as if restated fully herein.

192. Prior to each of Plaintiff's convictions, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described above.

193. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of his rights.

194. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

195. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

34

196. The Defendants' actions were taken under color of law and within the scope of their employment.

197. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

198. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

## Count VI: Illinois Law – Malicious Prosecution

199. Each paragraph of this Complaint is incorporated as if restated fully herein.

200. In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

201. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

202. The Defendants' actions were taken under color of law and within the scope of their employment.

35

203. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VII: Illinois Law – Intentional Infliction of Emotional Distress

204. Each paragraph of this Complaint is incorporated as if restated fully herein.

205. The actions, omissions, and conduct of Defendant Officers, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

206. The Defendants' actions were taken under color of law and within the scope of their employment.

207. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VIII: Illinois Law – Civil Conspiracy

208. Each paragraph of this Complaint is incorporated as if restated fully herein.

209. As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and

unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of his rights.

210. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

211. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

212. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count IV: Illinois Law – *Respondeat Superior*

213. Each paragraph of this Complaint is incorporated as if restated fully herein.

214. While committing the acts alleged in the preceding paragraphs, Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

215. Defendant City of Chicago is liable as principal for all torts committed by their agents.

## Count X: Illinois Law – Indemnification

216. Each paragraph of this Complaint is incorporated as if restated fully herein.

217. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

218. Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff Leonard Gipson, respectfully request that this Court enter a judgment in his favor and against the Defendants, City of Chicago, former Chicago Police Sergeant Ronald Watts, former Chicago Police Officer Kallatt Mohammed, Sergeant Alvin Jones, Officer Elsworth J. Smith, Jr., Officer Douglas Nichols, Officer Brian Bolton, Officer Manual Leano, Officer Kenneth Young, Officer Darrel Edwards, Officer Matthew Cadman, Officer Michael Spaargaren, Officer Gerome Summers, Officer Calvin Ridgell, Officer Robert Gonzalez, Officer Lamonica Lewis, Philip Cline, Debra Kirby, Karen Rowan, and other as-yet-unidentified officers of the Chicago Police Department, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, Leonard Gipson, hereby demands a trial by jury pursuant to

Federal Rule of Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,


/s/Scott Rauscher
One of Plaintiff's Attorneys


Jon Loevy
Arthur Loevy
Scott Rauscher
Joshua Tepfer
Theresa Kleinhaus
Sean Starr
Loevy & Loevy
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
Phone: (312) 243-5900

39