UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Leonard Gipson, | ) | |
| | ) | Case No. 18 CV 5120 |
| Plaintiff | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| City of Chicago, et al., | ) | |
| | ) | |
| Defendants | ) | |

**DEFENDANT OFFICERS' STATEMENT OF UNDISPUTED FACTS**

Defendants Alvin Jones, Elsworth J. Smith, Jr., Douglas Nichols, Jr., Brian Bolton, Manuel Leano, Kenneth Young, Darryl Edwards, Matthew Cadman, Michael Spaargaren, George Summers, Calvin Ridgell, Robert Gonzalez, and LaMonica Lewis (collectively "Defendant Officers" or "Defendants"), by their attorneys, submit the following statement of undisputed facts pursuant to Local Rule 56.1(a)(3).

**PARTIES**

1.     Plaintiff Leonard Gipson is a resident of Chicago, Illinois. Amended Complaint ("AC"), ECF No. 61`, ¶18.)

2.     In January and May of 2003, Sgt. Ronald Watts and Officers Alvin Jones, Kallatt Mohammed, Brian Bolton, Kenneth Young, Darryl Edwards, Matthew Cadman, Michael Spaargaren, Gerome Summers, Calvin Ridgell, and Robert Gonzalez ("Defendant Police Officers") were members of the Chicago Police Department ("CPD") and assigned to a tactical team of police officers who patrolled in the Ida B. Wells housing complex. ((AC at ¶¶ 19 – 21.) In August 2007, Sgt. Watts and Officers Douglas Nichols, Alvin Jones, Brian Bolton, Manuel Leano, LaMonica

Lewis and Elsworth Smith ("Defendant Police Officers") were members of the CPD and assigned to a tactical team of police officers who patrolled in the Ida B. Wells housing complex. (*Id.*)

3.     Defendant City of Chicago ("City") is a municipal corporation of the State of Illinois. (*Id.*, ¶ 24.)

## JURISDICTION AND VENUE

4.     This court has original jurisdiction over Plaintiff's federal claims (see 28 U.S.C. §§ 1331, 1343), and supplemental jurisdiction over his state law claims (see 28 U.S.C. § 1367). Venue in this judicial district is proper. See 28 U.S.C. § 1391(b).

## BACKGROUND

5.     The three arrests that gave rise to this action occurred at the Ida B. Wells housing complex (the "Wells Complex") on January 4, 2003, May 8, 2003 and August 28, 2007. (AC, ¶3.)

6.     The Wells complex was a hotbed of narcotics trafficking and infamously known as an open-air drug market.[1] Drugs were sold in its buildings all day and all night, seven days a week. (Group Ex. A-1 at 20:2-3; 88:19-21; Ex. A-2 at 26:19-22; Ex.

---

[1] (See e.g., Ex. A-1, Sharika Dotts February 15, 2023 Deposition at 19:2-3; 19:24-20:3; 81:19-82:1; Ex. A-2, Gregory Young February 16, 2024 Deposition 26:19-27:2; Ex. A-3, Raynard Carter May 12, 2022 Deposition 185:5-11,19-20; Ex. A-4, Bobby Coleman November 13, 2023 Deposition 23: 9-17; 25: 17-26:3; Ex. A-5, Milton Delaney July 26, 2021 Deposition 93:20-94:3; 141:2-13; Ex. A-6, Willie Gaddy December 1, 2022 Deposition 10:23-11:1; Ex. A-7, Goleather Jefferson June 27, 2022 Deposition 105:18-106:7; Ex. A-8, Arthur Kirksey December 6, 2022 Deposition 37:42-12; Ex. A-9, Jesse Lockett February 27, 2024 Deposition 42:16-18, 24-43:4; Ex. A-10, Damica Nickerson May 31, 2019 Deposition 17:15-20; Ex. A-11, Calvin Robinson December 15, 2022 Deposition 186:7-20; Ex. A-12, Henry Thomas March 16, 2021 Deposition 284:23-285:5).

A-3 at 185:8-11; Ex. A-4 at 23: 9-17; Ex. A-5 at 141:2-7; Ex. A-9 at 42:24-43:4; Ex. A-10 at 17:19-20.) Gipson was part of the drug enterprise at the complex and admittedly engaged in narcotics activity on a daily basis. (Ex. B, Leonard Gipson July 18, 2022 Deposition, at 41:2-4; 69:10-13.)

7.      The Gangster Disciples controlled and operated that drug enterprise. (Ex. C, Operation Sin City Report at CITY-BG-028596-028598; Ex. D, Bobby Coleman November 13, 2023 Deposition at 45:5-11; Ex. B, at 206:23-207:2.)

8.      Although Gipson was a member of the Black P. Stones gang, he was allowed to engage in narcotics activity at the Wells complex because his partner, Bobby Coleman, was a Gangster Disciple and he was close friends with other members of that gang. (Ex. B at 141-142:1, 206:23-207:16; Ex. D at 45:4-7, 81:21-82:6, 17-21.)

9.      In fact, Gipson at various times lived with Torlon Fumbanks, one of his closest friends who also was a Gangster Disciple and one of the managers of the drug sales at 527 E. Browning, one of the extension buildings within the Wells complex (the "527 ext.") and the site of two of the arrests at issue here. (Ex. D at 93:5-13, 93:20-21; Ex. C at CITY-BG-028592; CITY-BG-028602; Ex. E, January 19, 2019 Gipson COPA Interview Report, at 2; Ex. B at 65:2-6.) Gipson also used Fumbanks' car to pick up and distribute drugs. (Ex. D at 86:18-20.) Fumbanks' car was a Chevy Caprice that resembled an unmarked police car. (*Id.* at 121:20-23; Ex. J at 99:14-20 (Gipson testimony).)

10.     The Gangster Disciples named the drug lines they controlled and sold

out of the extension buildings for marketing purposes. (Ex. B at CITY-BG-028597.) The heroin lines Gipson supervised were named "Cash Money" and "Damn Near Raw." (Ex. B at 40:1-8; 44:16-23; 145:1-11; Ex. D at 27:21-28:7.)

11.     Gipson worked for Willie Gaddy who had exclusive control over the heroin sales at the 527 ext. as well as the 540 and 559 extension buildings also located within the Wells Complex.[2] (Ex. F Willie J. Gaddy December 1, 2022 Deposition at 18:19-23; 19:13-20; 20:9-13; 23:12-14; Ex. D at 82:17-83:8.) Gaddy supplied the heroin and Gipson and Coleman were responsible overseeing the sale of that heroin every day. (Ex. B at 38:19-21-40:1-8; Ex. F at 20:22-21:5; Ex. D at 67:7-13.)

12.     Gipson and Coleman would meet with Gaddy to pick up the daily drug supply and drive the drugs to the 527 ext. to distribute the daily supply to the sellers. (Ex. D at 83:9-84:1, 7-13.) They usually used separate cars. (Ex. D at 85:19-86:11.) Coleman used his own car and Gipson would use Fumbanks' car, again, a silver Chevy Caprice that looked like an unmarked police car, to do the pickups. (Ex. D at 86:18-20, 121:20-23; Ex. B at 77:15-17; Ex. J, January 14, 2004 Motion to Suppress Arrest Hearing Transcript, at 99:14-20 (Gipson testimony).)

13.     Gaddy testified that Gipson was his second in command. (Ex. F at 22:4-10.) Gipson was responsible for finding and authorizing individuals, primarily drug addicts, to sell the daily heroin supply he received from Gaddy. (*Id.* at 21:17-22:3; Ex. B at 40:6-7; Ex. D at 67:23-68:1.) Thus, Gipson did not engage in hand-to-hand drug

---

[2] Gaddy testified that the 527 ext. was the primary site for drug sales and the 540 and 559 exts. were back up buildings which were used if there was police activity at the 527 ext. (Ex. F at 28:8-22.)

transactions with the buyers. (Ex. B at 35:5-8; 40:1-8; 44:16-23; 145:1-11.) His job was to ensure that there were people there to sell the heroin every morning and that the sales continued each day until the daily supply was exhausted. (*Id.* at 41:2-7; Ex. D at 25:8-15.)

14.    No one was allowed to sell heroin at the 527 ext. without Gaddy, Gipson or Coleman's permission. (Ex. F at 20:9-13; Ex. D at 146:1-18.) And those who were authorized, could only sell the heroin Gaddy supplied. (Ex. D at 146:19-23.)

