**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| LEONARD GIPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  18 C 5120 |
| | ) | |
| CITY OF CHICAGO, Former CHICAGO | ) | Judge Steven Seeger |
| POLICE SERGEANT RONALD WATTS, | ) | |
| Former OFFICER KALLATT | ) | Magistrate Judge Sheila M. Finnegan |
| MOHAMMED, SERGEANT ALVIN JONES, | ) | |
| OFFICER ELSWORTH SMITH JR., | ) | |
| OFFICER DOUGLAS NICHOLS JR., | ) | |
| OFFICER BRIAN BOLTON, OFFICER | ) | |
| MANUEL LEANO, OFFICER KENNETH | ) | |
| YOUNG, OFFICER DARREL EDWARDS, | ) | |
| OFFICER MATTHEW CADMAN, | ) | |
| MICHAEL SPAARGAREN, OFFICER | ) | |
| GEORGE SUMMERS, OFFICER CALVIN | ) | |
| RIDGELL, OFFICER ROBERT | ) | |
| GONZALEZ, OFFICER LAMONICA | ) | |
| LEWIS, and any other yet unidentified | ) | |
| officers of the Chicago Police Department, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO BAR
THE TESTIMONY OF DR. JON M SHANE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ III

INTRODUCTION ............................................................................................. 1

SUMMARY OF DR. SHANE'S OPINIONS ....................................................... 3

LEGAL STANDARD ........................................................................................ 5

ARGUMENT .................................................................................................... 6

I.    Dr. Shane is qualified to provide opinions on the City of Chicago's failed police disciplinary system ......................................................................................... 6

II.   Dr. Shane used a reliable and commonly accepted methodology based on sufficient facts and data ......................................................................................... 8

      A.    Dr. Shane analyzed data from an appropriate timeframe. .................... 10

      B.    Dr. Shane analyzed relevant and appropriate materials. ....................... 13

      C.    Dr. Shane determined and achieved an appropriate sample size. ........... 18

III.  Dr. Shane reliably conducted his analysis of investigative quality. ................ 18

      A.    Dr. Shane's analysis appropriately identified characteristics of CR files to consider in applying the "thorough and complete" standard for police misconduct investigations. ................................................................. 19

      B.    There is no evidence of subjectivity in the data Dr. Shane relied on. ...... 23

      C.    Dr. Shane appropriately considered the rate at which CPD sustained, and failed to sustain, complaints of misconduct. .................................... 24

      D.    Dr. Shane's opinions that CPD failed to invest sufficient resources into investigating community complaints and frequently received complaint categories should not be excluded. ................................................. 26

IV.   Dr. Shane has a valid basis to opine that the deficiencies in CPD's disciplinary and supervisory systems would be expected to cause the specific officer misconduct in this case ................................................................................................... 27

V.    There is no reason to bar Dr. Shane from discussing the relevant sources he reviewed. . 29

VI.   Dr. Shane's opinions on Plaintiff's arrests are reliably formed and relevant. ............. 31

A.       Dr. Shane offered a sound opinion that the reports of Mr. Gipson's January and May 2003 arrests violated generally accepted standards. ..................................... 31

B.       Dr. Shane can opine that the reports he reviewed do not meet accepted standards because they obfuscate the details of the arrest to prosecutors. ............................ 34

C.       Defendants' criticisms of Dr. Shane's opinion about the January 4, 2003 and May 8, 2003 arrest reports lack merit. .................................................. 34

D.       Whether Dr. Shane's opinion on Plaintiff's August 2007 arrest report is admissible depends on Defendants' trial arguments. ............................................. 37

VII.   Dr. Shane's opinions are not unduly prejudicial. ................................................................. 37

CONCLUSION ................................................................................................................. 39

# TABLE OF AUTHORITIES

## CASES

*Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) ................................................. 34

*Andersen v. City of Chicago*, 454 F. Supp. 3d 808, (N.D. Ill. 2020) ............................................. 8

*Arias v. Allegretti*, No. 05 C 5940, 2008 WL 191185, (N.D. Ill. Jan. 22, 2008) ......................... 11

*Brown v. City of Chicago*, 633 F. Supp. 3d 1122 (N.D. Ill. 2022) ................................................. 12

*Calusinski v. Kruger,* 24 F.3d 931 (7th Cir. 1994) ........................................................................... 14

*Cf. United States v. Foster*, 939 F.2d 445 (7th Cir. 1991) .............................................................. 32

*Cummins v. Lyle Industries*, 93 F.3d 362 (7th Cir. 1996) ................................................................ 6

*Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ..................................................................................................................................................... 5

*DeLeon-Reyes v. Guevara*, No. 18 C 1028, 2019 WL 4278043 (N.D. Ill. Sept. 10, 2019) .......... 13

*Est. of Loury by Hudson v. City of Chicago*, No. 16-CV-4452, 2019 WL 1112260 (N.D. Ill. Mar. 11, 2019) ....................................................................................................................................... 18

*Garcia v. City of Chicago*, 2003 WL 22175618 (N.D. Ill. 2003) ................................................... 11

*Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 1715621 (N.D. Ill. Mar. 20, 2003) ........... 28

*Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010). ............................................................................. 8

*Godinez v. City of Chicago*, No. 16-CV-07344, 2019 WL 5597190 (N.D. Ill. Oct. 30, 2019) .... 18

*Groark v. Timek*, 989 F.Supp.2d 378 (D. N.J. 2013) ...................................................................... 13

*Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3142755 (N.D. Ill. July 25, 2017) ............. 9

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) ............................................... 6, 9, 34, 37

*Kindle v. City of Harvey*, No. 00 C 6886, 2002 WL 230779 (N.D. Ill. Feb. 15, 2002) ............... 28

*Kluppelberg v. Burge*, No. 13 C 3963, 2016 WL 6821138 (N.D. Ill. Sept. 16, 2016) ................. 8

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ............................................................. 6

*LaPorta v. City of Chicago*, 277 F. Supp. 3d 969 (N.D. Ill. 2017) ......................................... 18, 28

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698 (7th Cir. 2009) ................................................... 6

*Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 809 (7th Cir. 2013) .................. 23, 26

*Obrycka v. City of Chicago*, No. 07 C 2372, 2012 WL 4092653 (N.D. Ill. Sept. 17, 2012)........ 24

*Obrycka v. City of Chicago*, No. 07 C 2372, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012)........... 28

*Padilla v. City of Chicago*, No. 06-C-5462, 2009 WL 4891943 (N.D. Ill. Dec. 14, 2009).......... 13

*Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015)........................................................... 13

*Sherrod v. Berry*, 827 F.2d 195 (7th Cir. 1987), *vacated on other grounds*, 835 F.2d 1222 (7th Cir.1988) ............................................................................................................ 13

*Simmons v. City of Chicago,* No. 14 C 9042, 2017 WL 3704844 (N.D. Ill. Aug. 28, 2017) . 18, 24

*Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006 (7th Cir. 2006)............................................ 11

*Velez v. City of Chicago*, No. 18 C 8144, 2021 WL 1978364 (N.D. Ill. May 18, 2021)............. 12

*Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022) ...... 10

*Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495 (7th Cir. 2020) ................................. 5

**RULES**

Fed. R. Evid. 702 ................................................................................................................. 5

Fed. R. Evid. 703 ................................................................................................................. 5

**INTRODUCTION**

Plaintiff Leonard Gipson alleges that Defendant Sergeant Ronald Watts and members of the tactical narcotics enforcement squad he supervised framed him, repeatedly, after Gipson refused to pay a bribe that Watts demanded and instead complained to the police department about Watts' behavior. Today, Defendant Watts and his accomplice Defendant Kallatt Mohammed have been convicted of felonies for their corruption, and many of the other Defendant Officers have been placed on the State's Attorney's do-not-call Brady list, have resigned under investigation, or are facing termination as the result of (long-delayed) disciplinary proceedings.

Plaintiff alleges that Defendant City of Chicago enabled and caused his wrongful convictions by allowing a code of silence to fester within the Department; by maintaining a dysfunctional disciplinary system in which civilian complaints were routinely ignored and the City failed to properly respond to hundreds of complaints against the Defendant Officers; and by allowing an on and off criminal investigation against Defendants Watts and Mohammad to go on for nearly eight years without intervening to prevent further damage to innocent people framed by Watts's crew. Dkt. 61 (Pl.'s Am. Compl.) ¶¶ 79-86; 95-117.

Plaintiff retained Dr. Jon M. Shane to review evidence from this litigation and evaluate the quality of the City's disciplinary and supervisory systems from 1999-2011, along with the City's actions relative to Defendant Watts and members of his tactical team. Dr. Shane is a retired police captain and a current professor of criminal justice at John Jay College of Criminal Justice in New York, who has expertise in police policy and practices and in statistics. Ex. A (Shane Report) at 1. His many qualifications are discussed in more detail below. In this case, Dr. Shane described generally accepted standards in police discipline and supervision of narcotics enforcement police and provided an opinion on the practices of the Chicago Police Department

1

("CPD") during the time periods at issue. Ex. A. Using his training and background as a Ph.D. in Criminal Justice and his experience conducting statistical analysis, he also identified a statistically significant sample of police misconduct investigations from 1999-2011; wrote a codebook and trained data coders to identify and record information about those investigations; and conducted statistical analysis regarding Chicago's police disciplinary practices from 1999-2011. *Id.* Dr. Shane concluded that the Chicago Police Department's disciplinary and supervisory systems did not comply with nationally accepted standards despite ample notice of the risk of corruption in narcotics policing units. He also concluded that the criminal investigation resulting in Plaintiff's arrests fell short of nationally accepted standards.