15.    Gipson and Coleman also used drug addicts as lookouts in their heroin operation. (*Id.* at 89-90:21; 130:1-13.) As payment, Gipson would give them a "wake up" fix and those sick people were lined up waiting every day for the chance to sell for Gipson and receive their "wake up." (*Id.* at 130:2-13.)

16.     At the time of his arrests, Gipson was not employed. (Ex. B at 41:11-17.) Gipson supported himself exclusively by supervising the heroin sales at the 527 ext. (*Id.* at 41:11-17.) Gaddy testified that the sales supervised by Gipson and Coleman at the 527 ext. could net as much as $30,000 per day. (Ex. F at 27:20-28:7.) Coleman testified that he and Gipson averaged $4000 to $5000 per day as the "overseers" of the drug sales at the 527 ext. (Ex. D at 79:4-8.) On a good day, Coleman testified he and Gipson could clear $8000 to $10,000. (*Id.* 80:1-7.)

17.    Gipson testified he does not remember how much he made from his narcotics activity; nor does he remember when or how Gaddy paid him or whether he paid Gaddy for the drugs he sold or who he used to sell the drugs for him. (Ex. B at 39-43.) Gipson doesn't even remember when he started selling drugs (*Id.* at 177:16-

22; 178:4-6.) In fact, Gipson does not remember much. Gipson responded with "I don't remember," I can't recall," and "I don't know" 315 times at his deposition in this case. (See generally, Ex. B.)

18.     Gipson claims that, prior to his January 4, 2003 arrest (on some unknown day in some unknown year), Watts demanded that Gipson pay him money or he would send Gipson to jail for dealing drugs; Gipson claims he refused but continued selling drugs. (Ex. B at 31:21-32:13; 33:6-34:11; 38:11-13.) There is no evidence that any other defendant was present at the time. Nor is there any evidence that any other defendant ever extorted Gipson.

19.     Gipson testified that he knew Watts and Officers Mohammed, Jones, Cadman, J-Bug (Summers), Gonzalez and Mini (Leano) before his January Arrest. (*Id.* at 27:2-9; 14-18; 28:2-6.)

**Gipson's January 4, 2003 Arrest**

20.     In 2003, Gipson's girlfriend, Nichole Parker, lived at the 527 ext. (AC at ¶25; Ex. B at 73:13-15.) Gipson alternated between living with his girlfriend, his mother and Fumbanks. (Ex. D at 93:5-13, 93:20-21.) Gipson also frequently stayed in hotels when he was spending time with other women. (Ex. B at 71:16-72:2.)

21.     Throughout 2003, the Wells complex was actively patrolled by a tactical team of CPD officers supervised by defendant Watts. (AC at¶26.) That team was identified as unit 715. (Ex. G, Darryl Edwards October 28, 2021 Deposition, at 29:14-24; Ex. H January 4, 2003 Assignment and Attendance Sheets.) Defendants Bolton, Cadman, Edwards, Jones, Mohammed, Gonzalez, Ridgell, Spaargaren, Summers and

Young were members of unit 715. (Ex. H.)

22.     Unit 715 officers arrested Gipson on January 4, 2003. (Ex. I January 4, 2003 Vice Case Report at 1.) Specifically, Officer Summers was the officer who detained, searched and arrested him. (Ex. J at 52:14-15, 54:17-55:2.)

23.     Although defendant Gonzalez was a member of unit 715, he was not on duty on January 4, 2003 and thus did not participate in any aspect of Gipson's January arrest. (Ex. I at 1.) Nor did he participate in the decision to charge Gipson or in his criminal proceedings arising from that arrest. (See generally Ex. J and Ex. L, January 28, 2003 Grand Jury Testimony Transcript.)

24.     Defendants Leano, Lewis, Nichols and Smith were not members of unit 715. (See generally Ex. H; Ex. I at 1 and Ex. K, Officer Assignment Histories, at 1-3, 9.) [3]

25.      As such, they did not participate, and could not have participated, in the surveillance operation or Gipson's January Arrest. (Ex. I at 1; Ex. H.)

26.     Unit 715's primary responsibility was to try to decrease the enormity of the drug operations at the complex and the number of weapons within the Wells complex. (Ex. M, Gerome Summers February 11, 2020, at 36:13-24; 37:21-38:5; Ex. NN at 61:12-22, 63:8-10; Ex. QQ Michael Spaargaren March 7, 2022 Deposition, at 245:9-24.) The residents in the complex did what they could, calling in reports of drug activity in their buildings, as did other members of the community in the surrounding

_____

[3] See also Ex. NN, Douglas Nichols April 18, 2022 Deposition, at Vol. 1, 108:22-109:4; Ex. OO, Elworth Smith July 21, 2021 Deposition, at 42:23-43:4; Ex. PP, Manuel Leano September 26, 2019 Deposition, at 110:1117.

neighborhood. (Ex. M, at 41:4-43:18, 43:19-44:5; Ex. NN at 62:3-6, 63:19-23; Ex. QQ at 62:23-25.) The team also relied on confidential informants who tipped them off to incoming drug deliveries at specific locations. (Ex. M at 41:4-21; 44:18-45:17.) Surveillance and sting operations were also a critical part of the team's attempt to at least put some restraints on the drug trade, a community-devouring beast that generated tens of millions of dollars each year. (*Id.* at 110:21-111:7; Ex. G at 9-12; 52:9-12; Ex. PP at 8-79:4; Ex. QQ Michael Spaargaren March 7, 2022 Deposition, at 62:8-16, 66:16-47:2; Ex. MM, Matthew Cadman September 22, 2021, at 143:1-9.)

27.    Prior to Gipson's January 4, 2003 arrest, unit 715 had received a tip that "Fuzz" (Gipson's nickname) and "Bob" would be delivering and distributing the drugs for the daily drug sales at the 527 ext. that day. (Ex. J at 55:17-56:8; Ex I at 2; Ex. N, Kallats Mohammed November 15, 2023 Deposition, at 80:20-25, 81:1-10, 81:11-25, 82:1-5, 84: 2-18.) The tip also described the two vehicles that would be involved and gave 7:00 a.m. as the time the delivery would occur. (Ex. J at 56:1-6, 13-21.) Acting on that tip, unit 715 set up a surveillance operation and arrived at the 527 ext. at 6:00 a.m. (*Id.* at 56:1-12.)

28.    Officers Summers, Ridgell and Jones were posted in a vacant apartment on the second floor. (*Id.* at 28:19-31:1.) The windows of that apartment look out on the back parking lot of the 527 ext. (*Id.* at 31:5-10; 32:17-20.) The officers cracked open a window and positioned themselves where they could see any activity in the parking lot and hear any conversations in the back doorway (an open area without a door) which was 10 to 12 feet directly below them. (*Id.* at 33:15-24; 38:20-22.)

8

29.     Other officers, including Mohammed and Edwards, entered a vacant apartment on the third floor which did not have a view of the back parking lot and waited for radio instructions from Summers, Ridgell and Jones. (*Id.* at 13; 16:18-22; 17:14-16; 18:10-14; 23:18-24:17.) The officers not positioned in the third floor apartment, were stationed around the perimeter of the 527 ext. (*Id.* at 57:5-8.) The team was in constant radio contact. (*Id.* at 57:11-14.)

30.     At the hearing on Gipson's motion to suppress his arrest, Officer Summers testified that at some point during the operation, various team members saw a silver car circle the building three times and communicated this information by radio. (*Id.* at 57:9-22.) At the same time, Summers received radio communications that another car was behind the silver car; Summers also saw the vehicle behind the silver car. (*Id.* at 57:19-22.) The cars appeared to be following each other and both cars circled three times. (*Id.* at 41:1-42:3; 57:19-58:4.) The cars then circled through a fire lane that encircles the 527 ext. and two other buildings. (*Id.* at 58:5-59:10.)

31.     Summers further testified that he saw Gipson exit the silver car and approach five individuals who were standing outside the back doorway, 10 to 12 feet below the window where Summers was positioned. (*Id.* at 31:11-32:16; 33:1-5; 33:15-24; 38:20-22; 59:11-20.) Summers heard a brief conversation between Gipson and the individuals in which Gipson was confirming who was there and who was going to be selling the drugs ("work the packs") that day and who was going to be working security (watch out for police). (*Id.* at 59:21-60:18; 61:10-20.)

32.     Summers testified that Gipson then gestured to the second vehicle

(Coleman) and the vehicle pulled into the lot. (*Id.* at 39:19-40:1, 17-24; 42:7-13; 61:21-62:1.) Coleman exited his vehicle, met Gipson halfway and pulled a large plastic bag with numerous smaller bags inside it out of his pocket which Summers suspected were narcotics. (*Id.* at 42:7-43:24; 62:2-19; 63:5-64:2.) Coleman handed the bag to Gipson. (*Id.* at 44:15-20; 64:3-5.)