Defendants have filed two *Daubert* motions to exclude certain opinions made by Dr. Shane. Dkt. 156 (Officer Defs.' Mot.); Dkt. 172 (City Defs.' Mot.). Specifically, they challenge his qualifications; the timeframe of data and sources he relied on; the data Dr. Shane collected and analyzed; whether Dr. Shane's opinions on Plaintiff's arrests will help the jury; and whether Dr. Shane may rely in part on disciplinary investigations postdating the arrests and convictions of Defendants Watts and Mohammed, among other things. The Court should deny these motions because Shane is plainly well-qualified and used a routinely admitted methodology. Indeed, many of Defendants' arguments do not challenge Dr. Shane's qualifications or methodology, but instead seek evidentiary rulings based on other factors. *See* Dkt. 156 at 13 & n. 7 (Officer Defendants moving to exclude opinions as "highly prejudicial" under Rules 402 and 403 and promising to move again to exclude the opinions *in limine*); Dkt. 172 at 23 & n.7 (City Defendants moving to exclude opinions because of the risk of "wast[ing] trial time" and, again, promising to move again to exclude the opinions *in limine*). There is no merit to Defendants' arguments and Defendants do not justify asking the Court for multiple rounds of evidentiary

briefing. The Court should deny the Defendants' motions and bar them from relitigating the same issues multiple times.

## SUMMARY OF DR. SHANE'S OPINIONS

To form his opinions in this case, Dr. Shane analyzed an extensive set of documents and information, which included contracts between the police union and the City of Chicago, discovery responses, CPD policies, annual reports from the City of Chicago, hundreds of CR (disciplinary investigation) files against the Defendant Officers, hundreds of CR files derived from a random sample, dozens of deposition transcripts, reports and articles addressing the state of police discipline and supervision in the CPD, the FBI investigative file regarding Watts and Mohammed's corruption and the investigation thereof, and numerous academic articles and other publications on topics germane to his opinion. *E.g.*, Ex. A at 16 n.5-9, 76 n.63, 79 n.64, 81 n.67, 82 n.68-69, 98 n.82, 100 n.84, 118-24; Ex. B (Shane Report Ex. F-1 - Waddy Report) at 48-56.[1]

A major piece of Dr. Shane's analysis (although by no means the only piece) involved collecting, reviewing, and analyzing data from a random sample of police misconduct investigations ("CRs") by the CPD from 1999-2011. Dr. Shane determined a conservative sample size for the 1999-2011 period and sample sizes required to analyze sub-periods within that timeframe. Ex. A at 15, 17. He then obtained a sample of 1,265 CRs and created a codebook so that meaningful data could be extracted from those files and trained a team of data coders employed by Plaintiff's attorneys to extract the data, applying social science methodologies. *Id.* at 17-18. That data was compiled in a spreadsheet and provided to Dr. Shane. He then conducted a review and quality check to ensure the accuracy of the coding process. *Id.* at 18. Dr. Shane also

---

[1] Dr. Shane incorporated a previously written report on the disciplinary histories of various Defendant officers in this case—among other topics—into his opinion. Ex. B (Shane Report Ex. F-1 - Waddy Report).

reviewed a significant amount of material that was specific to the arrests of Mr. Gipson,

including the reports documenting his arrests.

Applying his expertise and knowledge and using social science methodologies, Dr. Shane

formed four global opinions:

1. The CPD did not follow accepted practices for conducting police misconduct investigations, and CPD's investigations did not comport with nationally accepted standards. Ex. A at 11.
2. The Defendant Officers accrued complaints at a rate that notified officials of a need for intervention and supervisory measures to stop adverse behavior and correct deficiencies, and the City's response to that notice did not comport with nationally accepted standards. *Id.* at 11.
3. CPD's accountability systems from 1999-2011 did not meet nationally accepted standards and did not effectively respond to patterns of allegations against officers that emerged during that time. *Id.* at 11-12.
4. The Defendant Officers' arrests of Plaintiff Gipson did not comport with nationally accepted standards, including in deficient reports that obfuscated which officers took what actions in the arrests and the use of "raid tactics" of conducting indiscriminate mass arrests, which CPD failed to prevent. *Id.* at 12.

Dr. Shane formed numerous further opinions that Defendants did not specifically address,

which include (but are not limited to):

1. CPD's investigations were characterized by (a) a focus on minor complaints at the expense of more serious allegations; (b) undue delays in investigations that compromised the effectiveness and integrity of the disciplinary system; (c) incomplete investigations that routinely omitted necessary steps, including collecting and reviewing relevant evidence; (d) frequent failures to conduct any investigation into complaints of misconduct; and (e) failures to conduct in-person interviews of accused and witness officers or otherwise ensure the integrity of those officers' responses. *Id.* at 52-72.
2. The City knew of serious deficiencies in its accountability systems, including especially the need to manage risks associated with exposure to drugs and money in narcotics units, such as Watts's tactical team. The City nonetheless failed to address those risks consistent with nationally accepted standards. For example, the City: set convoluted and unduly specific criteria for flagging problem officers and failed to use or review relevant information; failed to analyze or respond to trends of misconduct complaints against officers; did not specifically monitor narcotics policing units; and failed to rotate personnel out of corruption-prone assignments. *Id.* at 72-83.
3. The CPD's leaders were aware of mounting and extremely serious allegations against Defendants Watts, Mohammed, and others, and learned of evidence supporting those allegations, but did nothing to ensure that the allegations were promptly resolved to protect the community from harm. However, the CPD allowed the key whistleblowers

and police investigators involved in investigating Watts's misconduct to be retaliated against for breaking the code of silence. *Id.* at 87-96.

4. CPD failed to conduct timely and thorough integrity testing of the Defendant Officers, failed to regularly monitor their performance, failed to transfer them to non-enforcement assignments to protect the public, and failed to dissolve their unit despite mounting complaints and evidence of corruption. *Id.* at 96-100.

5. CPD endorsed mass search-and-arrests conducted in violation of generally accepted standards: specifically, stopping and searching everybody in public housing buildings despite lacking individualized and specific bases to do so. *Id.* at 100-101.

Defendants failed to discuss and address many of the above opinions and have thus forfeited *Daubert* argument on those opinions. Any arguments raised for the first time in Defendants' reply briefs are waived. *Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 507 n.30 (7th Cir. 2020).

## LEGAL STANDARD

Federal Rules of Evidence 702 and 703 govern the admissibility of expert witness testimony. Fed. R. Evid. 702 & 703. Opinion testimony is admissible if the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," if testimony is "based on sufficient facts or data," is "the product of reliable principles and methods," and if the opinion "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

The trial judge occupies a "gatekeeping role" and must scrutinize proffered expert testimony to ensure it satisfies each requirement of Rule 702. *Daubert*, 509 U.S. at 592-93, 597. The proponent of the expert evidence bears the burden of establishing, by a preponderance of the evidence, that the requirements set forth in Rule 702 and Daubert have been satisfied. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). This rule applies not only to scientific testimony but to all expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). A *Daubert* inquiry ultimately requires a two-step analysis: first, a determination of the expert's reliability, and second, whether the proposed expert testimony is relevant and aids

the trier-of-fact. *Cummins v. Lyle Industries*, 93 F.2d 362, 367-68 (7th Cir. 1996). In civil rights

cases such as this one, "[e]xpert testimony regarding relevant professional standards can give a

jury a baseline to help evaluate whether a defendant's deviations from those standards were

merely negligent or were so severe or persistent as to support an inference of intentional or

reckless conduct that violated a plaintiff's constitutional rights." *Jimenez v. City of Chicago*, 732

F.3d 710, 721–22 (7th Cir. 2013).

## ARGUMENT

I.   **Dr. Shane is qualified to provide opinions on the City of Chicago's failed police disciplinary system.**

Defendants ask the Court to bar all of Dr. Shane's opinions relating to the sufficiency of

the City's police disciplinary investigations because he "never worked as a supervisor or

investigator in internal affairs." Dkt. 172 at 5-6. Defendants ignore Dr. Shane's relevant internal

affairs experience: he was trained in conducting internal affairs investigations, conducted such

investigations for ten years, and has ample further qualifications to provide his opinions.

Defendants' attack on Dr. Shane's qualifications is meritless. To start, Defendants failed

to mention that Dr. Shane was trained in conducting internal affairs investigations when he

became a sergeant with Newark Police Department and that he subsequently conducted dozens

of internal affairs investigations as a supervisor from 1995 to 2005. Ex. C (Shane Dep.) at 15:24-

16:23. They also did not mention that Dr. Shane has been qualified and has testified as an expert

in internal affairs in state and federal court, and has reviewed internal affairs issues in numerous

other lawsuits. *Id.* at 19:20-20:17, 21:18-37:10; Ex. A at 161.

Dr. Shane served in the Newark, New Jersey Police Department for twenty years, retiring

as a captain in 2005. Ex. A at 1. For most of his career he drafted, reviewed, and implemented

operational and administrative policy. *Id*. He regularly consults with attorneys and law

6

enforcement agencies on police policy and practice issues and training programs; completed

training programs for senior law enforcement leaders in policy development, police policy, and

research; and has served as a Senior Research Associate to the Police Foundation for the past

twenty years.[2] *Id.* at 1, 3, 5.

Dr. Shane actively participates in national organizations addressing police policy

including the American Society of Criminology, the Police Executive Research Forum, and the

Academy of Criminal Justice Sciences. *Id.* at 6. He has served as a peer-review member for

more than a dozen academic journals on policing, police policy, and criminal justice. *Id.* at 9. He

has first-hand experience as a high-ranking officer in a major urban police department, which

provided him experience in police administration, operations, and organizational culture. *Id.* at

10. For the past fifteen years, he has also conducted research and taught students on a wide

variety of policing topics. *Id.* at 159. He has published articles on police discipline and police

administration and has delivered lectures, training workshops, and conference presentations on

police discipline and police administration. *Id.* at 163-65.

Even absent Dr. Shane's substantial experience in internal affairs and research on that

topic, his general knowledge of police administration and his review and application of relevant

standards alone would qualify him. Personal experience in the subfield under review is not

required. *Andersen v. City of Chicago*, 454 F. Supp. 3d 808, 813 (N.D. Ill. 2020) (rejecting

defendants' challenge to plaintiff's police practice expert on the basis that he did not "personally

investigat[e] homicides or . . . tak[e] subjects to be polygraphed"). At best for Defendants, Dr.