33. Summers testified that Gipson then returned to the building and approached the doorway and handed the drugs to two of the individuals in the back of the building and instructed them to give the other individuals their "wake up" fixes. (*Id.* at 64:6-65:8; 68:1-10.).

34. Summers testified he alerted the rest of the team and they all broke surveillance. (*Id.* at 44:21-46:6; 65:9-14.) Some of the officers went to detain the individuals by the back doorway and, as Summers went to the parking lot to detain Gipson, he passed those individuals and saw that those individuals still had the suspect narcotics in their hands. (*Id.* at 46:7-48:3; 52:10-18; 65:12-66:3.)

35. Summers testified that Gipson had attempted to drive out of the parking lot but Summers had radioed other officers to block the cars from leaving the lot and Summers then arrested and searched Gipson in the parking lot. (*Id.* at 52:22-55:2.)

36. At the same hearing, Edwards testified that on January 4, 2003 he was assigned to tactical team unit 715 and was conducting a narcotics investigation at the 527 ext. based on information that drugs were going to be distributed at that location. (*Id.* at 13:3-17.)

37. Edwards testified that his role in the investigation was to hide in a

10

vacant apartment on the third floor inside the 527 ext. and wait for information from other members of his unit. (*Id.* at 16:1-6, 18-22; 18:10-14.) Edwards was in radio contact with other members of the unit. (*Id.* at 17:22-18:9.)

38.     Edwards further testified that he received a communication describing an individual who he was instructed to detain (later identified as Marc Giles). (*Id.* at 18:15-24; 19:12-13.) Edwards located Giles in the parking lot behind the 527 ext. (*Id.* at 21:1-2, 10-12, 17.) Edwards searched Giles and recovered 20 baggies with suspect heroin in them. (*Id.* at 19:1-5.) Edwards testified that he did not see Giles come into possession of the baggies. (*Id.* at 19:6-8.)

39.     Edwards also testified he saw Gipson in the back parking lot. (*Id.* at 21:23-22:5.) Edwards could not recall which officer had detained Gipson. (*Id.* at 22:6-10.) Edwards testified that there were several other individuals detained in the parking lot. (*Id.* at 22:11-14.)

40.     Also at the same hearing, Officer Mohammed testified that he was instructed to detain an individual who was later identified as George Ollie. (*Id.* at 23:20-24:17; 27:4-21.) Mohammed further testified that he was not in a position to, and did not, witness any criminal activity. (*Id.* at 20:5-10; 27:14-21.) In his deposition, Kallatt Mohammed testified, consistent with his 2004 testimony, that he did not witness Gipson being detained. (Ex. N at 120:14-121:8.) After he had detained George Ollie, he saw Leonard Gipson being walked down the fire lane outside the building. (*Id.* at 120:14-121:4.) He did not see Gipson exchange drugs or police recovering drugs from him. (*Id.* at 109:24-25-110:1, 127:4-15.)

41.    In addition to Gipson, multiple individuals were arrested as part of the January 4, 2003 narcotics investigation, including Bobby Coleman, Marc Giles, George Ollie, Clifford Roberts, Larry Lomax and George Scroggins. (Ex. L at 2:7-3:3:16.)

### Co-Defendant Bobby Coleman

42.    Bobby Coleman was arrested and indicted along with Gipson in connection with the officers' January 4, 2003 narcotics operation. (Ex. L at 2:7-9.) Coleman's arrest report lists Ridgell as the first arresting officer and Young as the second arresting officer. (Ex. P, Bobby Coleman January 4, 2003 Arrest Report.) Coleman had two prior felony drug convictions at the time of his arrest. (Ex. O, Transcript of February 14, 2005 Bobby Coleman Plea Hearing, at 4:4-6.)

43.    On February 15, 2005, Coleman pled guilty to reduced charges and received a 4 year sentence. (*Id.* at 2:23-4:2) Before accepting his plea, the court properly admonished Coleman and Coleman stipulated to the factual basis discussed during the plea agreement negotiations. (*Id.* at 4:12-8:24.)

44.    Coleman testified at his deposition that he and Gipson had planned to meet on January 4, 2003 at 6:30 a.m. to discuss drug business. (Ex. D at 116:10-11; 117:22-118:5, 18-119:23.) Coleman drove his green Chrysler and, when Coleman arrived at the 527 ext., he circled the building. (*Id.* at 120:22-121:4; 174:18-21.) Coleman always circled the building before he parked to try to determine whether police were onsite. (*Id.* at 121:5-14.)

45.    Coleman testified that he knew Gipson was already at the 527 ext. when

he arrived because he saw Fumbanks' car, silver Chevy Caprice that looked like an unmarked police car, in the parking lot. (*Id.* at 86:18-20, 121:15-23.)

46.     Coleman pulled in the parking lot and stopped alongside Fumbanks' car. (*Id.* at 125:13-126:1.) Gipson was standing outside of the car and Coleman told him he was going to the store and Gipson said he was going to check on the building to see what's going on, who was there and who could sell drugs for them that day. (*Id.* at 126:2-23; 129:1-23; 130:14-17.) Coleman testified that he and Gipson would give the drug addicts they employed a bag or two for their "wake up" as compensation for selling their drugs. (*Id.* at 130:2-13.)

47.     Coleman testified that he then started pulling out of the parking lot but was cut off by two unmarked squad cars. (*Id.* at 130:21-131:23.) Coleman testified that Jones and Young were in one of the squads and took him out of his car and put him in the other squad. (*Id.* at 131:2-12.) Coleman testified that he knew Jones and Young and that neither officer said anything to him. (*Id.* at 132:8-22.) Either Jones or Young handcuffed him. (*Id.* at 134:10-13.)

48.     Coleman testified that he was taken back to the building. (*Id.* at 136:1-7.) An unidentified white officer who was driving the car told Coleman he was getting locked up that day. (*Id.* at 136:17-24.) Either Jones or Young were in the car with Coleman and the white officer. (*Id.* at 136:1-16.)

49.     Coleman further testified that Watts and Mohammed were standing outside the 527 ext. when they pulled up and Gipson arrived in another unmarked squad with two other officers. (*Id.* at 139:24-141:9.) Coleman cannot remember who

they were or whether he recognized them. (*Id.* at 141:1-3.)

50.     According to Coleman, Watts then came up to the window of the car Coleman was in and told Coleman he was going to frame him that day. (*Id.* at 141:10-16. 142:5-14.) No other officer said anything. (*Id.* at 142:15-16.) Coleman testified that about fifteen people were arrested but some of them were released at the station. (*Id.* at 142:20-143:8; 144:13-17.)

### *Co-Defendant Marc Giles*

51.     Marc Giles was also arrested in the January 4, 2003 surveillance operation. (Ex. L at 3:4-7.) Giles had 7 prior felony drug convictions and 1 prior felony gun conviction at the time of his arrest. (Ex. Q, Transcript of November 6, 2003 Marc Giles Plea Hearing Guilty Plea Transcript, at 2:17-3:3.) Giles' arrest report lists Ridgell as the first arresting officer and Edwards as the second arresting officer. (Ex. R, Marc Giles January 4, 2003 Arrest Report.)

52.     On November 6, 2003, Giles pled guilty to reduced charges and was sentenced to 8 years in prison. (Ex. Q at 2:2-6.) The court properly admonished Giles at the plea hearing. (*Id.* at 3:12-4:21; 10:17-22; 11:17-12:5.) The State provided the factual basis for the plea:

> [I]f called to testify, the State would call Officer Ridgell, Star Number 6997, who would testify that on January 4, 2003, that they received information from a CI regarding delivery of narcotics to 527 East Browning. He would state that somebody would be driving a green car and that person by the name of Fuzz would be in a similar car, similar to an unmarked police car.
>
> At that time the police officers and their sergeant set up surveillance points within the building, outside the perimeter. After surveillance for approximately an hour, they observed vehicles matching the descriptions given circling the area. The driver in the silver car,

he would identify as Offender Number 2, which is Gipson, park the vehicle in the rear of 527 East Browning and approach the rear.

The driver of the green vehicle, now known as Coleman, Offender Number 1, continued to circle the area. Offender Number 2, Gipson, was then met at the rear door by five male blacks, now known as Roberts Clifford, the defendants who are in court today, Marc Giles, George Ollie, Larry Lomax, and George Scroggins.