Shane's personal experience investigating internal affairs complaints is a basis for cross-

examination rather than a basis for deeming him unqualified at the gatekeeping stage. *See id.* at

---

[2] Defendants accuse Dr. Shane of misusing a report by the Police Foundation in his analysis; however, as discussed in Section III(C), it is Defendants who misstate that report.

813 (explaining that if the defendants want to "highlight the lack of experience Waller may have, for example, in personally investigating homicides or in taking subjects to be polygraphed, they may do so through cross-examination"); *Kluppelberg v. Burge*, No. 13 C 3963, 2016 WL 6821138 at *2 (N.D. Ill. Sept. 16, 2016) (explaining "that Adams was not an ASA during 1988 and 1989 may have some bearing on the weight of his testimony, just not its admissibility"); *see also Gayton v. McCoy*, 593 F.3d 610, 618 (7th Cir. 2010). Notably, Defendants identify no case where an expert with qualifications like Dr. Shane was found unqualified to testify on a subtopic within his area of expertise. They rely on cases that are far afield; for example, a holding that a law professor with no social science training could not opine on the methodology of a trained social scientist. *See Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3142755, at *4 (N.D. Ill. July 25, 2017).

Defendants also say that because Dr. Shane lacks experience in psychology, he is not "qualified" to testify that the failure to conduct appropriate police misconduct investigations would be expected to cause narcotics officers to engage in corruption, extortion, and fabrication of evidence. Dkt. 172 at 6. Of course, Dr. Shane is not going to opine on the specific psychological motivations of the Defendant Officers. He should, however, be permitted to testify that the reason for many accepted practices in police discipline and supervision is to prevent the very kinds of corruption that Plaintiff alleges. That is a police practices opinion within Dr. Shane's area of expertise, not a psychology opinion or an opinion about Defendants' state of mind. As discussed below, Dr. Shane has a reliable basis to offer that opinion.

## II.    Dr. Shane used a reliable and commonly accepted methodology based on sufficient facts and data.

In constitutional tort cases under Section 1983, police practices testimony is admissible when it provides "expert testimony regarding sound professional standards governing [the]

defendant[s] actions." *Jimenez*, 732 F.3d at 721. Such testimony is "relevant and helpful" because it can "give [the] jury a baseline to help evaluate whether [the] defendant[s'] deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated [Plaintiff's] constitutional rights." *Id.* at 721-22. Dr. Shane offers such testimony here.

Dr. Shane's report includes an extensive methodology section, and he has established that he used typical techniques in police practices and social sciences to form his opinions. Specifically, he identified and obtained a random sample of CRs from 1999-2011, gathered data from those CRs and ensured the reliability and quality of those data, and computed the frequency with which the City's investigators completed various investigatory tasks. Ex. A at 13-19. Likewise, Dr. Shane named and cited the sources for the generally accepted policing standards he applied. *E.g.*, *id.* at 19-20 (describing several sources for police standards for investigation of employee misconduct and public complaints); 20-21 (standards for supervising police personnel); 79-83 (standards for supervision of narcotics enforcement units). Throughout his report, he applies the standards he has identified. Defendants incorrectly assert that Dr. Shane did not read the CR files, but that is not true, and they ignored his testimony to the contrary. Ex. C (Shane Dep.) at 83:8-86:14. In short, Dr. Shane used a bread-and-butter police practices methodology, and Defendants provide no basis to take issue with it.

In short, Defendants do not identify anything wrong with Dr. Shane's police practices methodology, which included reviewing relevant evidence from Plaintiff's case and applying his knowledge and experience, as well as reviewing disciplinary files to identify whether the City failed to conduct appropriate investigations of police misconduct. Nor could they, as courts in this Circuit frequently admit testimony from experts applying the same or similar methodologies.

9

*See Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *8 (N.D. Ill. Sept. 30, 2022) (police practices experts use reliable methodology by reviewing case materials and filtering that evidence through the expert's knowledge and experience with policing); *id.* at *9 (holding that statistical analysis of sample of 1,230 CR files, including auditing of random 10 percent of those CRs, was reliable method of drawing opinion about whether the CPD exhibited a "widespread practice of failing to investigate and discipline police officers who engage in misconduct"). The review of CR files for patterns relevant to *Monell* claims "has been approved a number of times by courts in this circuit." *Arias v. Allegretti*, No. 05 C 5940, 2008 WL 191185, at *3 (N.D. Ill. Jan. 22, 2008) (citing *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1030 (7th Cir. 2006); *Garcia v. City of Chicago*, 2003 WL 22175618 (N.D. Ill. 2003)).

A. **Dr. Shane analyzed data from an appropriate timeframe.**

Dr. Shane reviewed 1,265 CR files produced by the City in discovery spanning the years 1999-2011, reviewing the data as a whole and divided into three time periods: 1999-2003; 2004-2007; and 2008-2011. Ex. A at 28-52. He concluded that across the entire sample, and within each period, the CPD consistently failed to conduct thorough and timely investigations of police misconduct and failed to devote the resources necessary to ensure unbiased investigations of complaints. *Id.* at 52-72. Defendants argue that because Plaintiff was arrested in 2003 and 2007, any material outside the timeframe is irrelevant to his claims. Not so.

First, Defendants argue that the timeframe for any *Monell* evidence in wrongful conviction constitutional tort litigation is five years preceding the date of the plaintiff's arrest. But Defendants provide no support for the contention that a "five-year period" has been "generally accepted" in this district. They cite just one case, a summary judgment ruling that criticized the plaintiff's *Monell* evidence for being distant in time and unrelated in topic to the police misconduct alleged by the plaintiff. *Brown v. City of Chicago*, 633 F. Supp. 3d 1122 (N.D.

10

Ill. 2022). That opinion referenced a "five-year period" leading up to the plaintiff's arrest on a few occasions, but without discussion of why that was the appropriate time period. The most direct discussion of that timeframe was when the court held the plaintiff could not proceed on a failure-to-discipline *Monell* theory at summary judgment because the three defendant detectives had only one allegation of misconduct between them within a **ten-year** timeframe, spanning from five years before and five years after the Plaintiff's arrest. *Id.* at 1176. In short, even if that court had reasons to define a five-year period based on the evidence and argument there, the opinion offers nothing (and Defendants identify nothing) to extend that framework to the facts of this case. Notably, *Brown* was not a *Daubert* decision and ultimately the time period was irrelevant because the court held that the plaintiff had failed to argue or provide evidence of causation. *Id.* at 1176.

Other courts resolving issues regarding the production of CR files in discovery related to constitutional tort *Monell* claims have not questioned that files beyond the five-year period may be **relevant** to a plaintiff's *Monell* claims. *See Velez v. City of Chicago*, No. 18 C 8144, 2021 WL 1978364, at *4 (N.D. Ill. May 18, 2021) (concluding there was "no question as to the relevance" of seven years of CR files requested by plaintiff, before going on to consider proportionality); *DeLeon-Reyes v. Guevara*, No. 18 C 1028, 2019 WL 4278043, at *9 (N.D. Ill. Sept. 10, 2019) (describing relevance of six years of CR files to *Monell* claims as "not seriously dispute[d]").

Second, there is no reason why the "end date" for admissible conduct should be set on August 2007 (Plaintiff's final complained-of arrest) or even November 2007 (Plaintiff's plea to that arrest). "The Seventh Circuit has recognized that 'subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy.'" *Padilla v. City of*

*Chicago*, No. 06-C-5462, 2009 WL 4891943 at *7 (N.D. Ill. Dec. 14, 2009) (quoting *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir. 1987), *vacated on other grounds*, 835 F.2d 1222 (7th Cir.1988)); *see also Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015) (noting that "[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right, " and inferences from such post-event facts "lend weight to a finding that there was a policy behind the actions which led to the constitutional violation") (citations omitted); *Groark v. Timek*, 989 F.Supp.2d 378, 398 (D. N.J. 2013) ("Subsequent incidents, however, may be relevant to show a continuous pattern that supports a finding of an accepted custom or policy."). This is logical: one sign that a city exhibited a pattern, practice, or policy is to evaluate whether it acted consistently with such a pattern, practice, or policy before and after the incident at issue. The longer the pattern continues, the more likely that such a pattern, practice, or policy was in place. Here, the evidence is relevant: Dr. Shane has concluded that the City's disciplinary and supervisory system fell far below accepted standards not only during the time of Plaintiff' arrests and convictions, but also before and after—a continuing pattern of deficiencies and a continuing failure to enact necessary changes.

The cases Defendants cite, again, are not on point. In *Calusinski v. Kruger*, the plaintiff attempted to establish *at trial* a **pattern** of unconstitutional excessive force by citing a single incident of excessive force three-and-a-half years after the incident of alleged excessive force against the plaintiff. 24 F.3d 931, 936 (7th Cir. 1994). Setting aside that the Seventh Circuit was reviewing an evidentiary decision from a trial and not a *Daubert* motion, even that discussion was dicta because the plaintiff had not named the municipality as a defendant in the operative complaint and therefore did not have a *Monell* claim. In any event, Dr. Shane has reviewed hundreds of investigatory files relating to police misconduct and offered opinions on data from

those investigations. The consistency of the Department's failures in each time period—1999-2003, 2004-2007, and 2008-2011—makes it more likely that the City knew of the deficiencies but decided not to address them. As just one example, it tends to rebut any argument that the City took reasonable measures to address the deficiencies but that those reforms took time to work; the consistent (and indeed, deteriorating) quality of investigations and investigatory outcomes undermines any such defense.