Offender 2, which is Gipson, was then heard by police officers tell Offenders 3 and 4, which is Clifford Roberts and the defendant who is in court today, "You two are going to work the pack." Offender Number 2, Gipson, then told George Ollie, Larry Lomax, and George Scroggins, "Ya'all going to security right back there."

Offender Number 2, which is Gipson, then waited until he saw Offender Number 1, Coleman, approach, waive his hand for him to come into the parking lot.

Offender Number 1 then parked the vehicle in the lot and approached the building on foot. He was met halfway there by Offender 2, which is Gipson. Coleman then reached into his front pocket, he had a clear plastic bag containing suspect narcotics to Offender Number 2, which is Gipson. Coleman then returned to his vehicle and waited.

At that time Gipson, who was Offender Number 2, then returned to where Defendant Marc Giles, Offender Number 3, Clifford Roberts, George Ollie, Larry Lomax, and George Scroggins were waiting. He then gave to Clifford Roberts and Marc Giles a bundle of suspect narcotics. He told Clifford Roberts to give George Ollie, Larry Lomax, George Scroggins their wake up. This is their wake up. Offender Number 2, which is Gipson, then returned to his vehicle.

Police officers then approached and stopped Clifford Roberts, Marc Giles, George Ollie, Larry Lomax, and George Scroggins in the first floor hallway. They recovered from Clifford Roberts 22 clear baggies, white powder, suspect heroin. From the defendant they recovered 20 small clear plastic baggies, suspect heroin. They also recovered 3 bags from George Ollie. And Larry Lomax and George Scroggins, 1 bag each.

(*Id.* at 5:7-7:17.)

53. Before the State's recitation, the court instructed: "Mr. Giles, I want you to pay particularly close attention to what the State is about to say because I'm going

to ask you questions about it afterwards." (*Id.* at 5:1-4.) After the recitation, Giles confirmed that he had heard the recitation; was sworn in; and affirmed that the facts recited were true and correct and that he did not disagree with any of those facts. at 8:10-9:2.) Also while still under oath, Giles identified, through photographs, co-defendants Coleman, Gipson, George Ollie, Clifford Roberts, Larry Lomax and George Scroggins. (*Id.* at 9:3-10:15.)

### *Co-Defendant George Ollie*

54.     George Ollie had six prior drug felonies and was on parole at the time of his arrest. (Ex. S, Transcript of January 14, 2004 George Ollie Plea Hearing, at 3:1-5, 14-22.) Ollie's arrest report lists Ridgell as the first arresting officer and Jones as the second arresting officer. (Ex. T, George Ollie January 4, 2003 Arrest Report.)

55.     On January 14, 2004, Ollie pled guilty to reduced charges and was sentenced to 2 years in prison.   (Ex. S at 3:6-9).

56.     In summary, the State provided the following factual basis: On January 4, 2003 at 7:30 a.m., Officer Ridgell observed Gipson, aka "Fuzz," drive up to 527 E. Browning Avenue. (*Id.* at 6:1-6.) Gipson approached a group of five males standing near a rear door: Roberts, Giles, Ollie, Lomax, and Scroggins. (*Id.* at 6:7-11.) Gipson stated to Roberts and Giles that they were going to "work the pack" (sell the drugs) and then stated to Ollie, Lomax, and Scroggins that they were going to work security. (*Id.* at 6:12-18.) Bobby Coleman then met Gipson, handed Gipson a large, clear plastic bag, and Gipson gave Ollie, Lomax, and Scroggins "their wakeup" (drugs). (*Id.* at 6:19-7:1.) Gipson then walked away and Ollie was apprehended by officers with three

16

packs of white powder; testing positive for heroin. (*Id.* at 7:2-8:4.)

57.     Before the State provided the factual basis, the court instructed Ollie to pay attention to the State's recitation of the evidence it expects to present at trial and told Ollie that the court would be asking him questions after the State was done. (*Id.* at 5:16-21.) After the State's recitation, Ollie was sworn by the court and affirmed that he had heard the recitation of expected evidence. (*Id.* at 8:7-15.) The court then asked Ollie whether the facts he had just heard were true and correct and Ollie said "Yes." (*Id.* at 8:7:16-18.) The court then asked Ollie if he disagreed with any fact recited by the State and whether there were any facts he wanted to add or change. (*Id.* at 8:19-24.) Ollie responded "No" to both questions. (*Id.*)

### *Co-Defendant Clifford Roberts*

58.     Clifford Roberts' arrest report lists Ridgell as the first arresting officer and Mohammed as the second arresting officer and the person who recovered and inventoried narcotics in Roberts's possession. (Ex. V, Clifford Roberts January 4, 2003 Arrest Report.)

59.     On October 9, 2003, Clifford Roberts also pled guilty to reduced charges and was sentenced to two 4-year consecutive terms. (Ex. U, Transcript of October 9 2003 Clifford Roberts Plea Hearing. At 11:2-9.)

60.     The State's factual basis was:

Judge if called to testify, Officer Ridgell, R-i-d-g-e-l-l, star 6997 would testify on January 4th of this year at 6:15, between 6:15 and 7:50 in the morning, he was at the area of 527 East Browning, part of the Ida B. Wells housing project. At that time he and his fellow officers observed 2 individuals driving around the area in vehicles known as Bob Coleman and Leonard Gibson [sic]. At that time, Coleman continued to circle the

17

area in his car and the defendant known as Leonard Gibson [sic] came out and was met at the rear door of that location by 5 individuals including Mr. Roberts. Those individuals were Marcus – or were Giles, Scroggins, Ollie and Lomax. At that time, Coleman told the group that, told the Offender Roberts and Giles they were going to work the pack which meant they were going to sell drugs and the other 3 were going to wind up working security. That Coleman and Gibson [sic] waited for Coleman who came, give him a pack. At that time, Gibson [sic] turned around and gave a pack of narcotics to Roberts and Giles. At that time, Judge, Roberts handed the 3 other guys there, Scroggins, Lomax and Ollie one packet of suspect narcotics, which is their payment for working security. The officers eventually approached, and placed Roberts, Giles, Scroggins, Ollie and Lomax into custody. They recovered off Mr. Roberts 22 small clear zip lock baggies, white suspect heroin and United States currency totaling 129 dollars from his hand. That was inventoried pursuant to proper Chicago Police procedures. Furthermore, this person from the Illinois State Police Crime Lab would testify they tested positive for heroin.

(*Id*. at 6-7.)

61.     Before the State provided the factual basis, the court instructed Roberts "to pay particularly close attention to what [the Assistant State's Attorney] has to say because when he's done, I'm going to ask you questions, do you understand?" (*Id*. at 5:23-6.) After the State's recitation, Roberts was sworn in by the court and affirmed that he had heard the recitation of expected evidence. (*Id*. at 8:6-8.) The court then asked Roberts whether all of the facts he had just heard were true and correct and Roberts said "Yes." (*Id*. at 8:9-12.) The court then asked Roberts if he disagreed with any fact recited by the State. (*Id*. at 8:13-14.) Roberts responded "No." (*Id*. at 8:15.)[4]

---

[4] Co-defendants Scroggins and Lomax also pled guilty to their charges arising from their January 4, 2003 arrests. (Group Ex. RR, Scroggins and Lomax Certified Statements of Conviction.)

***Plaintiff's Version of the Events of January 4, 2003***

62.     Gipson has given several different accounts of his January Arrest.

**Version One: Gipson's OPS Complaint**

63.     On January 13, 2003, Gipson filed a complaint with the Office of Professional Standards. (Ex. W at COPA-WATTS029880.) According to the complaint, Gipson claimed that on January 12, 2003, Watts and other unidentified officers entered his hotel room at the Amber Inn, damaged property and left. (*Id.*)

64.     Watts was notified of the complaint on February 13, 2003. (*Id.* at COPA-WATTS029883.) No other member of unit 715 was identified by Gipson (*id.*) and there is no evidence that any other member of unit 715 knew about the complaint.

65.     The investigator assigned to the complaint reported that, after several attempts, he was unable to reach Gipson by telephone and sent him a certified letter which was returned indicating that there was no residence with the number Gipson gave. (*Id.*, COPA-WATTS029877, COPA-WATTS029881, COPA-WATTS029886.) Thereafter, investigators went to the address Gipson provided and discovered that the address was for a vacant lot. (*Id.* at COPA-WATTS029877.)