In short, nothing in the cases that Defendants cite or in any other cases of which Plaintiff are aware suggests, let alone holds, that an expert offering opinions relating to *Monell* claims must rely on data from a five-year period preceding the incident at issue in the complaint and no more. There is no reason for the Court to bar or limit Dr. Shane's testimony based on his review of data from 1999-2011 and subperiods. And in any case, two of the subperiods that Dr. Shane analyzed—1999-2003 and 2003-2007—culminate precisely in the year of the challenged arrests. Any further criticism is jury argument, not a *Daubert* reason to bar the testimony.

## B. Dr. Shane analyzed relevant and appropriate materials.

Defendants take issue with Dr. Shane's use of reports from before and after the period of data analysis, including the Metcalfe Report from congressional hearings in 1972, the 1997 report from Mayor Daley's Commission on Police Integrity, a 2016 report from Mayor Emanuel's Police Accountability Task Force, and a 2017 report from the federal Department of Justice. "All of that material is irrelevant in time and scope to Gipson's case arising from his arrests in 2003 and 2007," Defendants argue, because "[i]t is unreliable to opine that the City was on notice of or deliberately indifferent to something in 2003 or 2007 based on evidence from 1972 or 2016." Dkt. 172 at 10. Defendants' argument might have merit if Dr. Shane were, indeed, arguing that policymakers in 2003 and 2007 were on notice because of the 2016 Police

13

Accountability Task Force report. But that argument is a strawman and does not reflect Dr. Shane's opinion.

Like other experts hired by Plaintiff and Defendants, Dr. Shane relied in part on secondary sources to form his opinion. That is a completely acceptable and noncontroversial way for experts to gather data. Indeed, the whole point of expert testimony is that experts may testify outside of their personal knowledge and involvement in the matter of litigation.

The report of the 1997 Commission on Police Integrity is especially germane to Plaintiff's claims. Some history (which Defendants omitted) is necessary. In 1997, several Chicago Police Department officers were indicted on conspiracy, racketeering, and extortion charges. Ex. D (1997 Commission on Police Integrity Report) at 2. In response, former Chicago Mayor Richard Daley appointed the Commission on Police Integrity to study police corruption in Chicago and to recommend strategies to reduce "the kind of misconduct discovered last year in the Austin and Gresham police districts"—i.e., officers employed in tactical drug units "using their positions . . . to rob and extort money and narcotics from drug dealers" and "commit[ing] robbery and sales of illegally confiscated narcotics." *Id.* at 4, 11-12. The Commission concluded:

> The scandals that have unfolded in Chicago and around the country in recent years reveal an indisputable fact: the corruption problem in law enforcement today is inextricably linked to the flourishing narcotics trade. **It is no coincidence that the ten Chicago officers under indictment today were assigned to two of the police districts with the highest incidence of narcotics arrests, nor that they all worked on tactical teams whose primary function was narcotics enforcement.**

*Id.* at 10 (emphasis added). As discussed below, the City never implemented one of the primary recommendations of the Commission, which was monitoring for misconduct on a unit-wide level, not just an individual basis, especially among drug enforcement units. Complaints against the Watts tactical team were streaming in within a few short years of the Police Integrity Report.

14

And Dr. Shane's reliance on the Police Integrity Report supports the argument that the City knew of the specific risks presented by tactical teams such as the Watts team and yet ignored those risks by failing to implement the safeguards its own Commission had identified as necessary.

Next consider the 2016 Police Accountability Task Force report, which reflects conclusions drawn by a government task force appointed by former Chicago Mayor Rahm Emanuel. Dr. Shane relied on this report, among other documents (including the actual Fraternal Order of Police contracts and the City's 30(b)(6) testimony), to form his understanding of the City's discipline and appeal processes, as well as historical attempts (and failures) to reform the CPD. For example, in 2016, that report concluded that many recommendations from Mayor Daley's 1997 Commission "were not addressed and still need attention." Ex. E (Police Accountability Task Force Report) at 24. And specifically, although the 1997 Commission recommended that CPD analyze **unit-wide** conduct—i.e., the same kind of drug unit misconduct that led the Commission to be appointed—it "[did] not appear [as of 2016] that CPD ever adopted that recommendation." *Id.* at 100.[3] That Report also found that the attempted reforms of the late 1990's and 2000's "in large part, were allowed to wither on the vine or were never executed at all," including because the City decided not to fund those programs. *Id.*

Dr. Shane is not relying on the Task Force Report to discuss policing practices in 2016. Rather, he addresses that Report's discussion of practices and policies from the late 1990's and 2000's as well as discussions about how the City failed to implement necessary policies and procedures from that time period. There is no reason why the Task Force's discussion of practices and policies in the late 1990's and 2000's—the exact time period at issue here—may

---

[3] The City's own 30(b)(6) representative in this case also admitted that he had no reason to believe the City had ever done anything to monitor for misconduct among drug units during the 1999-2011 timeframe. Ex. F (Timothy Moore 30(b)(6) Dep.) at 174:17-175:6.

not be considered. In fact, the City's 30(b)(6) witness in this case on discipline issues admitted

the City had no reason to disagree with numerous conclusions contained within the Police

Accountability Task Force report as applied to the 1999-2011 timeframe. Ex. F (Timothy Moore

30(b)(6) deposition) at 185:16-186:18.

Beyond the fact that the Report is relevant in this case, numerous courts in this District

have held that the Police Accountability Task Force (and the 2017 Department of Justice report)

is admissible for the truth of its contents because it "includes factual findings made by a public

office resulting from a legally authorized investigation." *Est. of Loury by Hudson v. City of

Chicago*, No. 16-CV-4452, 2019 WL 1112260, at *2 (N.D. Ill. Mar. 11, 2019); *see also Simmons

v. City of Chicago,* No. 14 C 9042, 2017 WL 3704844, at *8 (N.D. Ill. Aug. 28, 2017) (same, and

also admitting the Police Accountability Task Force report as a statement of an authorized person

or agent of an opposing party (the City); *Godinez v. City of Chicago*, No. 16-CV-07344, 2019

WL 5597190, at *4 (N.D. Ill. Oct. 30, 2019) (same); *LaPorta v. City of Chicago*, 277 F. Supp. 3d

969, 989 (N.D. Ill. 2017) (same).

Dr. Shane's reliance on the 2017 Department of Justice report is narrow and similarly

unproblematic. First, that report discusses Chicago's failures during the 2000's to implement a

functional early warning system:

> A 2007 study noted that nearly 90% of individuals with multiple complaints were
> never flagged by the EIS [Early Identification System], including officers who
> amassed more than 50 abuse complaints within five years. This study also
> discussed how, of the 33 officers with 30 or more complaints between 2001-2006,
> fewer than half had been flagged for intervention. Seven years later, the City was
> again informed, via the Safer Report, that CPD needed to revise its BIS and PCP
> programs, including updating the data collection systems to make them more user
> friendly. In particular, the Safer Report recommended integrating the command
> staff PRS with systems used by investigative agencies into a single, streamlined
> case management system. Doing so, according to the study's authors, would
> eliminate a significant shortcoming of the current system: "the inability to track
> an officer's conduct throughout her career."

16

Ex. G (Department of Justice Report) at 117. The DOJ concluded that CPD "does not have a functioning [early intervention system]" and that each of the Department's programs "suffers from inefficiencies that render them essentially useless." *Id.* at 111. The Report further supports Shane's observation that after the 1997 Report of the Mayor's Commission on Police Integrity, which recommended improvements in officer monitoring and evaluation programs, the Department "abandon[ed]" efforts to expand or improve its early warning systems because of a grievance filed by the police union. *Id*. Again, this report specifically discusses and addresses the exact time periods at issue relevant to Plaintiff's claims. Dr. Shane also took note of the fact that the City's 30(b)(6) witness on its disciplinary systems did not deny that numerous criticisms within the Department of Justice report were applicable in the 1999-2011 timeframe. Ex. F (Timothy Moore 30(b)(6) deposition) at 195:10-204:11. And as discussed above, the DOJ Report has been ruled admissible for the truth of its contents. There is nothing wrong with Dr. Shane relying on analysis from that report relating to the time periods at issue in this case.

Finally, Dr. Shane cited the 1972 report of the Blue Ribbon Panel convened by the Honorable Ralph H. Metcalfe, which found that as early as 1972, "complaints from citizens of abusive conduct by police are almost universally rejected by the Police Department's self-investigation system." Ex. A at 72. That report is by no means central to Dr. Shane's opinions, but it does provide relevant historical context. First, it explains the origin of the Office of Professional Standards, which was created in 1974 to investigate certain complaints of police misconduct and continued until 2007. Second, the report provides foundation for Dr. Shane's opinion that neither the Office of Professional Standards nor its successor, the Independent Police Review Authority, were effective in addressing the longstanding problem of failing to appropriately investigate and resolve citizen complaints. *Id.* at 72-83. It is unclear why

17

Defendants think that, as a social scientist and policing expert, Dr. Shane should not review and understand the history and origins of the CPD's disciplinary system or provide historical context for the continuing failure to appropriately address citizen complaints.

In summary, the materials Dr. Shane relied on generally explicitly address the specific time period at issue in this case, and Defendants have identified no reason to bar his opinion based on his review of those materials.

### C. Dr. Shane determined and achieved an appropriate sample size.

Dr. Shane conservatively determined the sample size of CRs that he required by (1) assuming he would need a big enough sample size to run a multiple variable analysis with up to nine predictor variables and (2) assuming a 60% error rate in cases. Ex. A at 17. As a result, he requested a sample size of 1,265 CR files, which the City produced and he analyzed. *Id.* However, although Dr. Shane obtained a big enough sample to run analyses using up to nine variables, the most complex statistical analysis he conducted used only two variables. Ex. C (Shane Dep. at 235:6-20). Defendants argue that at trial Dr. Shane should not be able to explain how he calculated this sample size; they hypothesize that the jury will be unduly impressed if he explains the sample size assumed a nine-variable multivariate analysis. But they offer no reason why Dr. Shane should not be able to explain what he did: in short, he obtained a bigger sample size than he needed, because he ran a less complex analysis than his calculations assumed. Any confusion (which is unlikely) can be easily cleared up through cross-examination.