**Version Two: Gipson's Motion to Suppress Testimony**

66.     At the hearing on his motion to suppress his arrest, Gipson testified that he dropped his girlfriend off at the front of the building and drove away. (Ex. J at 86:18-87:16.) He then noticed the police behind him and pulled over. (*Id.* at 87:15-17.) The officers took him out of the car and put him in the police car. (*Id.* at 87:22-24.) One officer was white and the other was African American. (*Id.* at 101:17-22.) One

officer drove him back to the 527 ext. and the other drove his car back. (*Id.* at 87:23-88:2.) Gipson did not see the officers who pulled him over testify at the hearing that day. (*Id.* at 87:18-21.)

67. When they arrived at the front of the building, Gipson saw Watts come out and walk up the police car. (*Id.* at 88:3-6.) Watts told him the drugs were his. (*Id.* at 88:6-7.) Gipson denied stopping at the 527 ext. when he dropped off his girlfriend or meeting Coleman there that morning. (*Id.* at 88:8-89:3.) He denied being in the back parking lot or having any conversations with anyone outside the rear of the 527 ext. (*Id.* at 89:23-90:7.) Gipson testified that he had been going home when the police pulled him over that morning. (*Id.* at 95:1-4.)

68. Gipson testified that he knew some of the officers who were there on scene and that they had harassed him numerous times. (*Id.* at 89:8-22.) Gipson admitted that although he claimed the officers had harassed him between ten and fifteen times, they had never arrested him before or planted drugs on him. (*Id.* at 96:7-19; 97:6-8.)

69. Gipson testified that he had been frequenting the 527 ext. since he met Fumbanks in high school 1997. (*Id.* at 90:8-15.) Gipson testified he was at the 527 ext. every other day and that he drove a silver Chevy Caprice that belonged to Fumbanks. (*Id.* at 99:4-20; 100:4-10.) Gipson testified that he had his own car but that he and Fumbanks had traded cars. (*Id.* at 100:4-14.)

**Version Three: Post-Conviction Affidavit allegations**

70. In his affidavit affixed to his post-conviction relief petition, Gipson

attested that at 6:30 a.m. on January 4, 2003, he left the Wells complex to go pick up his kids to take them to school. (Ex. V, Gipson April 27, 2017 Post-Conviction Affidavit, at ¶4.) He further attested that as he was driving, Watts and Jones pulled him over. (*Id.*) They told him to get out of the car, handcuffed him and put him in their unmarked car. (*Id.*) Once in the car, "they" told him that they had warned that if they ever saw him again, "'they would put something on [him].'" (*Id.*) Gipson also attested that: "They then took me back to 527 East Browning and took me into the lobby of the building. Officers Mohammed, Gonzalez, Leano (who we called 'Mini'), and several other officers were already in the lobby when we got there." (*Id.* at ¶5.) Gipson attested that Watts demanded money and Gipson told him he had none. (*Id.*) Gipson further attested that Watts and Jones then went around the corner and through the stairwell doorway while Mohammed, Mini and Gonzalez stayed with Gipson and watched him. (*Id.* at ¶6.) When Watts and Jones returned, Watts pulled out a bag of drugs and said "these are yours." (*Id.*) "They" arrested him and took him in. (*Id.*)

71.     Gipson also attested that he called OPS and filed a complaint over the telephone regarding his January Arrest. (*Id.* at ¶8.) Gipson attested that he told the individual whom he spoke with that Watts had planted drugs on him, falsely arrested him and threatened to do so again if he ever saw him. (*Id.*) Gipson further attested that the information recorded in the filed complaint was incorrect. (*Id.* at ¶9.)

**Version Four: Complaint allegations.** (AC, ¶48.)

72.     Gipson alleged in his Amended Complaint that Watts and Jones pulled

him over the morning of January 4, 2003, took him out of his car, handcuffed him, and put him in their squad. (AC at ¶¶32-35.) Once inside the car, Watts reminded him that Watts had previously warned him that Watts was going to frame. (*Id.* at ¶36.) Watts and Jones then took him to the 527 ext. (*Id.* at ¶37.) Once inside the 527 ext., Watts, Jones, and Gipson were joined by defendants Mohammed, Gonzalez, Leano and "several other officers" already in the lobby. (*Id.* at ¶38.) In the building, Watts shook down Mr. Gipson for money; Gipson refused; Watts pulled a bag of drugs out of his pocket; planted the drugs on him; and falsely arrested him. (*Id.* at ¶¶39-41.)

73.     Gipson also alleged that shortly after he was released on bond, he contacted OPS over the phone to file a complaint about his "false arrest" on January 4, 2003. *(Id.* at ¶¶42-43.) Gipson alleged that OPS failed to accurately report the details of his complaint and also failed to adequately investigate the complaint. (*Id.* at ¶44.)

**Version Five: COPA Statement**

74.     On January 7, 2019, Gipson told COPA investigators that on January 4, 2003 around 5:30-6:00 a.m., he left the Amber Inn on 39th Street with Nichole Parker. (Ex. E at COPA-WATTS030885.)

75.     Gipson explained away the early hour by claiming he was picking up his children to take them to school. (*Id.*)

76.     When confronted by COPA investigators that school was not in session on Saturday January 3, 2004, Gipson acknowledged that his children may have not

been going to school that day but that he did not recall. (*Id.*)

77.     Gipson stated that he stepped out of the car to kiss Parker goodbye but did not go all the way into the building. (*Id.*) He drove west on Browning, north on Rhodes, and east on 35th Street. (*Id.*) Watts and Jones pulled him over and approached his car. (*Id.*) They asked Gipson to get out of the car and put Gipson in the back of their police vehicle. (*Id.*)

78.     Gipson told COPA that Watts transported him to the front of the 527 building. (*Id.*) When they arrived, Watts allegedly told Gipson "whatever I find in this building is yours." (*Id.*)  After a few minutes, Watts returned with a bag of narcotics and told Gipson, "this is yours." (*Id.*)

79.     When confronted with his sworn testimony from his suppression hearing in which testified that that he was arrested by one white office and one African American officer, Gipson "clarified" in his COPA statement that both officers were African American. (*Id.* at COPA-WATTS030886.)

80.     When the COPA interviewer questioned him about his claim in his post-conviction affidavit that Gonzalez and Leano were in the lobby of the 527 ext. pointing out that neither officer was named in the police reports, Gipson admitted he was not sure which officers were present at his January Arrest and "clarified" that he was not in the lobby. (*Id.*)

81.     Gipson also told the investigators that he did not recall Mini (Leano) or Smitty (Smith) arriving on the team until after 2003. (*Id.* at COPA-WATTS030889.)

82.     Gipson also stated he did not recall what he told OPS in his complaint

but thought he would have brought up his January Arrest. (*Id.* at COPA-WATTS030887.)

83.    Gipson told investigators that he did not see Summers after his January Arrest. (*Id.* at COPA-WATTS030888.)

84.    Gipson also told the investigators that he did not recall Mini (Leano) or Smitty (Smith) arriving on the team until after 2003. (*Id.* at COPA-WATTS030889.)

**Version Six: Deposition Testimony**:

85.    Gipson testified that Watts and Jones pulled him over that day but he does not remember where he was pulled over. (Ex. B at174:4-10; 174:11-13.) Gipson further testified that he does not know who cuffed him or transported him. (*Id.* at 176:11-20.) Gipson was unable to identify any other officers even though he testified that he knew Watts and Officers Mohammed, Jones, Cadman, J-Bug (Summers), Gonzalez and Mini (Leano) before his January Arrest. (*Id.* at 27:2-9; 14-18; 28:2-6.)

86.    Gipson remembers Cadman being there but testified that Cadman did not do anything and just "stayed back" and he "really didn't see Cadman" but knew he was there. (*Id.* at 154:5-13; 155:1-3.)

87.    Although Gipson had previously seen Mohammed, the January 4, 2003 arrest was his first encounter with him. (*Id.*at 163:18-24.) Gipson can't recall what Mohammed did during his January 2003 arrest. Mohammed didn't put hands on him and didn't put him in custody. (*Id.* at 164:13-23.)

88.    When questioned about his January 13, 2003 OPS Complaint, Gipson could not recall details of the interaction described in the complaint and could not

recall the officers present at that time of the incident except for Sergeant Watts. (Ex. B at 103:22-24; 106:12-17 and 107:4-6.) Gipson also could not recall whether he spoke with someone from OPS over the phone or what he told OPS. (Id. at 104:9-12.) Gipson could not remember when the incident he reported occurred or what occurred when Watts and the other unidentified officers entered his hotel room. (*Id.* at 106:12-21; 107:4-6.)