### III. Dr. Shane reliably conducted his analysis of investigative quality.

Dr. Shane identified data to be extracted from the 1,265 CR files produced in this litigation as a random sample of CPD's police misconduct investigations from 1999-2011, and then analyzed that data (in addition to reviewing and discussing specific CRs and other evidence of the City's disciplinary and supervisory policies and practices) to form opinions about the

18

quality of CPD's disciplinary and supervisory systems. He applied a standard and reliable methodology, and his thorough analysis will help the jury. Defendants launch several criticisms of Dr. Shane's methodology, but none provide a basis to exclude or limit his testimony.

**A.    Dr. Shane's analysis appropriately identified characteristics of CR files to consider in applying the "thorough and complete" standard for police misconduct investigations.**

Defendants argue that Dr. Shane has not justified his methodology for identifying data points in the CR files to review in his analysis.  However, Defendants misstate the applicable standard and ignore the logical connection between the data Dr. Shane analyzed and the conclusions he reached.

**1.    Dr. Shane applied the applicable standard for internal affairs investigations: thorough and complete.**

The standard recognized by police departments, the Department of Justice, the International Association of Chiefs of Police ("IACP"), and local state agencies is that investigations of police misconduct must be thorough and complete. "A 'complete investigation' is one which includes all relevant information required to achieve the purpose of the inquiry" and "[t]he rules and procedures for an investigation must be framed to ensure its **integrity, thoroughness, and fairness.**" Ex. H (Department of Justice: Standards and Guidelines for Internal Affairs - Recommendations from a Community of Practice) at 27 (emphasis added). An IACP report says the same: "Police agencies have a duty to **investigate fully and completely** accusations of officer misconduct to protect the department's integrity and its credibility in the community, not to mention clearing the names of officers who have done no wrong." Ex. I (IACP Concepts and Issues) at 2 (emphasis added). The IACP Training Keys specify that an internal affairs investigation should not be reviewed until "the investigation is deemed to be complete" and that investigations that were incomplete should be designated as "[i]ncomplete

19

investigations." Ex. J (IACP Training Key III) at 3. On paper, the Chicago Police Department

also set a standard of conducting "**complete and thorough** investigations." Ex. K (Bureau of

Internal Affairs Standard Operating Procedures) at 13 (emphasis added). Various other state and

local entities reflect this standard. For example, the State of New Jersey has stated: "Each agency

must **thoroughly, objectively, and promptly** investigate all allegations against its officers." Ex.

L (New Jersey Office of the Attorney General: Internal Affairs Policy & Procedures) at 3

(emphasis added).

Dr. Shane applied the generally accepted "thorough and complete" standard in his

analysis, and Defendants offer no basis to conclude that "reasonableness" is the standard he

should have applied. Thus, Defendants' criticism that the sources he cited do not offer a standard

"for assessing the reasonableness of an administrative investigation" falls flat because

reasonableness is not the standard. Dr. Shane's application of the "thorough and complete"

standard also rebuts Defendants' criticism that Dr. Shane did not identify appropriate standards

for assessing misconduct investigations. Dkt. 172 at 16-17.

### 2. Dr. Shane reliably applied the correct "thorough and complete" standard.

As discussed, Dr. Shane developed a codebook identifying data of interest to him in the

1,265 CRs he reviewed and then analyzed data collected by coders he trained. Ex. M

(Codebook). Many of these data points collect basic descriptive information about the

complaints: the complainant, victim, and accused officer; a summary of the allegation; how long

the allegation took to resolve; and the disposition of the allegation. *Id.* at 3-6. Dr. Shane also

sought data on various investigative steps, including whether the investigator contacted the

complainant, victim, or witnesses, whether in-person interviews were conducted, whether

statements were taken, and whether various kinds of evidence were collected and preserved. *Id.*

20

at 6-12. As Dr. Shane notes, it is customary in the social sciences to hire coders to document data contained in voluminous documents, and his manner of analysis is consistent with tools and practices from the 1999-2011 time period, including similar spreadsheets Dr. Shane is personally familiar with from his experience in the Newark Police Department. Ex. A at 17-18.

Defendants complain that Dr. Shane has not identified a police department that used the exact same variables as he used in his analysis. Dkt. 172 at 13. But that is not the standard for reliability in this analysis. The question is whether there is a logical connection between the data Dr. Shane reviewed and the opinions he formed, and here there clearly is. His opinion was reasoned and is founded on those data. With that foundation, "[w]hether [the expert] selected the best data set to use . . . is a question for the jury, not the judge." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 809 (7th Cir. 2013). Specifically, "[a]ssuming a rational connection between the data and the opinion—as there was here—an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Id.* Among other things, Dr. Shane relied on standards from the federal Department of Justice stating that "a 'complete investigation' is one which includes all relevant information required to achieve the purpose of the inquiry." Ex. H (Department of Justice: Standards and Guidelines for Internal Affairs) at 29. Dr. Shane also relied on his experience and the materials he reviewed to identify data points to collect about the CRs that would be relevant to the completeness of the investigation. Defendants' qualms about the data he selected go to weight, not admissibility. *See, e.g., Simmons*, 2017 WL 3704844, at *11 (at trial, "defendants are entitled to explore claimed flaws in one of the databases of police complaint file data upon which plaintiff's experts relied"); *Obrycka v. City of Chicago*, No. 07 C 2372, 2012 WL 4092653, at *6-7 (N.D. Ill. Sept. 17, 2012)

(holding that arguments about choice of data and variables were for jury to consider and did not justify barring opinion).

Defendants also rely on an out-of-context quote from Dr. Shane about his methodology and the comparisons he made to other cities; specifically, that he "didn't compare the CPD to anyone else." Dkt. 172 at 13. That was an answer about specific data points within Dr. Shane's analysis, not a global statement about his methodology, as clarified by Dr. Shane during that deposition and as revealed in his report. For example, Dr. Shane reviewed numerous studies that considered internal affairs processes in other cities—including the rates of sustained complaints—and analyzed CPD's disciplinary and supervisory systems while applying that context. Ex. C (Shane Dep) at 348:15-349:8. However, Dr. Shane did not have access to the raw data from other cities, meaning he could assess their processes and sustain rates but could not conduct his own analysis of other cites' data; nevertheless, Dr. Shane was able to rely on the City's own reports, as well as the studies cited on page 16 of his report (which included a 1993 Police Foundation report, a 2001 report from the New York City Civilian Complaint Review, an eight-city study of police complaint data, a study using 2007 data from multiple agencies; and the City of Chicago's own annual reports) to make comparisons between Chicago and other cities. *Id.* at 349:5-20; Ex. A at 16. And Dr. Shane's report is replete with discussion of and references to studies and papers that analyzed police practices in other cities. Ex. A at, *e.g.*, 79 n.64, 80 n.65, 82 n.68, 98 n.81-82. Thus, although it is true that Dr. Shane did not have complaint-level data from other cities to draw comparisons to, it is equally true that he made comparisons to disciplinary systems and sustain rates from other cities as well as police practices from other cities more generally. None of this is "fatal" to Dr. Shane's opinions, as Defendants suggest.

**B.    There is no evidence of subjectivity in the data Dr. Shane relied on.**

Dr. Shane relied on a dataset containing information derived from 1,265 CR files (each of which may include dozens or hundreds of pages of material) and encoding the information into a spreadsheet suitable for statistical analysis. Ex. A at 14, 17-18. Dr. Shane recognized the possibility of subjectivity and addressed it via his methodology. He personally trained the coders and instructed them to resolve any ambiguities in favor of the City (i.e., marking an investigative step as completed if there was any evidence that it was completed). Ex. M (Codebook) at 1. Dr. Shane also personally audited the coding to ensure it had been done accurately. Ex. A at 18, 129-132. Notably, Defendants' motion does not identify a single inaccuracy in the spreadsheet.

Defendants also vaguely object that the data Dr. Shane gathered and analyzed is tainted because it relies on "subjective" assessments of the coders. Dkt. 172 at 11-14. Not so. First, the codebook includes explicit, objective instructions for how data should be gathered. Ex. M (Codebook) at 6-12. Second, Dr. Shane ensured the reliability of the analysis by personally inspecting it for accuracy, including that the variables in the data set matched the information contained in the CR documents. Ex. A at 18; Ex. C (Shane Dep.) at 177:1-178:14. By creating objective definitions for the data to be collected and personally ensuring that the data collected were accurate, Dr. Shane appropriately guarded against any subjectivity that the coders may have introduced. Defendants identify no authority suggesting that such a methodology (which, Dr. Shane has testified, is typical in the social sciences) is inappropriate. Defendants' arguments again go to weight, not admissibility. *Manpower*, 732 F.3d at 806 (noting it is abuse of discretion to "unduly scrutinize[]" data quality, which is typically a jury issue).

### C. Dr. Shane appropriately considered the rate at which CPD sustained, and failed to sustain, complaints of misconduct.

Defendants argue that Dr. Shane's analysis of the rate at which CPD sustained complaints of misconduct is unreliable and irrelevant. Dkt. 172 at 17-19. But Defendants misconstrue Dr. Shane's analysis and the relevance of those data for his opinion. Dr. Shane has not opined, and will not opine, that there is a universal "target sustain rate" that all police departments should strive for—for example, that if a police department sustains fewer than ten percent of complaints, it is below national standards. Dr. Shane can, however, opine that the City of Chicago, starting in 1999 and going forward, had not fixed the problem identified decades before by the Metcalfe Report—namely, that "complaints from citizens of abusive conduct by police are almost universally rejected by the Police Department[.]" Ex. A at 72. And the data Dr. Shane analyzed about the categories of complaints the City accepted and rejected—for example, that the City frequently sustained minor operations and personnel violations, but did not sustain a single coercive interrogation or coerced confession allegation across the entire sample—are relevant to his assessment of the integrity and effectiveness of the disciplinary system. *E.g.*, Ex. A at 32-33. Dr. Shane testified to the specific impact of the "very low" sustained rate—specifically, that it results in a failure to deter officer misconduct. Ex. C (Shane Dep.) at 195:5-196:11.