89.    When questioned about his post-conviction affidavit, Gipson claimed that his sworn statement that he was going to pick up his kids to take them to school that day was a "mistype." (*Id.* at 75:9-18.)

### *Plaintiff's Prosecution for his January 4, 2003 Arrest*

90.    Gipson was released on bond the day after he was arrested, January 5, 2003. (Ex. B at 101:13-21.) Gipson does not know who paid the $10,000 necessary to secure the bond and cannot remember whether the cash used to post the bond was his cash. (*Id.* at 101:23-102:5.)

91.    Gipson filed a motion to suppress his arrest and a hearing on that motion was held on January 14, 2004. (Ex. J.) Officers Edwards, Mohammed and Summers were the only defendants to testify at Gipson's suppression hearing. (*Id.* 2:11-13.)

92.    The court denied the motion. (*Id.* at 121:22-123:5.)

### Gipson's May 8, 2003 Arrest

93.    Unit 715 officers also arrested Gipson on May 8, 2003. (Ex. Y, May 28, 2007 Vice Case Report; Ex. Z May 8, 2003 Arrest Report.)

94.     Although Officer Bolton was a member of unit 715, he was not on duty on May 8, 2003. (See generally, Ex. Y and Ex. Z.) As a result, he did not participate in Gipson's May Arrest, author or sign any reports, sign the criminal complaint, recover or handle any drugs, or testify in any related judicial proceeding arising from the May arrest. (*Id.*)

95.     Officers Smith, Leano, Lewis and Nichols were not assigned to unit 715 and were not present at and did not otherwise participate in Gipson's May Arrest, charging or criminal proceedings arising from that arrest. (Ex. K at 1-3, 9; Ex. Y and Ex. Z; see also *supra* note 3.)

96.     Defendants Bolton and Spaargaren's names do not appear as a reporting or assisting officer, and Ridgell, Cadman, Edwards, Mohammed and Gonzalez' names only appear as assisting officers on any police documentation relating to Gipson's May 8, 2003 arrest. (See Ex. Y; Ex. Z.)

97.     There is no evidence that Ridgell, Bolton or Spaargaren witnessed or was otherwise aware of any alleged police officer misconduct occurring on May 8, 2003.

98.     There is no evidence that Defendant Ridgell was personally involved in commencing or continuing any criminal proceedings against Gipson relating to his May 8, 2003 arrest.

99.     Gipson gave different accounts of his May Arrest.

**Version One: Post-Conviction Petition Affidavit**

100.     In his post-conviction affidavit, Gipson attested that, on May 8, 2003, he

26

was outside of the 575 ext. where his girlfriend Nichole Parker lived when he was approached by Watts, Jones, Mohammed, Summers, Cadman, Edwards and Gonzalez. (Ex. X, April 27, 2017 Post-Conviction Affidavit, at ¶11.) Watts mocked him stating "Let me see if you can bond off this." (*Id.*) Watts then cuffed, arrested him and took him to 51st and Wentworth. (*Id.*)

**Version Two: COPA Statement**

101.    In his COPA statement, Gipson told COPA investigators he was leaving the 575 ext. and was near the front stairs when Watts and his crew pulled up. (Ex. E at COPA-WATTS030887.) Gipson also told the investigators that Watts grabbed him and said, "You put OPS on me. That was a pussy move". (*Id.*)

102.    Gipson stayed in the lobby while the police searched the building, and the officers planted the narcotics they found on Gipson. (*Id.*) Gipson recalled he had been visiting Shibion, aka "Shabooka," at her apartment earlier that morning and may also have spent the night there. (*Id.*) Gipson also told COPA investigators that he could not recall if drug sales were taking place that morning or who, if anyone, was in the lobby. (*Id.*)

103.    When asked about his claim in his post-conviction affidavit that Watts said, "Let me see if you can bond off this", Gipson stated Watts did say that but he was not sure if any other officer heard Watts. (*Id.*)

**Version Three: Amended Complaint Allegations**

104.    In his Amended Complaint, Gipson alleged that he was standing outside the 575 ext. and that, although he had no drugs on his person and was not doing

anything illegal, Watts, Jones, Summers, Cadman, Edwards, Gonzalez and others handcuffed, arrested and took him to 51st and Wentworth. (AC at ¶¶46-48.)

**Version Four: Deposition Testimony**

105.    At his deposition, Gipson testified that he does not remember why he was at the 575 ext. on May 8, 2003. (Ex. B at 108:3-5.) Although Gipson attested in his post-conviction petition affidavit that he was there because Nichole Parker lived there, Gipson admitted that information was incorrect. (*Id.* at 109:1-9.)

106.    Gipson testified that Watts pulled up to the 575 ext.; Watts mocked him regarding his ability to post bond; and that "they" came out with drugs and locked him up again. ((*Id.* at 110:7-11.) Gipson further testified that Watts went into the building, came out and put Gipson in the police car. (*Id.* at 112:3-18.)

107.    Gipson further testified that he does not remember seeing Watts with narcotics. (*Id.* at 112:19-21; 113:2-5.) Gipson testified that he couldn't remember any officer other than Mohammed being present with Watts and that he could not remember who was on Watts' "team" at that time. (*Id.* at 110:13-111:5.) And specifically, Gipson testified that he could not remember anything Mohammed had done that day and that he was not sure if Jones was there. (*Id.* at 111:14-16; 169:14-22.)

108.    Gipson admitted he knew Watts, Mohammed, Jones, Cadman, Summers, Gonzalez and Leano prior to his January Arrest and testified that he did not recall seeing them at the scene of the May Arrest. (Ex. B at 27:2-17; 28:2-10; 110:13-111:5, 14-20.)

109.   Gipson also told the investigators that Ridgell disappeared after 2003 and that he did not recall Mini (Leano) or Smitty (Smith) arriving on the team until after 2003. (*Id.* at COPA-WATTS030889.)

### *Plaintiff's Prosecution for his May 8, 2003 Arrest*

110.   On May 30, 2003, Jones testified about the circumstances of Gipson's May 8, 2003 arrest before the grand jury. (Ex. AA, Grand Jury Transcript, at 2:17-5:18.) The grand jury indicted Gipson on May 30, 2003 on one count of possession of a controlled substance.  (*Id.* at 6:3.)

### Gipson Enters Guilty Pleas for his January and May Arrests

111.   On August 24, 2004, Gipson pleaded guilty to the charges arising from his January and May Arrests. (Ex. BB, August 24, 2004 Plea Transcript.) Prior to his pleas, the court properly admonished him. (*Id.* at 4:17-6:2; 9:7-19.) He was also advised of his right to appeal. (*Id.* at 10:14-11:3.)

112.   There is no evidence that Gipson was coerced, under duress, or suffering from mental illness at the time he pled guilty to the drug crimes for which he was convicted. In fact, Gipson, while represented by counsel, affirmed to the court that his plea of guilty was freely given. (*Id.* at 5:24.) The court, on that same day, made a finding that Gipson's plea was voluntary. (*Id.* at 9:13-18.)

113.   Gipson admits that his pleas were negotiated. (Ex. B at 116:18-117:5; see also Ex. BB at 3:13-16, 5:8-15.) Gipson admits that he took the plea deal because "it was the best deal that [he] was going to get." (Ex. X at ¶15.)

114.   Gipson was facing 4 to 15 years on a Class 1 felony plus 2 years of

mandatory supervised release on the charges arising from the January arrest and 1 to 3 years plus 1 year mandatory supervised release on the May charges, (Ex. BB at 4:6-16.)

115.    Because of his pleas, some of the charges were reduced and some dismissed resulting in concurrent sentences in the Cook County Boot Camp program. (*Id.* at 3:22-4:5; 10:5-13.) In addition, the court considered his drug assessment satisfied by his time spent in custody. (*Id.* at 10:9-11.) Gipson was released from boot camp after 4 months (February 25, 2005). (Ex. X at ¶15.)

116.    Gipson admits that he could have but did not tell the court that he was allegedly framed. (Ex. B at 118:17-8; see also Ex. BB at 10:2-4.)

### Gipson's July 24, 2007 Arrest

117.    Gipson admitted that he continued to sell drugs after his release from boot camp. (Ex. B at 119:15-120:7.) At no time between his release from boot camp in 2005 and his August 2007 arrest did any Defendant Officer arrest him or plant drugs on him or demand money from him even though he was selling drugs on a daily basis. (*Id.* at 119:15-120:7; see generally Amended Complaint.)