Certainly, as Defendants note, policing scholars have identified challenges in calculating complaint sustain rates and comparing them between police departments. But policing scholars have not rejected comparisons of sustained rates wholesale. Indeed, the very Police Foundation study that Defendants cite (and misuse)[4] in support of their position contains an entire section

---

[4] Defendants' use of the 1993 Police Foundation report is a bait and switch. That report quotes an article commenting that the "complaints rate"—meaning the number of complaints **received** by a department—is "badly abused." Ex. N (Police Foundation Report) at 35. But the complaints rate (number of complaints) is entirely distinct from the sustained rate (how often complaints are sustained). The quote has nothing to do with the issue of sustained rates.

analyzing and comparing rates of sustained complaints between agencies of different sizes and kinds of municipalities. Ex. N (Police Foundation Report) at 4-53-4-65 (comparing sustained rates and disciplinary outcomes based on agency size and agency type). Clearly, the authors of that study did not think it was without value to analyze and compare sustain rates, and neither does Dr. Shane.

Defendants fail to identify any relevant support for their argument that Dr. Shane should be precluded from comparing discipline rates between municipalities, and the source they rely on (the Police Foundation Report) does that exact analysis. Thus, Dr. Shane should not be precluded from discussing discipline rates among municipalities as one piece of evidence supporting the conclusion that the City of Chicago has a widespread failure to discipline its officers. And there can be no doubt that the widespread failure to discipline officers, courts in this district have found, is evidence relevant to *Monell* liability. *LaPorta*, 277 F. Supp. 3d at 988 ("That none of Kelly's 18 or 19 CRs incurred prior to the LaPorta incident resulted in a sustained finding is further evidence from which a reasonable juror could infer that Kelly was reaping the benefits of the code of silence even before the LaPorta shooting."); *Obrycka v. City of Chicago*, No. 07 C 2372, 2012 WL 601810, at *8 (N.D. Ill. Feb. 23, 2012) (finding low rates of sustained complaints relevant to code of silence *Monell* theory); *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 1715621, at *7 (N.D. Ill. Mar. 20, 2003) (finding low sustain rate of complaints similar to plaintiff's allegations relevant to issue of *Monell* deliberate indifference); *Kindle v. City of Harvey*, No. 00 C 6886, 2002 WL 230779, at *3 (N.D. Ill. Feb. 15, 2002) (same). Dr. Shane's analysis of patterns of complaint investigations and sustain rates, and his comparisons to sustain rates of other cities, are relevant and reliably formed.

**D.    Dr. Shane's opinions that CPD failed to invest sufficient resources into investigating community complaints and frequently received complaint categories should not be excluded.**

Defendants' remaining arguments criticize Dr. Shane's reasoning, but they do not provide any basis to exclude or limit his testimony.

First, Defendants claim that Dr. Shane's finding that the City of Chicago was dramatically more likely to sustain internal than external complaints is not unique to Chicago and that Dr. Shane's conclusions are invalid because he did not specifically compare the difference in external versus internal complaint sustain rates between Chicago and other cities. Dkt. 172 at 14-15. As Dr. Shane noted, the City of Chicago has been aware for decades that it almost never sustains citizen (external) allegations of misconduct against its officers. That is true for the time period analyzed by Dr. Shane, during which only 1.7% of all citizen allegations of misconduct against officers were sustained, compared to 42.8% of all internal allegations of misconduct. Ex. A at 36. Simple division reveals that the City of Chicago was thus **twenty-five** times more likely to sustain internal allegations than external allegations. (42.8%/1.7%=25.2). This gap is relevant to other findings made by Dr. Shane, including that the City failed to address its trend of almost always rejecting external misconduct complaints and that the City directed too many resources to investigating minor internal matters and not enough resources to more serious allegations. Ex. A at 53, 72. Defendants do not explain why Dr. Shane needed to explicitly compare the ratio of internal and external sustained complaints from other cities to reach relevant conclusions.

Second, Defendants claim that Dr. Shane provides no basis for concluding that CPD should have but did not prioritize common complaint categories. Dkt. 172 at 15-17. Defendants are wrong because Dr. Shane has thoroughly described his basis. Dr. Shane noted that from 1999-2003, the CPD was more than ten times as likely to sustain an operation/personnel violations allegation—typically a minor infraction—than any other allegation type. Ex. A at 53.

Dr. Shane further noted that the City was warned about the risks of investing too many resources in investigating minor administrative complaints, but as revealed by his data analysis (and an admission by the City's 30(b)(6) witness), the CPD did nothing to shift more resources towards more serious allegations. Ex. A at 53; *see* Ex. F (Moore 30(b)(6) Dep.) at 178:16-22 (Q: "As far as you know, was there any effort to shift the allocation of resources during this time period away from more minor administrative investigations and towards more serious allegations of misconduct? A: "No. I don't -- I don't think there was a shift in manpower at the -- at Internal Affairs."). Nor is Dr. Shane's analysis limited to excessive force (which Plaintiff acknowledges is not one of his allegations in this case). Dr. Shane's point is broader: CPD was on notice that the most frequent complaints against its officers reflected potentially criminal action, actions relating to legitimacy and community perception, and Fourth Amendment violations; nevertheless, CPD focused on minor administrative allegations and declined to invest the necessary resources into addressing more common and more serious complaints, leading to insufficient and below-standards investigations. Ex. A at 30. Thus, Dr. Shane has not failed to provide the basis for his opinions; instead, Defendants have failed to address the reasons Dr. Shane has provided.

**IV.    Dr. Shane has a valid basis to opine that the deficiencies in CPD's disciplinary and supervisory systems would be expected to cause the specific officer misconduct in this case.**

Defendants contend that Dr. Shane cannot render a "moving force" opinion that the CPD's failures would be expected to cause corruption, extortion, and fabrication and suppression of evidence because he has not "attempt[ed] to causally connect the alleged deficiencies with the specific officer misconduct in this case." Dkt. 172 at 19-21. That is wrong, because Dr. Shane has ample basis (which he explains) for why the failures of supervision and discipline he discusses would be expected to lead to corruption. For example, he explained why the hazards of

27

drug policing—including involvement with illicit drugs, financial temptations, limited oversight, and the high stresses of the work—increase the risks of corruption in the absence of specific accountability measures, citing academic publications in support of his opinion. Ex. A at 78-83. Dr. Shane also explicitly discussed the direct link between prompt and thorough internal affairs investigations and accountability among police officers, writing, "When adverse behaviors are not addressed promptly and effectively, they can be taken for granted, perpetuated, and eventually normalized within the department; this is commonly known as normalized deviance, and has been the focus of police corruption research for several decades." *Id.* at 100. Here again, Dr. Shane cited multiple academic publications describing and explaining how corruption is normalized and socialized within policing. *Id.* at 100 n.84. As discussed above, that is a key risk that the City's own Commission on Police Integrity identified as a top priority for the City (and the City did nothing to address). Defendants cannot recast Dr. Shane's opinion as mere say-so by ignoring his analysis and the sources he cited.

There is also ample evidence connecting the general, known risks of drug policing to the specific pattern of misconduct exhibited by the Watts Team, which Dr. Shane discusses. For example, Defendant Mohammed was caught taking bribes in or around December 2007, as acknowledged by the then-head of CPD's Internal Affairs Division, Debra Kirby. Ex. A at 88. As early as 1999, Defendant Watts's name had surfaced as a "corrupt cop" who "was ripping off drug dealers and selling drugs," according to a former CPD officer who worked in internal affairs. *Id.* As is well-documented in the record, Defendants Watts and Mohammed were indicted for stealing money they believed to be drug proceeds and pleaded guilty to federal felony charges for that offense. Further, as discussed below in Section VI, Defendant Jones admitted to lying under oath about his participation in arrests during his team on Defendant Watts's squad,

and Defendant Mohammed admitted that the entire team's practice was to falsely list officers on arrest reports who had not in fact participated in those arrests. And as a group, the Defendant Officers racked up hundreds of citizen complaints of abusive behavior, including complaints that they framed innocent people and stole money from civilians.

Putting aside the abundant evidence that the Defendant Officers did, in fact, engage in dishonest acts and improper and illegal activities, the purpose of Dr. Shane's testimony is not to deliver a "bottom line" opinion on *Monell* liability. This evidence is related to the City's obligation (and failure) to guard against corruption in narcotics units. *Cf. United States v. Foster*, 939 F.2d 445, 451–52 (7th Cir. 1991) (holding expert testimony on dynamics of narcotics trafficking and investigation would help jury, which was unlikely to be familiar with that specialized area).

**V.     There is no reason to bar Dr. Shane from discussing the relevant sources he reviewed.**

Defendants seek to bar 12 pages of opinions contained in Dr. Shane's report at pages 72-83 because the evidence there—including evidence derived in part from the reports discussed in Section II(A) above—is too prejudicial to the City. Dkt. 172 at 21-23. This issue would be better addressed closer to trial when the Court has a full picture of the evidence that will likely be presented to the jury. If, however, the Court rules on the merits of this issue now, Defendants' request to limit Dr. Shane's testimony should be denied (and Defendants should not be allowed to relitigate the issue again at the *in limine* stage).