118.    Gipson was arrested on July 24, 2007 but not by any Defendant Officer and has not asserted any claims here from that arrest. (Ex. B 119:15-120:7; see generally Amended Complaint.)

119.    Gipson pled guilty to the charges arising from his July 24, 2007 as part of the plea deal he negotiated on the charges arising from his August 28, 2007 arrest. (Ex. HH at 4:8-5:4; Ex. B at 120:8-12.) That conviction has not been vacated. (Ex. B

at 120:13-15.)

### Gipson's August 28, 2007 Arrest

120.    On August 28, 2007, unit 264 arrested Gipson. (Ex. CC, August 28, 2007 Arrest Report; Ex. DD August 28, 2007 Vice Case Report.)

121.    Although defendants Young, Gonzalez, Lewis, and Mohammed were members of unit 264, they were not on duty on August 28, 2007. (See generally, Ex. CC; Ex. DD; and Ex. EE August 28, 2007 Assignment and Attendance Sheets.) These officers could not have participated, and did not participate, in Gipson's arrest, author or sign any reports, sign the criminal complaint, recover or handle the drugs, or testify in any related judicial proceeding arising from Gipson's August Arrest. ((Ex. CC; Ex. DD; Ex. GG, Transcript of September 25, 2007 Preliminary Hearing.)

122.    Defendants Bolton, Leano and Smith are identified only as assisting officers in the August 28, 2007 arrest report and did not testify at any point in Gipson's criminal proceedings arising from the August Arrest. (Ex. CC at 5; see generally, Ex. GG.)

123.    Defendants Ridgell, Cadman, Spaargaren, Summers and Edwards were not members of unit 264. (Group Ex. K at 4-8.) These officers did not participate, and could not have participated, in Gipson's August 28, 2007 Arrest. (Ex. CC; Ex. DD; Ex. EE.)

124.    There is no evidence that defendants Ridgell, Cadman, Spaargaren, Summers and Edwards, or Young, Gonzalez, Lewis, and Mohammed, were involved in any way in Gipson's August 2007 arrest.

125.    Defendant Ridgell was not a member of the Housing South Team as of 2007 when Gipson was arrested on August 28, 2007; rather, Defendant Ridgell transferred to a detail with the United States Marshall's service in 2004 where he remained well past 2007. (Ex. FF at 15:24-16:16, 61:11-19.) Defendant Ridgell only had contact with Defendant Watts in passing after his transfer. (*Id.*)

126.    There is no evidence that defendants Ridgell, Cadman, Spaargaren, Summers and Edwards, or Young, Gonzalez, Lewis and Mohammed, witnessed or was otherwise aware of any alleged police misconduct occurring on August 28, 2007.

127.    There is no evidence that defendants Ridgell, Cadman, Spaargaren, Summers and Edwards, or Young, Gonzalez, Lewis and Mohammed, were personally involved in initiating, commencing or continuing any criminal proceedings against Plaintiff relating to Plaintiff's August 28, 2007 arrest.

128.    Defendants Ridgell, Cadman, Spaargaren, Summers, Edwards, Young, Gonzalez, Lewis and Mohammed's names do not appear on any report relating to the August Arrest. (See Ex. CC; Ex. DD.)

129.    Officer Nichols attested to the arrest reports listing himself and Jones as the arresting officers. (Ex. CC at 2.) At the preliminary hearing, Nichols testified that on August 28, 2007 at 11:00 a.m. in the lobby of the 527 ext., he observed Gipson holding a clear plastic bag. (Ex. GG, at 3:1-4:2; 5:5-18; 8:10-13.) Nichols approached Gipson who placed the bag in his waistband. (*Id.* at 4:3-7.) Nichols recovered the bag which contained 15 smaller bags of suspect heroin. (*Id.* at 4:3-11; 7:6-11.) Nichols then conducted a custodial search and recovered an additional Ziplock bag containing 40

smaller bags of suspect crack cocaine. (*Id.* at 4:12-17.) Defendant Nichols was the only officer to testify in Gipson's criminal proceedings arising from his August arrest. (*Id.*)

### *Plaintiff's Version of the Events of August 28, 2007*

130.    Gipson has given several different accounts of his August Arrest.

### Version One: Post-Conviction Petition Affidavit

131.    In his post-conviction affidavit, Gipson attested that on August 28, 2007, he was leaving his girlfriend's residence at the 527 ext. when he encountered Watts and "his team" in the lobby. (Ex. X at ¶17.) He further attested that Watts asked him if he had anything for Watts; he replied no and left the building. (*Id.*)

132.    When Gipson was walking to his car, "multiple officers, including a female Officer [sic] I knew as Coco, circled around me." (*Id.*)

133.    Watts then approached Gipson and said "These are your drugs, hardass." (*Id.*) Watts then cuffed, arrested and took him to 51st and Wentworth. (*Id.*)

### Version Two: COPA Statement

134.    In his COPA statement, Gipson also told COPA investigators about his arrest on August 28, 2007. (Ex. E at COPA-WATTS030888.) Gipson relayed that his then pregnant girlfriend Nicole Parker was no longer living at the 527 building. (*Id.*) According to Gipson, he and Parker were visiting the building and sitting out front when they heard someone yell, "cleanup" and walked through the building. Gipson attempted to walk to his car but was stopped by Coca (Officer Lewis) and Smitty (Officer Smith) who told him "Watts want you inside." (*Id.*) When Gipson returned to the lobby, Watts told him "Whatever we find in this building is yours." (*Id.*) Gipson

then asked if he could leave his money with Parker and Watts allowed Gipson to hand Parker the money before he was transported to jail. (*Id.*) Gipson also stated that there were at least seven other individuals in the lobby but he was the only one who was arrested. (*Id.*)

135.    Gipson also told the investigators that Ridgell disappeared after 2003 and that he did not see Summers after his January Arrest. (*Id.* at COPA-WATTS030888 and COPA-WATTS030889.)

### Version Three: Amended Complaint

136.    In his Amended Complaint, Gipson alleged that while leaving his girlfriend's apartment, he encountered "Watts and his team" in the lobby of the 527 ext. (AC, ¶66.) He further alleged that Watts stopped him and demanded money. (*Id.* at ¶68.) Gipson refused to give Watts money and Watts told Officer Ridgell to detain him. (*Id.* at ¶¶69-70.) Gipson also alleged that while "[m]ultiple officers, including Defendant Lewis, circled around[him]," Watts approached him, pulled a bag of drugs out of his own pocket, and told Gipson that he was putting the drugs on him. (*Id.* at ¶71.)

### Version Four: Deposition Testimony

137.    At his deposition, Gipson claimed that he was standing in the front parking lot of the 527 ext. when Watts, Lewis and an African American officer pulled up to the front of the building and jumped out of their cars. (Ex. B at 121:20-123:1; 123:6-22.) Gipson is not sure whether the African American officer was "Smitty," a nickname for defendant Smith, or defendant Ridgell. (*Id.* at 125:4-14; 126:1-19.)

Watts sent Lewis and the other officer over to Gipson (*Id.* at 123:23-124:1.) The officers approached Gipson and took him into the 527 ext. (*Id.* at 124:12-17.) Inside the building, Watts told Gipson that if he found any drugs in the building, Gipson was going to jail. (*Id.* at 124:18-21.)

138.     Gipson testified that he does not remember whether any officers other than Lewis and the African American officer were present. (Id. at 124:22-125:3.) Specifically, Gipson does not remember if Leano or Jones or Nichols were present or took any action during the arrest. (*Id.* at 128:12-129:4.)

**Gipson Enters Guilty Pleas for his July and August 2007 Arrests**

139.     Gipson negotiated a plea deal in connection with his August arrest. (Ex. HH at 2:4-7; 6:23-8:1.) Part of that deal included a plea deal in connection with his July 2007 arrest. (*Id.* at 2:8-4:2.)

140.     As a result of Gipson's pleas, some of his charges were reduced and some dismissed in connection with both his July and August 2007 arrests. (*Id.* at 2:4-4:2.) After the reduction, Gipson was charged with a Class 4 felony and was facing 1 to 3 years in both cases. (*Id.* at 4:8-5:3.)

141.     Because of his pleas, Gipson received sentences of 2 years in each case. (*Id.* at 2:8-4:2; 13:19-23.) The court also allowed Gipson to remain in Cook County Jail for another week following his conviction and sentencing, rather than be transferred to the Illinois Department of Corrections, so he could see his newborn baby (*Id.* at 13:24-14:5.)

142.     Prior to his pleas, the court properly admonished Gipson. (*Id.* at 5:5-8:9.)

35

He was also advised of his right to appeal. (*Id.* at 14:11-15:8.)