As discussed in Section II(A), the Police Accountability Task Force report is admissible as containing factual findings from a public office's legally authorized investigation and as the statement of an authorized person or agent of an opposing party. The City's own conclusion through that Task Force, in 2016, was that "CPD's history is replete with examples of wayward

29

officers whose bad behavior or propensity for bad behavior could have been identified much earlier if anyone had viewed managing this risk as a business imperative." Ex. A at 74. Dr. Shane discusses the case of Jerome Finnigan, who was indicted on criminal charges in 2006, and who was the subject of 89 CRs between 2000 and 2008, and 161 CRs in his career. *Id.* at 74-75. The Report acknowledges that CPD never attempted to "intercede in [Finnigan's] obvious pattern of misconduct." *Id.* at 75. This is a direct example of CPD's failed supervisory and disciplinary systems, and Defendants offer no reason why Dr. Shane may not rely on the City's own report as evidence on that point. Dr. Shane is not "parroting" the Report; he is relying on it as one source among many of the City's disciplinary and supervisory practices.

Defendants complain that the four reports they take issue with (the Metcalfe Report, Commission on Police Integrity Report, Police Accountability Task Force Report, and Department of Justice Report) "unfairly prejudicial . . . in particular [to] the Defendant Officers" and will lead to a parade of horribles—an extensive debate over the scope and nature of these reports and the City's institutional response to them (including, for some reason, the consent decree put in place following the DOJ Report). Dkt. 172 at 22-23. That argument fails as well. Dr. Shane will provide his opinion and may explain that he formed his understanding of the City's practices through numerous documents, including the reports of City-appointed task forces. The Court will make trial rulings about relevance and proportionality and the parties will be bound by those rulings. But Dr. Shane is capable of efficiently describing the basis for his opinion without bringing in irrelevant information. And it is unfair for Defendants to ask the Court to make proportionality rulings at this stage, without the benefit of the pretrial materials the parties will provide or the context of any rulings the Court may make before that point.

30

The Defendants further overreach by asking the Court to exclude the entirety of Dr. Shane's opinions from pages 72 to 83 of his report. That section cites dozens of articles and reports addressing the relevant history of CPD's disciplinary and supervisory systems and is by no means limited to the four sources Defendants take issue with. For example, it includes a detailed discussion of standards for early warning systems and the City's failure to deploy an adequate system of that kind. Ex. A at 76-78. It also discusses the City's failures to proactively monitor groups or units of officers on a proactive basis or to focus such supervision on the most at-risk units. *Id.* at 78-83. The Court should reject Defendants' premature and inappropriately broad request to bar this testimony.

**VI.     Dr. Shane's opinions on Plaintiff's arrests are reliably formed and relevant.**

Defendants argue to exclude Dr. Shane's opinions regarding the above-discussed arrests and associated reports, but their contentions lack merit. Dkt. 156 at 6-10. Dr. Shane described generally accepted standards in police investigation and report-writing and described how the Defendant Officers' actions deviated from those standards. That is a standard methodology and a bread-and-butter police practices opinion, and is relevant to the jury making fact determinations about the Defendant Officers' states of mind—a required element of Plaintiff's claims. *Jimenez*, 732 F.3d at 721; *see also Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (discussing relevance of deviation from standard police practices to state-of-mind opinions).

**A.     Dr. Shane offered a sound opinion that the reports of Mr. Gipson's January and May 2003 arrests violated generally accepted standards.**

As Dr. Shane noted, Defendant Kallatt Mohammed has testified that Defendant Watts and the other Officer Defendants had a practice of listing the entire team as participants in arrests even if some members were not present. Ex. A at 107. In effect, the Officer Defendants engaged in "open casting" for their drug arrests—by failing to document who did what, any officer could

31

play any role at trial and claim to have been involved even if they were not. Dr. Shane opined that this method of writing arrest reports violated nationally accepted standards because such reports are not valuable to the prosecutor and are easily falsified. *Id.* at 108-10. Defendants' reports of Plaintiff's January 4, 2003 and May 8, 2003 arrests failed to comply with those standards. *Id.* at 113.

The offending reports, quite simply, make it impossible to tell what any given officer did or saw during the arrests. The January 4, 2003 arrest report and vice case report describe "R/Os" as making observations, breaking surveillance, and effecting an arrest, but does not specify which of the **nine** officers who were involved in the surveillance took any such action:

Ex. O (1/4/03 arrest report)



Ex. P (1/4/03 vice case report):

```
IN SUMMARY: R/Os RECEIVED INFORMATION FROM A C.I. THAT TWO M/Bs KNOWN AS BOB & FUZZ WOULD BE DELIVERING NARCOTICS TO
527 E. BROWNING. THE C.I. STATED THAT BOB WOULD BE DRIVING A GREEN CAR AND THAT FUZZ WOULD BE IN A SILVER CAR SIMILAR
TO AN UNMARKED POLICE VEHICLE. R/Os AND THEIR SGT. THEN SET UP SURVEILLANCE POINTS WITHIN THE BUILDING AND OUTSIDE
THE PERIMETER. AFTER SITTING ON SURVEILLANCE FOR MORE THAN AN HOUR, R/Os OBSERVED VEHICLES MATCHING THE DESCRIPTIONS
GIVING CIRCLING THE AREA. THE DRIVER OF THE SILVER NOW KNOWN AS OFF.#2 PARKED THAT VEHICLE IN THE REAR OF 527 E.
BROWNING AND APPROACH THE REAR DOOR. THE DRIVER OF THE GREEN VEHICLE NOW KNOWN AS OFF.#1 CONTINUED TO CIRCLE THE AREA.
OFF.#2 WAS THEN MET AT THE REAR DOOR BY FIVE M/Bs NOW KNOWN AS OFFS.#3,4,5,6,&7. OFF.#2 WAS THEN HEARD BY R/Os TELL
OFFS.#3 & 4 "YOU TWO ARE GOING TO WORK THE PACK". OFF.#2 THEN TOLD OFFS.#5,6,&7 "TALL GOING TO WORK SECURITY RIGHT
BACK HERE". OFF.#2 THEN WAITED UNTIL HE SAW OFF.#1 APPROACHING AGAIN AND THEN WAVED HIS HAND FOR HIM TO COME INTO THE
PARKING LOT. OFF.#1 THEN PARKED HIS VEHICLE IN THE LOT AND APPROACHED THE BUILDING ON FOOT. HE WAS MET HALF WAY THERE
BY OFF.#2. OFF.#1 HE REACHED INTO HIS FRONT PANTS POCKET AND HANDED A CLEAR PLASTIC BAG CONTAINING SUSPECT NARCOTICS
TO OFF.#2. OFF.#1 THEN RETURNED TO HIS VEHICLE AND WAITED. OFF.#2 THEN RETURNED TO WHERE OFFS.#3,4,5,6,&7 WERE. HE
THEN GAVE OFFS.#3&4 A BUNDLE OF SUSPECT NARCOTICS. HE TOLD OFF.#3 TO GIVE OFFS.5,6,&7 THERE "WAKE-UP". THIS TERM IS
KNOWN TO R/Os AS ONE SMALL ZIPLOCK BAGGIE OF SUSPECT NARCOTICS FOR PAY FOR WORKING SECURITY. OFF.#2 THEN RETURNED TO
VEHICLE AS R/Os BROKE THE SURVEILLANCE POINTS. R/Os THEN STOPPED OFFS.#3,4,5,6,&7 IN THE FIRST FLOOR HALLWAY. R/Os
THEN RECOVERED FROM OFF.#3 (ZZ) SMALL CLEAR ZIPLOCK BAGGIES WITH WHITE POWDER SUSPECT HERION AND A BUNDLE OF U.S.C.
TOTALING $129.00 FROM HIS HAND. OFF.#4 HAD (20) SMALL CLEAR ZIPLOCK BAGGIES WITH WHITE POWDER SUSPECT HERION IN HIS
HAND WHICH WAS RECOVERED. R/Os RECOVERED FROM OFF.#5 (3) SMALL CLEAR ZIPLOCK BAGGIES WITH WHITE POWDER SUSPECT HERION
FROM HIS HAND. OFFS.#6&7EACH WAS IN POSSESSION OF (1) CLEAR ZIPLOCK BAGGIE WITH WHITE POWDER SUSPECT HERION WHICH
WAS RECOVERED. OFFS.#1&2 TRIED TO FLEE THE SCENE IN THEIR VEHICLES, BUT WAS STOPPED AND PLACED IN CUSTODY IN THE
PARKING LOT. OFF.#2 HAD A CLEAR PLASTIC BAG CONTAINING (53) SMALL ZIPLOCK BAGGIES WITH WHITE POWDER SUSPECT HERION
IN HIS JACKET POCKET WHICH ALSO WAS RECOVERED BY R/Os. ALL THESE OFFENDERS WERE PLACED IN CUSTODY AND TRANSPORTED
TO THE 002 DISTRICT FOR PROCESSING. ALL THE THESE EVENTS OCCURRED WITHIN THE IDA B. WELLS CHA COMPLEX AND WITHIN
1000 FT. OF DOOLITTLE ELEMENTRY SCHOOL.
```

The May 8, 2003 vice case report exhibits the same flaw, except it refers vaguely to "A/O's" – arresting officers. That report lists a "first arresting/appearing officer," a "second arresting officer," and six other officers "assisting arrest," and does not state who took which actions relative to the arrest. Ex. Q (5/8/03 arrest report):

```
*****************-B-424                                              02637
THIS IS AN ARREST BY P.H.S. TACT UNITS 4512B,C,&D. THE ABOVE SUBJECT WAS OBSERVED BY A/Os THE
BUILDING AT 574 E. BROWNING AND APT.#604 CARRYING A BLACK BACK-PACK. UPON A/Os GOING TO THAT
LOCATION, THE SUBJECT ATTEMPTED TO THROW THE BACK-PACK OUT OF THE WINDOW. A/Os PREVENTED THE
SUBJECT FROM DOING SO AND RECOVERED THE BACK-PACK. INSIDE THE BACK-PACK WAS A LARGE PLASTIC
BAG W/WHITE POWDER SUSPECT HERION AND SEVERAL OTHER ITEMS USED IN THE MANUFACTURING/DELIVERY
OF HEROIN. THE SUBJECT WAS PLACED IN CUSTODY AND TRANSPORTED TO UNIT 715 FOR PROCESSING. ALL
THE RECOVERED WERE INVENTORIED AS SUCH.
```

Defendants quibble at the margins of Dr. Shane's opinion because there is no contesting his fundamental insight: the officers should have, but did not, specify who took what action during their arrests of Gipson. Notably, there is evidence in the case that the reports were falsified (above and beyond the testimony of Plaintiff and other arrestees). Defendant Mohammed pled the Fifth when he was asked whether the January and May 2003 reports were accurate and whether Gipson had been framed. Ex. R (Mohammed 11/18/2019 Dep.) at 100:18-104:1; 104:13-107:23.