143.    There is no evidence that Gipson was coerced, under duress, or suffering from mental illness at the time he pled guilty to the drug crimes for which he was convicted. In fact, Gipson, while represented by counsel, affirmed to the court that his plea of guilty was freely given. (*Id.* at 8:3-9.) In addition, the court on that same day made a finding that Gipson's plea was voluntary. (*Id.* at 12:2213:3.)

144.    Gipson was admitted to prison on November 20, 2007, paroled out on February 25, 2009, and discharged on June 15, 2009 for both sentences. (Ex. JJ Illinois Department of Corrections Offender Custody History; Ex. LL Illinois Department of Corrections Offender Movement Sheet.) During that time, Gipson was incarcerated at Stateville for 30 days, after which he went to work camp for a month and a half, and then into a work release program. (Ex. B at 131:3-16.)

145.    Because his conviction arising from his July 2007 arrest was not vacated, every single day of his incarceration in connection with his August Arrest, both pre and post-convictions, was credited to his lawful conviction arising from his July arrest. (Ex. LL; Ex. JJ.)

***Gipson's Failure to Adduce Necessary Evidence and Admissions***

146.    Gipson has not testified that any Defendant Officer other than Watts ever demanded money from him nor is there any evidence that they did. (See generally, Ex. B, Ex. J, BB, and Ex. HH; see also Ex. E and Ex. X.)

147.    Gipson has admitted that neither Gonzalez nor Leano nor Nichols nor Jones had ever planted drugs on him. (Ex. B at 221:17-222:4.)

148.    Gipson has admitted that he has never seen anyone pay a law enforcement officer a bribe. (*Id.* 30:10-19.)

149.    Gipson has admitted that he has never seen any Defendant Officer plant drugs on anyone or steal from money from anyone. (*Id.* at 30:22:31:13.)

150.    Gipson has admitted that he had no personal knowledge of any Defendant Officer engaging in any misconduct towards other individuals. (*Id.* at 30:10-19.)

151.    Plaintiff does not know who defendant Ridgell is or what role if any he played in any of Plaintiff's arrests. (Ex. B at 99:17-21, 125:23-126:19.)

152.    There is no evidence in this case that any involvement by defendants Ridgell, Jones, Cadman, Edwards, Gonzalez, Mohammed or Summers' involvement in Gipson's May Arrest was in retaliation against Gipson for making an OPS complaint based on his January 2003 arrest.

153.    There is no evidence that any Defendant Officer entered into an agreement with any other person or defendant to agree to frame or falsely initiate criminal charges against Gipson based on the events of January 4, 2003.

154.    There is no evidence that any Defendant Officer knew with certainty that any other police officers allegedly fabricated the circumstances of Gipson's January 4, 2003, May 8, 2003 or August 28, 2007 arrests.

155.    There is no evidence that any Defendant Officer entered into an agreement with any other person to agree to frame or falsely initiate criminal charges against Gipson based on the events of May 8, 2003 or August 28, 2007.

37

156. Defendant Cadman testified that, while he was on Unit 715, Public Housing South, he never saw any officer plant drugs on anyone, falsely arrest or frame anyone, or steal money from anyone. There is no evidence that Defendant Cadman witnessed or was otherwise aware of other police officers' misconduct occurring on January 4, 2003 or May 8, 2003. (Ex. MM at 151:14-24.)

157. Defendant Cadman denied ever having planted drugs on anyone. (Ex. SS, Cadman's Response to Gipson's Interrogatories, at #17.)

158. Defendant Spaargaren testified that he never planted or threatened to plant drugs on anyone or framed anyone for a drug crime. (Ex. QQ at 127:2 – 12); Ex. TT, Spaargaren's Response to Gipson's Interrogatories, at #17.)

159. Defendants Spaargaren and Cadman both deny ever participating in fabricating a police report, including drafting or signing off on such a report. There is no evidence that Spaargaren or Cadman knew with certainty that any other police officers allegedly fabricated the circumstances of Gipson's January 4, 2003 or May 8, 2003 arrests. *See* Ex. TT at #16; Ex. SS at #16.)

160. Neither Defendant Cadman nor Defendant Spaargaren wrote or signed the January 4, 2003 Vice Case Report and both are listed in Box 18 of the January 4, 2003 Vice Case Report. (Ex. I at 1.)

161. Neither Defendant Cadman nor Defendant Spaargaren are listed on Gipson's January 4, 2003 Arrest Report. (See Ex. KK, January 4, 2003 Gipson Arrest Report.)

162. Gipson observed Defendant Cadman at his arrest exiting or having just

exited the 527 building. (See Ex. UU, Gipson's Supplemental Answers to Defendant Jones, at 9, ¶11.)

163.    Gipson remembers Cadman being there but recalled he "really didn't do much" and "stayed back." (Ex. B at 154:5-13, 155:1 – 10.)

164.    Gipson does not know who Spaargaren is or recall if he was involved in effecting Gipson's arrest. (*Id.* at 157:23-158:3.)

165.    There is no evidence that Defendants Cadman or Spaargaren entered into an agreement with any other person to agree to frame or falsely initiate criminal charges against Gipson based on the events of January 4, 2003.

166.    Defendant Cadman was present at this arrest and is listed as an assisting officer in the May 8, 2003 Arrest Report and Vice Case Report. (Ex. Y at 1; Ex. Z at 1; Ex. X at ¶11.)

167.    Defendant Cadman did not sign or author the May 8, 2003 Vice Case Report or Arrest Report. (Ex. Y at 1); Ex. Z at 1.

168.    Gipson indicated in his deposition that during his May 8, 2003 arrest Defendant Cadman didn't put his hands on Gipson or do anything to wrong him. (Ex. B at 155: 6-13).

169.    There is no evidence in this case that Defendant Cadman's involvement in Gipson's May 2003 arrest was in retaliation against Gipson for making an OPS complaint based on his January Arrest.

170.    Defendant Spaargaren was not present for and did not participate in the May 8, 2003 Gibson arrest. (Ex. Y at 2.) Accordingly, after consultation with

39

Plaintiff's counsel, the parties agree that Defendant Spaargaren is entitled to summary judgment regarding claims arising from Gipson's May 8, 2003 arrest and prosecution.

171.  There is no evidence that Michael Spaargaren or Matthew Cadman was present for Gipson's August 28, 2007 arrest or involved in his prosecution stemming from the arrest. Accordingly, after consultation with Plaintiff's counsel, the parties agree that Matthew Cadman and Michael Spaargaren are entitled to summary judgment regarding claims arising from Gipson's August 28, 2007 arrest and prosecution.

<div style="margin-left:40%">Respectfully submitted,</div>

By:  /s/ Timothy P. Scahill
One of the Attorneys for Defendant
Calvin Ridgell
Special Assistant Corporation Counsel

By:  /s/ *William E. Bazarek*
Attorneys for Alvin Jones, Elsworth J. Smith, Jr., Douglas Nichols, Jr., Brian Bolton, Manuel Leano, Kenneth Young, Darryl Edwards, George Summers, Robert Gonzalez, and LaMonica Lewis
Special Assistant Corporation Counsel

Timothy P. Scahill
Steven B. Borkan
BORKAN & SCAHILL, LTD.
Two First National Plaza
20 South Clark Street, Suite 1700
Chicago, Illinois 60603
(312) 580-1030

Andrew M. Hale
Amy A. Hijjawi
Anthony E. Zecchin
Kelly M. Olivier
William E. Bazarek
Jason M. Marx
Hannah Beswick-Hale
Hale & Monico LLC
53 W. Jackson Blvd., Suite 334
Chicago, IL 60604
(312) 341-9646

By:  /s/ *Thomas M. Leinenweber*

One of the Attorneys for Defendants
Michael Spaargaren and Matthew
Cadman
Special Assistant Corporation Counsel

Thomas More Leinenweber
James Vincent Daffada
Michael J. Schalka
Kevin E. Zibolski
John Robert Stortz
Leinenweber Daffada & Sansonetti,
LLC
120 N. LaSalle St., Suite 2000
Chicago, IL 60602
(312) 606-8695

## CERTIFICATE OF SERVICE

I, William Bazarek, an attorney, hereby certify that, on November 20, 2024, I electronically filed the forgoing, DEFENDANT OFFICERS' STATEMENT OF UNDISPUTED FACTS with the Clerk of the Court using the ECF system, which simultaneously served copies on all counsel of record via electronic notification.

/s/ William Bazarek