**B.** **Dr. Shane can opine that the reports he reviewed do not meet accepted standards because they obfuscate the details of the arrest to prosecutors.**

Defendants take issue with an axiomatic principle of criminal investigations: police officers write police reports knowing they will be used by prosecutors. Defendants ask the Court to bar Dr. Shane from opining that the police reports written by Defendants obfuscated what each officer did, and therefore, would not have been useful to prosecutors. Dkt. 156 at 5-6.

Defendants ignore that Dr. Shane has provided ample support for his opinion that when officers write incomplete, misleading, and false reports, they impede and misdirect criminal prosecutions. As Dr. Shane notes in his report, "one of the primary goals of a police report is to serve as an aid for prosecutors to use when conducting criminal proceedings for the arrest." Ex. A at 107. He further relies on standards from the International Association of Chiefs of Police that elucidate what content and level of detail is necessary to meet accepted standards in police reports. *Id.* There is no merit to Defendants' contention that Dr. Shane, an experienced police officer and scholar, does not understand or is not qualified to testify about how police reports are used by prosecutors. It is entirely proper for Dr. Shane to comment on deviations from generally accepted standards. *Jimenez*, 732 F.3d at 721–22.

**C.** **Defendants' criticisms of Dr. Shane's opinion about the January 4, 2003 and May 8, 2003 arrest reports lack merit.**

First, Defendants claim that Dr. Shane made "misrepresentations" regarding Defendant Mohammed's deposition and the vice case report. Dr. Shane noted a contradiction: the vice case report says that the "R/O's," i.e., the Watts Team members listed in the report, had "set up surveillance points within the building and outside the perimeter." Ex. O (1/4/03 vice case report). But at his deposition, Mohammed testified that all the Watts Team members involved conducted surveillance from a single apartment. Ex. S (Mohammed 11/15/03 Dep.) at 80:16-82:5. Defendants claim that the vice case report could have been referring to patrol officers

34

outside the building, but that is not a natural reading of the report, and the jury can decide the disputed issue in any event. Defendants also claim that there is no conflict between the Vice Case Report—which states that the "R/Os" observed Gipson receive, and then give to another person, "a clear plastic bag containing suspect narcotics"—and Mohammed's deposition testimony, where he swore that he did not witness any drug transactions or any drugs being exchanged and he could not remember any other officer telling him that the officer had witnessed such an exchange. *Id.* at 94:25-97:24. This testimony goes exactly to Dr. Shane's point: the reports of Gipson's arrest should specify who saw him take what action prior to and during his arrest, and the reports lack any such detail. Regardless, it is an issue for cross-examination and not a reason to bar Dr. Shane's testimony.

Defendants appear to argue that it does not matter whether Mohammed's deposition testimony is true—i.e., whether the Defendants wrote fabricated reports to falsely arrest Plaintiff—because their expert Kevin Hughes, a former prosecutor, testified that the reports "contained the information he would expect them to contain" and were of the kind he typically relied on. Dkt. 156 at 8. Notwithstanding the reliability of Hughes's opinion (which is not the subject of this motion), the fact that Cook County prosecutors may have condoned insufficient reports is not a defense, and Defendants do not explain how his opinion helps them in any way. Even if it was a defense on the merits, Defendants offer no reason why that defense would provide a basis to bar Dr. Shane from offering a contrary position. Moreover, this underdeveloped argument is forfeited or waived.

Ultimately, Defendants resort to hyperbole, asserting that it is "ludicrous" and "nonsense" to suggest that the open-casting report of Gipson's arrest prejudiced Gipson in any way, because Gipson could have moved to quash his arrest or suppress evidence and called the officers to

testify. Dkt. 156 at 9. Defendants ignore that Gipson did exactly this: he moved to suppress his arrest. Their response also illustrates why Dr. Shane's opinion would be useful to the jury: it was easier for the Defendant Officers to lie about their false arrest of Plaintiff because they were allowed to write vague reports that did not tie them down to any particular account of the arrest—i.e., which officer did and saw what in the course of the arrest and investigation. It was harder for the Department to hold officers accountable, and harder for criminal defendants to impeach lying officers, because the Department did not require complete and accurate reports of arrests, as was the nationally accepted standard. The fact that officers could be examined about their actions does not diminish the harms caused by the City's deficient practices.

Finally, Defendants argue that Dr. Shane's opinion about the May 8, 2003 arrest report (that it, too, violated accepted standards because it did not specify which officer took what action) is "nothing more than a commentary on how the reports could have been written better." Dkt. 156 at 9. That criticism entirely ignores Dr. Shane's actual analysis: he identified an applicable standard, applied it to the police reports written by Defendants, and concluded that their failure to identify what officer took which action in the arrest was a substantial deviation from accepted standards, which, again, is a routinely admitted police practices opinion. Defendants' subsequent argument—that "it is not difficult for either party to find out what each officer did in an arrest"—is entirely meritless. Twenty-one years later, the Defendant Officers still cannot clearly account for who saw or did what during the arrests of Leonard Gipson because they were not required to memorialize that information. This is a trial argument for Defendants and provides no *Daubert* basis to bar Dr. Shane's opinions.

**D.      Whether Dr. Shane's opinion on Plaintiff's August 2007 arrest report is admissible depends on Defendants' trial arguments.**

Dr. Shane acknowledged that the vice case report documenting Plaintiff's arrest dated August 28, 2007 did not suffer the same flaws as the 2003 reports because the 2007 report provides some detail about which officer took which actions. Ex. A at 113. He also observed that if the jury credits Plaintiff's account of being falsely arrested, then the August 28, 2007 report violates generally accepted policing practices because it is fabricated. *Id.* Defendants complain that Dr. Shane is improperly "assessing credibility," Dkt. 156 at 10, but he does no such thing: he was careful to couch his conclusion as a hypothetical. If the jury believes Gipson that he was framed, then the report fails to meet generally accepted standards.[5]

Defendants also accuse Dr. Shane of taking a "cheap shot" because it would be "obvious" to the jury that the reports are improper if Plaintiff was, in fact, framed. Dkt. 156 at 10. But that depends on how Defendants present their defense. If Defendants intend to argue that the August 28, 2007 vice case report complied with accepted standards, Plaintiff must be allowed to present contrary opinion testimony. If Defendants do not intend to defend the report or to argue that it complied with accepted standards, they should say so, and Plaintiff would likely forego Dr. Shane's testimony on that specific report.

**VII.      Dr. Shane's opinions are not unduly prejudicial.**

Defendants contend that **all** of Dr. Shane's opinions should be barred because they are too unfairly prejudicial for the jury to hear. Dkt. 156 at 13. This argument is a pure strawman. Defendants summarize the entirety of Dr. Shane's thoroughly considered and well-reasoned

---

[5] To the extent that Defendants are arguing that Shane should not base an opinion on the assumption that Gipson is innocent, that argument fails as well. *See, e.g.*, *Baker v. City of Chicago*, 16-CV-8940, 2024 WL 5114168, at *6 (N.D. Ill. Aug. 20, 2024) ("an expert may give an opinion based upon factual assumptions even where the fact is disputed, so long as there is evidence to support such facts").

opinion in a single sentence: "that the Defendant Officers were inevitably going to end up corrupted by virtue of the simple that they were involved in narcotics-related cases." *Id.* Of course, Dr. Shane never said anything like that, in his report or during his depositions.

As described above, Dr. Shane will explain to the jury that there are well-known and well-documented risk factors requiring police departments to take proactive action to prevent corruption in narcotics units, like the Watts Team. Dr. Shane already acknowledged that he could not say that all narcotics officers would necessarily succumb to corruption. Ex. C (Shane Dep.) at 289:9-290:18. Frankly, it is bizarre to imagine that access to drugs, money, independence, and suspects with a motive to pay off officers would **not** increase the risk of corruption. And as already discussed, that is a key risk that the City's own Commission on Police Integrity identified as a top priority for the City (and the City did nothing to address). This evidence is central to Plaintiff's *Monell* claims and should not be excluded. Defendants have not identified any other way in which Dr. Shane's opinions would unduly prejudice the Officer Defendants, and having chosen to present the issue here, they should not be allowed to relitigate the issue during motions *in limine*.

Finally, Defendants argue that Dr. Shane should not be allowed to testify that officers on *Brady/Giglio* lists are not called to testify because of their dishonesty. Dkt. 156 at 12-13. The Court should wait to take that issue up until the *in limine* stage. Dr. Shane did not testify or opine, as Defendants accuse him, that the specific officers in this case were included on that list because of their dishonesty. And Dr. Shane's experience as a police officer and policing expert allows him to understand, in general, how and why officers are placed on prosecutors' *Brady/Giglio* lists. If this issue proves relevant, Dr. Shane should be allowed to opine on it.

**CONCLUSION**

Dr. Shane delivered a careful and well-reasoned opinion that will help the jury resolve issues central to Plaintiff's claims. The Court should deny Defendants' *Daubert* motions against him.

Respectfully submitted,

*/s/ Wallace Hilke*
*One of the attorneys for Plaintiff Leonard Gipson*

Jon Loevy
Arthur Loevy
Scott Rauscher
Josh Tepfer
Theresa Kleinhaus
Sean Starr
Wallace Hilke
Gianna Gizzi
LOEVY & LOEVY
311 North Aberdeen Street,
Chicago, IL 60607
(312) 243-5900
hilke@loevy.com

39