# EXHIBIT A

## FILED UNDER SEAL

# EXPERT OPINIONS OF DR. JON M. SHANE

**SUBMITTED TO:**   Wally Hilke, Esq.
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607

April 1, 2024

**PERTAINING TO:**   *Lionel White,* Plaintiff,

v.

City Of Chicago, Ronald Watts, Phillip Cline, Debra Kirby, Alvin Jones, Elsworth Smith, Jr., Kallatt Mohammed, Manuel Leano, Brian Bolton, Robert Gonzalez, And Douglas Nichols

Case No. 1:17-Cv-02877

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Leonard Gipson*, Plaintiff,

v.

City Of Chicago, Former Chicago Police Sergeant Ronald Watts, Former Officer Kallatt Mohammed, Sergeant Alvin Jones, Officer Elsworth Smith Jr.. Officer Douglas Nichols Jr., Officer Brian Bolton, Officer Manuel Leano, Officer Kenneth Young, Officer Darrel Edwards, Officer Matthew Cadman, Michael Spaargaren, Officer George Summers, Officer Calvin Ridgell, Officer Robert Gonzalez, Officer Lamonica Lewis, Philip Cline, Debra Kirby, Karen Rowan, And Any Other Yet-Unidentified Officers Of The Chicago Police Department,
Case No. 1:18-Cv-05120

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Ben Baker and Clarissa Glenn*
v.
City Of Chicago, Former Chicago Police Sergeant Ronald Watts, Officer Kallatt Mohammed, Sergeant Alvin Jones, Officer Robert Gonzalez, Officer Cabrales, Officer Douglas Nichols, Jr., Officer Manuel S. Leano, Officer Brian Bolton, Officer Kenneth Young, Jr.,

Officer Elsworth J. Smith, Jr., Philip J. Cline, Karen Rowan, Debra Kirby, and Other as Yet-Unidentified Officers of The Chicago Police Department

In The United States District Court For The Northern District Of Illinois Eastern Division

Case No: 1:16-Cv-08940

Chicago, Illinois

**PREPARED BY:**      Dr. Jon M. Shane
jmsnpd@gmail.com

# STATEMENT OF QUALIFICATIONS AND BASES OF OPINION

*Employment Record*

My name is Jon M. Shane. I am a professor of criminal justice at John Jay College of Criminal Justice, which is located at 524 W. 59th Street, New York, NY, 10019. I have been a member of the faculty in the Department of Law, Police Science and Criminal Justice Administration since January 2009. I teach graduate and undergraduate courses related to criminal justice with a concentration in policing. I also conduct research on policing. My expertise is police policy and practice and the theoretical underpinnings of the police, which are reflected in my teaching and research. My other teaching and research interests are situational crime prevention, social disorganization theory, routine activities theory, violent crime, and criminal justice statistics, particularly how statistics are used in criminal justice. In my capacity as a professor, I regularly consult with attorneys and law enforcement agencies around the country and internationally on police policy and practice issues and training programs.

Prior to my faculty appointment, I had a career in law enforcement in both civilian and sworn capacities from December 1985 to December 2005, retiring at the rank of captain from the Newark (NJ) Police Department. I began my law enforcement career on December 2, 1985 as a police dispatcher for the Clifton, New Jersey Police Department. On March 20, 1989, I became a police officer for the Newark, New Jersey Police Department. I held several positions throughout my career in both operational and administrative assignments. I was promoted to sergeant in June 1995; lieutenant in July 1998; captain in September 2000. On January 21, 2005, I was notified by the New Jersey Department of Personnel that I was eligible and qualified to be promoted to deputy chief according to state standards (certification # PL050068, January 14, 2005). The majority of my career was spent in both operational and administrative assignments drafting, reviewing, or implementing policy for the Newark Police Department. In these roles I created, revised, or reviewed policies and implementation orders governing the administration and operations of the Newark Police Department. I also provided direct advice and consultation with the Police Director, Chief of Police and other command staff members regarding agency policy that was based on research, trends, and best practices in U.S. law enforcement. Throughout my career, I supervised or managed police officers and other supervisors as they conducted criminal investigations, including homicide cases.

I began my research and teaching career in 2005 as a lecturer and an adjunct professor of criminal justice at Rutgers University and Fairleigh Dickinson University. Table 1 is a summary of my employment from 1985 to present; table 2 is a summary of my training, education and professional development, and table 3 is a summary of my related employment and experience. My curriculum vitae is attached.

**Table 1**
*Summary of Employment Record*

| Date | Agency | Assignment | Position |
|---|---|---|---|
| January 2009 Present | John Jay College of Criminal Justice, New York City | Department of Law and Police Science | Associate Professor |
| 2005/2008 | Rutgers University, Newark, NJ | Newark College of Arts and Sciences | Lecturer |
| Spring 2005 | Fairleigh Dickinson University, Teaneck, NJ | School of Administrative Science, Petrocelli College | Adjunct Professor |
| August 2004 December 2005 | Newark (NJ) Police Department | Office of the Chief of Police, Command Operations Center | Command Staff |
| April 2004 August 2004 | | Operations Bureau, North District Station | Commanding Officer |
| August 2002 April 2004 | | Office of the Police Director, Office of Policy, and Planning | Commanding Officer |
| June 2002 August 2002 | | Operations Bureau, East District Station | Commanding Officer |
| January June 2002 | | Office of the Police Director, Office of Policy, and Planning | Commanding Officer |
| April 2000 January 2002 | | Office of the Police Director, Office of Policy, Planning and Technology | Commanding Officer, Management Information Systems |
| July 1999 April 2000 | | Operations Bureau, North District Station | Tour Commander |
| July 1998 July 1999 | | Office of the Police Director, Office of Policy, and Planning | Executive Officer |
| September 1997 July 1998 | | Office of the Police Director | Special Assistant to the Police Director |
| May 1997 September 1997 | | Criminal Investigation Bureau, Violent Crime Division | Homicide Section Supervisor |
| June 1995 September 1995 | | Field Operations Bureau, East & West District Police Stations | Field Supervisor |

**Table 1**
*Summary of Employment Record*

| Date | Agency | Assignment | Position |
|---|---|---|---|
| August 1994 September 1997 | | Field Operations Bureau, Emergency Response Team | Operator and Team Supervisor |
| March 1993 May 1997 | | Office of the Police Director, Research, Analysis and Planning Division | Detective |
| November 1992 March 1993 | | Special Investigation Bureau, Special Projects Section, TARGET Team | Police Officer |
| August 1989 November 1992 | | Field Operations Bureau, South District Station | Police Officer |
| March 1989 August 1989 | | Office of the Chief of Police, Police Academy | Police Recruit |
| December 1985 March 1989 | Clifton (NJ) Police Department | Communications Division | Police Dispatcher |

*Education and Professional Development*

I hold a baccalaureate degree (October 2002), Master of Arts degree (January 2005) and doctoral degree (October 2008) in criminal justice from Rutgers University. I also hold a certification in non-profit management (August 2004) from Rutgers Graduate School of Public Administration. During my law enforcement career, I attended three senior management programs for police leadership: 1) 193rd Session of the FBI National Academy (April 5 – June 19, 1998); 2) 25th Session of the Senior Management Institute for Police (June 21, 2001); and 3) Police Foundation Visiting Police Fellowship program, Washington, D.C. (January – June 1997).

The FBI National Academy is a professional course of study for U.S. and international law enforcement leaders that serves to improve the administration of justice in police departments in the United States and abroad and to raise law enforcement standards, knowledge, and cooperation worldwide. The Senior Management Institute for Police (SMIP) is a program of the Police Executive Research Forum that provides senior police executives intensive training in the latest management concepts and practices used in business and government. SMIP promotes general management theory, policy development, planning processes, organizational structure, and behavior. The Visiting Police Fellowship program at the Police Foundation affords police leaders the opportunity to work with nationally recognized experts in policing, police policy, and research. The program allows the

fellow to benefit from the specialized skills of individual relationships and exposure to state-of-the-art ideas that promote professional growth through research, training, and technology.

During my tenure in the Newark Police Department, I was a state certified police academy instructor (April 15, 1993 – December 31, 2004) and a member of the Newark Police Emergency Response Team (December 1994 – September 1997). In my capacity as a police academy instructor, I taught various courses to recruit-level and in-service personnel including agency rules and policy, search and seizure, use of force, chemical agents, and tactics. In my capacity as an ERT member and supervisor, I was trained as a chemical agents instructor by the FBI and taught recruit-level and in-service personnel on the types, effects, and consequences of chemical agents.

My training sessions often combined classroom and practical exercises to add dimension and depth to the classroom material. Practical exercises allow trainees to directly apply the knowledge, skills, and abilities they acquired in the classroom to live sessions in a supervised manner. This gives the trainee immediate feedback and critique about the consequences and effects of their actions through a range of simulations that are designed to add as much realism and literal truth as possible to the exercise. Table 2 is a summary of my professional development.

**Table 2**
*Summary of Education and Professional Development*

| Date | School | Degree or Certificate |
|---|---|---|
| October 1, 2008 | Rutgers School of Criminal Justice, Newark, NJ | Doctorate, criminal justice |
| January 17, 2005 | Rutgers School of Criminal Justice, Newark, NJ | Master of Arts, criminal justice |
| August 31, 2004 | Rutgers Graduate School of Public Administration, Newark, NJ | Certificate, non-profit management |
| October 1, 2002 | Rutgers University, University College, Newark, NJ | Bachelor of Science, criminal justice |
| June 21, 2001 | Police Executive Research Forum, Harvard University John F. Kennedy School of Government, Senior Management Institute for Police—Session 25, Boston, MA | Certificate of completion |
| November 3, 1998 | Value-Centered Leadership: Ethics, Values and Integrity, International Association of Chiefs of Police, Newark, N.J. | Certificate of completion |
| April 5, 1998 June 19, 1998 | Federal Bureau of Investigation, FBI National Academy, 193rd session, Quantico, Va. | Certificate of completion |
| July 1997 | Practical Homicide Investigation, Vernon J. Geberth, Newark, NJ | Certificate of completion |
| January 1997 June 1997 | Police Foundation, Visiting Police Fellowship Program, Washington, D.C. | Certificate of completion |
| April 1995 | Chemical Agents in Law Enforcement Instructor, Federal Bureau of Investigation, Ft. Dix, NJ | Certificate of completion |

**Table 2**
*Summary of Education and Professional Development*

| Date | School | Degree or Certificate |
|------|--------|----------------------|
| June 25, 1993 | Advanced Criminal Investigations, Essex County Police Academy and Federal Bureau of Investigation, Cedar Grove, NJ | Certificate of completion |
| April 21, 1993 | Methods of Instruction, Newark Police Academy, New Jersey Division of Criminal Justice, Newark, NJ | Certificate of completion |
| April 15, 1993 December 31, 2004 | State Certified Police Academy Instructor, Newark Police Academy, Newark, NJ | Certificate of completion |
| November 18, 1992 | New York-New Jersey Anti-Car Theft Committee, National Insurance Crime Bureau, Tarrytown, NY | Certificate of completion |

*Related Employment and Experience*

In addition to my law enforcement career and my research and teaching career, I have related experience in police administration, criminal justice, and research. Table 3 summarizes my employment and related experience.

**Table 3**
*Related Employment and Experience*

| | |
|---|---|
| March 2006 July 2006 | Consultant to Essex County College, Newark, NJ to assist with design and implementation of a geographic information system (GIS) training program for law enforcement and homeland security initiatives |
| February 2005 September 2005 | *Staff Member*, NJ Attorney General's Office - Camden Commission for Public Safety. Final report accessible at http://www.state.nj.us/lps/com-report-camden.pdf |
| | *Research Associate, Rutgers Police Institute.* Conducted public safety research and a police management study in Camden, NJ as a staff member of the *Camden Commission for Public* Safety. Research included a management study on efficiency and recommendations on best practices for organizational change, deployment, and sustained crime control initiatives. |
| May 2004 Present | *Senior Research Associate, Police Foundation Washington, D.C.* Currently, serving as a senior research associate to the Police Foundation on a variety of topics related to policing. |
| October 2003 May 2004 | *Research Team Member, Rutgers Center for Mental Health.* Conducted research on police interactions and responses to persons with mental health issues. Study included conducting on site interviews with police officers as well as calls for service data analysis. |
| September 2003 September 2004 | *Differential Police Response: Neighborhood Social Disorganization and Police Response Time to Domestic Violence Calls.* Principal investigator and author of explanatory research on police response time to domestic violence calls in Newark, New Jersey. The objective was to explain the relationship between indicators of social disorganization and police response time to domestic violence calls for service. |

Based on my research, teaching, education, training, and experience, I am therefore familiar with the policies, practices and customs associated with policing, including the risks, vulnerabilities,

and uncertainties, as well as how police officers are trained, the importance of policy and how policy is developed and implemented at the line level.

*Publications*

      My publications are listed on my CV (attached).

*Basis of Opinion*

      In preparing this report and expressing my opinion, I relied on the knowledge I have acquired through research, teaching, education, and professional development that other experts in my field would consider reliable, as well as the materials reviewed and cited in my report. I also relied on my experience in criminal justice, police operations and police administration on the accepted standards of care recognized by police organizations and officials throughout the United States as the custom and practice for the administration, management and supervision of police agencies and police personnel. In this regard, I am an active member of the American Society of Criminology (ASC), the Police Executive Research Forum (PERF) and the Academy of Criminal Justice Sciences (ACJS). These organizations are dedicated to improving and promoting criminal justice policies, practices, education and professional standing for criminal justice educators and practitioners through a national and international research agenda that is multidisciplinary and focused on crime, delinquency, public policy analysis and debate.

      My professional opinion and police expertise are sought after through various invited lectures, training workshops, research grants and presentations at local, national, and international venues on crime, police management, police performance and police policy and practice issues:

1. Harris County Constable, Precinct 1, Houston, Texas (with Justice System Partners, South Easton, MA), May 2021.
2. Police policy advisor, Guatemala Public Ministry, June 2016.
3. Panelist, National Association for Civilian Oversight of Law Enforcement (NACOLE) and John Jay College of Criminal Justice, academic conference series - Building Public Trust: Generating Evidence to Enhance Police Accountability and Legitimacy, April 22, 2016.
4. United States Commission on Civil Rights, Office of Civil Rights Evaluation, panel on Police Practices and Prosecution of Police Deadly Force, invited panelist. Panel presentation, April 20, 2015.
5. Panel moderator, Bridging the Great divide: Can Police-Community Partnerships Reduce Crime and Strengthen Our Democracy? *Building Police Legitimacy with Community Stakeholders,* September 5, 2014.
6. Invited training workshop, Uruguayan National Police, Basic Course in Criminal Investigations Training Workshop, Montevideo, Uruguay*,* June 9 to June 20, 2014.
7. Police Foundation, National Institute of Justice and US Department of Justice, COPS Office, Sentinel Events Initiative on Wrongful Convictions, Washington, D.C., February 7, 2014.

8. Inter-American Development Bank policing presentation on policing and the expectations for developing countries, Washington, D.C., December 3, 2013.

9. Scholarship Program for Training in Advanced Criminal Investigations for Uruguay Police, (practice grant, Ministry of the Interior, Uruguay), October 18, 2013.

10. Invited training workshop, Uruguayan National Police, Advanced Course in Criminal Investigations Training Workshop, Montevideo, Uruguay, October 8-18, 2013.

11. Invited training workshop, Uruguayan National Police, Basic Course in Criminal Investigations Training Workshop, Montevideo, Uruguay, August 20 to September 5, 2013.

12. Invited training workshop, U.S. Army 89th Military Police Brigade, performance management training workshop, Ft. Hood, TX, July 29-30, 2013.

13. U.S. Department of Justice, National Institute of Justice roundtable on "sentinel events initiative" to uncover criminal justice system weaknesses that lead to organizational accidents, Washington, D.C., May 21-22, 2013.

14. Maritime Piracy: A Situational Analysis (research grant, PSC CUNY Award # 66767-00 44), May 15, 2013.

15. U.S. Army Military Police, Senior Leader Conference and Military Police 2020 Strategic Planning Session, National Conference Center, Lansdowne, VA, May 6-9, 2012.

16. Amendola, K., Hulcher, D. & Koval, K. with Heitman, A., & Shane, J. M. (2012). Personnel reallocation and scheduling: Final report staff scheduling options, Atlantic City, NJ Police Department. Washington, D.C: Police Foundation.

17. Amendola, K.A., Weisburd, D. Hamilton, E., Jones, G., Slipka, M., Shane, J.M & Ortiz, C[1]. (2012). The impact of law enforcement shift practices and extra-duty employment on various health, safety, performance, and quality of life measures. Washington, D.C: Police Foundation.

18. Invited panel participant, providing commentary on Roger Graef's When Cops Kill, to explore police shootings and what really happens to the brain and body of police officers when they pull the trigger. Moderated by President Jeremy Travis, John Jay College, April 22, 2013.

19. Panel moderator, 23rd Annual Problem-oriented Policing Conference, Houston Police Department: Back from the Brink: Reducing Crime and Disorder in the Antoine Corridor, Presenters: Michael Hill, Ryan Watson, and Chris Schuster., October 22-23, 2012.

20. University of New Haven, Center for Advanced Policing, Innovations in Police Management Course, New Haven, CT., August 6-10, 2012.

21. Research and teaching agenda Bramshill Police College (U.K.) January 2012 – April 2012.

22. Presentation to the Chinese People's Public Security University, Police Security Bureau, on creating a nexus between police workload and budget, police policy and practice issues, Beijing, China, November 27- December 3, 2011.

23. Deterrence or System Overload? The Effect of Imprisonment and Clearance Rates on Auto Theft in the United States, Annual Meeting American Society of Criminology, Washington, D.C., November 17, 2011.

24. Open Society's Roundtable on Current Debates, Research Agendas and Strategies to address racial disparities in police-initiated stops in the U.K. and U.S.A., Panel Moderator, John Jay College of Criminal Justice, New York, August 10-11, 2011.

25. U.S. Department of State and FBI, Panel Moderator, Community Policing and Conflict Resolution, Federal Plaza, New York City, May 4, 2011.

---

[1] This research report received the 2012 Outstanding Experimental Field Trial Award from the Division of Experimental Criminology/American Society of Criminology (ASC). The award was presented to Dr. Karen Amendola et al. at the 68th annual meeting of the ASC in Chicago on November 14, 2012.

26. Lexis/Nexis Government 2011 Insight Conference, *Panel Member,* moderated by Chuck Wexler, Executive Director Police Executive Research Forum (PERF), April 5, 2011.

27. New Haven (CT) Police Department, Investigative Training Course, West Haven, CT, November 9, 2010.

28. U.S. Department of Justice COPS Office National Leadership Roundtable, *Leadership For Public Safety II,* with the Community Policing Leadership Institute (CPLI) at the John Jay College of Criminal Justice Office of Continuing and Professional Studies, April 29-30, 2010;

29. The Impact of Organizational Stress on Police Performance (research grant, PSC CUNY Award # 63310-00-41), April 15, 2010.

30. Benjamin Cardoza Law School lecture on police accountability, Professor Ellen Yaroshefsky, March 10, 2010.

31. Jamaica Constabulary Police Force, Leading Police Performance and Accountability Symposium 2010, training workshop, Kingston, Jamaica, March 30–April 2, 2010.

32. The Myth of The American Police Quasi Military Model, Annual Meeting Academy of Criminal Justice Sciences, San Diego, CA, February 26, 2010.

33. Rethinking Police Use of Confidential Informants, Annual Meeting Academy of Criminal Justice Sciences, San Diego, CA, February 23, 2010.

34. Performance Management in Police Agencies: A Conceptual Framework, Annual Meeting American Society of Criminology, Philadelphia, PA, November 5, 2009.

35. Crime Track: A Statewide Crime Data Collection System, with Christopher Andreychak, Rutgers University—School of Criminal Justice, Annual Meeting American Society of Criminology, Philadelphia, PA, November 5, 2009.

36. Implementing and Institutionalizing Compstat in Maryland Police Agencies, with the University of Maryland, Institute for Governmental Service and Research, September 24-25, 2009; October 22-23, 2009; November 20, 2009.

37. Ohio Association of Chiefs of Police, 2008 in-service training conference, Deer Creek, Ohio, April 22, 2008.

38. Florida Police Chiefs Association 56th Annual Summer Training Conference, Palm Beach Gardens, FL, June 23, 2008.

39. Virginia Association of Chiefs of Police, Annual Conference, Hot Springs, VA, August 19, 2008.

40. The Houston Area Police Chief's Association, Woodlands Public Safety Training Center, Conroe, Texas, October 28, 2008.

41. Ottawa Association of Law Enforcement Planners, Algonquin College, Ottawa, Ontario, Canada, May 5, 2007.

42. Louisiana Attorney General's Command College, Baton Rouge, Louisiana, August 8, 2007;

43. IMPACT Users Technology and Performance Conference, Saratoga Springs, NY, September 17, 2007.

44. International Association of Law Enforcement Planners, Calgary, Alberta, Canada, October 16-17, 2007.

I am also a senior research associate at the National Policing Institute (formerly Police Foundation) Washington, D.C. and I have been empaneled by the Center for Problem-Oriented Policing to

conduct research on behalf of the U.S. Department of Justice, COPS Office, where I am active in police research that has national and international implications.

My research, participation in national forums and broad reading in policing and criminology have given me the theoretical and empirical grounding for examining the impact of police operations on the community. On January 24, 2011, I was named the "highly commended award winner" by the 2010 Emerald/European Foundation for Management Development, Outstanding Doctoral Dissertation Research Award. This international competitive award is conferred upon those whose dissertation research makes a significant contribution to the field. I received the award under the *Leadership and Organizational Development* category. To broaden my perspective on crime, criminology and policing issues, I serve as an occasional peer-review member for several national and international criminal justice and policing journals, including: Crime Science (2015), Criminology (2014); Criminology & Public Policy (2012); Sociological Quarterly (2012); Police Quarterly (2011); Criminal Justice Review (2011); International Journal of Police Science and Management (2011; Criminal Justice & Behavior (2010); Journal of Criminal Justice (2010); Taylor-Francis Publishing (2010); Thompson-Wadsworth Publishing; Police Practice & Research: An International Journal (2010); Policing: An International Journal of Police Strategies & Management (2009, 2012); *Environmental Criminology and Crime Analysis* abstract review (2011, 2012 conferences); and International Journal of Comparative and Applied Criminal Justice (2010). On August 20, 2011, I accepted appointment as an *Editorial Advisory Board Member* to the International Journal of Emergency Services published by Emerald.

My teaching and course design experience has provided me with first-hand knowledge of the ways police operations and policies impact the community in a pluralistic society governed by the rule of law. My teachings at the undergraduate level are: 1) Police and the Community; 2) Introduction to Criminal Justice; 3) Introduction to Law Enforcement; and 4) Criminology. My teachings at the graduate level are: 1) Contemporary Issues in Community Policing; 2) Police Ethics; 3) Problem-Oriented Policing; 4) Issues in Criminal Justice—Police and Corrections; 5) Using Computers in Social Science—Statistics; and 6) research methods and design. On January 14, 2011, I was appointed a member of the doctoral faculty in the criminal justice program, where I am responsible for teaching and mentoring students and serving the general needs of the doctoral program. Since my appointment at John Jay College, I have won various awards and been included on the Dean's List (2008-2009; 2009-2010; 2013-2014), a status conferred by the CUNY Office of

Graduate Studies in recognition for faculty members who mentor or substantially influence a graduate student's academic success. On August 25, 2011, I was named "Mentor of the Year" by the American Society of Criminology, the leading organization for practitioners and academicians from the many fields of criminal justice and criminology. On December 9, 2013, I was named the "2014 Outstanding Mentor of the Year" by the Academy of Criminal Justice Sciences.

Directly related to my teaching experience is my participation on the curriculum committee in the Department of Law, Police Science and Criminal Justice (LPS) Administration at John Jay College. The curriculum committee is responsible for: 1) creating proposals for a contemporary curriculum; 2) identifying standards for the discipline; 3) aligning the curriculum with Middle States' accreditation standards; 4) developing measurable objectives for courses; 5) identifying course-appropriate resource materials and textbooks; and 6) identifying linkages with the college mission. As part of the LPS curriculum committee, I participated in revising the criminal justice Bachelor of Science degree (CJBS, 2013) and the police studies degree (PS, 2014). I revised the introductory course on law enforcement, a key foundational course, and created a new course on police use of force for the Police Studies degree.

My administrative experience in policing has provided me with an understanding of the manner in which police policy and practice occurs on a daily basis, from the policy level to the line level. As a command-rank officer in a major urban police department, I had a unique opportunity to gain rare insight into police administration, operations and organizational culture, something that is difficult to observe in most other ways and often hidden from outsiders. In addition to the aforementioned experience, I also relied on the data presented in the documents that are listed under exhibits in this report to formulate my opinion.

*Previous Opinions*

I have either testified as an expert at trial or by deposition in the cases listed in my CV (appended). I have been compensated for my work on this matter at a rate of $395 per hour.

## I.    CONCLUSIONS AND OPINION

Based on the available evidence and data, within a reasonable degree of professional certainty in the policing industry, I conclude that the Chicago Police Department failed to properly conduct investigations of police misconduct in accordance with nationally accepted standards, and that their failure would be expected to cause officers involved in narcotics enforcement, like the Defendants in this case, to engage in corruption and extortion and to fabricate and suppress evidence. I also conclude that the arrests and the documentation of the arrests of Ben Baker, Clarissa Glenn, Leonard Gipson, and Lionel White Sr. fell below nationally accepted standards for policing. My opinion follows.

1. **Did the Chicago Police Department follow accepted practices for conducting investigations into complaints of police misconduct?** No. The content and overall quality of internal affairs investigations is substandard. The investigations do not comport with national standards for conducting internal affairs investigations.

2. **Did the Chicago Police Department fail to supervise officers through the internal affairs process consistent with accepted industry practices when complaints against the officers were generated?** Yes. The Chicago Police Department supervisory staff knew or should have known that complaints against officers were accruing in a manner that signaled a need for intervention. The Chicago Police Department also should have taken supervisory measures to stop the adverse behavior and correct the deficiencies consistent with their agency's policies. The actions of supervisory staff are not consistent with the nationally accepted standards for police supervision. The failure to supervise the defendants in the instant case would lead a reasonable officer to conclude that the Chicago Police Department accepted the defendants' conduct.

3. **Did a pattern of allegations emerge against CPD officers between 1999 and 2011?** Yes. Clear patterns[2] of allegations emerged across various years of several types of offenses. The Chicago Police Department supervisory staff knew or should have known that clear patterns of personnel complaints were emerging across various years and several types of offenses, and should have taken measures to stop the adverse behavior and correct the deficiencies.

---

[2] A pattern is defined as given to a regular or repeated form; forming a consistent or characteristic arrangement. The patterns observed in the instant case come from the frequency and type of allegations shown in the data among a relatively small group of officers.

Overall, the data reveal that the Chicago Police Department's accountability systems (i.e., supervision and personnel investigations) are broadly ineffective for detecting misconduct and holding officers accountable when they violate CPD policy. The findings are not consistent with the nationally accepted standards discussed in my report.

4. **Did the CPD officers' actions fall below nationally accepted standards for policing with respect to the arrests of Ben Baker, Clarissa Glenn, Leonard Gipson, and Lionel White Sr.?** Yes. Aspects of the arrests of Ben Baker, Clarissa Glenn, Leonard Gipson, and Lionel White Sr. fall below nationally accepted standards. I understand that all of these individuals allege that CPD officers framed them for crimes they did not commit. Needless to say, if that is true, the conduct of the arresting officers fell below nationally accepted standards for policing. I was not retained to assess whether these individuals were framed; however, I have identified ways in which the arrests, and in particular the documentation of those arrests and other simultaneous arrests or near-simultaneous arrests fell below nationally accepted standards. I will discuss these issues in more detail below. In short, the reports of the arrests at issue are not documented in a way that would allow a third-party, such as a prosecutor, to understand which officers took action, or when they took action, with respect to the arrests at issue. Based on a review of the record, I also understand that some of the reports were signed by officers who did not witness the events at issue. In addition, some officers signed the name of other officers to the arrests reports without acknowledging that they were doing so. These practices fall below nationally accepted standards and also the CPD's own standards. Finally, at least some of these arrests may be consistent with the illegal policy that Defendant Alvin Jones discussed whereby the Watts team, and other tactical teams, would raid buildings and stop everyone in the building without first attempting to determine whether there was a legitimate law enforcement reason for the stop.

## II.    BACKGROUND AND METHODOLOGY

This report was created as part of the *In re: Watts Coordinated Pretrial Proceedings*, and I understand that it is being submitted in particular for the cases brought by Ben Baker, Clarissa Glenn, Leonard Gipson, and Lionel White Sr. Mr. Baker alleges that he was wrongfully arrested three times (two of which are the subject of his lawsuit); Ms. Glenn

alleges that she was wrongfully arrested once; Mr. Gipson alleges that he was wrongfully arrested three times; and Mr. White's estate alleges that he was wrongfully arrested once. Each of these Plaintiffs filed a contemporaneous complaint register (CR) for at least one of their arrests (in Mr. Baker's case, the CR was filed by Ms. Glenn, though he cooperated with various authorities). At the time, none of the CRs was sustained. Recently, COPA reinvestigated the CRs relating to Mr. Baker and Ms. Glenn's arrest and Mr. White's arrest, and as a result has recommended that numerous officers be fired for their misconduct related to those arrests and related arrests.

**Basis for Opinion.** The basis for the opinion is set forth below.

1. *My training and experience.* As discussed above, this report is based on my extensive experience as a police officer, police supervisor, researcher, statistician, and scholar.

2. *Chicago Police Department Discovery Materials.* The data were supplied by Plaintiff's counsel in electronic format consistent with discovery in this case. The source data are a random sample of CPD internal affairs records known as Complaint Register (CR) files from 1999 to 2011. The data were analyzed using MS Excel and Statistical Package for the Social Sciences (SPSS version 18, also known as Predictive Analytics SoftWare, PASW Statistics 18. SPSS and PASW are the same software).

3. *CR File Selection Methodology and Data Coding Process.* A list of CR numbers issued by the Chicago Police Department for internal affairs cases between 1999 and 2011 was supplied to me by Plaintiff's counsel; who received the CR files from the defendants' counsel. A more detailed description of the data I relied on for the CR numbers is contained in Appendix C. The CR files that were used in this report were drawn from a random sample of CPD CR files between those years (table 4).

| Table 4 | | |
| --- | --- | --- |
| Summary of Complaint Register Files Between 1999-2011 | | |
| Years | Cases Available | Cases Selected (1.13%) |
| 1999 | 5749 | 65 |
| 2000 | 9191 | 103 |
| 2001 | 9165 | 103 |
| 2002 | 9362 | 105 |
| 2003 | 8100 | 91 |
| 2004 | 8041 | 91 |
| 2005 | 7543 | 85 |
| 2006 | 7717 | 87 |
| 2007 | 9609 | 108 |
| 2008 | 9756 | 110 |
| 2009 | 10072 | 113 |
| 2010 | 9522 | 107 |
| 2011 | 8609 | 97 |
| **Total** | **112,436** | **1265** |

A total of 112,436 files were available for selection (1999-2011). To determine sample size, the G*Power sample size calculator software was used based on developing a multiple regression model. Using standard statistical parameters, the minimum sample size was 791 cases. Allowing for a 60% error rate in cases,[3] the total sample selected was 1,265, which

---

[3] Errors can be broadly categorized into two main groups: **1)** sampling errors and **2)** non-sampling errors.

**Sampling Errors:**

1. **Random sampling error:** This error arises due to the fact that a sample is used instead of the entire population. It is caused by the natural variation in the population and is unavoidable in sample-based research. Random sampling error cannot be eliminated, only minimized. Sampling error was minimized in the instant case by increasing the sample size by 60% from 791 to 1,265. By including the desired error rate in the sample size calculation, random sampling error was minimized. This reduces the chance of obtaining a misleading result. A larger sample size, considering the error rate, leads to increased statistical power. This means the findings are more likely to be generalizable to the entire population (i.e., the entire Chicago Police Department internal affairs process). Generalizability is critical because it allows you to confidently apply conclusions to the broader group of internal affairs cases, not just the specific sample that was drawn. Essentially, including the error rate in the sample size calculation helps to strike a balance between efficiency (collecting fewer CR files) and reliability (obtaining accurate and generalizable results to the entire Chicago Police Department). By incorporating this information, you ensure the data have sufficient statistical rigor to draw meaningful conclusions.

2. **Systematic sampling error:** This error occurs when the sampling method or procedure is biased, leading to a sample that is not truly representative of the population. Systematic sampling was eliminated by using a random method sampling method instead of non-random sampling method.

**Non-sampling Errors:**

1. **Coverage error:** This error occurs when the sampling frame (the list or source from which the sample is drawn) does not accurately represent the target population. The CPD directed Plaintiff to lists of CRs generated by public record requests and other sources in which the CPD produced records regarding its CRs, so I am comfortable relying on the CPD's identification of its CRs as the records custodian of those CRs.

2. **Non-response error:** This error arises when some units or individuals in the sample do not respond or participate in the study, leading to potential biases. The CPD directed Plaintiff to rely on previously produced lists of CRs and

resulted in proportional draw of 1.13% of the total CRs available for the time period (table 5).

| Table 5 | | |
|---|---|---|
| *Sample Size Calculation* | | |
| | | (Based on G*Power |
| | | 3.1.9.7 software for |
| Effect Size | 0.02 | multiple regression) |
| Power Level | 0.8 | |
| Predictors | 9 | |
| Alpha Level | 0.05 | |
| Sample Size | 791 | |
| Error Rate In Cases | 60% | |
| Sample size + error rate | **1,265** | |
| Proportionate draw | 1.13% | |

Once the sample size was known (n=1,265), cases were separated by each year (1999-2011) in MS Excel and assigned a position value from 1 to the highest corresponding case for that year (e.g., 1999=1 to 5,749; 2000=1 to 9,191 – see Appendix C-2.). Next, the individual cases were selected using free randomization software (Urbaniak, 2016).[4] I generated thirteen sets of data (1999-2011), one for each year, using unique numbers (no duplicates), and sorted them from least to greatest for each year to derive a proportionate sample (see exhibits for the list from each year).

As discussed below, I also analyzed the CRs according to three time periods: 1999-2003 (n=465 CRs); 2004-2007 (n=368 CRs); and 2008-2011 (n=394 CRs). The sample size for each time period is sufficiently large to ensure statistically significant findings for each time period, regardless of the population size, because even making conservative estimate about population proportion (i.e., assuming that as many as 30% of CPD CRs are generally sustained, which is a substantially higher proportion than typically observed), a sample of 321 CRs would produce statistically significant results regardless of the total population of CRs.

---

publicly available CRs, and thus I have no reason to doubt that the list I relied on for sampling is reliable and accurate.

3. **Processing error:** This error can arise during data collection, coding, entry, or analysis, leading to inaccuracies or inconsistencies in the data. I designed a codebook, trained coders, and reviewed the resulting spreadsheet for quality to address the possibility of this error.

[4] Urbaniak, G. C., & Plous, S. (2013). Research Randomizer (Version 4.0) [Computer software]. Retrieved on February 1, 2023, from http://www.randomizer.org/.

For the variable of interest here—the rate at which allegations are sustained—complaints against police officers do not follow a normal distribution. One previous study—the Police Foundation's 1993 report, "Police Use-of-Force: Official Reports, Citizen Complaints, and Legal Consequences"—found that 10.4% of citizen complaints of excessive force were sustained by city police departments.[5] As another example, from 1997-2001, 11.6% of police misconduct investigations were sustained by the New York City Civilian Complaint Review Board.[6] An eight-city study (Terrill, 2016) found that approximately 11% of all external allegations (and 2% of external excessive force allegations) were sustained across eight medium-to-large US cities.[7] In more recent years, a study using 2007 LEMAS data (Pryor, et. al, 2019) found that about one in ten (9.755%) external use of force complaints was sustained.[8] Indeed, CPD's own calculations of internal affairs dispositions—although CPD is not very clear about its basis or methodology for its calculations—reveal sustained rates in this range and well short of a normal distribution. For example, CPD's 1999/2000 annual report indicated 693 out of 5063 (13.7%) internal affairs allegations were sustained in 1999, 189/2636 (7.2%) excessive force complaints sustained in 1999, 536/3918 (13.7%) internal affairs allegations sustained in 2000, 145/2481 (5.8%) excessive force complaints sustained in 2000, 477/4941 (9.7%) sustained internal affairs investigations in 2005, 83/2707 (3.1%) excessive force complaints sustained in 2005, 283/3861 (7.3%) internal affairs investigations sustained in 2010, and 44/2907 (1.5%) IPRA investigations sustained in 2010.[9]

[5] Pate, A. M., L. A. Fridell, and E. E. Hamilton. (1993). Police Use-of-force: Official Reports, Citizen Complaints, and Legal Consequences, Volumes I and II. Washington, DC: The Police Foundation

[6] Retrieved on March 1, 2024 from https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_biannual/2001_annual.pdf

[7] The eight cities included in this study are Fort Wayne, Indiana; Columbus, Ohio; Colorado Springs, Colorado; St. Petersburg, Florida; Knoxville, Tennessee; Charlotte-Mecklenburg, North Carolina; Portland, Oregon; and Albuquerque, New Mexico. This study analyzed disciplinary data on an allegation level. From those (19.9%) were allegations of improper force; 1,234 (22.2%) were for discourtesy; and 3,221 (57.9%) were for other types of misconduct allegations. Terrill, 2016, p. 159. Terrill, W., & Ingram, J. R. (2016). Citizen complaints against the police: An eight city examination. *Police Quarterly, 19*(2), 150–179. https://doi.org/10.1177/1098611115613320.

[8] Pryor, C., Boman, J., Mowen, T. and McCamman, M. (2019). A national study of sustained use of force complaints in law enforcement agencies. *Journal of Criminal Justice, 64:* 23-33.

[9] Retrieved on March 1, 2024 from https://home.chicagopolice.org/statistics-data/statistical-reports/annual-reports/

For each study period, table 6 shows the estimated sample and the actual sample size available. Across all study periods, the sample size is sufficient to generalize the findings from the sample of CPD CRs to the entire population of CPD CRs.

**Table 6**
*Minimum Sample Size Required for Each Study Period to Ensure Generalizable Findings*

| | Study Period | | |
|---|---|---|---|
| **Parameters** | **1999-2003** | **2004-2007** | **2008-2011** |
| Margin of Error[10] | 5% | 5% | 5% |
| Confidence Level[11] | 95% | 95% | 95% |
| Population Size[12] | 41,567 | 32,910 | 37,959 |
| Estimated Sustained Rate[13] | 30% | 30% | 30% |
| Actual Sample Available | 465 | 368 | 394 |
| Minimum Sample Size[14] | 321 | 320 | 320 |

Plaintiff's counsel hired attorneys ("data coders") to code the data. A code book was developed and guided the training (see code book exhibit). On August 3, 2023, I conducted a 90-minute training session to review and instruct on the coding process with the data coders. The code book was used by the data coders. In social sciences, it is customary practice to hire coders to document data contained in voluminous documents so that the information therein can be analyzed. Further, the Newark Police Department in the early

---

[10] The **margin of error** is the amount of error that you are willing to tolerate. For example, if 90% of respondents answer *yes*, and 10% answer *no*, then you may be willing to tolerate a larger amount of error than if the respondents are split 50-50 or 45-55. Lower margin of error requires a larger sample size. By convention, social science uses the 5% margin of error standard.

[11] The **confidence level** is the amount of uncertainty you are willing to tolerate. For example, suppose there are 20 yes-no questions in a survey. With a confidence level of 95%, you would expect that for one of the questions (1 in 20), the percentage of people who answer *yes* would be more than the margin of error away from the true answer. The true answer is the percentage you would get if you exhaustively interviewed everyone. Higher confidence level requires a larger sample size. By convention, social science uses the 95% confidence level standard.

[12] The number of cases there are to choose your random sample from. The sample size for all CPD CR files between 1999 and 2011 is 112,436.

[13] As discussed above, the 30% sustained rate is a conservative estimate of the expected sustain rate for CR's. Making a more conservative estimate (i.e., a higher expected sustain rate) increases the sample size required and improves the reliability and generalizability of the findings.

[14] This is the minimum recommended size for the study period based on the parameters.

1990's used similar spreadsheets to identify and analyze police misconduct allegations.[15] The manner of analysis I have used is consistent with the available tools and practices of police departments during this time period. On January 30, 2024, once the data coding was complete, I developed a random selection of completed cases that were coded (10%, n=127) to review, and inspect for accuracy by matching the variables in the data set to the information contained in the CR file. The coded cases were selected at random by developing a randomization formula in MS Excel.[16] I reviewed and inspected all 127 files, and I did not observe any coding errors from the random CR file inspections (see Appendix C for the list of CRs that were reviewed).

The data in the CR files are relational. This means a one-to-many relationship exists when a parent record (e.g., one incident, identified by the CR number) potentially references other related records (e.g., many allegations, many officers, or dispositions).[17] The data were coded at the allegation level (1999-2011, n=4,346). The unit of analysis was switched when appropriate to accommodate the analysis. For example, one officer may receive many allegations from a single CR. If there are many allegations in a single CR, then there are many dispositions for one complaint (one disposition for each allegation). Switching the unit of analysis accommodates the one-to-many relationship in the data (e.g., one CR, many officers; one officer, many allegations; many allegations, many dispositions).

4. *Methodology for Computing Percentage of Completed Investigative Activities in the CR Files.* The unit of analysis switched from the allegation level to the CR level for this analysis. Completed investigative activities (tables 45-48) were computed by: 1) summing the yes and no

---

[15] Between 1999 and 2011, police departments were using MS Excel and Lotus 1-2-3 spreadsheet software to analyze internal affairs data, along with relational database management systems (RDBMS) (the Newark Police Department was using spreadsheets and RDBMS from at least 1993. The RDBMS systems was developed by the Police Foundation, Washington, DC known as RAMS—Risk Analysis Management System).

[16] INDEX(SORTBY(A3:A8,RANDARRAY(ROWS(A3:A1267))),SEQUENCE(E3)). This formula picks a random order for the values in A3:A1267 and then selects a certain number of values from that shuffled list based on their order (e.g., first, second, etc.). For example, if A3:A8 contains values {1, 3, 5, 7, 9}, and K3 is 2, then the formula might return 7, and 5 (depending on the random shuffle).

[17] For example, CPD Form 44.112 (Rev. 3/84) is a relational form, where it captures the incident (identified by the CR#) and may list a single officer with many allegations and many dispositions.

dimensions[18] (e.g., 305); then dividing the yes dimensions by the subtotal (e.g., 268/305=87.9%). So, for example, whether the investigating officer obtained the arrest report for any victim/complainant involved in a CR investigation, this dimension occurred 87.9% of the times in which this dimension was applicable. During the training, the coders were instructed to code the data favoring the CPD when there was evidence that the investigative activity was completed. This means the coder would code the variable "YES."

5. *Standards for Investigating Internal Affairs Cases.* The Internal Association of Chief's of Police (IACP) promulgated a model policy on conducting internal affairs investigation. The standards in effect during the relevant period were:

   a. IACP Model Policy Investigation of Employee Misconduct, July 2001.

   b. IACP Concepts and Issues Paper, Investigation of Employee Misconduct (1990).

   c. IACP Internal Affairs Training Keys Investigation of Public Complaints, Part I #529, and Part II, #530, and Part III, #531) promulgated in 2001.[19]

   All allegations lodged against a police officer must be thoroughly, objectively, and promptly investigated. As with all other investigations, lawful procedures are expected to be used to gather all evidence pertaining to the allegations lodged against the officer. Complaints must be objectively, and expeditiously investigated to ensure all information necessary to arrive at a proper disposition is collected and preserved.

   In terms of reports, records and documents, all relevant reports should be obtained and preserved as expeditiously as possible. Internal agency reports relating to a subject officer's duties should be examined. This may include arrest and investigative reports, and radio, patrol, vehicle, and evidence logs pertaining to or completed by the officer. The investigator should also examine and retrieve all electronic, computer, digital and video records, such as those records created by radio and telephone recorders, computer aided dispatch systems, mobile data terminals, in-car video systems, video surveillance systems and other forms of audio and video recording. Records and documents of any other individual or entity that

---

[18] Not applicable and refused were not included. I considered including "refused" responses in the calculation, but because it is difficult to determine whether an interaction was "refused" because of the investigator or the complainant (or witness, or other person contacted) I opted to exclude it. In any case, the "refused" category was rarely applied and including it or excluding it would not affect my conclusions.

[19] There are no important substantive differences during the 1999-2011 time period that would affect my analysis.

could prove helpful in the investigation should be examined. This may include reports from other law enforcement agencies, hospital records, medical reports, jail records, court transcripts, F.B.I. or S.B.I. records, motor vehicle abstracts, and telephone and cellular phone records. If a search or communications data warrant or a subpoena is necessary, then the investigator should obtain one.

Investigators are also expected to obtain all relevant physical evidence such as fingerprints, clothing, hair or fabric fibers, bodily fluids (DNA), stains and weapons should be handled according to established evidence procedures to avoid contamination and preserve chain of custody. With respect to radio and telephone recordings, the original recording is the best evidence and should be secured at the investigation's outset. Entire tapes or transmissions should be reviewed to reveal the totality of the circumstances.

Photographs and video recordings should be obtained if they are relevant to the investigation. For example, if a complaint involves excessive use of force, then photographs of the complainant/victim and the officer should be taken as close as possible to the time of the incident. Photographs also can be used to create a record of any other matter the investigator believes is necessary. Whenever possible, digital color photography should be used to convey accuracy.

It is important to document complainants' concerns, even if the person taking the complaint believes the concerns are unfounded or frivolous. If such complaints are not documented or handled appropriately, then public dissatisfaction will grow, fostering a general impression of agency insensitivity to community concerns. The internal affairs investigator is expected to use any lawful investigative techniques, including inspecting public records, questioning witnesses, interviewing the subject officer, questioning agency employees, conducting an area canvass, conducting surveillance, and collecting evidence to confirm or dispel the allegations.

6. *Standard for Supervising Police Personnel.* The Internal Association of Chiefs' of Police (IACP) promulgated a model policy on early warning systems (EWS). The standard in effect during the relevant period was the IACP Model Policy on Early Warning Systems (March 2002). The EWS is an aspect of supervision and internal affairs investigations that was first promulgated by the IACP in their 1990 Concepts and Issues Paper on Investigation of Employee Misconduct. An EWS is a means for supervisors to identify and assess employee

performance issues involved in potential-risk incidents and intervene where appropriate. The IACP EWS policy is an outgrowth of research conducted by the U.S. Commission on Civil Rights in 1981 that noted all police departments should develop an early warning system intended to identify problem officers, or those "who are frequently the subject of complaints or who demonstrate identifiable patterns of inappropriate behavior."[20]

In March 2001, the Commission for the Accreditation of Law Enforcement Agencies (CALEA) also promulgated the national standard for law enforcement agencies pursuing accreditation. CALEA promulgated standard 35.1.9 that declared all law enforcement agencies pursuing accreditation must develop a written directive should for EWS to identify agency employees who may require agency intervention.[21]

---

[20] U.S. Commission on Civil Rights. (1981). *Who Is Guarding the Guardians?* Washington, D.C.: U.S. Government Printing Office: 81.

[21] Commission on Accreditation for Law Enforcement Agencies. (2001). *Law Enforcement Agency Standards.* CALEA: Arlington, VA. The standard reads: "A written directive establishes a Personnel Early Warning System to identify agency employees who may require agency intervention efforts. The system shall include procedures for:
a.  provisions to initiate a review based on current patterns of collected material;
b.  agency reporting requirements of conduct and behavior;
c.  documented annual evaluation of the system;
d.  the role of first and second level supervision;
e.  remedial action; and
b.  some type of employee assistance such as a formal Employee Assistance Program, peer counseling, etc.

**Commentary**: A comprehensive Personnel Early Warning System is an essential component of good discipline in a well-managed law enforcement agency. The early identification of potential problem employees and a menu of remedial actions can increase agency accountability and offer employees a better opportunity to meet the agency's values and mission statement.

The agency's Personnel Early Warning System should be initiated when certain types of incidents occur and there should be an evaluation of collected material. Such material may include, but not necessarily be limited to: agency performance evaluations, citizen complaints, disciplinary actions, use of force incidents, internal affairs, supervisory and employee reports such as workmen's compensation claims, and traffic accidents.

The agency should not be faced with investigating an employee for a serious case of misconduct only to find there was an escalating pattern of less serious misconduct, which could have been abated through intervention. The failure of the agency to develop a comprehensive Personnel Early Warning System can lead to the erosion of public confidence in the agency's ability to investigate itself: while putting the public and agency employees in greater risk of danger.

A Personnel Early Warning System should include options and reviews available through use of force reporting (Subchapter 1 .3 , Use of Force), the disciplinary system (Chapter 26, Disciplinary Procedures), employee assistance program (Chapter 22, Compensation, Benefits, and Conditions of Work) and Internal Affairs (Chapter 53, Internal Affairs).

The first and second levels of supervision are crucial elements to a successful Personnel Early Warning System and should be emphasized in the agency's procedures.

The IACP also promulgated a series of Training Keys in 2001 on investigating public complaints that set forth the role of supervisors in policing. The IACP EWS policy notes: "It is the duty of line supervisors to directly monitor the performance and behavior of personnel under their charge on a daily basis. The EWS is a tool to assist supervisory personnel in monitoring employee performance" (IACP, 2002, p. 1). Also, IACP Training Key 530, Investigation of Public Complaints: Part II - Receiving and Processing Complaints notes: "Supervisors are generally considered to have primary initial responsibility for observing officers' behavior for revealed and corrected. Misconduct…" (IACP, 2001, p. 2).

Supervisors are a police department's most important asset for continually reinforcing evolving policies, procedures, goals, and objectives, and for ensuring that they are carried out properly. The primary responsibility for maintaining and reinforcing officer conformance with the department's standards of conduct and operational procedures is lodged with first-line supervisors, as expressed by the IACP. Supervisors are required to closely monitor and evaluate the general conduct and performance of all officers in their unit. Personnel evaluations must be the product of daily observation and close working relationships. Supervisors must remain attentive to any indications of behavioral, physical, or other problems that may affect an officer's job performance as well as any behaviors that may indicate conduct that is inconsistent with state and federal laws, as well as department policy, procedures, and rules. When observed, any information of this type that is deemed relevant should be documented immediately. When problems are detected, a supervisor should recommend additional training, counseling, or other corrective action.

Of the discovery that I reviewed, there is nothing to indicate that the Chicago Police Department supervised the officers involved in the arrests at issue here by identifying and monitoring their behavior through either an electronic or paper-based system of agency records, despite the fact that they knew or should have known that allegations were accruing and then subsequently initiating and ensuring corrective action was taken. When CRs are generated, the Department's supervisory apparatus is activated to initiate and ensure the matter is investigated consistent with accepted standards and corrective action is taken.[22]

---

[22] Chicago Police Department General Order 93-3 Complaint and Disciplinary Procedures (effective January 15, 1993).

Police supervision exists at graduated levels distinguished by ranks[23] with increasing responsibility to ensure personnel meet the legal, ethical and policy standards of the industry. As a matter of basic personnel management and human resource development, every police department in the United States has an obligation to monitor its employees' performance through its supervisors to ensure standards of workmanship, conduct, and output are maintained, that personnel are called to account, and that desired police objectives are achieved.

Police agencies recruit, select, and train officers to effectively serve the goals of the organization. Effective personnel management assumes that employee performance is assessed and evaluated on a regular basis, and that the organization collects and analyzes performance data relevant for that purpose. CR/allegation data is one element. For example, the Chicago Police Department maintains a tall organizational structure. Supervisors at every level are tasked with the responsibility to monitor personnel for compliance with industry standards.[24] This is reflected in the characteristics of the respective job class promulgated by the City of Chicago, Human Resources, Police Job Specifications:[25]

    a.  **Sergeant.** Responsible for:

---

[23] The Chicago Police Department's supervisory rank structure is: (1) Sergeant, (2) Lieutenant, (3) Captain, (4) Commander, Director, Coordinator, (5) Deputy Chief, (6) Chief, (7) Deputy Superintendent; (8) First Deputy Superintendent, and (9) Superintendent of Police (Chicago Police Department, Department Organization For Command, General Order G01-02, Effective, May 10, 2018. Retrieved on June 24, 2023 from https://directives.crimeisdown.com/directives/data/a7a57be2-1291da66-88512-91e3-fb25744de048d4ef.html?commit=7d10e9f4e8ef6cf625d86b5078446faa3d4bc730).

[24] All supervisory members of Chicago Police Department "…are responsible and accountable for the maintenance of discipline and will provide leadership, supervision and continuing training and example to ensure the efficiency of unit operations. They have the responsibility to influence subordinate members and to motivate them to perform at a high level of efficiency. They have the responsibility for the performance of all subordinates placed under them and while they can delegate authority and functions to subordinates, they cannot delegate responsibility. They remain answerable and accountable for failures or inadequacies on the part of their subordinates (CPD Rules and Regulations, p. 9, CITY-BG-059177). The CPD defines a "supervisory member" as "a member responsible for the performance of duty and the conduct of other members" (CPD Rules and Regulations, p. 9, CITY-BG-059177). This is consistent with national standards that corrective action must be taken by a supervisor (Investigation of Allegations of Employee Misconduct, IACP, April 2019, p. 3), and that "Any supervisor within the department should be authorized to accept and record a public complaint" (IACP Training Key #530, p. 2). The IACP also notes "Supervisors are generally considered to have primary initial responsibility for observing officers' behavior for potential misconduct; thus, responsibility for primary intake of public complaints reinforces their knowledge and ability to carry out this function" (IACP Training Key #530, p. 2; also see p. 4 "…the initial responsibility for complaint review should lie with the supervisor receiving the complaint."

[25] Retrieved on June 24, 2023, from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html.

      i.    …supervising subordinate personnel…

      ii.    Supervises subordinate personnel including…monitoring officer activity, providing guidance to officers on how to handle incidents, monitoring adherence to department policies and procedures, and ensuring that officers are carrying out assigned responsibilities;

      iii.    Performs various leadership and mentoring duties by observing and evaluating subordinate performance and, as appropriate, providing direction, regular feedback, counseling, and/or coaching to resolve performance problems and improve subordinate work performance;

      iv.    Observes subordinate behavior for signs of personal and/or wellness issues and suggests appropriate internal and external resources to address the issue(s);

      v.    Receives, reviews, and investigates allegations of officer misconduct and prepares and submits related documentation up the chain-of-command as required by department policy;

      vi.    Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers.[26]

b. **Lieutenant.** Responsible for:

      i.    Ensures that Sergeants are monitoring their officers' daily activities;

      ii.    Maintains an environment in which clear standards exist for acceptable behavior and performance and sets an exemplary personal example;

      iii.    Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers;[27]

c. **Captain.** Responsible for:

      i.    Serves as a final reviewer of citizen complaints and investigations of employee misconduct; recommends changes and highlights critical points before submission to the Commander;

---

[26] City of Chicago Sergeant Class Title, Code 9171, Police Job Specifications (retrieved on June 24, 2023 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

[27] City of Chicago Lieutenant Class Title, Code 9173, Police Job Specifications (retrieved on June 24, 2023 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

      ii.    Gathers and evaluates information from electronic systems directly and through reports prepared by staff to use in identifying issues; solving problems;

      iii.    Provides direction, consultation, and guidance to staff to maintain staff performance, help them resolve unusual, sensitive, or complex problems; and ensure staff compliance with policies and procedures;

      iv.    Conducts performance evaluations[28] to document staff performance; reviews performance evaluations completed by subordinate supervisors to ensure that proper procedures are followed, and evaluation processes are conducted in a standardized manner;

      v.    Reviews citizen complaints and investigations of employee misconduct to ensure the integrity of complaint investigations;

      vi.    Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers.[29]

d.  **Commander.** Responsible for:

      i.    Reviews citizen complaints and investigations of employee misconduct to ensure the integrity of complaint investigations;

      ii.    Directs research and analysis related to developing long-term plans regarding operations and developing policies and procedures to address current and potential new problems;

      iii.    Assesses and reviews complex written information including policies and procedures, legislation, case law, etc. to evaluate operations, inform decisions, and determine compliance with policies, procedures, and legal mandates;

      iv.    Reviews, assesses, and implements appropriate responses to issues based on data gathered through a variety of sources;

---

[28] Chicago Police Sergeants are required, by policy, to submit semi-annual performance evaluations of their subordinates (CPD Special Order S03-03-01, Field Operations, Bates CITY BG 59166). All supervisors are required by CPD Rules and Regulations to "…evaluate members in their assigned duties" (CPD Rules and Regulations, p. 9, CITY-BG-059177). A "supervisory member" is defined by CPD Rules and Regulations as "A member responsible for the performance of duty and the conduct of other Members" (CPD Rules and Regulations, p. 9, CITY-BG-059177).

[29] City of Chicago Captain Class Title, Code 9175, Police Job Specifications (retrieved on June 24, 2023 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

    v.   Provides direction, consultation, and guidance to staff to maintain staff performance, help them resolve unusual, sensitive, or complex problems; and ensure staff compliance with policies and procedures;

    vi.   Conducts performance evaluations to document staff performance; reviews performance evaluations completed by subordinate supervisors to ensure that proper procedures are followed, and evaluation processes are conducted in a standardized manner;[30]

e. **Deputy Chief.** Responsible for:

    i.   Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers;

    ii.   Direction and management of a major bureau or division within the Chicago Police Department (e.g., Internal Affairs);

    iii.   Demonstrated commitment to holding supervisory personnel accountable for the timely and effective execution of organizational policy by individuals under their command;[31]

f. **Chief.** Responsible for:

    i.   Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers;

    ii.   Demonstrated commitment to holding supervisory personnel accountable for the timely and effective execution of organizational policy by individuals under their command;[32]

g. **Deputy Superintendent.** Responsible for:

---

[30] City of Chicago Commander Class Title, Code 9752, Police Job Specifications (retrieved on June 24, 2023 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html). The job specifications are consistent with the responsibilities described in CPD General Order 86-4, District Commanders (effective June 10, 1986).

[31] City of Chicago Deputy Chief Class Title, Code 9796, Police Job Specifications (retrieved on June 24, 2023 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

[32] City of Chicago Chief Class Title, Code 9785, Police Job Specifications (retrieved on June 24, 2023 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

     i.    Manages CPD administrative functions such as Field Services, Records Inquiry, Performance Management, Training Division, and Professional Counseling;

     ii.    Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers;

     iii.    Demonstrated commitment to holding supervisory personnel accountable for the timely and effective execution of organizational policy by individuals under their command; [33]

h.   **First Deputy Superintendent.** Responsible for:

     i.    Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers;

     ii.    Demonstrated commitment to holding supervisory personnel accountable for the timely and effective execution of organizational policy by individuals under their command;[34]

i.   **Superintendent of Police.** Responsible for:

     i.    The Superintendent of Police will plan, organize, staff, direct and control the personnel and resources of the Department to attain the goals and implement the regulations set forth herein;[35]

     ii.    The Superintendent is charged with the responsibility and has the authority to maintain discipline within the department;[36]

     iii.    Directs the organization, promotion, and disciplinary action of all department members;

     iv.    Complies with department rules, regulations, policies, and all Federal, State, and Municipal laws that govern the activities of Police Officers;

---

[33] City of Chicago Deputy Superintendent Class Title, Code 9782, Police Job Specifications (retrieved on June 24, 2023 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

[34] City of Chicago First Deputy Superintendent Class Title, Code 9781, Police Job Specifications (retrieved on June 24, 2023 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

[35] Chicago Police Department Rules and Regulations, pp. 8-9, Bates BG59176-59177.

[36] Chicago Police Department Complaint and Disciplinary Procedures Policy, effective January 15, 1993, Bates BG-59013.

v.   Demonstrated commitment to holding supervisory personnel accountable for the timely and effective execution of organizational policy by individuals under their command.[37]

The duties reflected in the job characteristics promulgated by the Chicago Police Department are intrinsic to supervision and have been ever since the ranks were established. This is not limited to Chicago but is a general proposition that applies to all police departments. The responsibilities exist to provide direction and control over personnel and to ensure personnel meet their legal and ethical obligations as they carry out their assigned duties. Although the means to achieve these ends may change over time (e.g., the advent of technology), the standards remain constant. Identifying problematic employees is necessary to protect citizens from police misconduct.

## III.   PATTERN OF ALLEGATIONS AGAINST CHICAGO POLICE OFFICERS 1999-2011

The study period is between 1999 and 2011. One set of analyses includes the full data set (1999-2011). I also analyzed three specific time periods: **1)** 1999-2003; **2)** 2004-2007; and **3)** 2008-2011. I wanted to analyze shorter time periods, each consisting of about a third of the study period, because doing so allows me to test whether my conclusions hold across specific time periods as well as the entire study period. If I had only analyzed the data from 1999-2011, then it would be hard to determine whether the conclusions I reached regarding misconduct investigations were the same in the early part of the period (e.g., around 1999 or 2000) and the final part of the period (e.g., around 2010 or 2011). I identified study periods that would allow me to maintain a sufficient sample size, as discussed below, while also being of a short enough time period each (4-5 years) to allow me to be confident that the trends I identified held for the entire time period. In the full data set there are 1,226 unique CR numbers (i.e., internal affairs investigations) that resulted in 4,346 allegations. Five (5) CR numbers were not included in the analysis because the date the CR was initiated fell outside

---

[37] City of Superintendent of Police Class Title, Code 9957, Police Job Specifications (retrieved on June 24, 2023 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

of the 1999-2011 time period (CRs) and 34 CR numbers were not included because the CRs contained no allegations of misconduct.[38]

1. **Summary of Allegations Against Personnel.** The personnel allegation data is described as follows: The data range is 13 years, from 1999 to 2011, consisting of 4,346 allegations (table 7), 1,227 unique investigations, and 12 unique allegation categories (table 8).

**Table 7**
*Allegations by Year 1999-2011*

| Year | n | % |
|------|------|--------|
| 1999 | 209 | 4.8% |
| 2000 | 309 | 7.1% |
| 2001 | 318 | 7.3% |
| 2002 | 389 | 9.0% |
| 2003 | 357 | 8.2% |
| 2004 | 299 | 6.9% |
| 2005 | 303 | 7.0% |
| 2006 | 291 | 6.7% |
| 2007 | 376 | 8.7% |
| 2008 | 309 | 7.1% |
| 2009 | 414 | 9.5% |
| 2010 | 421 | 9.7% |
| 2011 | 351 | 8.1% |
| **Total** | **4346** | **100.0%** |

**Table 8**
*Allegations by Category 1999-2011*

| Allegation | n | % |
|------------|------|--------|
| Excessive Force | 969 | 22.3% |
| Operation or Personnel Violations | 926 | 21.3% |
| Demeanor | 823 | 18.9% |
| Unlawful Search, Entry, or Arrest | 771 | 17.7% |
| Theft / Improper Inventory Procedure | 317 | 7.3% |
| Property Damage | 215 | 4.9% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 122 | 2.8% |
| Domestic Violence | 75 | 1.7% |
| Integrity Violations - Non-Inculpatory | 58 | 1.3% |
| Other | 33 | 0.8% |
| Coercive Interrogation / Coerced Confession | 25 | 0.6% |
| Juvenile Policy Violations | 12 | 0.3% |
| **Total** | **4346** | **100.0%** |

2. **Pareto Analysis.** The Pareto Principle (also known as the 80-20 Rule) is a principle of analysis that indicates certain types of events are highly concentrated among particular

---

[38] The five CRs that were not included because the CR initiated date was outside the 1999-2011 timeframe are: 1050651; 1050976; 1042276; 251448; 1032062. Not included because the CR contained no allegations of misconduct: 1010879; 1010926; 1012973; 1018970; 1019588; 1033299; 1029256; 1030859; 1032988; 1034928; 1035667; 1036846; 1036898; 1037528; 1038742; 1038882; 1039211; 1041093; 1041102; 1041236; 1043618; 1045219; 1045604; 1045975; 1047620; 1047692; 1048559; 1048617; 1049054; 1049513; 1050415; 1050859; 1050937; 1029772.

people, places, and things (in the instant case, allegations against Chicago police officers). This kind of concentration is not peculiar to allegations against police officers but is almost a universal law. For example, a small portion of the population holds most of the wealth. As applied to police personnel allegations, the principle is useful to determine where allegations are concentrated so police supervisors and managers can focus resources and attention to those allegations that will that yield the greatest preventive benefits.

Table 9 shows the allegation categories based on frequency. Eighty percent of the allegations emanate from 33% of the categories. Excessive force is the leading allegation, which is criminal, and should be treated with the utmost preventive action by CPD. There was a clear pattern of allegations arising over the study period, most of which dealt with a physical confrontation (e.g., excessive force), actions that affect legitimacy and community perception (demeanor), and Fourth Amendment violations (unlawful entry, search, or arrest).[39] The allegations that affect legitimacy are contrary to the duties listed in the job specifications for every rank in the Chicago Police Department, which is to promote positive community relations. Had the Superintendent of Police and the command staff prioritized the effort to address the most common allegations—consistent with their job specifications—then they would have been able to intervene and stop the defendants' adverse behavior through a personnel improvement plan and/or other adverse employment action. This is why supervisors at every level in the CPD are tasked with the responsibility to monitor personnel for compliance with industry standards.

---

[39] Because "Operation or Personnel Violations" is a broad category, I do not find its prevalence as significant as the other most-frequently used allegation types.

**Table 9**
*Pareto Analysis of Allegations 1999-2011*

| Allegation | n | % | Cum. % | Cum. % of Allegation Categories |
|---|---|---|---|---|
| Excessive Force | 969 | 22.3% | 22.3% | 8.3% |
| Operation or Personnel Violations | 926 | 21.3% | 43.6% | 16.7% |
| Demeanor | 823 | 18.9% | 62.5% | 25.0% |
| Unlawful Search, Entry, or Arrest | 771 | 17.7% | 80.3% | 33.3% |
| Theft / Improper Inventory Procedure | 317 | 7.3% | 87.6% | 41.7% |
| Property Damage | 215 | 4.9% | 92.5% | 50.0% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 122 | 2.8% | 95.3% | 58.3% |
| Domestic Violence | 75 | 1.7% | 97.1% | 66.7% |
| Integrity Violations - Non-Inculpatory | 58 | 1.3% | 98.4% | 75.0% |
| Other | 33 | 0.8% | 99.1% | 83.3% |
| Coercive Interrogation / Coerced Confession | 25 | 0.6% | 99.7% | 91.7% |
| Juvenile Policy Violations | 12 | 0.3% | 100.0% | 100.0% |
| **Total** | **4346** | **100.0%** | | |

3. **Internal and External Allegations by Allegation Source**. There were 4,346 allegations (table 10). Of those, 93% were from external sources (n=4035) and 7% were from internal sources (n=311).

**Table 10**
*Allegations by Allegation Source 1999-2011*

| Allegation | External | Internal | Total |
|---|---|---|---|
| Excessive Force | 960 | 9 | 969 |
| Operation or Personnel Violations | 717 | 209 | 926 |
| Demeanor | 788 | 35 | 823 |
| Unlawful Search, Entry, or Arrest | 763 | 8 | 771 |
| Theft / Improper Inventory Procedure | 306 | 11 | 317 |
| Property Damage | 213 | 2 | 215 |
| Fabricated Evidence and Integrity Violations (inculpatory) | 120 | 2 | 122 |
| Domestic Violence | 73 | 2 | 75 |
| Integrity Violations - Non-Inculpatory | 35 | 23 | 58 |
| Other | 23 | 10 | 33 |
| Coercive Interrogation / Coerced Confession | 25 | 0 | 25 |
| Juvenile Policy Violations | 12 | 0 | 12 |
| **Total** | **4035** | **311** | **4346** |

4. **Allegations by Disposition.** Table 11 shows allegations by the disposition. Of the total allegations, 4.6% received an initial recommended disposition of "sustained" from the investigator; the remainder were not sustained, not investigated, exonerated, unfounded, or received another disposition or no disposition.[40]

---

[40] It is not necessary to remove the allegations that were not investigated from analysis; as I discuss, the CPD made a conscious decision to avoid thoroughly investigating those allegations. However, for purposes of analysis, if the 518 allegations that were not investigated were removed from this analysis, then the total number of allegations declines from 4,346 to 3,828 (12% fewer allegations), and the percentage recommended sustained after initial investigation increases slightly from 4.6% to 5.2%.

**Table 11**
*Allegations by Disposition 1999-2011*

| Year | Exonerated | None (not investigated) | Not Sustained | Other | Sustained | Unfounded | Total |
|---|---|---|---|---|---|---|---|
| Excessive Force | 50 | 69 | 400 | 1 | 16 | 433 | 969 |
| Operation or Personnel Violations | 68 | 114 | 230 | 3 | 132 | 379 | 926 |
| Demeanor | 9 | 134 | 346 | 3 | 17 | 314 | 823 |
| Unlawful Search, Entry, or Arrest | 57 | 114 | 247 | 4 | 4 | 345 | 771 |
| Theft / Improper Inventory Procedure | 12 | 26 | 106 | 2 | 4 | 167 | 317 |
| Property Damage | 17 | 19 | 52 | 2 | 1 | 124 | 215 |
| Fabricated Evidence and Integrity Violations (inculpatory) | 7 | 23 | 52 | | 4 | 36 | 122 |
| Domestic Violence | 1 | 2 | 52 | | 6 | 14 | 75 |
| Integrity Violations - Non-Inculpatory | | 9 | 24 | | 15 | 10 | 58 |
| Other | | 3 | 8 | 4 | 1 | 17 | 33 |
| Coercive Interrogation/Coerced Confession | 2 | 4 | 3 | | | 16 | 25 |
| Juvenile Policy Violations | 6 | 1 | | | | 5 | 12 |
| **Total** | **229** | **518** | **1520** | **19** | **200** | **1860** | **4346** |

Table 12 highlights the rate of allegations recommended sustained after initial investigation among allegations of potentially criminal conduct (indicated by the shaded cells).

**Table 12**
*Allegations Recommended Sustained After Initial Investigation 1999-2011*

| Year | Exonerated | None (not investigated) | Not Sustained | Other | Sustained | Unfounded | Total | % Sustained |
|---|---|---|---|---|---|---|---|---|
| Excessive Force | 50 | 69 | 400 | 1 | 16 | 433 | 969 | 1.7% |
| Operation or Personnel Violations | 68 | 114 | 230 | 3 | 132 | 379 | 926 | 14.3% |
| Demeanor | 9 | 134 | 346 | 3 | 17 | 314 | 823 | 2.1% |
| Unlawful Search, Entry, or Arrest | 57 | 114 | 247 | 4 | 4 | 345 | 771 | 0.5% |
| Theft / Improper Inventory Procedure | 12 | 26 | 106 | 2 | 4 | 167 | 317 | 1.3% |
| Property Damage | 17 | 19 | 52 | 2 | 1 | 124 | 215 | 0.5% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 7 | 23 | 52 | 0 | 4 | 36 | 122 | 3.3% |
| Domestic Violence | 1 | 2 | 52 | 0 | 6 | 14 | 75 | 8.0% |
| Integrity Violations - Non-Inculpatory | 0 | 9 | 24 | 0 | 15 | 10 | 58 | 25.9% |
| Other | 0 | 3 | 8 | 4 | 1 | 17 | 33 | 3.0% |

**Table 12**
*Allegations Recommended Sustained After Initial Investigation 1999-2011*

| Year | Exonerated | None (not investigated) | Not Sustained | Other | Sustained | Unfounded | Total | % Sustained |
|---|---|---|---|---|---|---|---|---|
| Coercive Interrogation / Coerced Confession | 2 | 4 | 3 | 0 | 0 | 16 | 25 | 0.0% |
| Juvenile Policy Violations | 6 | 1 | 0 | 0 | 0 | 5 | 12 | 0.0% |
| **Total** | **229** | **518** | **1520** | **19** | **200** | **1860** | **4346** | |

As discussed throughout this report, the CPD regularly failed to thoroughly investigate allegations even when the allegations involved potentially criminal conduct. I find CPD's failure to investigate those allegations meaningful for the reasons described here and below. Notably, the only action CPD was prohibited from taking in an investigation without an affidavit was interviewing the accused CPD member; CPD was free to interview other officers, canvass the scene, speak with the complainant, victim, and/or witnesses, and take numerous other steps (Moore deposition, p. 110). There is no evidence in discovery that the CPD provided supervisors with information about the affidavit investigation override, such as memoranda, addendum to a General Order, or an internal affairs training bulletin about when it is appropriate to seek one or guidance on investigative steps to take when an affidavit could not be obtained (Moore deposition, p. 111). Thus, I find it appropriate to include allegations that were not investigated—by CPD's own choice—in my overall analysis of the data, as demonstrated by the following examples:

a. **CR # 1023657 (Feb 2009):** The complainant alleged that two officers lied in their testimony and falsely arrested him in order to cover up an error: that they attempted to arrest him under a wrong warrant (the complainant was Black, but the warrant was for a White male). The investigator averred that it was impossible to contact the complainant by phone because he was in jail. As someone in custody whose whereabouts were known, jails routinely make prisoners available for law enforcement purposes, especially interview by internal affairs officers. We also see in the CR relating to Lionel White Sr., discussed later in this report, that investigators knew that they could interview complainants who were in custody when they wanted to do so (see CR# 313536). The investigator did not collect supporting evidence from the arrest, relying only on the arrest report and apparently making no effort to

determine whether dashcam video existed and then obtain that video, canvass the area, or contact others who might have relevant information including his common law wife and son who were, according to the complainant, nearby during the interaction.

b. **CR # 1042360 (Dec 2010):** The complainant alleged that officers removed $500 from her home, but did not inventory or return the money. The investigator spoke with the complainant, and she told him that she would need to decide whether to submit an affidavit. The CR file represents a complete lack of investigative activities. For example, the CR file includes a 3-page documentation of the search warrant that reflects a search warrant was executed at the complainant's residence and that property was recovered from the house. However, the search warrant only lists the property type as "other" and does not include a detailed description of what property was taken. A more thorough review of records, in addition to other investigative steps, could have revealed whether money was in fact taken from the complainant's home.

c. **CR #1042823 (Jan 2011):** The complainant alleged that he was falsely arrested for traffic violations and unlawful use of a weapon (UUW, or illegal possession of a firearm). No investigator was assigned, no attempt was made to interview the complainant, and no investigative steps were taken. Instead, the CR was closed with the comment "see arrest rpt." Instead of trying to interview the complainant and understanding the full basis for his allegations, the CPD unilaterally closed the CR.

d. **CR #1047968 (Aug 2011):** the complainant alleged that the accused officer initiated a false investigative alert against her, and that the CPD detective was motivated to do so because he was a friend of the purported victim (identified as the "subject") of a fight. CPD never investigated whether the involved officer was inappropriately using police powers to benefit a family friend. Instead, the CR was administratively closed without investigation.

As described by these brief examples, CPD at times closed CRs without contacting the complainants and without gathering available and pertinent information despite there being no clear justified reason for failing to do so. For these reasons, and based on my review as a whole of many CR files in this case and other litigation involving CPD, I conclude it is most

appropriate to evaluate the rate of recommended sustained allegations using all CR's containing allegations of misconduct, whether or not CPD investigated them for the following reasons:

    a.  **Transparency and accountability:** By including all complaints, even those that were not formally investigated, my analysis provides a more comprehensive and transparent view of the allegations made against CPD officers. This promotes accountability and helps identify potential patterns or issues that may have been overlooked or dismissed without proper investigation.

    b.  **Identifying potential biases:** Evaluating only the complaints that were investigated may introduce biases, as the decision to investigate a complaint could be influenced by a range of factors, such as the nature of the allegation, the individuals involved, or departmental policies. Including all complaints helps mitigate the impact of such potential biases.

    c.  **Comprehensive data analysis and pattern recognition:** Using a comprehensive dataset that includes all allegations allows for more robust data analysis and may reveal patterns or trends that would go undetected if the data were not considered.

Table 13 shows the likelihood of sustaining an allegation based on the source (internal or external), and tests for relationship between these variables using the chi-square test of independence.[41] The test proceeds from the claim that there is no relationship between the two categorical variables being analyzed (allegation source and disposition). In simpler terms, the test proceeds from the claim that that knowing the value of one variable does not provide any information about the value of the other variable.

If an allegation was generated from an internal source, then the CPD investigators recommended sustaining the allegation 42.8% of the time (133 recommended sustained / 311 total internal allegations = 42.8%), which is higher than expected (indicated by the positive residual in the shaded cells). However, if the allegation was generated from an

---

[41] Chi-square is a statistical test that is applied with two nominal variables from a single population. The procedure is used to determine whether there is a significant relationship between the two variables. SPSS was used to test for this relationship. The variable "initial disposition recommended by investigator" was dichotomized into sustained (=1) and all other dispositions (=0, which includes exonerated, none-not investigated, not sustained, unfounded and other).

external source, then the CPD investigators recommended sustaining the allegation 1.7% of the time (67 recommended sustained /4035 total external allegations = 1.7%). This wide disparity results in a statistically significant relationship[42] ($p<.000$) with a very strong positive association (V=.506), where internal allegations are more likely to be sustained than external allegation (as indicated by the positive standard residuals in the shaded cells +31.4, compared to -8.7).[43]

Said differently, external allegations (those generated by sources outside CPD) are less likely to be sustained than those generated by sources inside the CPD. This means the outcome of an investigation (sustained or not sustained) depends, at least partly, on the source of the allegation (internal or external).

**Table 13**
*Disposition by Source (full data set) 1999-2011*

| Allegations | | | Source | | Total |
|---|---|---|---|---|---|
| | | | Internal | External | |
| | | n | 178 | 3968 | 4146 |
| | All Other Dispositions | Expected n | 296.7 | 3849.3 | 4146.0 |
| | | % of Total | 4.1% | 91.3% | 95.4% |
| | | Std. Residual | -6.9 | 1.9 | |
| Disposition | | n | 133 | 67 | 200 |
| | | Actual sustain rate | 42.8% (133/311) | 1.7% (67/4035) | |
| | Sustained | Expected n | 14.3 | 185.7 | 200.0 |
| | | % of Total | 3.1% | 1.5% | 4.6% |
| | | Std. Residual | 31.4 | -8.7 | |
| Total | | n | 311 | 4035 | 4346 |
| | | Expected n | 311.0 | 4035.0 | 4346.0 |
| | | % of Total | 7.2% | 92.8% | 100.0% |
| $\chi^2(1) = 1111.270$, $p<.000$, V=.506 | | | | | |

---

[42] A "significant relationship" is the likelihood that a result or relationship is caused by something other than mere random chance, meaning he result did not happen by chance alone. By statistical convention, significant relationships exist at the 0.05 alpha level or lower. Significant does not mean important or meaningful; significant means the finding is not likely due to chance alone, and that the observed effect or relationship between variables is likely to be real and not simply due to random variation in the data.

[43] The residuals are based on the difference between the observed (O) and the expected (E) values. They are useful in helping to interpret chi-square tables by providing information about which cells contribute to a significant chi-square. If the standardized residual is beyond the range of ± 2, then that cell can be considered a major contributor. A positive residual (+) means that there are more observed cases in a cell than you would expect in the null hypotheses were true (i.e., the null hypothesis is that the disposition (sustained/not sustained) and allegation source (external/internal) are independent). A negative residual (-) means that there are fewer observed cases than you would expect if the null hypothesis were true.

Divided between internal and external allegation types, the data become clear: for the most serious kinds of external allegations, including coercive interrogation and coerced confessions, excessive force, integrity violations, theft, and unlawful search/entry/arrest, the CPD almost never sustained allegations from complainants.

**Table 14**
*Sustained Rates for Internal and External Allegations 1999-2011*

| Allegation | Internal Allegations | | | External Allegations | | |
|---|---|---|---|---|---|---|
| | # of internal allegations investigator recommended sustained | # of internal allegations | % of internal allegations investigator recommended sustained | # of external allegations investigator recommended sustained | # of external allegations | % of external allegations investigator recommended sustained |
| Coercive Interrogation/Coerced Confession | --- | --- | --- | 0 | 25 | **0.0%** |
| Demeanor | 10 | 35 | **28.6%** | 7 | 788 | **0.9%** |
| Domestic Violence | 0 | 2 | **0.0%** | 6 | 73 | **8.2%** |
| Excessive Force | 4 | 9 | **44.4%** | 12 | 960 | **1.3%** |
| Fabricated Evidence and Integrity Violations (inculpatory) | 0 | 2 | **0.0%** | 4 | 120 | **3.3%** |
| Integrity Violations - Non-Inculpatory | 15 | 23 | **65.2%** | 0 | 35 | **0.0%** |
| Juvenile Policy violations | --- | --- | **---** | 0 | 12 | **0.0%** |
| Operation or Personnel Violations | 99 | 209 | **47.4%** | 33 | 717 | **4.6%** |
| Other | 1 | 10 | **10.0%** | 0 | 23 | **0.0%** |
| Property Damage | 1 | 2 | **50.0%** | 0 | 213 | **0.0%** |
| Theft / Improper Inventory Procedure | 3 | 11 | **27.3%** | 1 | 306 | **0.3%** |
| Unlawful Search, Entry, or Arrest | 0 | 8 | **0.0%** | 4 | 763 | **0.5%** |
| **Total** | **133** | **311** | **42.8%** | **67** | **4035** | **1.7%** |

## IV. PATTERN OF ALLEGATIONS AGAINST CHICAGO POLICE OFFICERS 1999-2003.

This study period analyzes data between 1999 and 2003. In this data set, there are 465 unique CR numbers (i.e., internal affairs investigations) that resulted in 1,582 allegations.

1. **Summary of Allegations Against Personnel.** The personnel allegation data is described as follows: The data range is 5 years, from 1999 to 2003, consisting of 1,582 allegations (table 15), 465 unique CR investigations, and 12 unique allegation categories (table 16).

**Table 15**
*Allegations by Year 1999-2003*

| Year | n | % |
|---|---|---|
| 1999 | 209 | 13.2% |
| 2000 | 309 | 19.5% |
| 2001 | 318 | 20.1% |
| 2002 | 389 | 24.6% |
| 2003 | 357 | 22.6% |
| **Total** | **1582** | **100.0%** |

**Table 16**
*Allegations by Category 1999-2003*

| Allegation | n | % |
|---|---|---|
| Excessive Force | 382 | 24.1% |
| Demeanor | 337 | 21.3% |
| Operation or Personnel Violations | 337 | 21.3% |
| Unlawful Search, Entry, or Arrest | 228 | 14.4% |
| Theft / Improper Inventory Procedure | 103 | 6.5% |
| Property Damage | 77 | 4.9% |
| Domestic Violence | 48 | 3.0% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 36 | 2.3% |
| Integrity Violations - Non-Inculpatory | 25 | 1.6% |
| Other | 5 | 0.3% |
| Juvenile Policy Violations | 2 | 0.1% |
| Coercive Interrogation / Coerced Confession | 2 | 0.1% |
| **Total** | **1582** | **100.0%** |

2. **Pareto Analysis.** Table 17 shows the allegation categories based on frequency. Eighty one percent of the allegations emanate from 33% of the categories. Excessive force is, again, the leading allegation, which is criminal, and should be treated with the utmost preventive action by CPD. As with the full data set, there was a clear pattern of allegations arising over the study period, most of which dealt with a physical confrontation (e.g., excessive force), actions that affect legitimacy and community perception (demeanor), and Fourth Amendment violations (unlawful entry, search, or arrest).[44] As explained in the previous section, the allegations that affect legitimacy are contrary to the duties listed in the job specifications for every rank in the Chicago Police Department, which is to promote positive community relations. Had the Superintendent of Police and the command staff prioritized the effort to address the most common allegations—consistent with their job specifications—then they would have been able to intervene and stop the defendants' adverse behavior through a personnel improvement plan and/or other adverse employment action. This is why supervisors at every level in the CPD are tasked with the responsibility to monitor personnel for compliance with industry standards.

---

[44] Allegations marked "Operation or Personnel Violations" are not specific.

**Table 17**
*Pareto Analysis of Allegations 1999-2003*

| Allegation | n | % | Cum. % | Cum. % of Allegation Categories |
|---|---|---|---|---|
| Excessive Force | 382 | 24.1% | 24.1% | 8.3% |
| Demeanor | 337 | 21.3% | 45.5% | 16.7% |
| Operation or Personnel Violations | 337 | 21.3% | 66.7% | 25.0% |
| Unlawful Search, Entry, or Arrest | 228 | 14.4% | 81.2% | 33.3% |
| Theft / Improper Inventory Procedure | 103 | 6.5% | 87.7% | 41.7% |
| Property Damage | 77 | 4.9% | 92.5% | 50.0% |
| Domestic Violence | 48 | 3.0% | 95.6% | 58.3% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 36 | 2.3% | 97.9% | 66.7% |
| Integrity Violations - Non-Inculpatory | 25 | 1.6% | 99.4% | 75.0% |
| Other | 5 | 0.3% | 99.7% | 83.3% |
| Juvenile Policy Violations | 2 | 0.1% | 99.9% | 91.7% |
| Coercive Interrogation / Coerced Confession | 2 | 0.1% | 100.0% | 100.0% |
| **Total** | **1582** | **100.0%** | | |

3. **Internal and External Allegations by Allegation Source**. There were 1,582 allegations (table 16). Of those, 93% were from external sources (n=1473) and 7% were from internal sources (n=109) (table 18).

**Table 18**
*Allegations by Allegation Source 1999-2003*

| Allegation | External | Internal | Total |
|---|---|---|---|
| Excessive Force | 380 | 2 | 382 |
| Demeanor | 321 | 16 | 337 |
| Operation or Personnel Violations | 257 | 80 | 337 |
| Unlawful Search, Entry, or Arrest | 228 | 0 | 228 |
| Theft / Improper Inventory Procedure | 96 | 7 | 103 |
| Property Damage | 77 | 0 | 77 |
| Domestic Violence | 48 | 0 | 48 |
| Fabricated Evidence and Integrity Violations (inculpatory) | 36 | 0 | 36 |
| Integrity Violations - Non-Inculpatory | 21 | 4 | 25 |
| Other | 5 | 0 | 5 |
| Juvenile Policy Violations | 2 | 0 | 2 |
| Coercive Interrogation / Coerced Confession | 2 | 0 | 2 |
| **Total** | **1473** | **109** | **1582** |

4. **Allegations by Disposition.** Table 19 shows allegations by the disposition. Of the total allegations, 5.2% were sustained, the remainder received some other disposition.[45]

---

[45] It is not necessary to remove the allegations that were not investigated from analysis; as I discuss, the CPD made a conscious choice not to thoroughly investigate those allegations. However, for purposes of analysis, when accounting for allegations that were not investigated (n=4, .25%), the total number of allegations declines from 1,582 to 1,578 (.25% fewer allegations). Sustained dispositions did not change (remained at 5.2%).

**Table 19**
*Allegations by Disposition 1999-2003*

| Allegation | Exonerated | None (not investigated) | Not Sustained | Sustained | Unfounded | Total |
|---|---|---|---|---|---|---|
| Excessive Force | 23 | 1 | 218 | 4 | 136 | 382 |
| Demeanor | 3 | | 222 | 7 | 105 | 337 |
| Operation or Personnel Violations | 50 | 2 | 123 | 62 | 100 | 337 |
| Unlawful Search, Entry, or Arrest | 38 | 1 | 117 | 1 | 71 | 228 |
| Theft / Improper Inventory Procedure | 8 | 0 | 57 | 3 | 35 | 103 |
| Property Damage | 5 | 0 | 30 | | 42 | 77 |
| Domestic Violence | 1 | 0 | 39 | 3 | 5 | 48 |
| Fabricated Evidence and Integrity Violations (inculpatory) | 7 | 0 | 16 | | 13 | 36 |
| Integrity Violations - Non-Inculpatory | 0 | 0 | 19 | 2 | 4 | 25 |
| Other | 0 | 0 | 5 | | | 5 |
| Juvenile Policy Violations | 2 | 0 | 0 | 0 | 0 | 2 |
| Coercive Interrogation / Coerced Confession | 0 | 0 | 0 | 0 | 2 | 2 |
| **Total** | **137** | **4** | **846** | **82** | **513** | **1582** |

Table 20 shows of those allegations that were potentially criminal (indicated by the shaded cells), the sustained rate was as follows:

**Table 20**
*Sustained Rate by Allegation 1999-2003*

| Allegations | Exonerated | None (not investigated) | Not Sustained | Sustained | Unfounded | Total | % Sustained |
|---|---|---|---|---|---|---|---|
| Operation or Personnel Violations | 50 | 2 | 123 | 62 | 100 | 337 | 18.40% |
| Integrity Violations - Non-Inculpatory | | 0 | 19 | 2 | 4 | 25 | 8.00% |
| Domestic Violence | 1 | 0 | 39 | 3 | 5 | 48 | 6.25% |
| Theft / Improper Inventory Procedure | 8 | 0 | 57 | 3 | 35 | 103 | 2.91% |
| Demeanor | 3 | 0 | 222 | 7 | 105 | 337 | 2.08% |
| Excessive Force | 23 | 1 | 218 | 4 | 136 | 382 | 1.05% |
| Unlawful Search, Entry, or Arrest | 38 | 1 | 117 | 1 | 71 | 228 | 0.44% |
| Coercive Interrogation / Coerced Confession | 0 | 0 | 0 | 0 | 2 | 2 | 0.00% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 7 | 0 | 16 | 0 | 13 | 36 | 0.00% |
| Juvenile Policy Violations | 2 | 0 | | 0 | 0 | 2 | 0.00% |
| Other | | 0 | 5 | 0 | 0 | 5 | 0.00% |
| Property Damage | 5 | 0 | 30 | 0 | 42 | 77 | 0.00% |
| **Total** | **137** | **4** | **846** | **82** | **513** | **1582** | **5.18%** |

Table 21 shows the likelihood of sustaining an allegation based on the source (internal or external), and tests for relationship between these variables using the chi-square test of independence. If an allegation was generated from an internal source, then the CPD investigators recommended sustaining the allegation 42.2% of the time (46 recommended sustained/109 total internal allegations = 42.2%), which is higher than expected (indicated by the positive residual in the shaded cell). However, if the allegation was generated from an external source, then the CPD investigators recommended sustaining the allegation 2.4% of the time (36 recommended sustained/1473 total external allegations = 2.4%) which is lower than expected (indicated by the negative residual in the shaded cells). This wide disparity results in a statistically significant relationship ($p<.000$) with a very strong positive association (V=.454), where internal allegations are more likely to be sustained than external allegation (as indicated by the positive standard residuals in the shaded cells +17.0, compared to -4.6).

Said differently, external allegations (those generated by sources outside CPD) are less likely to be sustained than those generated by sources inside the CPD. This means the outcome of an investigation (sustained or not sustained) depends, at least partly, on the source of the allegation (internal or external).

**Table 21**
*Disposition by Source 1999-2003*

| Allegations | | | Source | | Total |
|---|---|---|---|---|---|
| | | | Internal | External | |
| Disposition | All Other Dispositions | n | 63 | 1437 | 1500 |
| | | Expected n | 103.4 | 1396.6 | 1500.0 |
| | | % of Total | 4.0% | 90.8% | 94.8% |
| | | Std. Residual | -4.0 | 1.1 | |
| | Sustained | n | 46 | 36 | 82 |
| | | Actual sustain rate | **42.2% (46/109)** | **2.4% (36/1473)** | |
| | | Expected n | 5.6 | 76.4 | 82.0 |
| | | % of Total | 2.9% | 2.3% | 5.2% |
| | | Std. Residual | **17.0** | **-4.6** | |
| Total | | n | 109 | 1473 | 1582 |
| | | Expected n | 109.0 | 1473.0 | 1582.0 |
| | | % of Total | 6.9% | 93.1% | 100.0% |
| $\chi^2$ (1) = 326.420, $p<.000$, V=.454 | | | | | |

As was observed for the entire 1999-2011 dataset, external allegations – especially the most serious allegations – were rarely sustained against CPD officers during this time period.

**Table 22**
*Sustained Rates for Internal and External Allegations 1999-2003*

| Allegation | Internal Allegations | | | External Allegations | | |
|---|---|---|---|---|---|---|
| | # of internal allegations investigator recommended sustained | # of internal allegations | % of internal allegations investigator recommended sustained | # of external allegations investigator recommended sustained | # of external allegations | % of external allegations investigator recommended sustained |
| Coercive Interrogation/Coerced Confession | --- | --- | --- | 0 | 2 | 0.0% |
| Demeanor | 3 | 16 | 18.8% | 4 | 321 | 1.2% |
| Domestic Violence | --- | --- | --- | 3 | 48 | 6.3% |
| Excessive Force | --- | 2 | --- | 4 | 380 | 1.1% |
| Fabricated Evidence and Integrity Violations (inculpatory) | --- | --- | --- | 0 | 36 | 0.0% |
| Integrity Violations - Non-Inculpatory | 2 | 4 | 50.0% | 0 | 21 | 0.0% |
| Juvenile Policy violations | --- | --- | --- | 0 | 2 | 0.0% |
| Operation or Personnel Violations | 39 | 80 | 48.8% | 23 | 257 | 8.9% |
| Other | --- | --- | --- | 0 | 5 | 0.0% |
| Property Damage | --- | --- | --- | 0 | 77 | 0.0% |
| Theft / Improper Inventory Procedure | 2 | 7 | 28.6% | 1 | 96 | 1.0% |
| Unlawful Search, Entry, or Arrest | --- | --- | --- | 1 | 228 | 0.4% |
| **Total** | **46** | **109** | **42.2%** | **36** | **1473** | **2.4%** |

## V.   PATTERN OF ALLEGATIONS AGAINST CHICAGO POLICE OFFICERS 2004-2007.

1. **Summary of Allegations Against Personnel.** The personnel allegation data is described as follows: The data range is 4 years, from 2004 to 2007, consisting of 1,269 allegations (table 23), 368 unique CR investigations, and 12 unique allegation categories (table 24).

**Table 23**
*Allegations by Year 2004-2007*

| Year | n | % |
|---|---|---|
| 2004 | 299 | 23.5% |
| 2005 | 303 | 23.9% |
| 2006 | 291 | 22.9% |
| 2007 | 376 | 29.7% |
| **Total** | **1269** | **100.0%** |

**Table 24**
*Allegations by Category 2004-2007*

| Allegations | n | % |
|---|---|---|
| Excessive Force | 307 | 24.2% |
| Unlawful Search, Entry, or Arrest | 271 | 21.4% |
| Operation or Personnel Violations | 262 | 20.6% |
| Demeanor | 202 | 15.9% |
| Theft / Improper Inventory Procedure | 97 | 7.6% |
| Property Damage | 47 | 3.7% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 46 | 3.6% |
| Integrity Violations - Non-Inculpatory | 13 | 1.0% |
| Domestic Violence | 10 | 0.8% |
| Coercive Interrogation / Coerced Confession | 8 | 0.6% |
| Other | 5 | 0.4% |
| Juvenile Policy Violations | 1 | 0.1% |
| **Total** | **1269** | **100.0%** |

2. **Pareto Analysis.** Table 25 shows the allegation categories based on frequency. Eighty-two percent of the allegations emanate from 33% of the categories. Excessive force is, again, the leading allegation, which is criminal, and should be treated with the utmost preventive action by CPD. As with the full data set, there was a clear pattern of allegations arising over the study period, most of which dealt with a physical confrontation (e.g., excessive force), actions that affect legitimacy and community perception (demeanor), and Fourth Amendment violations (unlawful entry, search, or arrest).[46] As explained in the previous sections, the allegations that affect legitimacy are contrary to the duties listed in the job specifications for every rank in the Chicago Police Department, which is to promote positive community relations. Had the Superintendent of Police and the command staff prioritized the effort to address the most common allegations—consistent with their job specifications—then they would have been able to intervene and stop the defendants' adverse behavior through a personnel improvement plan and/or other adverse employment action. This is why supervisors at every level in the CPD are tasked with the responsibility to monitor personnel for compliance with industry standards.

---

[46] Allegations marked "Operation or Personnel Violations" is not specific.

**Table 25**
*Pareto Analysis of Allegations 2004-2007*

| Allegations | n | % | Cum. % | Cum. % of Allegation Categories |
|---|---|---|---|---|
| Excessive Force | 307 | 24.2% | 24.2% | 8.3% |
| Unlawful Search, Entry, or Arrest | 271 | 21.4% | 45.5% | 16.7% |
| Operation or Personnel Violations | 262 | 20.6% | 66.2% | 25.0% |
| Demeanor | 202 | 15.9% | 82.1% | 33.3% |
| Theft / Improper Inventory Procedure | 97 | 7.6% | 89.8% | 41.7% |
| Property Damage | 47 | 3.7% | 93.5% | 50.0% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 46 | 3.6% | 97.1% | 58.3% |
| Integrity Violations - Non-Inculpatory | 13 | 1.0% | 98.1% | 66.7% |
| Domestic Violence | 10 | 0.8% | 98.9% | 75.0% |
| Coercive Interrogation / Coerced Confession | 8 | 0.6% | 99.5% | 83.3% |
| Other | 5 | 0.4% | 99.9% | 91.7% |
| Juvenile Policy Violations | 1 | 0.1% | 100.0% | 100.0% |
| **Total** | **1269** | **100.0%** | | |

3. **Internal and External Allegations by Allegation Source**. There were 1,269 allegations (table 26). Of those, 89.9% were from external sources (n=1142) and 10.1% were from internal sources (n=127). Excessive force and unlawful search, entry or arrest were the leading categories, both of which are potentially criminal.

**Table 26**
*Allegations by Allegation Source 2004-2007*

| Allegations | External | Internal | Total |
|---|---|---|---|
| Excessive Force | 302 | 5 | 307 |
| Unlawful Search, Entry, or Arrest | 265 | 6 | 271 |
| Operation or Personnel Violations | 176 | 86 | 262 |
| Demeanor | 186 | 16 | 202 |
| Theft / Improper Inventory Procedure | 95 | 2 | 97 |
| Property Damage | 45 | 2 | 47 |
| Fabricated Evidence and Integrity Violations (inculpatory) | 46 | 0 | 46 |
| Integrity Violations - Non-Inculpatory | 7 | 6 | 13 |
| Domestic Violence | 8 | 2 | 10 |
| Coercive Interrogation / Coerced Confession | 8 | 0 | 8 |
| Other | 3 | 2 | 5 |
| Juvenile Policy Violations | 1 | 0 | 1 |
| **Total** | **1142** | **127** | **1269** |

4. **Allegations by Disposition.** Table 27 shows allegations by the disposition. Of the total allegations, 4.9% were sustained, the remainder received some other disposition.[47] Again,

---

[47] It is not necessary to remove the allegations that were not investigated from analysis; as I discuss, the CPD made a conscious choice not to thoroughly investigate those allegations. However, for purposes of analysis, when accounting for allegations that were not investigated (n=65), the total number of allegations declines from 1,269 to 1,204. The rate of sustained dispositions increases slightly (5.2%).

excessive force and unlawful search, entry or arrest were the leading categories, both of which are potentially criminal.

**Table 27**
*Allegations by Disposition 2004-2007*

| Allegations | Exonerated | None (not investigated) | Not Sustained | Sustained | Unfounded | Total |
|---|---|---|---|---|---|---|
| Excessive Force | 12 | 4 | 94 | 8 | 189 | 307 |
| Unlawful Search, Entry, or Arrest | 7 | 9 | 82 | 0 | 173 | 271 |
| Operation or Personnel Violations | 12 | 26 | 54 | 41 | 129 | 262 |
| Demeanor | 2 | 22 | 62 | 8 | 108 | 202 |
| Theft / Improper Inventory Procedure | 2 | 1 | 21 | 1 | 72 | 97 |
| Property Damage | 0 | 0 | 10 | 1 | 36 | 47 |
| Fabricated Evidence and Integrity Violations (inculpatory) | 0 | | 31 | | 15 | 46 |
| Integrity Violations - Non-Inculpatory | 0 | 1 | 5 | 4 | 3 | 13 |
| Domestic Violence | 0 | 0 | 3 | 0 | 7 | 10 |
| Coercive Interrogation / Coerced Confession | 0 | 0 | 2 | 0 | 6 | 8 |
| Other | 0 | 2 | 2 | 0 | 1 | 5 |
| Juvenile Policy Violations | 0 | 0 | 0 | 0 | 1 | 1 |
| **Total** | **35** | **65** | **366** | **63** | **740** | **1269** |

Table 28 shows of those allegations that were potentially criminal (indicated by the shaded cells), the sustained rate was as follows:

**Table 28**
*Sustained Rate by Allegation 2004-2007*

| Allegations | Exonerated | None (not investigated) | Not Sustained | Sustained | Unfounded | Total | % Sustained |
|---|---|---|---|---|---|---|---|
| Integrity Violations - Non-Inculpatory | 0 | 1 | 5 | 4 | 3 | 13 | 30.77% |
| Operation or Personnel Violations | 12 | 26 | 54 | 41 | 129 | 262 | 15.65% |
| Demeanor | 2 | 22 | 62 | 8 | 108 | 202 | 3.96% |
| Excessive Force | 12 | 4 | 94 | 8 | 189 | 307 | 2.61% |
| Property Damage | 0 | | 10 | 1 | 36 | 47 | 2.13% |
| Theft / Improper Inventory Procedure | 2 | 1 | 21 | 1 | 72 | 97 | 1.03% |
| Coercive Interrogation / Coerced Confession | 0 | 0 | 2 | 0 | 6 | 8 | 0.00% |
| Domestic Violence | 0 | 0 | 3 | 0 | 7 | 10 | 0.00% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 0 | 0 | 31 | 0 | 15 | 46 | 0.00% |
| Juvenile Policy Violations | 0 | 0 | 0 | 0 | 1 | 1 | 0.00% |
| Other | 0 | 2 | 2 | 0 | 1 | 5 | 0.00% |
| Unlawful Search, Entry, or Arrest | 7 | 9 | 82 | 0 | 173 | 271 | 0.00% |
| **Total** | **35** | **65** | **366** | **63** | **740** | **1269** | **4.96%** |

Table 29 shows the likelihood of sustaining an allegation based on the source (internal or external), and tests for relationship between these variables using the chi-square test of independence. If an allegation was generated from an internal source, then the CPD investigators recommended sustaining the allegation 42.5% of the time (54 recommended sustained/127 total internal allegations = 42.5%), which is higher than expected (indicated by the positive residual in the shaded cell). However, if the allegation was generated from an external source (n=9), then the CPD investigators recommending sustaining the allegation 0.8% of the time (9 recommended sustained/1142 total external allegations = 0.8%), which is lower than expected (indicated by the negative residual in the shaded cells). This wide disparity results in a statistically significant relationship ($p$<.000) with a very strong positive association (V=.577), where internal allegations are more likely to be sustained than external allegation (as indicated by the positive standard residuals in the shaded cells +19.0, compared to -6.3).

Said differently, external allegations (those generated by sources outside CPD) are less likely to be sustained than those generated by sources inside the CPD. This means the outcome of an investigation (sustained or not sustained) depends, at least partly, on the source of the allegation (internal or external).

**Table 29**
*Disposition by Source 2004-2007*

| Allegations | | | Source | | Total |
|---|---|---|---|---|---|
| | | | Internal | External | |
| | | n | 73 | 1133 | 1206 |
| | All Other | Expected n | 120.7 | 1085.3 | 1206.0 |
| | Dispositions | % of Total | 5.8% | 89.3% | 95.0% |
| Disposition | | Std. Residual | -4.3 | 1.4 | |
| | | n | 54 | 9 | 63 |
| | | Actual sustain rate | 42.5% (54/127) | 0.8% (9/1142) | |
| | Sustained | Expected n | 6.3 | 56.7 | 63.0 |
| | | % of Total | 4.3% | .7% | 5.0% |
| | | Std. Residual | 19.0 | -6.3 | |
| | | n | 127 | 1142 | 1269 |
| Total | | Expected n | 127.0 | 1142.0 | 1269.0 |
| | | % of Total | 10.0% | 90.0% | 100.0% |

$\chi^2$ (1) = 421.865, $p$<.000, V=.577

As was observed for the entire 1999-2011 dataset, external allegations – especially the most serious allegations – were rarely sustained against CPD officers during this time period.

**Table 30**
*Sustained Rates for Internal and External Allegations 2004-2007*

| Allegation | Internal Allegations | | | External Allegations | | |
|---|---|---|---|---|---|---|
| | # of internal allegations investigator recommended sustained | # of internal allegations | % of internal allegations investigator recommended sustained | # of external allegations investigator recommended sustained | # of external allegations | % of external allegations investigator recommended sustained |
| Coercive Interrogation/Coerced Confession | --- | --- | --- | 0 | 8 | 0.0% |
| Demeanor | 7 | 16 | 43.8% | 1 | 186 | 0.5% |
| Domestic Violence | 0 | 2 | 0.0% | 0 | 8 | 0.0% |
| Excessive Force | 4 | 5 | 80.0% | 4 | 302 | 1.3% |
| Fabricated Evidence and Integrity Violations (inculpatory) | --- | --- | --- | 0 | 46 | 0.0% |
| Integrity Violations - Non-Inculpatory | 4 | 6 | 66.7% | 0 | 7 | 0.0% |
| Juvenile Policy violations | --- | --- | --- | 0 | 1 | 0.0% |
| Operation or Personnel Violations | 37 | 86 | 43.0% | 4 | 176 | 2.3% |
| Other | 0 | 2 | 0.0% | 0 | 3 | 0.0% |
| Property Damage | 1 | 2 | 50.0% | 0 | 45 | 0.0% |
| Theft / Improper Inventory Procedure | 1 | 2 | 50.0% | 0 | 95 | 0.0% |
| Unlawful Search, Entry, or Arrest | 0 | 6 | 0.0% | 0 | 265 | 0.0% |
| **Total** | **54** | **127** | **42.5%** | **9** | **1142** | **0.8%** |

## VI. PATTERN OF ALLEGATIONS AGAINST CHICAGO POLICE OFFICERS 2008-2011.

1. **Summary of Allegations Against Personnel.** The personnel allegation data is described as follows: The data range is 4 years, from 2008 to 2011, consisting of 1,495 allegations (table 31), 394 unique CR investigations, and 12 unique allegation categories (table 32).

**Table 31**
*Allegations by Year 2008-2011*

| Year | n | % |
|---|---|---|
| 2008 | 309 | 20.7% |
| 2009 | 414 | 27.7% |
| 2010 | 421 | 28.2% |
| 2011 | 351 | 23.5% |
| **Total** | **1495** | **100.0%** |

**Table 32**

*Allegations by Category 2008-2011*

| Allegations | n | % |
|---|---|---|
| Operation or Personnel Violations | 327 | 21.9% |
| Demeanor | 284 | 19.0% |
| Excessive Force | 280 | 18.7% |
| Unlawful Search, Entry, or Arrest | 272 | 18.2% |
| Theft / Improper Inventory Procedure | 117 | 7.8% |
| Property Damage | 91 | 6.1% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 40 | 2.7% |
| Other | 23 | 1.5% |
| Integrity Violations - Non-Inculpatory | 20 | 1.3% |
| Domestic Violence | 17 | 1.1% |
| Coercive Interrogation / Coerced Confession | 15 | 1.0% |
| Juvenile Policy Violations | 9 | 0.6% |
| **Total** | **1495** | **100.0%** |

2. **Pareto Analysis.** Table 33 shows the allegation categories based on frequency. Nearly 78% (77.8%) percent of the allegations emanate from 33% of the categories. Although excessive force is not the leading category during this period, it remains for almost 19% (18.7%) of the leading allegations. As with the full data set, there was a clear pattern of allegations arising over the study period, most of which dealt with a physical confrontation (e.g., excessive force), actions that affect legitimacy and community perception (demeanor), and Fourth Amendment violations (unlawful entry, search, or arrest). As explained in the previous sections, the allegations that affect legitimacy are contrary to the duties listed in the job specifications for every rank in the Chicago Police Department, which is to promote positive community relations. Had the Superintendent of Police and the command staff prioritized the effort to address the most common allegations—consistent with their job specifications—then they would have been able to intervene and stop the defendants' adverse behavior through a personnel improvement plan and/or other adverse employment action. This is why supervisors at every level in the CPD are tasked with the responsibility to monitor personnel for compliance with industry standards.

**Table 33**
*Pareto Analysis of Allegations 2008-2011*

| Allegations by Category | n | % | Cum. % | Cum. % of Allegation Categories |
|---|---|---|---|---|
| Operation or Personnel Violations | 327 | 21.9% | 21.9% | 8.3% |
| Demeanor | 284 | 19.0% | 40.9% | 16.7% |
| Excessive Force | 280 | 18.7% | 59.6% | 25.0% |
| Unlawful Search, Entry, or Arrest | 272 | 18.2% | 77.8% | 33.3% |
| Theft / Improper Inventory Procedure | 117 | 7.8% | 85.6% | 41.7% |
| Property Damage | 91 | 6.1% | 91.7% | 50.0% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 40 | 2.7% | 94.4% | 58.3% |
| Other | 23 | 1.5% | 95.9% | 66.7% |
| Integrity Violations - Non-Inculpatory | 20 | 1.3% | 97.3% | 75.0% |
| Domestic Violence | 17 | 1.1% | 98.4% | 83.3% |
| Coercive Interrogation / Coerced Confession | 15 | 1.0% | 99.4% | 91.7% |
| Juvenile Policy Violations | 9 | 0.6% | 100.0% | 100.0% |
| **Total** | **1495** | **100.0%** | | |

3. **Internal and External Allegations by Allegation Source**. There were 1,495 allegations (table 34). Of those, 95% were from external sources (n=1420) and 5% were from internal sources (n=75).

**Table 34**
*Allegations by Allegation Source 2008-2011*

| Allegations | External | Internal | Total |
|---|---|---|---|
| Operation or Personnel Violations | 284 | 43 | 327 |
| Demeanor | 281 | 3 | 284 |
| Excessive Force | 278 | 2 | 280 |
| Unlawful Search, Entry, or Arrest | 270 | 2 | 272 |
| Theft / Improper Inventory Procedure | 115 | 2 | 117 |
| Property Damage | 91 | 0 | 91 |
| Fabricated Evidence and Integrity Violations (inculpatory) | 38 | 2 | 40 |
| Other | 15 | 8 | 23 |
| Integrity Violations - Non-Inculpatory | 7 | 13 | 20 |
| Domestic Violence | 17 | 0 | 17 |
| Coercive Interrogation / Coerced Confession | 15 | 0 | 15 |
| Juvenile Policy Violations | 9 | 0 | 9 |
| **Total** | **1420** | **75** | **1495** |

4. **Allegations by Disposition.** Table 35 shows allegations by the disposition. Of the total allegations, 3.7% were sustained, the remainder received any other disposition.[48]

---

[48] It is not necessary to remove the allegations that were not investigated from analysis; as I discuss, the CPD made a conscious choice not to thoroughly investigate those allegations. However, for purposes of analysis, when accounting for allegations that were not investigated (n=449, 30%), the total number of allegations declines from 1,495 to 1,046 (30% fewer allegations). Sustained dispositions increased to 5.3%.

**Table 35**
*Allegations by Disposition 2008-2011*

| Allegations | Exonerated | None (not investigated) | Not Sustained | Other | Sustained | Unfounded | Total |
|---|---|---|---|---|---|---|---|
| Operation or Personnel Violations | 6 | 86 | 53 | 3 | 29 | 150 | 327 |
| Demeanor | 4 | 112 | 62 | 3 | 2 | 101 | 284 |
| Excessive Force | 15 | 64 | 88 | 1 | 4 | 108 | 280 |
| Unlawful Search, Entry, or Arrest | 12 | 104 | 48 | 4 | 3 | 101 | 272 |
| Theft / Improper Inventory Procedure | 2 | 25 | 28 | 2 | | 60 | 117 |
| Property Damage | 12 | 19 | 12 | 2 | | 46 | 91 |
| Fabricated Evidence and Integrity Violations (inculpatory) | | 23 | 5 | | 4 | 8 | 40 |
| Other | | 1 | 1 | 4 | 1 | 16 | 23 |
| Integrity Violations - Non-Inculpatory | | 8 | | | 9 | 3 | 20 |
| Domestic Violence | | 2 | 10 | | 3 | 2 | 17 |
| Coercive Interrogation / Coerced Confession | 2 | 4 | 1 | | | 8 | 15 |
| Juvenile Policy Violations | 4 | 1 | | | | 4 | 9 |
| **Total** | **57** | **449** | **308** | **19** | **55** | **607** | **1495** |

Table 36 shows of those allegations that were potentially criminal (indicated by the shaded cells), the sustained rate was as follows:

**Table 36**
*Sustained Rate by Allegation 2008-2011*

| Allegations | Exonerated | None (not investigated) | Not Sustained | Other | Sustained | Unfounded | Total | % Sustained |
|---|---|---|---|---|---|---|---|---|
| Integrity Violations - Non-Inculpatory | 0 | 8 | 0 | 0 | 9 | 3 | 20 | 45.0% |
| Domestic Violence | | 2 | 10 | 0 | 3 | 2 | 17 | 17.6% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 0 | 23 | 5 | 0 | 4 | 8 | 40 | 10.0% |
| Operation or Personnel Violations | 6 | 86 | 53 | 3 | 29 | 150 | 327 | 8.9% |
| Other | | 1 | 1 | 4 | 1 | 16 | 23 | 4.3% |
| Excessive Force | 15 | 64 | 88 | 1 | 4 | 108 | 280 | 1.4% |
| Unlawful Search, Entry, or Arrest | 12 | 104 | 48 | 4 | 3 | 101 | 272 | 1.1% |
| Demeanor | 4 | 112 | 62 | 3 | 2 | 101 | 284 | 0.7% |
| Coercive Interrogation / Coerced Confession | 2 | 4 | 1 | 0 | 0 | 8 | 15 | 0.0% |
| Juvenile Policy Violations | 4 | 1 | 0 | 0 | 0 | 4 | 9 | 0.0% |
| Property Damage | 12 | 19 | 12 | 2 | 0 | 46 | 91 | 0.0% |
| Theft / Improper Inventory Procedure | 2 | 25 | 28 | 2 | 0 | 60 | 117 | 0.0% |
| **Total** | **57** | **449** | **308** | **19** | **55** | **607** | **1495** | **3.7%** |

Table 37 shows the likelihood of sustaining an allegation based on the source (internal or external), and tests for relationship between these variables using the chi-square test of independence. If an allegation was generated from an internal source, then the CPD investigators recommended sustaining the allegation 44% of the time (33 recommended sustained/75 total internal allegations = 44%), which is higher than expected (indicated by the positive residual in the shaded cell).

However, if the allegation was generated from an external source, then the CPD investigators recommended sustaining the allegation 1.5% of the time (22 recommended sustained/1420 total external allegations = 1.5%), which is lower than expected (indicated by the negative residual in the shaded cells). This wide disparity results in a statistically significant relationship ($p<.000$) with a very strong positive association (V=.492), where internal allegations are more likely to be sustained than external allegation (as indicated by the positive standard residuals in the shaded cells +18.2, compared to -4.2).

Said differently, external allegations (those generated by sources outside CPD) are less likely to be sustained than those generated by sources inside the CPD. This means the outcome of an investigation (sustained or not sustained) depends, at least partly, on the source of the allegation (internal or external).

**Table 37**
*Disposition by Source 2008-2011*

| Allegations | | | Source | | Total |
|---|---|---|---|---|---|
| | | | Internal | External | |
| | All Other Dispositions | n | 42 | 1398 | 1440 |
| | | Expected n | 72.2 | 1367.8 | 1440.0 |
| | | % of Total | 2.8% | 93.5% | 96.3% |
| | | Std. Residual | -3.6 | .8 | |
| Disposition | Sustained | n | 33 | 22 | 55 |
| | | Actual sustain rate | 44% (33/75) | 1.5% (22/1420) | |
| | | Expected n | 2.8 | 52.2 | 55.0 |
| | | % of Total | 2.2% | 1.5% | 3.7% |
| | | Std. Residual | **18.2** | **-4.2** | |
| Total | | n | 75 | 1420 | 1495 |
| | | Expected n | 75.0 | 1420.0 | 1495.0 |
| | | % of Total | 5.0% | 95.0% | 100.0% |

$\chi^2(1) = 362.273$, $p<.000$, V=.492 (Fisher's Exact Test due to low cell count in one cell)

As was observed for the entire 1999-2011 dataset, external allegations – especially the most serious allegations – were rarely sustained against CPD officers during this time period.

**Table 38**
*Sustained Rates for Internal and External Allegations 2008-2011*

| Allegation | Internal Allegations | | | External Allegations | | |
|---|---|---|---|---|---|---|
| | # of internal allegations investigator recommended sustained | # of internal allegations | % of internal allegations investigator recommended sustained | # of external allegations investigator recommended sustained | # of external allegations | % of external allegations investigator recommended sustained |
| Coercive Interrogation/Coerced Confession | --- | --- | --- | 0 | 15 | 0.0% |
| Demeanor | 0 | 3 | 0.0% | 2 | 281 | 0.7% |
| Domestic Violence | --- | --- | --- | 3 | 17 | 17.6% |
| Excessive Force | | 2 | 0.0% | 4 | 278 | 1.4% |
| Fabricated Evidence and Integrity Violations (inculpatory) | 0 | 2 | 0.0% | 4 | 38 | 10.5% |
| Integrity Violations - Non-Inculpatory | 9 | 13 | 69.2% | 0 | 7 | 0.0% |
| Juvenile Policy violations | --- | --- | --- | 0 | 9 | 0.0% |
| Operation or Personnel Violations | 23 | 43 | 53.5% | 6 | 284 | 2.1% |
| Other | 1 | 8 | 12.5% | 0 | 15 | 0.0% |
| Property Damage | --- | --- | --- | 0 | 91 | 0.0% |
| Theft / Improper Inventory Procedure | 0 | 2 | 0.0% | 0 | 115 | 0.0% |
| Unlawful Search, Entry, or Arrest | 0 | 2 | 0.0% | 3 | 270 | 1.1% |
| **Total** | **33** | **75** | **44.0%** | **22** | **1420** | **1.5%** |

# VII.    TRENDS ACROSS ALL TIME PERIODS AND CONCLUSIONS REGARDING QUALITY OF INVESTIGATIONS

1. **Investigations during different time periods.** In the three time periods analyzed—1999-2003, 2004-2007, and 2008-2011—striking and consistent allegation trends emerged. First, throughout all of those time periods, the CPD focused almost all of its attention on operation and personnel violations. In other words, CPD was more concerned with allegations like failing to provide city business license information (CR # 262949), improperly giving parking tickets (CR # 251791), and failing to display a vehicle registration sticker (CR #259248) than with allegations by citizen that they had been abused or mistreated by police officers. In fact, during all time periods, most sustained allegations were for operation or personnel violations (table 39).

**Table 39**
*Sustained Allegations by Study Period*

| Year | Investigator-Recommended Sustained - Operation/Personnel Violations Allegations | Investigator-Recommended Sustained – All Other Allegations | Investigator-Recommended Sustained Allegations – Total |
|---|---|---|---|
| 1999-2003 | **62 (62/337, 18.4%)** | **20 (20/1245, 1.6%)** | 82 (82/1582, 5.2%) |
| 2004-2007 | 41 (41/262, 15.6%) | 22 (22/1007, 2.2%) | 63 (63/1269, 5.0%) |
| 2008-2011 | 29 (29/327, 8.9%) | 26 (26/1168, 2.2%) | 55 (55/1495, 3.7%) |
| **Total (1999-2011)** | 132 (132/926, 14.3%) | 68 (68/3420, 2.0%) | 200 (200/4346, 4.6%) |

From 1999-2003, CPD was **more than ten times** as likely to sustain an operation/personnel violations allegation (18.4%) than it was to sustain an allegation in all other categories (1.6%) (indicated by the shaded cells). Although the City had been warned as early as 1997 that its investigators spent too much time addressing administrative violations and that as a result its investigators did not have enough capacity to investigate more serious allegations, it did nothing during the 1999-2011 time period to shift the allocation of resources away from minor internal matters and towards more serious allegations (Moore deposition, pp. 178-179).

2. **Delays in investigation.** CPD's disciplinary system also allowed for lengthy delays that further reduced the effectiveness of misconduct investigations and discipline. Among all allegation categories, the average length of the initial investigation was 99.9 days. Among sustained allegations, the average length of initial investigations was 290 days for operation or personnel violations and 417 days for all allegation types (the 417-day average reflects the investigation lengths of all 200 sustained allegations divided by 200). Investigations of many other allegation types took, on average, more than 417 days, including the some of the allegations that are most critical to public confidence in the police: integrity violations, excessive force, and unlawful search, entry, and seizure.

**Table 40**

*Average Investigation Length for **Sustained** Allegations, 1999-2011*

| Allegation | n | Average Length of Investigation (days) |
|---|---|---|
| Fabricated Evidence and Integrity Violations (inculpatory) | 4 | 1249 |
| Integrity Violations - Non-Inculpatory | 15 | 987 |
| Excessive Force | 16 | 842 |
| Unlawful Search, Entry, or Arrest | 4 | 790 |
| Domestic Violence | 6 | 743 |
| Operation or Personnel Violations | 132 | 290 |
| Theft / Improper Inventory Procedure | 4 | 205 |
| Demeanor | 17 | 187 |
| Other | 1 | 110 |
| Property Damage | 1 | 60 |
| **Total** | **200** | **416.765** |

**Table 41**

*Average Investigation Length for All Allegations, 1999-2011*

| Allegation | n | Average Length of Investigation (days) |
|---|---|---|
| Domestic Violence | 75 | 589.9 |
| Integrity Violations - Non-Inculpatory | 58 | 338.4 |
| Other | 33 | 319.8 |
| Fabricated Evidence and Integrity Violations (inculpatory) | 122 | 172.0 |
| Excessive Force | 969 | 170.1 |
| Operation or Personnel Violations | 926 | 145.5 |
| Unlawful Search, Entry, or Arrest | 771 | 108.0 |
| Demeanor | 823 | 99.9 |
| Coercive Interrogation / Coerced Confession | 25 | 96.9 |
| Property Damage | 215 | 80.9 |
| Juvenile Policy Violations | 12 | 79.2 |
| Theft / Improper Inventory Procedure | 317 | 73.2 |
| **Total** | **4346** | **139.1** |

**Table 42**

*Average Investigation Length for All Allegations, 1999-2003*

| Allegation | n | Average Length of Investigation (days) |
|---|---|---|
| Domestic Violence | 48 | 586.6 |
| Other | 5 | 390.0 |
| Juvenile Policy Violations | 2 | 127.0 |
| Excessive Force | 382 | 84.5 |
| Fabricated Evidence and Integrity Violations (inculpatory) | 36 | 82.7 |
| Integrity Violations - Non-Inculpatory | 25 | 82.2 |
| Operation or Personnel Violations | 337 | 70.0 |
| Demeanor | 337 | 64.8 |
| Unlawful Search, Entry, or Arrest | 228 | 52.3 |
| Theft / Improper Inventory Procedure | 103 | 52.2 |
| Property Damage | 77 | 50.3 |
| Coercive Interrogation / Coerced Confession | 2 | 31.0 |
| **Total** | **1582** | **84.9** |

**Table 43**

*Average Investigation Length for All Allegations, 2004-2007*

| Allegation | n | Average Length of Investigation (days) |
|---|---|---|
| Integrity Violations - Non-Inculpatory | 13 | 573.5 |
| Operation or Personnel Violations | 262 | 223.5 |
| Other | 5 | 216.6 |
| Excessive Force | 307 | 163.0 |
| Fabricated Evidence and Integrity Violations (inculpatory) | 46 | 143.2 |
| Coercive Interrogation / Coerced Confession | 8 | 132.0 |
| Demeanor | 202 | 117.2 |
| Domestic Violence | 10 | 106.7 |
| Unlawful Search, Entry, or Arrest | 271 | 84.9 |
| Theft / Improper Inventory Procedure | 97 | 74.7 |
| Property Damage | 47 | 70.2 |
| Juvenile Policy Violations | 1 | 49.0 |
| **Total** | **1269** | **144.3** |

**Table 44**
*Average Investigation Length for All Allegations, 2008-2011*

| Allegation | n | Average Length of Investigation (days) |
|---|---|---|
| Domestic Violence | 17 | 883.4 |
| Integrity Violations - Non-Inculpatory | 20 | 505.9 |
| Other | 23 | 327.0 |
| Excessive Force | 280 | 294.5 |
| Fabricated Evidence and Integrity Violations (inculpatory) | 40 | 285.6 |
| Unlawful Search, Entry, or Arrest | 272 | 177.5 |
| Operation or Personnel Violations | 327 | 160.4 |
| Demeanor | 284 | 129.3 |
| Property Damage | 91 | 112.3 |
| Theft / Improper Inventory Procedure | 117 | 90.4 |
| Coercive Interrogation / Coerced Confession | 15 | 87.0 |
| Juvenile Policy Violations | 9 | 71.9 |
| **Total** | **1495** | **191.8** |

Of course, the investigator's recommendation is only the first step of the process. Officers in CPD had many options to appeal and further delay discipline. After an investigator recommends sustaining discipline, the case is forwarded through the accused officer's chain of command ("Command Channel Review"). The Superintendent then receives the recommendation and decides whether to sustain discipline and whether to impose the same punishment or a different punishment than recommended by the investigator. An officer can challenge sustained findings and disciplinary recommendations in arbitration. Further, if the Superintendent seeks termination of an accused officer, the Chicago Police Board holds an evidentiary hearing (like a trial) to determine whether to sustain discipline against the officer, and if so, what the penalty should be. The officer can then appeal the decision of the Chicago Police Board in court. These procedures are described in the FOP union contracts, were discussed by the City's representative Timothy Moore during his 30(b)(6) deposition, and are summarized in various reports regarding the City of Chicago (i.e., the Police Accountability Task Force report and the Department of Justice Investigation).

The following are examples of investigations where I found substantial delays in misconduct investigation and discipline:

a. **CR # 259325 (Jan 2000):** This CR investigation was received in January 18, 2000, but was not submitted to the Superintendent until March 2002, after which it received even more review during the appeal process (CITY-WATTS CR-005522). The Superintendent did not issue an order of suspension until May 16, 2002 (CITY-WATTS CR-005567). This was a fairly straightforward allegation that an officer punched and endangered a medically vulnerable resident because of perceived disrespect. There is no explanation why the investigation required more than two years to complete, or any evidence in the CR file of supervisory oversight to ensure the investigation was expedited.

b. **CR # 1025740 (April 2009):** In this complaint that an officer used excessive force with an expandable baton and failed to properly document his actions, among other allegations, the investigator began the investigation in April 2009, but did not even complete the investigation until August 29, 2011. The Superintendent did not issue discipline until April 23, 2012, three years after the allegation was made (CITY-WATTS CR-069102).

c. **CR # 311881 (Mar 2006):** The investigators took three-and-a-half years – until November 2009 – to submit their investigation for command channel review (CITY-WATTS CR-055476). The complainant alleged that officers had pointed a gun to his head, threatened to kill him, and beat him because they perceived he had disrespected them (CITY-WATTS CR-055502-055503). A video recovered from the restaurant corroborated the complainant's claims (CITY-WATTS CR-055505-055506). Ultimately, the Chancery Court of Cook County reversed the City's termination and suspension of some of the officers because **"The Superintendent essentially conceded . . . that the lengthy delay [of 51 months] could not be explained"** (CITY-WATTS CR-056159). The court reversed the disciplinary findings (CITY-WATTS CR-056172). Thus, the City's delays not only signaled to officers that their misconduct would not be timely reviewed or disciplined, but the delay was actually the reason why no discipline was imposed against the appealing officers. These lengthy delays also send a message to the community that CPD will not take their complaints seriously.

3. **Investigative Quality.** Chicago Police Department General Order 93-3, Conduct of the Investigation, states "The ranking on-duty member of the unit which has initiated an investigation or to which an investigation has been assigned will immediately designate a command or supervisory member of the unit to conduct the investigation. Every effort will be made to ensure that the investigation is conducted by an impartial member" (Bates CITY BG 59022). Analyzing the CR files for evidence of investigative dimensions that are commonly part of every internal affairs investigation (table 45)[49] indicates the investigations frequently contain missing elements that could change the disposition of the case. Therefore, the investigations are not thorough as required by CPD policy. This deprives the victim/complainant, the CPD, and the public of an accurate and unbiased investigation.[50]

    Supervisory review and approval of a personnel investigation is an endorsement of the investigative process. Each investigation that is flawed, but subsequently endorsed by each member of the command staff in the chain of command is explicit approval of the investigative process. Supervisory review and approval of police reports at the time they are submitted is an administrative function aimed at accountability and is intended to ensure:

a. The reports are complete and reflect the actions and omissions of the submitting officer;

b. The approved department forms are utilized, which ensure consistency and due process;

c. The details of the incident establish the elements of a crime or rule infraction and, if necessary, the required levels of proof (i.e., reasonable suspicion; preponderance of the evidence; probable cause);

d. The officer's actions are consistent with legal and administrative rules;

e. Identify collateral issues important to the agency's performance, including policy and procedures, competency and skills of individual officers, and appropriate topics for in-service training;

f. A supervisor provides immediate contact with the submitting officer and has an opportunity to review the incident in its totality and provide direction and control over personnel, materials and resources as needed;

---

[49] Table 45 reflects the entire data set (1999-2011). Table 46 reflects the same analysis for 1999-2003; table 47 2004-2007; table 48 2008-2011.

[50] Tables 13, 21, 29, and 37 suggest potential bias in the personnel investigations.

g. The official reports follow the approved chain of command from point of origin to final
destination so that all members in the chain of command remain informed.

To effectively supervise investigative personnel, a supervisor is required to know
common investigative tasks (e.g., area canvass; interview victim witnesses and officers),
common investigative techniques (e.g., surveillance; collect evidence; record statements) and
to probe officers for answers when they submit a report that does not contain these
common elements. This is the quintessence of supervision. A report that is missing common
investigative tasks must be returned to the officer to be completed and resubmitted. If a
supervisor is aware of common investigative tasks and techniques, then the supervisor would
be able to identify reporting deficiencies and any missed tasks toward a thorough
investigation. However, the supervisors that endorsed the CR files knew or should have
known that common investigative elements were missing, but approved them anyway. By
endorsing police reports, the supervisors are accountable for and concur with the reports'
contents, the officers' conduct, and they also attest that the reports meet the customary
standards listed above. Because the supervisors endorsed the investigations submitted by the
internal affairs investigators, the supervisors agreed with the investigator's method even
though the method did not comport with accepted industry standards. When flawed
investigations are endorsed, the Department misses the opportunity to uncover potential
problems, preempt emerging patterns and take corrective action.

Conducting an internal investigation is a process. That process encompasses a range of
activities resulting in a final product that involves collecting and interpreting facts to inform
criminal and/or administrative proceedings. The CR files are replete with incomplete
activities fundamental to a thorough investigation. When these activities are left unaddressed,
the investigation is not thorough and lacks evidence sufficient to justify the disposition.
Consequently, the final product includes equivocal findings and equivocal findings result in
an unreliable investigation. The general recurring themes arising from the content analysis of
the investigations that support my conclusion appear in table 45, which presents a summary
of investigative activities from the CR files, expressed in numerical terms that were
completed. These activities are fundamental to any internal affairs investigation and are
expected to be completed in each applicable case to ensure a thorough investigation (as

required by CPD General Order 93-3 and the associated CPD Special Orders and as required by nationally accepted standards for internal affairs investigations). Because many of these activities are incomplete, they reflect a lack of initiative and tenacity that are indispensable for a thorough investigation. The result is a final product whose findings are unreliable. My opinion is that overall the investigations conducted by CPD during the 1999-2011 time period were superficial, were not thorough, and did not comport with nationally accepted standards for such investigations.[51]

**Table 45**
*Completed Investigative Activities in the CR Files (1999-2011)*

| Investigative Dimension | n | Yes | No | Subtotal (yes & no) | % of Yes | Not Applicable | Refused |
|---|---|---|---|---|---|---|---|
| Arrest Report for Any Victim/ Complainant | 1227 | 268 | 37 | 305 | 87.9% | 922 | 0 |
| Arrest Photos of Any Victim/ Complainant | 1227 | 226 | 78 | 304 | 74.3% | 923 | 0 |
| District Phone Tapes Preserved | 1227 | 266 | 149 | 415 | 64.1% | 812 | 0 |
| Any Victim Contacted | 1227 | 653 | 461 | 1114 | 58.6% | 113 | 0 |
| Complainant Contacted | 1227 | 718 | 507 | 1225 | 58.6% | 2 | 0 |
| In-Person Interview with Any Witness | 1227 | 113 | 101 | 214 | 52.8% | 1012 | 1 |
| Medical Treatment Received by Any Victim | 1227 | 129 | 118 | 247 | 52.2% | 980 | 0 |
| Any Victim Described Pain or Injuries | 1227 | 241 | 224 | 465 | 51.8% | 762 | 0 |
| Did Any Victim Request Medical Attention | 1227 | 127 | 120 | 247 | 51.4% | 980 | 0 |
| In-Person Interview with Any Victim | 1227 | 321 | 323 | 644 | 49.8% | 571 | 12 |
| In-Person Interview with Complainant | 1227 | 318 | 395 | 713 | 44.6% | 509 | 5 |
| Any Witness Contacted | 1227 | 214 | 297 | 511 | 41.9% | 716 | 0 |
| Any Officer Submit Administrative Report | 1227 | 507 | 720 | 1227 | 41.3% | 0 | 0 |
| Radio Communication Tapes Preserved | 1227 | 309 | 635 | 944 | 32.7% | 283 | 0 |
| Photos of Any Victim Taken by CPD | 1227 | 267 | 852 | 1119 | 23.9% | 108 | 0 |
| Any Accused Officer Identified by Any Victim | 1227 | 258 | 861 | 1119 | 23.1% | 108 | 0 |
| Statement Taken From Any Witness | 1227 | 46 | 168 | 214 | 21.5% | 1012 | 1 |
| Statement Taken from Any Victim | 1227 | 135 | 511 | 646 | 20.9% | 570 | 11 |
| Statement Taken From Complainant | 1227 | 123 | 591 | 714 | 17.2% | 509 | 4 |
| Any Accused Officer Identified by Any Witness | 1227 | 67 | 346 | 413 | 16.2% | 814 | 0 |
| Scene Canvass | 1227 | 137 | 970 | 1107 | 12.4% | 120 | 0 |
| Any Accused Officer Statement Taken | 1227 | 81 | 1146 | 1227 | 6.6% | 0 | 0 |
| Photos of Scene Obtained | 1227 | 59 | 1059 | 1118 | 5.3% | 109 | 0 |
| Any Non-Accused Officer Statement Taken | 1227 | 30 | 632 | 662 | 4.5% | 565 | 0 |
| Cameras Located at Scene | 1227 | 42 | 1080 | 1122 | 3.7% | 105 | 0 |
| Any Officer Referred to Cook County Prosecutor's Office | 1227 | 3 | 751 | 754 | 0.4% | 473 | 0 |

---

[51] Regarding these data, one CR 271390 actually contained separate complaints from two different complainants against the same officer, and their separate complaints received separate findings (CITY-WATTS CR-053661, outcome of first complainant's allegations); CITY-WATTS CR-053663-053665 (initiating investigation into separate set of allegations). Because these are two separate complaints with different allegations, different complainants, and different accused officers, that CR is treated as two separate CRs for purposes of the investigative activities analysis.

**Table 46**
*Completed Investigative Activities in the CR Files (1999-2003)*

| Investigative Dimension | n | Yes | No | Subtotal (yes & no) | % of Yes | Not Applicable | Refused |
|---|---|---|---|---|---|---|---|
| Arrest Report for Any Victim/ Complainant | 465 | 109 | 9 | 118 | 92.4% | 347 | 0 |
| Complainant Contacted | 465 | 328 | 136 | 464 | 70.7% | 1 | 0 |
| Any Officer Submit Administrative Report | 465 | 326 | 139 | 465 | 70.1% | 0 | 0 |
| Any Victim Contacted | 465 | 290 | 126 | 416 | 69.7% | 49 | 0 |
| Arrest Photos of Any Victim/ Complainant | 465 | 81 | 37 | 118 | 68.6% | 347 | 0 |
| District Phone Tapes Preserved | 465 | 94 | 66 | 160 | 58.8% | 305 | 0 |
| Any Witness Contacted | 465 | 128 | 95 | 223 | 57.4% | 242 | 0 |
| Medical Treatment Received by Any Victim | 465 | 54 | 55 | 109 | 49.5% | 356 | 0 |
| Did Any Victim Request Medical Attention | 465 | 51 | 57 | 108 | 47.2% | 357 | 0 |
| In-Person Interview with Any Victim | 465 | 130 | 161 | 291 | 44.7% | 172 | 2 |
| In-Person Interview with Any Witness | 465 | 56 | 72 | 128 | 43.8% | 336 | 1 |
| Any Victim Described Pain or Injuries | 465 | 104 | 135 | 239 | 43.5% | 226 | 0 |
| In-Person Interview with Complainant | 465 | 127 | 201 | 328 | 38.7% | 137 | 0 |
| Radio Communication Tapes Preserved | 465 | 107 | 271 | 378 | 28.3% | 87 | 0 |
| Any Accused Officer Identified by Any Victim | 465 | 111 | 307 | 418 | 26.6% | 47 | 0 |
| Any Accused Officer Identified by Any Witness | 465 | 44 | 143 | 187 | 23.5% | 278 | 0 |
| Photos of Any Victim Taken by CPD | 465 | 95 | 323 | 418 | 22.7% | 47 | 0 |
| Statement Taken from Any Victim | 465 | 46 | 245 | 291 | 15.8% | 171 | 3 |
| Scene Canvass | 465 | 62 | 366 | 428 | 14.5% | 37 | 0 |
| Statement Taken From Any Witness | 465 | 17 | 111 | 128 | 13.3% | 336 | 1 |
| Statement Taken From Complainant | 465 | 40 | 287 | 327 | 12.2% | 137 | 1 |
| Any Accused Officer Statement Taken | 465 | 35 | 430 | 465 | 7.5% | 0 | 0 |
| Photos of Scene Obtained | 465 | 20 | 412 | 432 | 4.6% | 33 | 0 |
| Any Non-Accused Officer Statement Taken | 465 | 11 | 259 | 270 | 4.1% | 195 | 0 |
| Cameras Located at Scene | 465 | 5 | 428 | 433 | 1.2% | 32 | 0 |
| Any Officer Referred to Cook County Prosecutor's Office | 465 | 1 | 286 | 287 | 0.3% | 178 | 0 |

**Table 47**
*Completed Investigative Activities in the CR Files (2004-2007)*

| Investigative Dimension | n | Yes | No | Subtotal (yes & no) | % of Yes | Not Applicable | Refused |
|---|---|---|---|---|---|---|---|
| Arrest Report for Any Victim/ Complainant | 368 | 82 | 17 | 99 | 82.8% | 269 | 0 |
| Arrest Photos of Any Victim/ Complainant | 368 | 75 | 23 | 98 | 76.5% | 270 | 0 |
| District Phone Tapes Preserved | 368 | 81 | 41 | 122 | 66.4% | 246 | 0 |
| Any Victim Described Pain or Injuries | 368 | 84 | 45 | 129 | 65.1% | 239 | 0 |
| Did Any Victim Request Medical Attention | 368 | 50 | 36 | 86 | 58.1% | 282 | 0 |
| Any Victim Contacted | 368 | 194 | 143 | 337 | 57.6% | 31 | 0 |
| Complainant Contacted | 368 | 209 | 159 | 368 | 56.8% | 0 | 0 |
| Medical Treatment Received by Any Victim | 368 | 48 | 37 | 85 | 56.5% | 283 | 0 |
| In-Person Interview with Any Victim | 368 | 99 | 90 | 189 | 52.4% | 174 | 5 |
| In-Person Interview with Any Witness | 368 | 23 | 24 | 47 | 48.9% | 321 | 0 |
| In-Person Interview with Complainant | 368 | 97 | 108 | 205 | 47.3% | 159 | 4 |
| Radio Communication Tapes Preserved | 368 | 96 | 181 | 277 | 34.7% | 91 | 0 |
| Any Witness Contacted | 368 | 47 | 100 | 147 | 32.0% | 221 | 0 |
| Any Officer Submit Administrative Report | 368 | 110 | 258 | 368 | 29.9% | 0 | 0 |
| Photos of Any Victim Taken by CPD | 368 | 92 | 245 | 337 | 27.3% | 31 | 0 |
| Statement Taken From Any Witness | 368 | 12 | 35 | 47 | 25.5% | 321 | 0 |
| Statement Taken from Any Victim | 368 | 47 | 144 | 191 | 24.6% | 174 | 3 |
| Any Accused Officer Identified by Any Victim | 368 | 72 | 265 | 337 | 21.4% | 31 | 0 |
| Statement Taken From Complainant | 368 | 42 | 165 | 207 | 20.3% | 159 | 2 |
| Any Accused Officer Identified by Any Witness | 368 | 13 | 88 | 101 | 12.9% | 267 | 0 |
| Scene Canvass | 368 | 35 | 297 | 332 | 10.5% | 36 | 0 |
| Any Accused Officer Statement Taken | 368 | 23 | 345 | 368 | 6.3% | 0 | 0 |
| Any Non-Accused Officer Statement Taken | 368 | 11 | 190 | 201 | 5.5% | 167 | 0 |
| Photos of Scene Obtained | 368 | 12 | 324 | 336 | 3.6% | 32 | 0 |
| Cameras Located at Scene | 368 | 7 | 330 | 337 | 2.1% | 31 | 0 |
| Any Officer Referred to Cook County Prosecutor's Office | 368 | 1 | 244 | 245 | 0.4% | 123 | 0 |

**Table 48**
*Completed Investigative Activities in the CR Files (2008-2011)*

| Investigative Dimension | n | Yes | No | Subtotal (yes & no) | % of Yes | Not Applicable | Refused |
|---|---|---|---|---|---|---|---|
| Arrest Report for Any Victim/ Complainant | 394 | 77 | 11 | 88 | 87.5% | 306 | 0 |
| In-Person Interview with Any Witness | 394 | 34 | 5 | 39 | 87.2% | 355 | 0 |
| Arrest Photos of Any Victim/ Complainant | 394 | 70 | 18 | 88 | 79.5% | 306 | 0 |
| District Phone Tapes Preserved | 394 | 91 | 42 | 133 | 68.4% | 261 | 0 |
| In-Person Interview with Any Victim | 394 | 92 | 72 | 164 | 56.1% | 225 | 5 |
| Any Victim Described Pain or Injuries | 394 | 53 | 44 | 97 | 54.6% | 297 | 0 |
| In-Person Interview with Complainant | 394 | 94 | 86 | 180 | 52.2% | 213 | 1 |
| Medical Treatment Received by Any Victim | 394 | 27 | 26 | 53 | 50.9% | 341 | 0 |
| Did Any Victim Request Medical Attention | 394 | 26 | 27 | 53 | 49.1% | 341 | 0 |
| Any Victim Contacted | 394 | 169 | 192 | 361 | 46.8% | 33 | 0 |
| Complainant Contacted | 394 | 181 | 212 | 393 | 46.1% | 1 | 0 |
| Statement Taken From Any Witness | 394 | 17 | 22 | 39 | 43.6% | 355 | 0 |
| Radio Communication Tapes Preserved | 394 | 106 | 183 | 289 | 36.7% | 105 | 0 |
| Any Witness Contacted | 394 | 39 | 102 | 141 | 27.7% | 253 | 0 |
| Statement Taken from Any Victim | 394 | 42 | 122 | 164 | 25.6% | 225 | 5 |
| Statement Taken From Complainant | 394 | 41 | 139 | 180 | 22.8% | 213 | 1 |
| Photos of Any Victim Taken by CPD | 394 | 80 | 284 | 364 | 22.0% | 30 | 0 |
| Any Accused Officer Identified by Any Victim | 394 | 75 | 289 | 364 | 20.6% | 30 | 0 |
| Any Officer Submit Administrative Report | 394 | 71 | 323 | 394 | 18.0% | 0 | 0 |
| Scene Canvass | 394 | 40 | 307 | 347 | 11.5% | 47 | 0 |
| Cameras Located at Scene | 394 | 30 | 322 | 352 | 8.5% | 42 | 0 |
| Any Accused Officer Identified by Any Witness | 394 | 10 | 115 | 125 | 8.0% | 269 | 0 |
| Photos of Scene Obtained | 394 | 27 | 323 | 350 | 7.7% | 44 | 0 |
| Any Accused Officer Statement Taken | 394 | 23 | 371 | 394 | 5.8% | 0 | 0 |
| Any Non-Accused Officer Statement Taken | 394 | 8 | 183 | 191 | 4.2% | 203 | 0 |
| Any Officer Referred to Cook County Prosecutor's Office | 394 | 1 | 221 | 222 | 0.5% | 172 | 0 |

4.  *Failure to fully investigate allegations of misconduct and the "affidavit requirement."* The CRs I reviewed include many examples of allegations that were never investigated because the Chicago Police Department did not obtain an affidavit in support of the allegations. I have reviewed statutory language and union contracts that discuss this requirement. The Illinois legislature in 2003 passed a statute amending the Uniform Peace Officers' Disciplinary Act, effective January 1, 2004, that stated: "Anyone filing a complaint against a sworn peace officer must have the complaint supported by a sworn affidavit" (50 ILCS 725/3.8(b)). However, that Act also contained an exception: the affidavit requirement did not apply if the City bargained otherwise in a collective bargaining agreement. Specifically, the law stated: "The provisions of this Act apply only to the extent there is no collective bargaining agreement currently in effect dealing with the subject matter of this Act" (50 ILCS 725/6). The Act also does not specify that the complainant must be the person who signs the affidavit.

In the 1999-2003 contract between the Fraternal Order of Police and the Chicago Police Department, there was no requirement to obtain an affidavit to investigate any complaint of misconduct (1999-2003 FOP Contract). That changed in the 2003-2007 contract, effective July 1, 2003 to June 30, 2007, which stated that except for anonymous complaints of criminal conduct and complaints by one Department member against another, the Department will make a "good faith effort" to obtain "an appropriate affidavit," meaning an affidavit in which the complainant "affirms under oath that the allegation(s) and statement(s) made by the complainant are true," and that "no officer" will be required to "answer any allegation of misconduct" without such an affidavit (except for exceptions including anonymous complaints of criminal conduct) (2003-2007 FOP Contract, pp. 115-116). This language was retained in the 2007-2012 contract (2007-2012 FOP Contract, pp. 74-75). I find no evidence in discovery that the City attempted to bargain against this requirement or otherwise mitigate it; in fact, the City's representative previously testified at deposition that the City made no attempt to change the language in 2012 (Klimas deposition, 2/22/17, 72: 8; 73: 12).

The contract allowed the City to continue investigations even in the absence of an affidavit from the complainant by obtaining an affidavit from the head of the appropriate disciplinary body verifying that "he or she has reviewed objective verifiable evidence" leading him or her to conclude "that it is necessary and appropriate for the investigation to continue" (2003-2007 FOP Contract, p. 116; 2007-2012 FOP Contract, p.74). Despite having this option, the City essentially never used this procedure; the disciplinary agencies submitted **<u>requests</u>** for affidavit overrides just 34 times in the eleven-year period between February 18, 2005 and January 1, 2016 (98 times total between February 18, 2005 and December 26, 2018, with 64 of those requests submitted after January 1, 2016).[52] The City's representative confirmed that he had no reason to disagree with those numbers (Moore deposition, p. 113.

Thus, because the City neglected to bargain for the ability to pursue complaints without affidavits and because the City failed to use the collective bargaining agreement's procedures allowing it to override the affidavit requirement when appropriate, the City ignored a sizable portion of civilian complaints against its officers. Indeed, the City's representative admitted

---

[52] Evaluation of the Affidavit Override in Disciplinary Investigations, p. 12.

that he had no reason to disagree that the affidavit requirement was implemented because it was bargained between the union and CPD in its 2003-2007 contract (Moore deposition, p. 109).

The so-called "affidavit requirement" was not a requirement. Exceptions existed that allowed the CPD's to initiate and ensure an internal affairs investigation based on "objective verifiable evidence." By casting the affidavit as a "requirement," the CPD avoided conducting investigations when allegations were made against police officers, which impaired its effectiveness in the following ways:

a. **Lack of accountability:** By circumventing the investigation of potentially corrupt officers, the city undermined accountability mechanisms within the CPD. This lack of accountability enabled misconduct to continue.

b. **Abuse of power:** The city's failure to bargain in good faith with the union was abusive and not in the best interest of the public. The city used its position to protect CPD officers from scrutiny.

c. **Erosion of process:** Avoiding internal affairs investigations into potentially corrupt activities deprived the public of an equitable process, as well as the opportunity to identify corrupt officers, and clear an innocent victim's/complainant's name. As such, victims of CPD misconduct were denied justice by CPD.

d. **Compromised public safety:** By failing to invoke the internal affairs process when "objective verifiable evidence" existed, corrupt CPD officers were allowed to continue operating without oversight.

e. **Ethical concerns:** By failing to invoke the internal affairs process when "objective verifiable evidence" existed, the City's actions raised ethical concerns about the prioritization of protecting CPD personnel over upholding the principles of justice, transparency, and the rule of law that the public expects and is entitled to.

Candor and honesty are intrinsic to police operations.[53] Veracity promotes pro-social behavior so that social order and mutual trust are preserved. The job specifications for the Chicago police rank structure are replete with supervisory functions that require successive

---

[53] The Cook County State's Attorney's Office promulgated a list of CPD Brady/Giglio officers that they cannot call to testify because of their dishonesty (updated July 17, 2023) (Bates PL JOINT 82730-82734).

ranks to monitor subordinate personnel for compliance with agency policy. Police policy exists to provide clear guidelines, rules, and procedures that govern the actions and conduct of police officers. These policies are designed to ensure that individual police officers and law enforcement agencies operate efficiently, fairly, and in compliance with the law while maintaining the safety and security of the public. A promulgated policy is only effective when it is consistently and appropriately enforced by supervisors within the agency. Enforcement by supervisors is a crucial step to ensuring that policies are followed, and that officers' actions align with the department's standards and values.

5. **Examples consistent with my opinions:**

In addition to conducting quality control review of specific CRs and conducting statistical analysis on the CRs as a whole, I also reviewed the dataset and additional specific CRs to glean further insight on the CPD's processes for investigating allegations of misconduct. In my review of the dataset, I identified specific CRs that were consistent with my conclusions, including failures to adequately discipline misconduct and failures to sufficiently investigate misconduct of the most serious categories (including alleged integrity violations and coerced confessions).

   a. **Failures to sufficiently discipline misconduct and discipline being reduced through the appeal/review process:**

      i. **CR# 1042276 (CITY-WATTS CR-064213) (December 2010).** This complaint was initiated on December 26, 2010 for an "accidental discharge" of firearm by an officer (CITY-WATTS CR-064258). A civilian witness was interviewed. She reported that from her bedroom window she saw two officers approaching the driver of a red SUV, that the officers yelled at the driver to get out of the car with no response, that the car then began slowly rolling forward, and that the driver's side officer pulled his gun, dropped down, and shot at the driver's rear tire (CITY-WATTS CR-064275-064276). The officer reported that the discharge was accidental—and did not notify at the time that he had fired shots—but the evidence showed an intentional discharge (CITY-WATTS CR 64284-87). The investigator sustained two Rule 14 violations against the officer for making false reports regarding (CITY-WATTS CR 64287). But even though the facts were straightforward and involved an integrity violation by the officer, the matter rested for more than

four years until July 8, 2015, when the officer signed a mediation agreement, and a one-day suspension was imposed in April 2016—more than five years after the incident (CITY-WATTS CR-064219).

ii.   **CR # 1025740 (April 2009).** In this investigation, the IPRA investigator concluded that Sergeant Andre Hasan had failed to initiate a complaint when requested to do so by the mother of an alleged victim of police excessive force and that the sergeant failed to report misconduct even when an officer under his supervision admitted to carrying a weapon that he was not certified to carry and use (CITY-WATTS CR-069135). However, the Superintendent did not impose discipline against the Sergeant for integrity violations or failure to report misconduct. Instead, the only Rule violations sustained by the Superintendent were "inattention to duty" and "failure to promote department efforts to implement policy/goals," which do not reflect the finding that the Sergeant attempted to cover up misconduct by a subordinate by not initiating a disciplinary investigation when requested by the victim's mother and not initiating a disciplinary proceeding when his subordinate admitted misconduct to him. This is also an example of a complaint involving failure to sufficiently note or document integrity violations.

iii.  **CR # 1035196 (CITY-WATTS CR-070825) (April 2010).** The accused officer was found to have sent messages to his estranged wife including "Die bitch so I can shit on your grave and piss on your tombstone," and according to her sworn affidavits, the officer had thrown a television at her, pushed her to the ground, threatened her, choked her, and pushed her head against a wall, threatened to have her arrested at her job, and made false complaints against her (CITY-WATTS CR-070838, 070868, 070879). He was also found to have violated a court order of protection (CITY-WATTS CR-070831). Three years later, the City entered a mediation agreement imposing just a two-day suspension (CITY-WATTS CR-070837). The City made no real effort to investigate whether the accused officer had committed falsehoods; their strategy was just to ask him whether the reports he had made, which he had been accused of fabricating, was true or not (CITY-WATTS CR-071235-

71292). Generally accepted standards required the investigators to seek external evidence that could be used to confront the accused officer.

    iv. **CR # 305652 - CITY-WATTS CR-032786-032878 (May 2005).** In this investigation, two prosecutors participating in a "ride-along" exercise alleged that the officers failed to administer required warnings and monitoring of a DUI suspect. The investigators concluded that the accused officer failed to perform a required test but then lied on his police report by documenting that he had actually performed the test. Despite a sustained finding involving lying on a report, the Department issued just a one-day suspension (CITY-WATTS CR-032787).

b. **Insufficient Investigations of Coerced Confession and Integrity Violation Allegations**

    i. **CR No. 309825 (11/23/2005).** This is a semi written and typed complaint from a mother who alleges that two male officers made her son take off all of his clothes and sit in front of them nude until he confessed to robbing a classmate of $1.35 (p.4). The complaint says that the mother, the complainant, refused to sign. The finding was deemed to be "unfounded" because the complainant refused to sign the sworn affidavit (p. 8). The investigator did not interview the victim. Moreover, there was no documentation of what the mother said, no attempt to gather any documents, and no attempt to canvas the scene. These were insufficient investigative steps for a serious allegation of a coercive interrogation.

    ii. **CR No. 275606 (11/26/2001).** This was a written report alleging that two officers questioned her client without counsel despite informing the detectives that they wanted to exercise their right to counsel. The defendant was charged with first degree murder. The complaint alleged that the investigating Sergeant made "numerous telephone call[s]" (p. 5) to the attorney's office for an interview. The attorney made several return calls back, and stated that she didn't intend to file a report but complained that the police had not allowed her client to access counsel and had interviewed her client despite notice that he should not be interviewed without counsel.

No substantive effort was made to determine who may have been involved in denying the alleged victim access to counsel.

iii. **CR #252153 (March 1999):** The complainant alleged that the officer struck him in the face during a traffic stop. The officer gave contradictory statements: in a written to/from report made during the investigation he denied striking the complainant, but he in fact admitted to striking the complainant "while defending himself" in a report a month earlier (CITY-WATTS CR-000516). The initial recommendation for lying in an official report was a 2-day suspension, but the Department imposed no discipline whatsoever (CITY-WATTS CR-000516). The investigator recommended a Rule 14 "making a false report" violation on this basis (CITY-WATTS CR-000526). This is also an example of undue delay in investigation; although the investigation was complete by June 1999, the investigation was not reviewed by the Complaint Review Panel until July 12, 2000 (CITY-WATTS CR-000593, 000613). The file does not indicate that the Department took any further action to discipline an apparent deliberate falsehood by an officer during an investigation.

iv. **CR #1044797 (April 18, 2011).** This complaint shows how the CPD failed to use information available to the City – including evidence from lawsuits and criminal proceedings – to identify serious integrity violations. A complaint was initiated in April 2011 that, among other things, the accused officer had lied about seeing the victim place drugs in a stop sign. The investigation was closed in June 2011 because the victim had filed a lawsuit and his attorney had not provided more information. The victim was acquitted of a felony drug charge and filed a lawsuit that was settled for $99,000. An investigation was not then reopened; only after a separate office, the City of Chicago Inspector General, conducted an investigation and obtained more information did the CPD reopen the investigation in August 2014. That investigation revealed that the accused officer falsified multiple reports, falsely arrested the victim, and falsely testified under oath.

Much like the Baker/Glenn arrest discussed in more detail below, the investigation revealed that the accused officer could not have possibly seen the supposed hiding of drugs by the victim. Notably, the letter that initiated the investigation contained allegations of criminal conduct – perjury – that could have and should have been investigated regardless of cooperation: "On June 28, 2010, the officers were on patrol in unit 15 and Officer Velez falsely testified that he observed someone placing heroin at the base of a stop sign. Once the officers arrive on the scene, the video shows that they arrest two individuals—the one whom actually did place the drugs at the stop sign and another man. They tell everyone else that they can leave. As Mr. Conley walks away, the investigation references actions shown on a video. The investigation indicates the video reveals Officer Velez grabbed Mr. Conley's arm. Mr. Conley testified at trial that Officer Velez told him: 'You look like one slick nigger. It's your lucky day. You're going to take this case.'

The investigation also describes the video showing the officers release the actual individual who committed the crime. The video then shows the officers handcuff Mr. Conley, place him in the patrol wagon, and then drive away. Based on the overwhelming evidence that Mr. Conley did not commit the crime, Mr. Conley was found not-guilty at trial. Despite the officers' knowledge that Mr. Conley did not commit the crime, the officers arrested Mr. Conley for the crime, charged Mr. Conley with the crime, caused Mr. Conley to be incarcerated for the crime, and signed the complaint against Mr. Conley alleging he committed the crime. Moreover, Officer Velez committed perjury not once, but twice, at the preliminary hearing and at the trial. Furthermore, the officers harassed Mr. Conley at his home prior to the trial and continue to harass him today."

A simple map contained in the investigation file showed that Officer Velez lied, and reflected – much as in the Watts case – what could have been uncovered in a timely manner if investigators had thoroughly investigated the allegations.



Addendum A: Overhead view showing intersection of Augusta Blvd. and Lavergne Ave. and the T- intersection of Cortez St. and Lavergne Ave. (the Corner). (Google Maps)

Officer Velez was ultimately separated from the Department, but only after the CPD had closed the initial investigation and reinvestigated the allegations based only on a separate agency's independent investigation (CITY-WATTS CR-064883-064886, 64891, 64910, 64985). Until that time, the CPD intended to retain Officer Velez in their employ.

6. **There is no evidence the officers submit reports accounting for their actions separately without conferring on a common story with each other beforehand**. A fundamental principle of conducting any investigation (criminal or administrative) involving multiple targets and witnesses is to keep the individuals separate to ensure they do not agree on a common story and their recollection of the facts is as they remember them and is not contaminated by another person's recollection of the event. The CPD investigators do not necessarily control the reporting situation; this allows officers to confer beforehand, which is not an accepted investigative practice. The CPD investigators may also proffer questions

ahead of time for the officers to answer, sometimes delivered via requests for to/from reports, which reveals the investigator's intentions, signals where the investigation is heading and enables officers to confer about a common story.[54] This preempts the investigator's ability to test the veracity of the witness; preformatted questions for the target or the witness to answer is not the same as reviewing notes or documents prior to answering any questions. Invariably, when the officer submits their report they deny the allegations, or deny witnessing anything that would confirm the allegation. This impugns the propriety of the questioning since an internal investigation must be objective.

## VIII.   CHICAGO POLICE DEPARTMENT'S LONG-TERM NOTICE OF POOR MANAGEMENT AND INSUFFICIENT INVESTIGATIONS OF ALLEGED MISCONDUCT.

The Chicago Police Department has history of corruption, and both the City and Police Department have been aware of these problems for decades.[55] The personnel complaint function was originally administered by CPD internal affairs. However, the 1972 Metcalfe Report found that internal affairs "…complaints from citizens of abusive conduct by police are almost universally rejected by the Police Department's self-investigation system" (p. 32).[56] By 1974, the City developed the Office of Professional Standards (OPS). This body was intended as an independent police

---

[54] For example, Moore confirmed at deposition that the CPD does issue a set of predefined questions to officers to answer instead of requiring them to sit for formal statements. There is no integrity over this practice since the investigator loses the ability to control the independence of the officers' answers. The investigator also loses the ability to solicit immediate feedback from contemporaneous answers (Moore deposition, 56: 20-25; 57: 1-25). Moore explained that this method was a matter of efficiency, which indicates the CPD may not have invested sufficient resources to conduct proper internal investigations and used this shortcut method to prioritize time over uncovering the truth.

[55] See: **1)** Commission on Police Integrity. (November 1997). Report of the Commission on Police Integrity. Chicago, IL, p. 9, for a chronology of significant cases between 1960 and 1997; **2)** Police Accountability Task Force Report. (April 2016). Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve, pp. 23-24, for a discussion of previous corruption task forces (Bates BAKER GLENN 6794-6983); **3)** Futterman, C. B., Mather, H. M., & Miles, M. (2007). The Use of Statistical Evidence to Address Police Supervisory and Disciplinary Practices: The Chicago Police Department's Broken System. *DePaul Journal for Social Justice*, *1*, 251 329 (documenting a litany of police corruption cases, and the CPD's internal disciplinary data that reveal a substandard accountability system).

[56] A Report and Recommendations Based on Hearings Before the Blue Ribbon Panel convened by the Honorable Ralph H. Metcalfe. (1972). Misuse of Police Authority in Chicago. The findings from the Metcalfe Report in 1972 that CPD "almost universally rejected by the Police Department's self-investigation system" is consistent with the data in the instant case on the same issue. The data in the instant case reveal that 91.3% of external allegations against CPD officers were not sustained (a disposition similar to "universally rejected") (see table 13).

oversight agency tasked with investigating citizen complaints. However, it was soon evident that OPS had direct ties to CPD, the Chief Administrator was appointed by the Mayor and worked under the Police Superintendent. The OPS conducted "sloppy investigations," and they were "vulnerable to pressure by the police union."[57]

The OPS continued until 2007 when it was dissolved and replaced by the Independent Police Review Authority (IPRA). Other than changing its name, the discovery materials that I reviewed do not suggest that IPRA was substantively different from OPS. For example, IPRA's Chief Administrator was also appointed by the Mayor and "inherited the exact same staff (from OPS) that was inadequate, and had a culture of protecting the police."[58] Indeed, the City's representative testified that the only two major changes from OPS to IPRA were **1)** a transition to all civilian investigators and **2)** "a bit more transparency," meaning sharing more information about the investigations they conducted (Moore deposition, p. 128). The City, through its representative, disclaimed knowledge of any operational change in terms of how it conducted its investigations or new powers or authority to conduct investigations (Moore deposition, p. 129).

IPRA's failure publicly manifested around 2015 following the police-involved shooting death of Laquan McDonald. At that time, Mayor Rahm Emanuel assembled the Police Accountability Task Force to investigate the problems inside CPD, and soon IPRA's failures were evident. The Task Force found that IPRA was "under-resourced, lack[ed] true independence" and was "not held accountable for their work." Also, IPRA had not investigated "40% of complaints filed,"[59] and its

---

[57] Shielded from Justice: Police Brutality and Accountability in the United States. Chicago: Office of Professional Standards. Retrieved on July 7, 2023 from https://www.hrw.org/legacy/reports98/police/uspo55.htm. The report also found a disciplinary system fraught with long investigative delays, credibility issues with OPS staff, and rude staff, all of which contribute to a system that did not prioritize the complainant. The notion that OPS conducted "sloppy investigations" is similar to what the data in the instant case reveal. Many investigations were incomplete and missing essential elements that rendered them unreliable (see tables 45 to 48).

[58] Cabaniss, W. (October 13, 2015). The Origins of IPRA. *South Side Weekly*. Retrieved on July 7, 2023, from https://southsideweekly.com/the-origins-of-ipra/.

[59] The data in the instant case bear some similarity to this finding. There are 14 CR files that bear the "not investigated" disposition (CR numbers 300778, 1004698, 1008321, 1013134, 1014553, 1055288, 1056042, 1058489, 1058852, 1059446, 1060620, 1082599, 1091128, 1091138).

"disciplinary recommendations" were "reduced or eliminated...in 73% of cases."[60] The conclusion I reach is that IPRA was biased in favor of the police.[61]

Whether OPS, and IPRA, the institutional responses have been lackluster, nothing more than current practices repackaged under a new name, with reform recommendations going unanswered.[62] For example, the 2016 Police Accountability Task Force Report noted:

"The fact of the matter is that there is a general absence of a culture of accountability within CPD, largely because no one in top leadership has taken ownership of the issue. Although so-called 'problem officers' are either well known to their supervisors and CPD's leadership or easily identified, few steps are being taken to proactively manage and redirect those officers' conduct. The effective tools for providing greater oversight and supervision to officers are well known and widely used in other jurisdictions. There appears to be no urgency within CPD around accountability. Something must change, and that change must come from the highest levels of CPD.

CPD's efforts to actively monitor and improve officer behavior appear to be at a standstill, but the problem is not new. CPD's history is replete with examples of wayward officers whose bad behavior or propensity for bad behavior could have been identified much earlier if anyone had viewed managing this risk as a business imperative (p. 96, Bates BAKER GLENN 6895).

But, despite [Officer Jerome Finnigan's] outward appearances, red flags were piling up long before 2006. Between 2000 and the time he was indicted in 2006 and ultimately resigned in 2008, Finnigan racked up 89 CRs. Over the entire course of his career, he had 161 total CRs—a shocking number by any standard. These CRs were

---

[60] Police Accountability Task Force Report. (April 2016). Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve, pp. 11-12.

[61] The data in the instant case bear some similarity to this finding. Tables 13, 21, 29, and 37 reveal bias in favor of the police, where the overwhelming majority of external allegations against the officers were not sustained.

[62] Concerning recommendations for reform from the Commission on Police Integrity, (November 1997), the Police Accountability Task Force Report (April 2016) notes "Unfortunately, other recommendations were not addressed and still need attention" (p. 24, Bates BAKER GLENN 6823).

for a range of serious complaints, including numerous lawsuits; numerous warrantless, non-consensual searches; theft; and other felony crimes. And yet, according to CPD records provided by the City, no effort was ever taken to enroll Finnigan in the department's formal intervention programs or otherwise intercede in his obvious pattern of misconduct (Finnigan was later identified in CPD's manual efforts to identify and enroll more officers in the department's formal intervention programs—discussed in more detail below—but, by that point, Finnigan had already been indicted.) (p. 97, Bates BAKER GLENN 6896).

In 2005, another CPD officer, Corey Flagg, was arrested for his part in a ring of five Englewood officers who used traffic stops and home invasions to rob drug dealers. Flagg pled guilty to conspiracy to distribute cocaine and marijuana, as well as possession of a firearm in a drug trafficking crime, and was sentenced to nearly 10 years in prison. Flagg's record also raised numerous red flags. As with Finnigan, Flagg incurred large numbers of CRs during his tenure at CPD—88 in total—and received a number of lengthy suspensions (Unlike Finnigan, Flagg was enrolled in the department's behavioral intervention program in 2003) (p. 97, Bates BAKER GLENN 6896).

Some might argue that Finnigan's and Flagg's criminal conduct is aberrational. It is not. Police corruption cases in Chicago may not be commonplace, but neither are they rare occurrences. Former CPD Gang Crimes Officer Joseph Miedzianowski (sentenced to life imprisonment for racketeering, drug conspiracy and robbery), former CPD Chief of Detectives William Harnhardt (pled guilty to racketeering and conspiracy) and former CPD Narcotics Officer Glenn Lewellen (guilty of narcotics conspiracy) are but three of the most notorious instances of police corruption in recent memory. But there have been others, and it is clear that some portion of the Chicago police force still is not meeting their professional and legal obligations" (p. 97, Bates BAKER GLENN 6896).

1. **Early intervention systems.** Early intervention systems[63] are intended as incident-driven systems, not outcome-driven systems. This means despite the outcome of any internal investigation, or whether someone files a complaint, the incident is the driving factor, not the outcome, for taking personnel action before negative discipline becomes necessary. When personnel allegations arise, it is incumbent upon supervisors and managers to initiate and ensure action is taken to address the allegations, especially when a pattern accrues, notwithstanding the outcome of any investigation. Although the officers involved in Plaintiffs' arrests accrued several allegations during the relevant period of the discovery that I reviewed, there is nothing to indicate that the Chicago Police Department acted on the data to disrupt the pattern.

   In a related case, the City's expert Jeffrey Noble formed the opinion that although the City did not have an early warning system during this time, it did have an "Early Identification and Intervention System." (Noble expert disclosure in *Waddy* at 25). However, there is no evidence in discovery that any information from these systems was provided to supervisors in a regular, rigorous, or consistent manner. In fact, the evidence available to me

---

[63] An early warning system, either electronic or paper-based is intended to assist supervisors and managers in identifying employees whose performance warrants review and, where appropriate, outlining intervention procedures in circumstances where the employee's behavior may have negative consequences for the employee, coworkers, the agency, and/or the public. Early warning systems serve to improve employee health, promote community-police relations, encourage positive behavior, and reduce public complaints. These systems also assist the employee in reaching their full potential by using data to identify performance trends worthy of review and enhance supervision.

[63] Identifying and addressing patterns of complaints against police officers has been an element of police personnel management and academic research since the early 1970s (see for example: A.E. Wagner. **1972**. "Patterns in Police Misconduct - Citizen Complaints Against The Police." UMI Dissertation service. Ann Arbor, MI—correlational techniques were used to compare the relationships between the individuals and their milieu. Findings indicate that police officers accused of misconduct are seldom disciplined since few cases are substantiated and rarely differ from any other officer; Toch, H. J., Grant, D., & Galvin, R. T. (**1975**). *Agents of change.* New York: John Wiley—developed a program in which Oakland, California, police officers with records of use-of-force incidents were counseled by peer officers; Milton, Catherine. H., Jeanne W. Halleck, James Lardner, and Gary L. Albrecht. (**1977**). "Police use of deadly force." Washington, DC: National Police Foundation—examined use of force complaints; Porter, B. (**1984**). *The Miami riot of 1980.* Lexington, MA: Lexington Books and U.S. Commission on Civil Rights. (**1984**). *Confronting racial isolation in Miami.* Washington, DC: Government Printing Office—The Miami Police Department became concerned with its officers' behavior that generated citizen complaints in **1979** in response to a major police-community relations crisis (the study period was 1976 to 1978). The IACP defined the industry standard for EWS in their 1990 Concepts and Issues Paper on Investigation of Employee Misconduct early warning systems, By March 2002, the IACP issued its EWS model policy. The IACP EWS policy was an outgrowth of research conducted by the U.S. Commission on Civil Rights in 1981 that noted all police departments should develop an early warning system intended to identify problem officers, or those "who are frequently the subject of complaints or who demonstrate identifiable patterns of inappropriate behavior" (U.S. Commission on Civil Rights. (1981). *Who Is Guarding the Guardians?* Washington, D.C.: U.S. Government Printing Office: 81). In 2001, CALEA also promulgated the industry standard for police agencies pursuing accreditation to promulgate an EWS policy.

is the opposite. In 2017, the Department of Justice wrote in its investigation of the Chicago Police Department:

> "Compounding its supervision problems, CPD does not have a meaningful early intervention system (EIS) to effectively assist supervisors in identifying and correcting problematic behavior. CPD's current behavior intervention systems are underused and inadequate, putting both officers and the public at risk" (Bates BAKER GLENN 005147).

Their assessment was extremely critical and reflected some of the most common faults of such systems: "Currently, despite having spent significant time and resources building an EIS, CPD does not have a functioning system. Instead, there are several semi-connected data-collection, intervention, and counseling programs, each of which suffers from inefficiencies that render them essentially useless" (Bates BAKER GLENN, 5247). The failures identified in this report overlap with the timeframe of the DOJ report: "Our review of CPD's data confirms that the Department enrolls very few officers in its interventional programs, especially for a department of its size. Between January 2010 and July 2016, CPD enrolled only 38 officers in BIS [behavioral Intervention System]. An additional 60 members were referred for enrollment, but never enrolled" (Bates BAKER GLENN 5250). In fact, the Department abandoned past efforts at reform and improvement. Although its software program named "BrainMaker" was adopted in 1994, and would have enabled the Department to identify trends and intervene with problem officers, the City stopped using it after two years and "all the data and reports it produced 'went missing'" (BAKER GLENN 005253). The City also failed to expand or improve its EWS programs after the 1997 Report on the Mayor's Commission on Police Integrity, instead yielding to a grievance filed by the police union and abandoning efforts to expand or improve the program (BAKER GLENN 005253).

My review of the early intervention policies and the lack of evidence in discovery that early intervention was conducted in any effective or systematic manner is consistent with this later assessment. Indeed, the City's representative testified that even the supervisors of officers who had sustained disciplinary complaints against them would not learn whether the complaints against them were sustained or not (Moore deposition, pp. 124-125). Supervisors

could request five-year sustained complaint histories, but received that information only at their own initiative, it was not routinely made available as a supervisory mechanism (Moore deposition, pp. 126-127). This is directly contradictory to accepted standards for monitoring and supervising officers.

The City's representative also described that there was an automated system at some point during the 1999-2011 time frame, but its criteria were so convoluted that it could not have been helpful in preventing misconduct. Specifically, the CRM System would "raise a flag" when there were five CRs initiated within a time period (six months or a year) and all of those cases had the same category code (i.e., involved the same category of alleged misconduct), and the chief of internal affairs would decide whether and how to use that information (Moore deposition, pp. 168-173). There is no evidence in discovery that the City kept regular reports of how many officers were referred in this manner (Moore deposition, p. 173). The City also did not take any other action to analyze or respond to trends in not-sustained CRs, which is another supervisory failure (Moore deposition, p. 176).

2. **Failure to Monitor At-Risk Groups of Officers.** The City was on notice by 1997 that it was necessary to monitor officers for misconduct on a group level and to take specific measures to address misconduct by at-risk teams of officers, especially narcotics officers or officers who worked with drugs and money. A commission appointed by Mayor Daley reported in 1997, just 2 years before the CR's I examined, concluded that it was incumbent on the City to focus its attention and resources on drug-policing-related corruption, writing: "the corruption problem in law enforcement today is inextricably linked to the flourishing narcotics trade. It is no coincidence that the ten Chicago officers under indictment today were assigned to two of the police districts with the highest incidence of narcotics arrests, nor that they all worked on tactical teams whose primary function was narcotics enforcement" (1997 Repot of the Commission on Police Integrity, p. 11).

However, the City did not take any action to specifically monitor gang tactical teams or narcotics teams on a proactive basis to respond to this insight and trend—that corruption was concentrated in areas where police handled money and drugs (see Moore deposition, pp. 177-178). In the 1997 report, the authors specifically recommended that the Department monitor unsustained complaints and look at unit-wide records, writing: "some system needs to be in place which allows the Department to take some appropriate action when a clear

pattern of non-sustained complaints exists" (1997 Report. p. 21). Regarding unit-wide trends, the Commission wrote,

> "Furthermore, the Commission recommends that the Chicago Police Department look not just at the records of individual police officers but also at units within the Department. The ten officers now under indictment did not come from ten different units of assignment spread throughout the organization. Chicago's recent experience is consistent with the police scandals around the country and in our own history going back to Summerdale - corrupt police officers (like other groups of criminals) tend to bond together in groups. As the Chicago Police Department moves toward a comprehensive early-warning system, therefore, an effort should be made to identify specific units which have a higher than usual rate of allegations of misconduct" (1997 Report, p. 21).

There is no evidence in discovery that the City conducted any such team-level, squad-level, or division-level analysis to identify the troubling trends that the Mayor's Commission had identified in 1997 (see Moore deposition, pp. 174-175). The City conceded that it had no reason to deny that IPRA had power to examine patterns of complaints, and no reason to conclude that IPRA ever actually examined patterns of complaints (Moore deposition, p. 186). In other words, IPRA could have examined patterns of complaints, but it decided not to do so.

The City's failure to act fell well short of nationally accepted standards for supervising corruption-prone units such as narcotics enforcement. A police tactical team that deals with narcotics operations is a corruption-prone assignment that requires additional supervision. Working in a tactical narcotics team is more prone to corruption compared to other assignments within a police department, regardless of the agency's size or location.[64] The

---

[64] The Chicago Commission Report found that the Chicago Police Department "…has embraced a comprehensive community policing strategy (featuring decentralized authority and greater discretion for officers) at a time when *a flourishing narcotics trade poses greater temptation and opportunity for corruption*" (Commission on Police Integrity. (November 1997). Report of the Commission on Police Integrity. Chicago, p. 22); also see: **1)** Stevens, D. J. (1999). Corruption among narcotic officers: A study of innocence and integrity. *Journal of Police and Criminal Psychology, 14*(2), 1-10; **2)** United States General Accounting Office. (1998). *Law Enforcement: Information on Drug-related Police Corruption: Report to the Honorable Charles B. Rangel, House of Representatives*. Washington, D.C: USGAO; **3)** Williams, J. R., Redlinger, L. J., &

tactics that must be used to enforce drug laws create an impetus toward dishonesty (e.g., undercover operations, surveillance locations, secrecy, search warrants; reverse sting operations, buying narcotics). Police officers assigned to tactical narcotics enforcement are exposed to corruption hazards more frequently and to a greater degree than other elements of the police department, which requires additional supervision. For example:

a. **Involvement with illicit drugs:** Working closely with narcotics exposes officers to the illegal drug trade. The presence of large quantities of drugs, drug proceeds (i.e., cash, vehicles, weapons), and interactions with drug traffickers leave officers vulnerable to bribery, theft, drug-related offenses (i.e., planting drugs; fabricating evidence; fabricating official reports; fabricating testimony under oath; selling drugs; conducting unlawful searches). There are considerable pressures involved in enforcing drug laws, such as long hours, difficulty with effective enforcement by the same officers over long periods of time, pressures toward corruption, and pressures for performance.

b. **Financial temptations:** The lucrative nature of the drug trade can make officers susceptible to financial temptations. The potential for significant financial gains from drug trafficking can lead to misconduct, including accepting bribes, protecting drug dealers (i.e., "street tax"[65]), or engaging in drug-related activities themselves (e.g., selling drugs; selling guns; protecting drug operations).

c. **Limited oversight with an ethos of secrecy, loyalty, and solidarity:** Narcotics investigations often involve plainclothes operations and sensitive intelligence. This often creates an environment with limited oversight, which provides opportunities for officers to engage in misconduct without detection. The secrecy surrounding investigations can

---

Manning, P. K. (1979). *Police narcotics control: Patterns and strategies*. Department of Justice, Law Enforcement Assistance Administration, National Institute of Law Enforcement and Criminal Justice (the researchers noted: "The potential for police corruption is high because the high profits and risks of illicit business, and the limited access to other forms of influence, make dealers and users focus their attention on the police agencies whom they attempt to bribe, influence, or control directly or indirectly, p. 5…In Southern City the vice section head reported to the deputy director heading the division who in turn reported to the police chief equivalent. One salient reason for a chief maintaining close contact with a vice group is a concern for reducing the risk of corruption. Vice enforcement is, as we argue above, vulnerable to corruptive practices," p. 32).

[65] In police parlance, "street tax" is money collected by a police officer from a drug dealer to allow the dealer to continue selling drugs in a given area without the threat of arrest or enforcement. The Chicago Commission Report identified other cities across the United States that faced a cycle of police corruption related to narcotics enforcement including New York City, Miami, New Orleans, Philadelphia, Los Angles and Detroit (Commission on Police Integrity. (November 1997). Report of the Commission on Police Integrity. Chicago, pp. 7-8).

also create an atmosphere where misconduct is more likely to occur. Since officers depend on each other,[66] secrecy and loyalty create a bond of silence. These characteristics not only promote police corruption, but impede efforts to control and detect it, which is why close supervision is so important.

d. **Managerial failures:** Various management-related factors associated with drug-related corruption include ineffective top-command (i.e., headquarters) and field supervision, failure by top police officials to promote integrity, and weaknesses in a police department's internal investigative structure and practices.

e. **High-stress environment:** Narcotics enforcement is often highly demanding and stressful. Officers typically face intense pressure to produce results and effect arrests. This operating environment leaves officers prone to unethical or illegal practices to achieve their objectives.[67]

f. **Cultivating confidential informants:** Working with confidential informants poses unique challenges since informants are human assets that require special care (compared to tangible assets such as physical equipment). Cultivating informants through the arrest process requires additional oversight that is not found in other assignments. Although informants can provide useful information that police officers could not otherwise

---

[66] By way of example, Frank Serpico, NYPD, the center of the infamous *Knapp Commission Report of Police Corruption* (1973), was shot during a drug raid after his comrades allegedly failed to assist him during the entry. Detective Serpico was famous for not succumbing to the lucrative corruption that pervaded narcotics enforcement in New York City at that time. He was known for his ethical behavior, and for exposing widespread corruption in the NYPD at various levels.

[67] Williams, J. R., Redlinger, L. J., & Manning, P. K. (1979). *Police narcotics control: Patterns and strategies*. Department of Justice, Law Enforcement Assistance Administration, National Institute of Law Enforcement and Criminal Justice (regarding informants, the researchers noted: "In situations where money for informants is scarce and the pressures for enforcement necessitate the continued use of informants, there is a strain toward practices which are illegal and may lead to corruption. Furthermore, when raids produce possible resources in the form of drugs and money that can be used to pay informants and finance additional work, there can develop compromising situations. The lack of resources allocated become a major structural feature placing strains upon the officers caught in the situation. Asked to do a difficult task without proper resources, and then having the task produce resources that can be used presents an enormous temptation. At first the temptation is to utilize confiscated drugs to pay informants, but later can develop into much more serious forms of corruption especially when, the agents become cynical about the goals of enforcement. Then, agents may begin to utilize the confiscated evidence for their own purposes; yet one must realize that in some such situations, the structural feature beginning the process was the lack of resources allocated," p. 285).

access, they may carry sinister motives. This is why police officers and supervisors must abide by policy, to safeguard against those motives.[68]

Rotating personnel out of corruption-prone assignments is a managerial practice that has been advocated for several decades. The practice was first documented in 1970 by the IACP in 1970 (Standards for the Staffing and Organization of Municipal Narcotics and Dangerous Drug Enforcement Units[69]). The IACP model policy on this practice in 1994 (September 1994) was named the Personnel Transfer and Rotation Policy. This policy was intended "…to define the requirements, conditions and process for the transfer and rotation of sworn personnel duty assignments" (p. 1). The policy specifically notes: "Officers engaged in undercover operations in general, and deep cover operations in particular, as defined by the officer-in-charge of these operations a*re subject to rotation from these assignments after a period of three years,* although they may continue to serve in other investigative capacities. a). Continued assignment to deep cover operations for more than three years shall be at the discretion of the chief executive officer or his designate. b). No officer may continue assignment to deep cover operations for more than five years" (pp. 2-3) (emphasis added). The IACP recognized that undercover operations, such as narcotics and gang enforcement, were prone to hazards that required rotation.

Police departments with active tactical narcotics units must engage in various prevention practices, such as: **1)** making a commitment to integrity from the top to the bottom of the organization; **2)** changing the police culture to ensure secrecy and solidarity do not outweigh ethics; **3)** requiring command accountability (i.e., requiring a commitment to corruption control throughout the entire department, especially by field supervisors[70]); **4)** raising the age

---

[68] Jones-Brown, D., & Shane, J. M. (2011). An exploratory study of the use of confidential informants in New Jersey. *Newark, NJ: American Civil Liberties Union of New Jersey*; Shane, J. (2016). *Confidential informants: A closer look at police policy.* London: Springer.

[69] For a very detailed treatment of narcotics control and its associated corruption hazards, see Williams, J. R., Redlinger, L. J., & Manning, P. K. (1979). *Police narcotics control: Patterns and strategies.* Department of Justice, Law Enforcement Assistance Administration, National Institute of Law Enforcement and Criminal Justice.

[70] Although the Chicago Police Department promulgated policies that define specific actions from field supervisors, and has developed a tall rank structure, there is nothing in the discovery that I reviewed to indicate that command accountability for corruption was prevalent during the instant case.

and educational requirements for entry level and special assignments; **5)** implementing or improving integrity training at the recruit level; **6)** implementing or improving integrity training and accountability measures for career officers; **7)** periodic command rotation to eliminate stress, tension, and opportunity for corruption experienced by investigators; **8)** appropriate adequate resources to ensure the organization's goals can be achieved without shortcuts or compromises, which reduces strain and temptation. Police officers who act on their own accord (e.g., pressing arrestees into confidential informants) must be scrutinized, and their official reports must be subject to strenuous review to ensure their practices are within policy.

3. **Failure to Implement Sufficient Policies Governing Confidential Investigations.** For nearly eight years, Sergeant Watts and Kallatt Mohammed were the subject of a "confidential investigation" by the Chicago Police Department. All of the City's policies for conducting confidential investigations were contained in three documents: **1)** General Order 93; **2)** Special Order 08, and **3)** the Bureau of Internal Affairs Standard Operating Procedures.[71] These policies are grossly insufficient. General Order 93-3 and its subsections say nothing about confidential investigations, and only refer generally to a few procedural rights given to officers accused of criminal conduct (CITY-BG-059013-059075). Special Order 08 and its subsections also say nothing about the conduct of confidential investigations (CITY-BG-059085-059132). That leaves only the Standard Operating Procedures, which include just a few pieces of guidance on conducting confidential investigations, such as : **1)** how to prepare a case report so that it would not be distributed beyond the investigator; **2)** the process for obtaining confidential complaint register numbers; a general description of what the Confidential Investigation Section did; and **3)** descriptions of medical roll abuse and residency investigations (unrelated to the investigations at issue here) (IAD SOP at 2, 12 16-17, 22-23; Moore deposition, pp. 158-159, 161-165). These policies fell below accepted standards because they did not guide investigators on how to maintain the confidentiality of their investigations or how to pursue confidential investigations without leaking information to the accused member. Indeed, it appears that an ATF/CPD task force officer leaked a witness's cooperation (Wilbert Moore/"Big Shorty") to Sergeant Watts, but there is no evidence in discovery that that this leak was ever investigated, even though Wilbert Moore

---

[71] See deposition testimony of City's 30(b)(6) representative Timothy Moore.

was shot and killed around this time. This is consistent with what the City's representative described: that internal affairs investigators had discretion to investigate leaks of confidential information or not (Moore deposition, pp. 152-155). In sum, CPD's confidential investigations policies failed to meet accepted standards.

4. **Failure to Implement Sufficient Policies Governing Findings in Misconduct Allegations.** A critical activity in misconduct investigations is judging the credibility of witnesses, as often the accused officer gives a different account of what happened than the complainant, and the investigator must decide which witness is more believable. The City's representative testified that an investigator would typically not sustain a complaint in such circumstances in the absence of "video or photo," some other "objective" evidence, or a witness who was not the partner of the accused officer or a relative of the complainant (Moore deposition, pp. 61-62). The only information given to investigators regarding how to weigh witness credibility was the description of the four possible findings (sustained, not sustained, exonerated, unfounded); however, those descriptions do not provide any information on how to weigh the credibility of witnesses. The entirety of those descriptions are shown below from CPD General Order 93-3, Addendum 3:

Per Department General Order 93-3, Addendum 3, when the investigation is complete, classify the complaint as one of the following:

A. "Unfounded"    When the allegation is false or not factual.

B. "Exonerated"    When the incident occurred but the actions of the accused were lawful and proper.

C. "Not Sustained"    When there is insufficient evidence either to prove or disprove the allegation.

D. "Sustained"    When the allegation is supported by substantial evidence to justify disciplinary action.

The City did not provide investigators with any guidance on weighing credibility and allowed them—as the City's representative testified at deposition was the practice—to simply classify allegations as "not sustained" when the evidence came down to the complainant's testimony against the accused officer. This is below accepted standards for conducting internal investigations. The City should have instructed its investigators to interview accused officers in person, and to collect objective evidence to confirm or dispel the allegations, especially when multiple officers witnessed a complaint of misconduct so their independent accounts could be tested against one another.

5. **Summary Punishment Action Request System (SPAR) is not a substitute for thorough disciplinary investigations.** I am aware that police supervisors could issue SPARs – Summary Punishment Action Requests – to punish conduct viewed as "a less serious transgression." (Special Order S08-01-05 – Effective 1/15/1993). However, supervisors were provided no reference point to determine whether misconduct should be punished via a SPAR or a request for a complaint register number and full disciplinary investigation; that was left to their discretion (Moore deposition, pp. 133-134). Further, the guidance on SPARs was so vague that, according to the City through its representative, any category of misconduct could be classified as a SPAR, even though the policy on its face was limited to 26 specific categories of misconduct (Moore deposition, pp. 135-136) (Moore did clarify that allegations involving criminal misconduct were not supposed to be the basis of a SPAR, Moore deposition, p. 215.) SPARs were limited to minor punishments and could not be considered in further disciplinary actions after a year, when it was "expunged" and removed from the officer's record (Moore deposition, pp. 137-138). Further, the officers of the CPD knew that SPARs would not remain on their record after a year and thus would not impact them in further disciplinary actions (Moore deposition, p. 141). There is no reason to believe that this alternative form of discipline, which was limited in punishment, would be quickly expunged, and lacked any clear criteria for application, was an effective substitute for the thorough investigation and resolution of disciplinary complaints.

6. **Other failures to conduct sufficient investigations.** The Department of Justice, in a 2017 report, identified many serious deficiencies in the CPD's disciplinary system. The City failed to rebut those deficiencies and in fact admitted to many of them in its representative's testimony in this case. For example, the City did not track how often witnesses were

interviewed or how quickly they were interviewed (Moore deposition, p. 196). The City could not provide how often meaningful investigations were conducted in the absence of an affidavit from a complainant (except to say that investigations proceeded when no affidavit was required, for example when an officer complained against another officer) (Moore deposition, pp. 196-198). The City allowed coaching of witnesses by their legal representatives, including consulting off the record and making no record of the off-the-record period or any coaching during that time period (Moore deposition, pp. 198-199).[72] The City could not identify any policy requiring investigators to gather information from parallel criminal proceedings in disciplinary investigations or otherwise requiring periodic reviews to gather evidence of potential misconduct from criminal cases (Moore deposition, pp. 199-201). The City had no reason to disagree that IPRA rarely used its discretionary powers to initiate Rule 14 (integrity/dishonesty) violation investigations when officers made false statements (Moore deposition, pp. 201-202). The City had no system to give all officer disciplinary findings bearing on credibility to prosecutors, either (Moore deposition,, pp. 202-203). The City did not dispute that nearly 90% of officers with multiple complaints against them, including officers with more than 50 abuse complaints against them, were not flagged by the Department's Early Intervention System (Moore deposition, pp. 203-204).

7. **Testimony from CPD leaders**. Deposition testimony from CPD leaders in the internal affairs process also demonstrates that investigators failed to complete sufficient and thorough investigations. For example, Juan Rivera testified regarding the typical steps in the investigation of a CR. He testified that after taking a statement from a complainant, it was possible to end the CR investigation immediately if the investigator believed, at that point, that the CR was unfounded (Rivera deposition, 112: 14-18). The investigator could also ask the complainant to sign a "form of declination" and stop the complaint then (Rivera deposition, 112:19, 113:2). There is no evidence in discovery that the CPD appropriately guided its investigators' discretion in making these decisions. General Order 93-3, Special Order 08-01, and the BIA Standard Operating Procedures—which the City's representative testified were the only documents that set policy and procedure for internal affairs investigations—do not explain how and when investigators should close investigations,

---

[72] This sort of collaboration is akin to the contamination of issuing CPD officers a predefined set of questions to answer during an internal an investigation, where there is no independence.

other than that they should close them at any time they believe the investigation to be unfounded (Moore deposition, pp. 23, 156). It is important to note that Rivera's testimony deviates from the written standard operating procedures, which state that investigators were "required to complete a thorough and comprehensive investigation" even when the complaint was withdrawn (BIA SOP, p. 14). However, considering that I reviewed many complaints that lacked a thorough and comprehensive investigation in the absence of a signed affidavit, it is clear that the City did not enforce the language of the Standard Operating Procedures during this time period.

## IX.  NOTICE TO THE CITY OF CHICAGO THAT NUMEROUS SERIOUS ALLEGATIONS OF CORRUPTION AGAINST WATTS AND MOHAMMED HAD NOT BEEN ADDRESSED

Leaders within the Chicago Police Department were continuously made aware that Sergeant Watts and the officers he supervised had been accused of serious misconduct and needed to be monitored and investigated. For example, an internal affairs investigation into Ronald Watts began in 2004, when Juan Rivera was a lieutenant assigned to the Confidential Investigations section of CPD's Internal Affairs unit (Rivera deposition, 57:20-25). Juan Rivera returned as Chief of the Bureau of Internal Affairs in March 2009 (Rivera (Spalding) deposition, 29: 21, 30: 3). Shortly thereafter, he was briefed about a sting operation in which Mohammed stole money (Rivera (Watts) deposition, p. 59-61). Juan Rivera, who was Chief of the Bureau of Internal Affairs from March 2009 through his deposition on December 4, 2014, was made aware that Sergeant Watts was suspected of committing murders and at his deposition stated he had no reason to doubt that at the time (Rivera (Spalding) deposition, 29: 21; 30:30).

Although Rivera received repeated notice of serious allegations against Watts and his officers, he did not hasten the investigation or take other measures to mitigate the harm caused by those officers. In fact, while Rivera was in the Confidential Investigations section, other investigations involving Watts, Mohammed, and "others on the team" were "absorbed" into a confidential investigation, and CPD decided not to interview any of those witnesses, apparently because the FBI "made it clear that any witnesses, and whatnot, they were going to interview themselves" (Rivera deposition, 72:17, 77: 17). Rivera did brief the interim Superintendent Terry Hillard regarding the investigation, providing command staff with notice of the alleged misconduct.

(Rivera deposition, 9/6/23, 120: 12; 121: 7). He further testified that everyone up the chain of command, including the Superintendent, was briefed about Operation Brass Tax starting in 2009 (Rivera deposition, pp. 121: 8-18; Rivera confidential deposition, pp. 55: 22; 56: 10). As Superintendent, Phillip Cline (who was superintendent from November 2003 to April 2007) had at least ten conversations related to the Watts investigation, including IAD personnel assigned to the FBI Task Force (Cline deposition, 12/08/23, 25: 16-25). Cline has "no doubt" he would have learned the allegations against Sergeant Watts (Cline deposition, 36: 19-24). Cline was Superintendent from November 2003 to April 2007 (see https://www.nytimes.com/2007/04/03/us/03chicago.html retrieved on July 24, 2023).

Debra Kirby testified that as the head of the CPD's Internal Affairs Division, she monitored the progress of the investigation into Watts and updated the Superintendent on its progress (Kirby deposition, 10/13/22,  83:1; 84: 8). She testified that she would have told him that Mohammed was caught taking bribes in or around December 2007 (Kirby confidential deposition, 72: 4-10). Ms. Kirby was Assistant Deputy Superintendent of the Internal Affairs Division from July 2004 to March 2008 (Kirby deposition, 10/13/22, 34: 4-20, 39:14-19).

Garry McCarthy testified at deposition that he received updates on the Watts investigation during the time period he was Superintendent, including from May 2011 to February 2012 (McCarthy deposition, 6/14/23, 38:17; 39:3; 43: 10; 45: 16).

According to Peter Koconis, a CPD officer who had worked in internal affairs, Sergeant Watts's name surfaced in 1999 as a "corrupt cop" who "was ripping off drug dealers and selling drugs" (Koconis deposition (Spalding), 22: 6-20).

The testimony cited here, if true, demonstrates that CPD leaders had consistent notice of allegations of misconduct against Watts and Mohammed, including that Mohammed had been caught taking bribes as early as 2007. But instead of acting to limit the damage caused by Watts and Mohammed, CPD's leaders allowed retaliation against the officers who had exposed the misconduct. There is evidence in discovery that CPD tolerated not only retaliation against residents who complained against Ronald Watts, but also retaliation against the CPD officers who investigated Watts's misconduct. Effective anti-retaliation measures are required by nationally accepted standards to protect whistleblowers and ensure that nobody is discouraged from making complaints against police officers. For example, there is testimony from Daniel Echeverria and Shannon Spalding's lawsuit against the Chicago Police Department that after they had sought CR investigations of other

officers and supervisors on their own behalf after they were retaliated against and threatened for their participation in the Watts investigation, Mr. Rivera refused to initiate any such investigation (Koconis (Spalding) deposition, 88:3; 90:18). Instead, according to Koconis, Rivera exposed Spalding and Echeverria for their role in investigating CPD officers (Koconis (Spalding) deposition, 91:18; 92:19). Janet Hanna, the administrative assistant to Lieutenant Cesario at the Fugitive Apprehension Unit (where Spalding and Echeverria were assigned after the Watts investigation was completed) also testified to the retaliation. Specifically, Cesario ordered her to throw away and ignore Spalding and Echeverria's overtime requests; Cesario also told her that Spalding and Echeverria were Internal Affairs Department "rats" who she should be "very leery" of (Hanna (Spalding) deposition, 47: 4-14). Lieutenant Cesario then told Hanna that Spalding and Echeverria should be given "dead-end cases" (Hanna (Spalding) deposition, 51:19; 52: 22). Hanna was required to screen for such cases to assign Shannon and Echeverria and to copy the sergeant, lieutenant, and commander on those assignments (Hanna (Spalding) deposition, 55:4-14).

Lieutenant Cesario personally handpicked the assignments for Spalding and Echeverria, which he did not do for any other officers (Hanna (Spalding) deposition, 59:22; 60: 22). Ms. Hanna also testified that in June 2012, Lieutenant Cesario ordered several sergeants "to not provide any backup for Shannon [Spalding] or Danny [Echeverria] and to not work with them at all"(Hanna (Spalding) deposition 70: 3-11). Ms. Hanna's coworker, Coleen Dougan, testified that she did not remember being warned in this way by Lieutenant Cesario and that she had not heard Spalding or Echeverria being referred to as rats (Coleen Dougan (Spalding) deposition).

I did not make any credibility determinations as to these witnesses; however, Ms. Hanna's sworn deposition testimony should have been reason enough to investigate whether Lt. Cesario and others retaliated against Spalding or Echeverria for their work investigating Sgt. Watts, but I have received no evidence in discovery that any such due diligence was performed by the Chicago Police Department. This lack of rigor is consistent with Department's overall pattern of ignoring the misconduct of Sgt. Watts and his team and instead allowing it to perpetuate. Retaliation for raising complaints and trying to expose corruption falls below nationally accepted standards for internal investigation. Such behavior naturally discourages others from complaining in the future. There is no evidence in discovery that CPD took appropriate measures to prevent or address such retaliation.

Furthermore, Ms. Hanna testified at deposition that she had entered the Chicago Police Department police academy in May 1994, and that while she was there, she was taught "we do not

break the code of silence. Blue is blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. . . . [Y]ou never break the code of silence" (Hanna (Spalding) deposition, 10:17-19, 45: 18; 46: 4). Ms. Hanna also testified that instructors openly spoke about and taught the code of silence during training (Hanna (Spalding) deposition, 46: 5-16).

As discussed elsewhere in my report, nationally accepted standards warned of the dangers of the police code of silence during this time period and CPD in particular had received repeated notice that a code of silence was present in the Department.[73]

## X.    CPD'S FAILURE TO MONITOR, SUPERVISE, AND DISCIPLINE THE DEFENDANT OFFICERS

Clarissa Glenn and Ben Baker's complaints against Watts and his crew did not stand alone; as detailed in this report and its appendices, dozens of similar allegations were made by other complainants. Appendix D contains a list of similar allegations made against certain Defendant officers involved in Plaintiffs' arrests.

If CPD had a properly functioning disciplinary system, which it did not, it would have discovered that Watts and his crew were routinely fabricating police reports. A striking example of this is found in the simultaneous arrest of suspects at 574 E. 36th Street and 511 East Browning Avenue on December 11, 2005. Through what can only be described as falsified police reports and testimony, Officer (and Defendant) Alvin Jones claimed to conduct two arrests in two different locations at the same time.

The following table, taken from COPA report #108774, demonstrates the contradictions in the reports:

---

[73] *Klipfel & Casali v. Gonzalez et al.,* 2006; *Obrycka v. City of Chicago*; Anthony Abate, 2012; Mink, O. G., Dietz, A. S., & Mink, J. (2000). Changing a police culture of corruption: Implications for the police psychologist, *Journal of Police and Criminal Psychology, 15*(2), 21-29; Hagedorn, J., Kmiecik, B., Simpson, D., Gradel, T. J., Zmuda, M. M., Sterrett, D., ... & Chebat, T. (2013). Crime, Corruption and Cover-ups. Anti-Corruption Report Number 7. University of Illinois at Chicago Department of Political Science.

| December 11, 2005 | | |
|---|---|---|
| | **511 East Browning Avenue** | **574 East 36th Street** |
| Time of Arrival | 12:00 p.m. | 12:00 p.m. |
| Time of Arrest | 12:12 p.m. | 12:08 p.m. |
| Time of Transport | 12:30 p.m. | 12:18 p.m. |
| Arrested | **Ben Baker and Clarissa Glenn** | **Willie Robinson, Michael Henderson, Louis Moore, Larry Pulley, Laurence Little** |
| Arresting Officers | Alvin Jones and Kallatt Mohammed | Kallatt Mohammed and Elsworth Smith Jr. |
| Assisting Officers | Elsworth Smith Jr., Robert Gonzalez, Manuel Leano | Alvin Jones |
| Additional Witnesses | **David Soltis, Ronald Watts** | |
| Approving Supervisor | Ronald Watts | Ronald Watts |
| Testimony | **Alvin Jones (Grand Jury)** | **Elsworth Smith Jr. (Preliminary Hearing)** |
| | | Alvin Jones, Elsworth Smith Jr. (Motion to Quash Arrest) |
| | Sgt. Jones was in the vicinity of 511 East Browning Avnue on December 11, 2005, at approximately 12:12 p.m. Sgt. Jones observed Ben Baker commit a traffic violation, and he observed Clarissa Glenn hand a bag of suspect narcotics to Ben Baker. | On December 11, 2005, at approximately 12:00 p.m., Officer Smith was in the vicinity of 574 East 36th Street conducting a narcotics investigation with his partner, Officer Mohammed. They were in contact with surveillance officer Alvin Jones, who was with another partner, Sgt. Jones radioed to the enforcement team that he saw a Black male conducting narcotics transactions in front of 574 East 36th Street. |

*COPA LOG #1087742 Combined Information from Reports of Simultaneous Arrests. Police personnel common to both sets of arrests appear in red.*

With respect to one set of arrests, the officers claimed that Alvin Jones, acting as a surveillance officer, radioed to the enforcement team that he saw a Black male selling narcotics. The officers arrested five men (Willie Robinson, Louis Moore, Laurence Little, Michael Henderson, and Larry Pulley). Sgt. Watts approved the vice case report listing Jones and Mohammed as the officers who "discovered," "witnessed," and "reported [the] offense." The report is signed by Smith, and Mohammed is identified as the attesting officer in each arrest report. Jones was not listed as a participant in any of the five reports.

When COPA investigators interviewed Henderson, Moore, and Robinson (all of whom were arrested at 527 E. 36th street), all three men maintained that they were in the lobby when Watts and his team - including Smith, Mohammed, and Jones - entered and apprehended them. Henderson and Robinson recalled that Watts received a message that another target had been located and had left to arrest Baker, who Robinson claims Watts "had it in for him, period," because he would not cooperate with Watts and his team.

In interviews with COPA in 2019, Jones claimed that he and Watts had set up surveillance in a parking lot on the west side of Rhodes Avenue, north of Browning, and waited between 30 minutes and 2 hours before Baker arrived.



*Marked as Exhibit F in Statement of Sergeant Alvin Jones.*[74]

Jones claimed that he saw Plaintiff Glenn hand Plaintiff Baker a bag that Baker placed in the driver's side armrest console of their vehicle, and that he, along with Watts, Smith, and Mohammed, then arrested Baker and Glenn.

---

[74] According to COPA Log #1087742, Jones drew an oval around the parking lot on the west side of Rhodes where he and Watts set up surveillance. Jones made a small circle where he first saw Baker's vehicle and drew a line to show the path the vehicle traveled south on Rhodes. The "X" indicates the location where Baker and Glenn stopped in the parking lot south of 511 E. Browning. The "A" marks the location of Jone's vehicle during the stop.

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG #1087742**



*COPA Demonstrative exhibit #3 LOG #1087742*

Jones was later shown the vice case report, arrest reports, and testimony indicating that he had also claimed to have been present at the simultaneous arrest of Willie Robinson, Louis Moore, Laurence Little, Michael Henderson, and Larry Pulley. He admitted it was impossible for him to have surveilled both arrests. He tried to explain, "we got the times wrong. I don't know who. I don't know how" (COPA Summary Report #1087742 at 16). He admitted that it was also impossible for Mohammed or Smith, both listed as arresting officers at 574 E. 36th, to have conducted both surveillance operations and both arrests at the same time. After COPA investigators inquired about the impossibility of the accuracy of the reports and his testimony and reminded him that statements could not be used in a criminal proceeding, Jones stated, "I remember that [the Baker and Glenn arrests] occurred how I said it occurred because that's how I remembered it. You can't be in two places at one time. That [his participation in the 574 E. 36th Street arrests] may not be the truth that I was over there conducting surveillance over there, that may not be the truth" (COPA Summary

Report #1087742 at 17). In the same interview, he admitted to lying under oath about 574 East 36th St, and that Smith's report of the simultaneous arrests at 574 E. 36th Street was false.

If internal affairs investigators in 2005 had pursued the allegations against Smith and other Watts team members with vigor, then they would have investigated the pattern of arrests those officers had made and certainly would have interviewed the officers about what they were doing on the days that were subject of CRs such as the Baker/Glenn arrests. They would have looked for evidence that the officers were fabricating evidence, lying in reports, or shaking down drug dealers or other residents. They would have interviewed numerous individuals arrested by Watts and his crew to see if they had consistent accounts of misconduct. They also would have discovered, sooner or later, that Jones and other members of the Watts team were claiming to be in two places at once, falsifying records of arrests, and covering up misconduct.

As demonstrated by the fact that COPA did discover this, it is not just a mere possibility to say that if CPD had a properly functioning internal affairs system during the time periods that are the subject of this report, it would have discovered the Watts team's corruption. I also reviewed 4 other COPA investigation reports relating to investigations that were initiated or continued following Watts and Mohammed's arrests. These include LOG # 1085254 (Lionel White Sr. – naming Alvin Jones, Elsworth Smith, Manuel Leano, Brian Bolton, Robert Gonzalez, Douglas Nichols – recommending separation of each); Log #1087717 (Jamar Lewis – naming Calvin Ridgell Jr., Gerome Summers Jr., Robert Gonzalez, Brian Bolton, and Frankie Lane – recommending separation of Ridgell Jr. and Summers Jr.); LOG # 1089229 (Ben Baker – naming Alvin Jones and Kenneth Young - administratively closed because both officers resigned while the investigation was pending; Log # 1092530 (Ben Baker & Clarissa Glenn – naming Alvin Jones and Elsworth Smith – recommending separation of both). In these investigations, investigators thoroughly sought evidence and conducted in-person interviews to confront the accused officers with contradictions in their testimony and reports. These reports provide further evidence that a properly functioning internal affairs system would have discovered the corruption many years before COPA did. The City's witness testified that only the officer with personal knowledge of an arrest should be the author of the report (Fitzgerald deposition, 216: 9-18). This violation could have been easily discovered, but was not.

Other witnesses have corroborated that the practice of writing false police reports occurred in other sections of the CPD, too. For example, Janet Hanna, the administrative assistant at the

Fugitive Apprehension Unit (where Spalding and Echeverria were assigned after the Watts investigation was completed), corroborated that the same practice of falsely listing team members on arrest reports was followed by the Fugitive Apprehension Unit (Hanna (Spalding) deposition, 74: 6; 82: 19). There is no accepted standard in policing to list police personnel that have nothing to do with the arrest or other enforcement action (e.g., recovered the evidence; conducted the surveillance) on official government documents.

There are numerous other examples of COPA reinvestigating a complaint about members of the Watts team and sustaining findings of misconduct despite CPD previously having knowledge of the same complaint and failing to conduct a reasonable investigation. One particularly relevant example is for Plaintiff Lionel White. Like Baker and Glenn, Mr. White participated in a contemporaneous CR investigation regarding misconduct by the investigating officers (CR #313536). OPS took a summary statement from Mr. White regarding allegations of a warrantless entry search and described Officer Alvin Jones beating him without provocation under Sergeant Watts's supervision. The officers present a completely different version of events that involves Mr. White fleeing from the officers and initiating an assault against them. The officers do not discuss entering Mr. White's residence. Mr. White identified some of the officers using photographs.

Despite the seriousness of these allegations and the documented injuries, OPS never interviewed any of the involved officers and instead relied solely on untested to-/from- accounts from the officers based on pre-defined questions with their version of events. The investigation also does not include interviews with potential witnesses. It appears that the investigator made minimal efforts to interview a small number of witnesses and made no effort to interview other witnesses. The investigation also does not reference whatsoever the individuals arrested as part of the reverse sting (discussed in more detailed below), which would have been critical information to understand what the officers could or could not have been doing when Mr. White was arrested. Perhaps most importantly, the investigation does not the unlawful entry. With such a widely divergent account of events, the investigator should have visited the scene, photographed the scene, and attempted to locate and interview witnesses that were inside the apartment. By contrast, it appears that COPA conducted a thorough investigation into Mr. White's arrest and the circumstances of the reverse-sting arrests, which ultimately led to the conclusion that multiple officers committed misconduct and should be terminated from CPD.

I have reviewed COPA reports that in total recommend that CPD fire 10 officers that were part of the Watts team: Brian Bolton, Robert Gonzalez, Alvin Jones, Manuel Leano, Douglas Nichols, Calvin Ridgell, Elsworth Smith, and Kenneth Young. This is an extraordinary number of officers from one tactical team to have been found by their own disciplinary agency to have committed serious misconduct, especially when combined with the fact that Defendants Mohammed and Watts left the force after being found guilty of corruption and therefore were not even the subject of the COPA reinvestigations.

At bottom, the COPA reinvestigations shows that investigations into the allegations against Watts and his team members were not only possible but would have resulted in findings many years ago that the officers were engaging in misconduct. The fact that COPA conducted these investigations years after the fact and was still able to track down many of the relevant witnesses and investigate the other relevant facts, and yet CPD failed to do so when the complaints were originally made, is a prime example of how CPD's internal affairs system failed during the relevant time period. There is additional evidence in discovery that the CPD failed to supervise the officers involved in Plaintiff Baker, Glenn, Gipson, and White Sr.'s arrests:

1. *Chicago Police Department's Failure to Supervise the Officers Involved in Plaintiffs' Arrests.* When the CPD began receiving allegations against the officers involved in Plaintiffs' arrests that the officers were engaged in adverse behavior (e.g., selling drugs, paying informants with drugs, stealing, fabricating evidence,[75] unlawfully prosecuting individuals[76]), the Department had an obligation to identify the behavior, initiate and ensure an internal affairs investigation and stop their conduct.[77]

---

[75] The CPD was aware of repeated allegations of fabrication of evidence against the officers involved in Plaintiffs' arrests. Knowing the complainants alleged that they had never handled the evidence, a reasonable investigative measure would have been to submit the evidence for forensic analysis (e.g., fingerprinting, DNA testing) to eliminate the complainant as an offender. If a complainant had handled the evidence, particularly over a longer period (such maintaining a "stash" and peeling off smaller quantities from larger quantities to serve customers), then forensic analysis may confirm or dispel the investigator's suspicions. This did not occur.

[76] For example, Clarissa Glenn made allegations against Sergeant Watts for fabricating evidence (CR # 309282, Bates CITY BG 012903 to 012927; also see CR # 313683 for a case of fabricating evidence. This matter took 406 days before it was completed, and even then it was not really completed, as described later in this report). Chief Barbara West testified at deposition that one complaint against Sergeant Watts occurred in April 2008, it was subsequently assigned to Joseph Barnes in September 2009, and then assigned to Sergeant Chester in June 2013. This is evidence of a continuing pattern after Sergeant Watts was arrested. There is no explanation in discovery for the investigative delay (West deposition, 91: 23-24; 92-93: 2).

[77] Calvin Holiday testified at deposition that if multiple investigations were open against a CPD employee, then the investigations may have been assigned to different investigators with each not necessarily aware that separate

Doing so is consistent with the accepted industry practice for supervision, early warning systems and internal affairs investigations. Given that the allegations were criminal, stronger supervisory measures such as targeted integrity testing[78] was warranted.[79] The Department should have quickly executed a series of integrity tests to identify whether any officers associated with Sergeant Watts engaged in corruption, bribe-taking, or fabrication of evidence. Instead – although a few such tests were conducted over time – the CPD allowed the investigation to drag on for 8 years (see City's First Amended Answer to Plaintiff Clarissa Glenn's June 7, 2017 Interrogatories to Defendant City of Chicago, describing investigation beginning in 2004 and concluding in 2012 with arrests of Watts and Mohammed).

Integrity testing is a logical extension of an employer's right to evaluate employees' work performance and honesty. As an aspect of supervision, the intent behind integrity testing is to manage risk. Such a practice is aimed at testing the target's compliance or expected response against the actual observed response. Integrity testing is: **1)** used as an anti-corruption tool to identify and catch corrupt police officers; **2)** to create a more comprehensive corruption barometer by providing a limited measure of corruption within the Department; **3)** used to create an environment of supervisory omnipresence; and **4)** used to identify training needs and communicate these needs for appropriate follow up. Although the instant case was ripe for an integrity test,[80] the discovery materials indicate that any integrity testing effort was insufficient.

---

investigations were underway (Holiday deposition, 51: 6-25; 52-53: 4). This reflects a management failure that implicates duplication of effort, consistency, and fairness, and strengthening the investigative process. Situational awareness allows for a more comprehensive analysis of the evidence, and a more robust investigation overall. The input and feedback from multiple investigators can help strengthen the case, identify any potential weaknesses or biases, and increase the chances of arriving at a just and accurate conclusion.

[78] Integrity testing is a term used to describe various covert conditions intended to assess a police officer's ability to avoid tempting counterproductive behavior and comply with the requirements of the position. Calvin Holiday testified at deposition that integrity testing was discussed in the instant case, but the frequency and intensity of that testing was far below what was required (Holiday deposition, 91: 23-25; 92-94: 1).

[79] Although the FBI eventually investigated the defendant officers, the CPD did not act swiftly enough when they had information that the defendant officers were committing crimes. The CPD allowed the defendant officers to continue in their role for several years, harming individuals at the Ida B. Wells housing development (see affidavit of Pete Koconis; also see interview of Wilbert Moore, April 7, 2005, where Moore conveyed to Special Agent Susan Bray of the ATF Chicago Field Office that Sergeant Watts had been receiving illegal payments to allow drug sales to continue, Watts unlawfully took possession of two rifles, and Watts took possession of forty (40) bags of "weed.").

[80] For example, the FBI investigation (Bates PL Joint 50235) indicates in 2004 the CPD internal affairs division was aware of "rumors circulating throughout the Ida B. Wells housing development that Chicago Police Department Sergeant Ronald Watts was a corrupt Police Officer and that Watts, along with other members of his team, routinely

Failing to take supervisors actions would lead reasonable officers to believe that the city condoned their conduct.

2. **Regular performance evaluations**. Performance evaluations are an instrument for determining individual strengths and weaknesses across a spectrum of performance dimensions related to an employee's specific function. They can also detect emerging problems. By job description, Chicago police captains and police commanders are required to conduct "performance evaluations to document staff performance; review performance evaluations completed by subordinate supervisors to ensure that proper procedures are followed, and evaluation processes are conducted in a standardized manner." Of the discovery that I reviewed, there is nothing to indicate that any Chicago police captain or commander submitted any performance evaluations for officers involved in Plaintiffs' arrests in the instant cases.

3. **Transfer to a non-enforcement assignment**. Transferring a police officer from an enforcement position to an administrative position when personnel allegations accrue, or when criminal allegations are reported, is a common practice. Doing so removes the officer from contact with the public and eliminates their enforcement capacity, thus eliminating the opportunity to cause harm. Of the discovery that I reviewed, there is nothing to indicate that the Chicago Police Department transferred any of the officers involved in Plaintiffs' arrest to an administrative position during the time periods at issue.

4. **Dissolving the unit in which the officers involved in Plaintiffs' arrest were assigned.[81]** Although a specialized tactical narcotics division may be useful, if it causes more harm than good, then it should be dissolved. It is evident from the discovery materials that a culture[82] of

---

used their positions as Police Officers to extort individuals at Ida B. Wells." This is precisely the type of condition that requires a swift integrity test. However, the evidence in discovery indicates the CPD was slow to consider integrity testing, which would have developed evidence suitable for prosecution.

[81] As one example in Chicago, the Police Department dissolved the Special Operations Section after several incidents of misconduct were reported (David Heinzmann & Emma Graves Fitzsimmons, October 10, 2007, "Cops disband elite unit," *Chicago Tribune*). The **Los Angeles Police Department** dissolved the Rampart CRASH unit (an anti-gang unit) on March 3, 2000 following a corruption scandal that began around March 1997 (see PBS Frontline, LAPD Blues. Retrieved on June 24, 2023 from https://www.pbs.org/wgbh/pages/frontline/shows/lapd/scandal/cron.html). The **NYPD** dissolved the Street Crime Unit after the unit was involved in some of the city's most notorious police shootings (see Ali Watkins, June 15, 2020, "N.Y.P.D. Disbands Plainclothes Units Involved in Many Shootings," *New York Times*. Retrieved on June 24, 2023 from https://www.nytimes.com/2020/06/15/nyregion/nypd-plainclothes-cops.html).

[82] Daniel Echeverria testified at deposition that he was often referred to as a "rat" or "rat motherfucker" by his supervisor Lieutenant Pascua (Echeverria deposition, 95: 15-18), and that Sergeant Janice Barney was also prone to insulting personnel in the Inspections Unit 126 (Echeverria deposition, 106: 10-24; 107: 1). Mr. Echeverria also testified at deposition that Commander O'Grady informed Echeverria and Spaulding's Fugitive Apprehension Division

supervisors that they were "rats" and should be "treated accordingly" (Echeverria deposition, 152: 19-24; 153: 1-11; 154: 21-24; 155: 3). This culture of labeling and stigmatizing individuals who report misconduct as "rats" is detrimental to police accountability and the Department's overall integrity, does not engender positive interpersonal relations, and is contrary to all CPD supervisors' responsibilities to motivate employees as defined by CPD Rules and Regulations (CPD Rules and Regulations, p. 9, Bates CITY18796. The CPD defines a "supervisory member" as "a member responsible for the performance of duty and the conduct of other members," CPD Rules and Regulations, p. 12, Bates CITY18809). In a similar case (see *Klipfel & Casali v. Gonzalez et al,* 2006.), CPD Officer Joseph Miedzianowski "…told other CPD gang crimes officers not to work with ATF, and especially not to work with Klipfel because she was a rat and may be wearing a wire" (p. 3). This same cultural behavior existed in 1993 involving CPD Officer Miedzianowski, long before Echeverria encountered it in his work unit. Chicago Mayor Rahm Emanuel also addressed the negative culture in CPD speaking about the Laquan McDonald police shooting (October 20, 2014): "We need a painful but honest reckoning of what went wrong, not just in this one instance but over decades. We need to talk about what to do differently to ensure that incidents like this do not happen again; about the police culture that allows it and enables it…Supervision and leadership in the police department and the oversight agencies that were in place failed…Nothing less than complete and total reform of the system and the culture that it breeds will meet the standard we have set for ourselves as a city" (American Rhetoric, Rahm Emanuel, Chicago City Council Address, December 9, 2015. Retrieved on July 8, 2023, from https://www.americanrhetoric.com/speeches/rahmemanuelcitycouncil9december2015.htm).

There is relationship between police culture and police corruption, which holds across international settings. See for example: **1)** Campbell, J. L., & Göritz, A. S. (2014). Culture corrupts! A qualitative study of organizational culture in corrupt organizations. *Journal of Business Ethics*, *120*(3), 291-311 (the research found that corrupt organizations perceive themselves to fight in a war, which leads to their taken-for-granted assumption that 'the end justifies the means.' This assumption inspires many values and norms of the organizational culture. An important value in a corrupt organization is "security", and an important norm is punishment of deviant (i.e., non-corrupt) behavior"); **2)** Amagnya, M. A. (2023). Police officers' support for corruption: examining the impact of police culture. *Policing: An International Journal*, *46*(1), 84-99 (the study of Ghanaian police officers found that "the perception of corruption prevalence, lack of deterrence (i.e., perceived oversight measures) and the Upper East Region significantly predicted officers' support for corruption. Particularly, lack of deterrence was a consistent predictor of support for corruption across different models compared to corruption prevalence"); **3)** Mink, O. G., Dietz, A. S., & Mink, J. (2000). Changing a police culture of corruption: Implications for the police psychologist. *Journal of Police and Criminal Psychology*, *15*(2), 21-29 (the study found that "to the extent that relationships are embedded in a culture of corruption and meta-pathologies such as dishonesty, an officer's sense of well-being will forever fall short of achieving wholeness and less than optimum performance will be achieved. As the culture continues to become increasingly more toxic, the individual's performance will continue to decline"); **4)** Hagedorn, J., Kmiecik, B., Simpson, D., Gradel, T. J., Zmuda, M. M., Sterrett, D., ... & Chebat, T. (2013). Crime, Corruption and Cover-ups. Anti-Corruption Report Number 7. University of Illinois at Chicago Department of Political Science (the study found "The "blue code of silence," while difficult to prove, is an integral part of the department's culture and it exacerbates the corruption problems [and] The listing in our report of the 295 convicted police officers and their illegal activities demonstrate that corruption in Chicago Police Department is not confined to a few isolated cases. While people can debate whether the CPD has a culture that promotes corruption, the findings clearly show that the CPD has at the very least a culture that tolerates police misconduct and corruption"); **5)** Garduno, L. S. (2019). Explaining police corruption among Mexican police officers through a social learning perspective. *Deviant behavior*, *40*(5), 602-620 (the research examined the causes of corruption among Mexican police officers and found that positive definitions and reinforcement towards corruption are significant predictors of police corruption, and partially mediate the effect of job dissatisfaction on corruption).

Although police culture may be positive (i.e., support for integrity), negative culture (i.e., one that tends to ignore corruption) is a key factor associated with drug-related police corruption. The cultural disposition supporting drug-related corruption includes: **1)** a code of silence with grave consequences for those violating it; **2)** loyalty to other officers above all else, including personal integrity; **3)** cynicism or disillusionment about the job, the criminal justice system, and public support for those who performed properly; and **4)** indoctrination on the job as to what is acceptable behavior—for example, ignoring corruption. These cultural expectations facilitate corruption by **1)** setting the standard that nothing was more important than the loyalty of officers to each other (e.g., not stopping even the most serious forms of corruption; and **2)** thwarting efforts to control corruption, thereby leading officers to cover up for other officers' crimes

supervisory indolence and abrogation of responsibility were pervasive in the tactical narcotics team to which the defendants were assigned. Conduct by the officers involved in White, Gipson, Baker, and Glenn's arrests persisted for several years. This is an indication that, despite being aware of the allegations through years of citizen complaints, successive levels of supervision ignored those allegations and allowed the officers to continue in their assignment. With so many successive layers of supervision, and so many accumulated allegations, the tactical narcotics team continued to operate unfettered. The tacit message to supervisors and officers engaged in tactical operations was continue doing what you are doing, because what you are doing is good.[83] There is no need to change. When adverse behaviors are not addressed promptly and effectively, they can be taken for granted, perpetuated, and eventually normalized within the department; this is commonly known as normalized deviance, and has been the focus of police corruption research for several decades.[84] Police officers may come to accept such actions as part of the culture, making it challenging to report misconduct when they are exposed to it. This is tantamount to managerial indifference, including an abrogation of the Superintendent's responsibility to direct the organization.[85]

5.  **Practices of false arrests.** Defendant Alvin Jones testified at deposition that when he worked on Defendant Sergeant Watts's tactical squad, it was his practice to "stop as many people as we can" when conducting a sweep of the buildings (Jones deposition, 02/26/2020, 196: 10-24). He

---

(see Caldero, M. A., & Crank, J. P. (2010). *Police ethics: The corruption of noble cause*. Routledge; Goldschmidt, J., & Anonymous. (2008). The necessity of dishonesty: police deviance, 'making the case' and the public good. *Policing & Society*, *18*(2), 113-135.).

[83] For example, Sgt. Watts apparently made statements that he had little to concern himself with from the Office of Professional Standards (OPS). One complainant (Pamela Nooner) gave a statement to OPS that when she threatened to call OPS about Watts and his unlawful search, Watts replied "Fuck OPS, they aint going to do shit. Don't you see I keep beating my cases" (Bates CITY BG 12064, CR # 305849). This indicates that a reasonable officer in Watts' position would believe that the CPD condoned his behavior.

[84] See: **1)** Barker, T. (1977). Peer group support for police occupational deviance. *Criminology, 15*(3), 353-366 (the research examines the way the opportunity structure and socialization practices within the occupation combine with peer group support to create a social situation where certain corrupt acts are tolerated and accepted); **2)** Ashforth, B. E., & Anand, V. (2003). The normalization of corruption in organizations. *Research in Organizational Behavior*, *25*, 1-52 (the research explains how otherwise morally upright individuals can routinely engage in corruption without experiencing conflict, how corruption can persist despite the turnover of its initial practitioners, how seemingly rational organizations can engage in suicidal corruption and how an emphasis on the individual as evildoer misses the point that systems and individuals are mutually reinforcing).

[85] See City of Chicago Superintendent of Police Class Title, Code 9957, Police Job Specifications (retrieved on June 24, 2023 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

explained that the practice was to stop everybody in the building and to search everybody because "they may have had the narcotic[s] passed off to them"; agreed that nobody had ever suggested that it was inappropriate to stop and search people leaving a building on a mass basis; and specified that his team did not just stop "most of the people [they[ could" but instead "everybody [they] could" (Jones deposition, 2/27/20, 473: 4; 475: 8). Jones testified that this practice was pervasive: it was done in various housing projects in Stateway Gardens and Robert Taylor's homes and was the practice the whole time he worked in Ida B. Wells (Jones deposition, 2/27/20, 475: 17; 476: 16).

Lieutenant Mann, who supervised Watts and his tactical team, knew that Watts's teams would go into buildings at Ida B. Wells and immediately stop and search everybody in the lobby of the building, and he believed that it was appropriate to do so (Mann deposition, 94: 3; 95: 5). Stopping and searching a large group of people because they all happen to be entering or leaving the building at the time the police arrive is inconsistent with generally accepted standards for having individualized and specific bases for stopping, searching, and arresting someone.

6. **Failure to supervise the Defendant officers.** I reviewed the deposition of Lt. Kenneth Mann, who supervised Ronald Watts and the other officers in his unit. Lt. Mann did not review any of the unit's arrest reports for permissible actions, but just to make sure "they were filled out correctly" (Mann deposition, 41: 18-24). He had no way to know if the reports were true or false (Mann deposition, 41: 25; 42: 4). He never personally observed Watts or his team making a drug arrest (Mann deposition, 43: 6-15). He believed that on the police reports, the one or two officers listed as "arresting officers" personally made the arrests, and he expected his subordinates to write arrest reports so that officers personally involved in arrests would be listed as arresting officers numbers one and two (Mann deposition, 43: 22; 50: 4). He only described meeting with Sergeant Watts in group settings: at roll calls and when he called all-sergeants meetings (Mann deposition, 52: 18; 53: 6). He described a hands-off approach to supervision, saying, "Well, being a supervisor of a specialized unit, you have to rely on those individuals that work for you, and I supervised them, but they have demonstrated that they can work independently of supervision. That's why they were on the teams. But I really count on the supervisors, the sergeants, to bring to me any problems or requests, but I don't know what to say with Ronnie [phonetic] -- totally, with Sergeant Watts. It totally caught me off guard and

by surprise" (Mann deposition, 76: 23; 77: 7). Lt. Mann was not aware of anything present to check a rogue sergeant as he said. Lieutenant Mann was asked at deposition, "So if you rely on . . . the sergeant and the sergeant is a criminal, is there some -- is there a backstop in the system to find problems with the sergeant?" and he answered "I -- I don't know" (Mann deposition, 77: 8-12).

Further, Lt. Mann chose not to investigate allegations of a "tariff" or "tax" charged by Watts; he had a "direct interaction" with "a couple of civilians that told [him] that Watts was charging a tariff or a tax." Lt. Mann explained that he responded by "asking [them] if they were making a formal complaint" but that "they walked away from me" (Mann deposition, 80: 22; 81: 4). Lt. Mann also told Commander Walter Green about those allegations (Mann deposition, 87: 9; 89: 1). Lt. Mann understood the complaint to be that Watts was taking money from drug dealers to sell drugs (Mann deposition, 93: 7-17). Lt Mann testified that he investigated "hundreds" of CRs – and because he never worked in internal affairs, all of those would have been allegations against his subordinates – but he never sustained a single one (Mann deposition, 117: 3-20; 119: 19-120: 15).

I note that Lt. Mann personally conducted the investigation of several CRs against the officers under his supervision, and in those investigations, he failed to comport with nationally accepted standards for conducting thorough and comprehensive investigations. True to his testimony, he did not sustain a single allegation in any of these CRs:

a.  **CR's 309282 and 309359 (Nov 2005):** Plaintiff Clarissa Glenn alleged that Defendant Watts had searched her residence without a warrant or permission, threatened to harm her, and threatened to arrest her, and that he was harassing Plaintiff Ben Baker and threatened to take Plaintiff Ben Baker to jail. As the investigator, Lt. Mann did not contact Ms. Glenn, or contact Plaintiff Ben Baker (whom Ms. Glenn had said Watts was harassing), conduct a scene canvass, contact any witness, interview any officer, or seek an administrative report from any officer. Even though Lt. Mann had the complainant's address, he did not make any attempts to contact her in person (CITY-BG-012905). Ms. Glenn named a witness to an incident where the accused officer, "possibly Ronald Watts," threatened her with bodily harm and arrest, but Lt. Mann also did not make any effort to contact that witness (CITY-BG-012916). The complaint was "reopened" as of September 5, 2006, nearly a year after Lt. Mann's cursory attempts to contact the

complainant (CITY-BG-012912, 012914). Notably, although the complaint was received in-person, Investigator Grace Wilson, who received the complaint, did not attempt to obtain an affidavit, and did not ask for details about the threats that the officers had made (CITY-BG-012905). More than a week passed between when the complaint was received on October 24 2005 and when it was assigned to Lt. Mann on November 2, 2005 (CITY-BG-012905).

b. **CR 309372 (Nov 2005):** The complainant alleged that Sgt. Watts failed to arrest an offender who subsequently followed her home and battered her with a baseball bat. Lt. Mann never canvassed the scene and never sought any statement from any officer, even though the complainant gave a statement; instead, he relied on cursory to-/from- reports. The complainant further alleged that Sgt. Watts told her that he would not arrest the man who had threatened her with a baseball bat because she admitted to displaying a knife in self-defense, and Sgt. Watts had told her "that if he arrested the offender he would have to arrest her for the knife" (CITY-BG-012947). Lt. Mann's description of the interview with the complainant is cursory; for example, he writes, "Ms. Mays admits that when the Police and Fire Ambulance arrived on the scene she refused service because she was mad," but he never confirmed with Ms. Mays whether she asked for a police report from officers after she was assaulted or for any further details about why she initially refused medical treatment (CITY-BG-012947). Officer Kenneth Young gave a vague to-/from- report that did not specify the time or place of the interaction, or which other officers were present (CITY-BG-012948). Sgt. Cornelius Brown gave a more detailed to-/from- report but he never personally interacted with the complainant; nevertheless, he reported the hearsay that the complainant "refused to cooperate with the police" without explaining where or how he learned that information (CITY-BG-012949-012950).

Lt. Mann spoke to one witness who did not observe the assault or any police activity or police contact with the complainant, and he did not attempt to speak with other witnesses, according to the file (CITY-BG-012951). Sgt. Watts submitted a vague to-/from- in response to the allegations, where he said that "other officers" (but did not identify them) were approached by the complainant, that he "attempted to question her," that the complainant used profanities towards "the male black on the scene" (i.e.,

the man who later attacked her), and Sgt. Watts directed the officers to generate contact cards on both (CITY-BG-012954). He never denied the victim's allegation that he told her he couldn't do anything (including take a report) without arresting them both and he was not questioned about that allegation. His account is inconsistent with Kenneth Young (assuming Young was present for this interaction, which this cursory investigation does not establish) because Kenneth Young does not mention that the witness was questioned or that contact cards were written. The report contains a highlighted "disorderly conduct – false alarm to 911" arrest and sentence from two years prior for the complainant (CITY-BG-012963). Lt. Mann's CR file includes a checklist of investigatory steps that is incomplete or misleading: Lt. Mann reports that he contacted "all complainants and witnesses" (he never asked the other officers for other witnesses, including the identities of all responding officers) (CITY-BG-012966).

c. **CR 1028321 - CITY-BG-018774 (July 2009):** This complaint was initiated on July 17, 2009 (CITY-BG-018775). The complainant alleged that victim Bruce Powell was falsely arrested and that an "unknown sergeant" told him not to report what had happened (CITY-BG-018777). The CR was assigned to Sgt Ronald Watts even though he was the supervisor of the complained-against officers, Douglas Nichols, and Manuel Leano, and therefore there was a significant possibility that he was the complained-against sergeant (in fact, all three were on duty on the date relating to the complaint) (CITY-BG- CITY-BG-018783; 018796). Sergeant Watts requested reassignment because the CR involved a complaint against an "unknown sergeant," but only after he had twice spoken to the complainant by phone and had reported that the complainant was "unwilling to cooperate" (CITY-BG-018783). Lt. Mann was reassigned the complaint, but did not take any other investigative steps and submitted the CR for review with no recommendation; even though the alleged victim was imprisoned and easy to contact, he did not make any effort to contact the victim.

d. **CR 1029240 (Sept 2009):** The complainant alleged that Ronald Watts had called the victim a "smart bitch," threatened, "I'm going to bust your head," cancelled all of the victim's requests for a Captain to come to the scene and allowed his officers to also curse at the victim. Lt. Mann took a statement from the complainant but did not contact the victim, did not canvass the scene, did not contact witnesses, and did not interview

the officers. Instead, he relied on to-/from- statements from the involved officers, which were cursory and consisted mainly of denials of the allegations instead of the detailed accounts of what happened that would allow for a thorough investigation (CITY-BG-019413; CITY-BG-019416; CITY-BG-019422). Lt. Mann obtained a signed affidavit on November 7, 2009 (CITY-BG-019376) but neglected to conduct a further interview at that time; instead, he waited nearly three months until January 26, 2010 and again on February 9, 2010, to attempt to re-contact the victim and witnesses (CITY-BG-019427). These are unnecessary delays, and there is no explanation for the delays.

e. **CR 1030958 (Oct 2010):** The complainant alleged that Sgt. Watts cursed at him, refused to take his complaint, and said "What's your problem? Get the fuck out of my office for being too loud." Lt. Mann did not contact witnesses, did not canvass the scene, and did not take statements from accused or involved officers. Instead, he relied on to-/from- reports from the officers. The narrative reveals the complainant alleged that she asked to file a complaint at the station where her daughter was arrested, but Sgt. Watts instead told her "to leave the station or he would arrest her" (CITY-BG-019897). Watts admitted that he threatened to arrest her unless she ceased "being loud and using profanities" and did not deny that she tried to then make a complaint (CITY-BG-019897). The "to-/from-" reports that Lt. Mann obtained are wholly insufficient. In one report, Officer Elsworth Smith states that he did not observe the three allegations but says absolutely nothing about what he did observe or remember about an arrest he as admittedly involved in (CITY-BG-019929). Based on these extremely minimal and perfunctory to-/from- reports, most of which consist of the officers in the vicinity stating that they did not hear what Defendant Watts said or could not remember the interaction, Lt. Mann did not sustain the allegations (CITY-BG-019930). I do not see any credible evidence that Lt. Mann could have adequately weighed the credibility of the complainant against Ronald Watts with such sparse information. I observed this pattern of dismissing serious allegations after receiving cursory to/from memos across many CRs I was provided.

7. **OFFICER ANALYSIS FROM *WADDY V. CITY OF CHICAGO*.** I have appended the report I wrote in an Illinois state court case, *Waddy v. City of Chicago,* where I reviewed the entire disciplinary history of certain officers who were involved in Alvin Waddy's arrest and

prosecution. Specifically, I reviewed the findings as to Defendants Ronald Watts, Kallatt Mohammed, Elsworth J. Smith, Jr., Robert Gonzalez, Manuel Leano, Douglas Nichols, Alvin Jones, Brian Bolton, and Lamonica Lewis. There, I noticed flaws in the investigations into the Defendant officers consistent with my opinions here. I incorporate those conclusions, attached as Appendix F.

Also, I have reviewed my findings from that report, and I conclude that the individual investigations into those officers were not consistent with nationally accepted standards. The investigations lack many fundamental elements of a standard internal affairs investigation, which are intended to uncover facts that confirm or dispel the allegations. Without following accepted industry standards for investigations, such as collecting all relevant evidence and adhering to due process, the investigator's findings are incomplete, biased, and unreliable.

## XI. WHETHER THE CPD OFFICERS' ACTIONS FELL BELOW NATIONALLY ACCEPTED POLICING STANDARDS WITH RESPECT TO THE ARRESTS OF BEN BAKER, CLARISSA GLENN, LEONARD GIPSON, AND LIONEL WHITE SR.:

As noted in the introduction, framing individuals for crimes they did not commit, including by fabricating police reports, falls far below nationally accepted standards for policing. There are also numerous warning indicators with respect to how the reports documenting the arrests and other nearby arrests occurring near the same time and place, as discussed in more detail below. Before addressing the individual Plaintiffs' cases, I will provide a brief overview of nationally accepted standards for writing police reports. First, a brief discussion of the goals of writing police reports. IACP training manuals and policies provide a good basis for thinking about nationally accepted standards for preparation of police reports. Specifically, IACP Training Key #434 discusses "Principles of Report Writing." As that training key explains:

"There are four generally accepted reasons for a police officer to write a report: for historical records, as a management tool, as an aid for testifying in court and as a guard against civil or related actions that may be brought against the officer or the agency. Historical records are critical to the department, the public and elected officials. Among other things, these records provide the ability to see how well an agency is doing compared to previous years or to other jurisdictions" (p. 1).

Moreover, one of the primary goals of a police report is to serve as an aid for prosecutors to use when conducting criminal proceedings for the arrest. To accomplish these goals, police reports must be complete and accurate, including a detailed factual summary of the incident and the arrest. The IACP provides a useful shorthand for discussing a complete and accurate report --- the five "Cs" of a good report: "complete; clear, concise, concrete, and correct" (pp. 2-4). To be complete, the report must answer the relevant "Who, What, Where, When, Why and How questions," recognizing that there are dozens and dozens of permutations on such questions. Although the actual content of a complete report will vary by incident and arrest, basic information must include the identity of the officer who prepared the report and a description of what happened, including who was involved in the arrest. To be "clear," a report should use plain language that is easy to understand, and the author should use active voice instead of passive voice wherever possible. To be "concise" means to get to the point without clutter. "Concrete" in this context means that reports should include as much specific and factual detail as possible. "Correct" means that the facts and details are accurate. In line with nationally accepted standards for policing, the IACP recommends that report writers double check names, dates, times, and other details on a report before finalizing the report.

With these principles in mind, I will discuss the specific cases at issue.

**Baker/Glenn**.

I recognize that Ben Baker claims he was falsely arrested by the Watts team three times, although he was not convicted of one of the cases and is therefore only suing for two instances of false arrest (March 23, 2005, and December 11, 2005). His partner, Clarissa Glenn, also alleges that on December 11, 2005, she was falsely arrested by the Watts team alongside Ben Baker. Issues with the reports relating to Mr. Baker's and Ms. Glenn's arrests are discussed below.

At the outset, it is worth noting that Defendant Kallatt Mohammed testified that the Watts team had a practice of listing all of the officers on the team as participants in arrests even if some members of the team were not present (Mohammed deposition, 11/15/2023, 34: 6; 35:19). According to Mohammed, Defendant Sgt. Watts was the person who instructed him about this practice of including all team members on reports (Mohammed deposition, 36: 15-38: 13).

The practice that Mohammed describes is problematic and falls below nationally accepted standards in that a report that inaccurately lists officers participating in the arrest when they did not

in fact participate.[86] That report cannot function as a useful aid to prosecutors in conducting criminal proceedings because the prosecutors are unable to determine who knows what about the events at issue based on the report. Such reports also expose officers and municipalities to claims of false arrest such as the claims at issue in these cases—To defend against a false claim for wrongful arrest, officers and municipalities should be able to point to accurate reports that correctly document real arrests based of verifiable evidence. When the reports themselves are inaccurate on their face, it is problematic for defending against accusations of wrongdoing.

It appears that the reports relating to Mr. Baker and Ms. Glenn's arrest on December 11, 2005 were written in conformity with the Watts team's practice of including team members who may not have been involved in the arrests at all. With respect to the Vice Case Report, Mohammed's name is listed as the second reporting officer, and a signature appears below his name, suggesting that he witnessed the events described in the report. By all accounts, he did not, and the signature is not actually his signature (see Alvin Jones deposition, July 19, 2023, 141: 1; 143: 12). As an initial matter, there is nothing on the Vice Case Report indicating that Defendant Jones signed for Defendant Mohammed. That in and of itself violates nationally accepted police standards that require accurate and complete reports, because this report is not accurate in that it suggests it was written or at least signed off on by Defendant Mohammed when in fact it was not. That also violates CPD policy, which limits the circumstances in which an officer can sign for another officer and requires certain steps, such as a clear notation that the signature is being made with the other officer's permission (see Lt. Fitzgerald deposition).

The above signature issue takes on extra significance with respect to the December 11, 2005 Vice Case Report documenting Baker and Glenn's arrest because the narrative section of the report also falls below nationally accepted standards for police reports in that it is not sufficiently detailed or complete, and specifically it fails to discuss who saw what and who was involved. In particular, the narrative report repeatedly refers to R/Os in describing the actions that the police officers took that day, but it does not specify which R/O took which action. Rather, the report repeatedly says that R/Os carried out certain activities and the arrests. According to the first reporting officer (who

---

[86] The generally accepted standard is that all officers involved in an incident or an arrest that have facts to convey must produce a supplemental report (sometimes known as a continuation report). This standard allows officers and supervisors to identify the specific actions and knowledge of each officer and increases accountability by requiring officers to account for their specific actions.

wrote the report per his own testimony), R/Os stands for Reporting Officers (Alvin Jones deposition, July 19, 2023, 142: 4; 142: 8).[87]

The R/Os listed on the December 11, 2005 arrest report at Defendants Jones and Mohammed. This is problematic and falls below nationally accepted standards for police reports because Mohammed, who has no recollection of ever being involved in an arrest of Baker or Glenn, testified that he only remembers talking to Baker and Glenn at the police station after they were arrested. Defendant Jones himself testified that Mohammed did not in fact participate in the arrest of Baker or Glenn. Thus, the report is not accurate or complete – it says that Defendant Mohammed participated in numerous acts that he did not in fact participate in. Not only does this fall below nationally accepted police practices for report writing, but it also does not comply with CPD's written policies. As Lt. Fitzgerald explained during his deposition, it is not possible to know who did what by reviewing the Vice Case Report, but under CPD policy, the authors of the report must have personal knowledge (Fitzerald deposition, 216: 9; 216: 18, testifying that an officer would not be an author of a report without personal knowledge). In fact, after reviewing the report, Mr. Fitzgerald testified that he was unable to determine which officer did what for the arrest, but expressed his confidence that Jones and Mohammed would be able to do so based on the fact that they were the reporting officers (Fitzerald deposition, 213: 15; 214: 14).[88]

There is one additional, related problem with respect to the Baker/Glenn Vice Case report that also falls below nationally accepted standards and CPD standards. As Mr. Fitzgerald acknowledged, CPD policy requires that officers who witnessed the offense be listed as witnesses on the report. Although he wavered somewhat in describing what "witness" to the offense means, ultimately he concluded that the terms means to actually witness part of the offense (Fitzerald deposition, 213: 15; 214: 14). The Baker/Glenn Vice Case Report identifies witnesses who did not witness any part of the offense, including most notably Defendant Mohammed (City BG 00029-30).

This is problematic on its own because it means that the report is not complete or accurate. It is even more problematic when combined with the fact that Defendants Jones, Mohammed, and others are documented as being involved in other arrests at almost the exact same time as the

---

[87] The March 23, 2005 Vice Case Report for Mr. Baker's arrest suffers from the same problems, identifying R/Os as taking certain actions without any attribution for which R/O did what.

[88] Along the same lines, the arrest report for the December 11, 2005 arrest lists Jones and Mohammed as the arresting officers. This is neither complete nor accurate given the undisputed evidence that Mohammed did not arrest Baker or Glenn and at the earliest arrived on the scene after they were in handcuffs.

Baker/Glenn arrests, but in a different location. More specifically, Jones is listed as witnessing other arrests, and Mohammed is listed as the second Reporting Officer for those arrests (COPA-WATTS002267-68). Jones also testified in court for one of those other arrests that he had been conducting surveillance at a time that would have conflicted with his purported involvement in the Baker/Glenn arrests, and Defendant Elsworth Smith (listed as the first Reporting Officer for the Vice Case Report of the other arrests) testified in that case that Jones had conducted the surveillance that led to the arrests.

When confronted with these discrepancies by COPA, Defendant Jones admitted that the reports documenting both arrests could not be accurate, and he further admitted that he provided false testimony. There is no evidence in discovery that the reports documenting the other arrests were provided to the prosecution in the Baker/Glenn matter, or to the criminal defense team. According to their own testimony from the criminal proceedings with respect to one of the other arrests (Willie Robinson/Roberson), the Vice Case Report of those other arrests is not complete or accurate, in that it says nothing about surveillance conducted by Alvin Jones that led to the arrests.

Had the Defendants been following nationally accepted standards with respect to police reports, the reports would have documented all of the relevant information, including that Jones had been conducting surveillance that led to those arrests, and they would have provided all of the reports to the prosecution, which would have given them to the Baker/Glenn defense team as exculpatory evidence. Even setting that disclosure issue aside, the other reports are also not written in a complete or accurate way.

**Lionel White Sr.**

Mr. White's estate alleges that he was wrongfully arrested on April 24, 2006. Plaintiff Lionel White Sr.'s arrest suffers from many of the same issues as the Baker/Glenn arrests, and the officers' actions fall below nationally accepted policing standards in the same ways. The White Sr. Vice Case Report is purportedly signed by officers Jones and Smith, but in reality, Jones signed for Smith without any acknowledgement on the paperwork that he was doing so (Jones deposition, February 27, 2020, 367: 17; 368: 15). Mr. Jones does not recall whether Smith reviewed the report before Jones signed his name to it (Jones deposition, February 27, 2020, 368: 11; 368: 15). Defendant Smith testified that he does not remember being involved in White Sr.'s arrest, and Defendant Jones appears to say that Jones was the only person involved in the arrest. Mr. Jones prepared the arrest

report and listed Smith as the second arresting officer merely because he was one of Jones' partners that day, even though Smith has no firsthand knowledge (Jones deposition, February 27, 2020, 342: 13; 362: 17). Mr. Jones acknowledges that Smith had nothing to do with the arrest other than being listed as the second arresting officer on the arrest report. Nonetheless, the narrative sections of the arrest report and the Vice Case Report do not explain which reporting officer or arresting officer performed which activity. They also fail to explain what any of the other listed officers did with respect to Mr. White's arrest. For the same reasons explained above, these failures fall below nationally accepted standards for report writing.

Also similar to the Baker/Glenn arrest on December 11, 2005, a number of other individuals were arrested around the same time as Mr. White by the same group or a subset of the same group as the officers who arrested Mr. White. Those individuals were arrested during something that the officers described as a reverse sting, where the officers purportedly act in an undercover role to catch people trying to buy drugs. I have reviewed some testimony and reports relating to these arrests, and they too fall below nationally accepted standards for policing. The narrative section of the reports appear to be almost entirely completed before the arrests occurred (Jones deposition, February 27, 2020, 418: 15; 421: 4) Although it might be appropriate to fill in some parts of the narrative before an operation such as a reverse sting in a known drug market, these reports include exact quotes that are attributed to the individuals who were arrested (see Vice Case and Arrest Report attachments to COPA Exhibits to Elsworth Smith March 13, 2019 Statement).

It is not appropriate, and falls far below nationally accepted standards, to attribute quotes to a person arrested for a crime when the person did not use the quoted language. Doing so makes a report inaccurate; an inaccurate report is unreliable, and an unreliable report defeats the officers' probable cause for an arrest). According to Lt. Fitzgerald, doing so also violates CPD's policy, although Defendant Smith explained that the Watts team commonly engaged in the practice. In addition, the vice case reports and arrest reports from the reverse sting include inconsistent times of arrest and inconsistent times when the officers arrived on scene. This is true even when comparing some of the vice case and arrest reports from the same arrest.

For example, the vice case report for John Pierce's arrest says that the officers arrived on scene at 11:15 and that Mr. Pierce was arrested at 11:30. However, Mr. Pierce's arrest report says that he was arrested at 11:40. The vice case report for the arrest of Cleothus Morris says that the officers arrived on scene at 11:30 and that Mr. Morris was arrested at that time as well. The vice case

report documents the arrest of Thomas Mitchell, which says that the officers arrived on scene at 2:38 pm and it has no time of arrest at all, while the vice case report of George Green's arrest says that the officers arrived on scene at 2:38 pm and that Mr. Green was arrested at the same time. Mr. Green's arrest report states that he was arrested at 12:25, and Mr. Mitchell's arrest report states that he was arrested at 12:30.

On their face, these reports are not accurate or complete given that they have conflicting times of arrest, meaning that they cannot be considered to have accurately documented the arrests. Combined with the fact that the quotes attributed to the individuals who were arrested appear to have been written before the arrests, the reports present a troubling picture of what happened at 575 Browning on April 24, 2006. In fact, Defendant Jones himself acknowledged that the inconsistencies are problematic (Jones deposition, February 27, 2020, 412: 3; 412: 13). In preparing these reports (and for Watts, signing off on them), the officers fell far below nationally accepted standards for policing. Supervisors who endorsed these reports also violated accepted standards that require supervisors to ensure the reports are accurate.

I reviewed COPA's report of the White Sr. arrest and the arrests of the individuals during the reverse sting, and the reports indicate that the individuals deny saying that they wanted "blows" or attempting to buy drugs from an officer on April 24, 2006. I was not retained to determine whether these individuals are telling the truth, but I note that the officers' failure to properly prepare police reports exposes them and CPD to questions about the validity of all of these arrests. I have also not seen any evidence in discovery that the reports from the reverse sting were provided to White Sr.'s criminal defense attorney or to the prosecutors despite the fact that all of the inconsistencies (including the fact that some of the reports placed the officers on the scene before White Sr. was arrested, which conflicts with the testimony of Defendant Jones in the White Sr. case) would have been exculpatory for Mr. White

Finally, if a jury accepts as true the fact that the individuals who were arrested as part of the reverse sting were arrested without probable cause and without asking for drugs, then it appears to me that the arrests comported with the policy that Defendant Jones testified about whereby members of the Watts team would attempt to detain every person they came across when they entered into a building, rather than only those who they had cause to detain (Jones deposition, February 27, 2020, 473: 14; 476: 6).

**Leonard Gipson.**

Mr. Gipson alleges that he was wrongfully arrested by the Watts team three times, on January 4, 2003, on May 8, 2003, and again on August 28, 2007. The reports of Gipsons' arrests suffer from many of the same problems identified above, and in particular fail to identify which officer or officers did what.

With respect to the January 4, 2003 arrest, the arrest report discusses a surveillance operation and notes that "R/Os" took certain actions, but it fails to list which reporting officers it is referring to, and the report also only lists two officers as being involved when we know that additional officers were involved because the Vice Case Report lists many additional officers as witnesses. Similar to the arrest report, the Vice Case Report describes what "R/Os" purportedly did with respect to the arrests, but it fails to specify which R/Os did what. This includes who purportedly received information from a C.I. (relevant both to the prosecution and the criminal defense team), and who participated in the purported surveillance and from where. The Vice Case Report refers to multiple surveillance points, but when Kallatt Mohammed testified about the arrest at a deposition, he stated that all of the officers were together in one location. He also provided testimony that conflicted with the report itself, including the critical information that the officers purportedly saw Gipson engaged in drug transactions (Mohammed deposition, November 15, 2023, 87: 15; 133: 19). The lack of detailed information in the Vice Case Report falls below nationally accepted standards and could have reasonably been anticipated to hamper Gipson's defense of the charges brought against him by providing a roadblock to his ability to question the officers and otherwise defend against the charges.

The May 8, 2003 arrest report is also problematic in that it describes an arrest purportedly by three different sets of partners but provides no detail whatsoever about what any of the officers did. The Vice Case Report from the August 28, 2007 arrest is the only report from these three cases that I have reviewed that appears to identify with any level of specificity what officer took what action. Of course, I understand that Mr. Gipson denies committing any criminal offense on August 28, 2007, and he has obtained a certificate of innocence. If his version of events is accurate, then the police officers' actions in falsely arresting him and preparing a false report fell far below nationally accepted standards for policing even though the Vice Case Report identifies with some specific what Defendant Nichols purportedly did with respect to the August 28, 2007 arrest.

## XII.    CONCLUSION.

The evidence in discovery indicates that the internal investigation system and the supervisory apparatus in the Chicago Police Department were flawed to such a degree that the officers involved in Plaintiffs' arrests could expect to avoid the scrutiny of a supervisor, and avoid a thorough investigation into their conduct. The result is that the accused officers and the public could expect that their complaint would almost invariably result in a not sustained finding. A properly functioning internal investigation system should ensure:

1.  **Fairness and Impartiality:** Officers and the public deserve and expect that investigations into alleged misconduct will be conducted in a fair and unbiased manner, ensuring that all parties involved are treated equitably. However, the data reveal that those external to the CPD (i.e., the public) who complain about CPD officers are less likely to have their allegations sustained.[89]

2.  **Consistency:** Officers and the public deserve and expect that internal investigations into alleged misconduct are conducted consistently across the department for similar offenses. Inconsistencies can breed resentment and undermine the legitimacy of the disciplinary system. A thorough internal affairs investigation is required by CPD policy,[90] but the data reveal that the elements of a standard internal affairs investigation were not always conducted, even after accounting for dimensions that were not applicable, or unclear in the CR file. The CPD policy requires that investigators "contact *all* complainants *and* witnesses as soon as possible" (emphasis mine).[91]

3.  **Protection from Retaliation:** Officers and the public who report misconduct or cooperate with internal affairs investigations deserve and expect protection from retaliation, ensuring a culture of openness and accountability. However, CPD member Daniel Echeverria testified at deposition that he was often referred to as a "rat" or "rat motherfucker" by his supervisor Lieutenant Pascua (Echeverria deposition, 95: 15-18), and that Sergeant Janice Barney was

---

[89] Tables 13, 21, 29, and 37 suggest potential bias in the personnel investigations.

[90] See Chicago Police Department General Order 93-3 Complaint and Disciplinary Procedures (effective January 15, 1993) and the associated Special Orders for a consistently thorough investigative process.

[91] Chicago Police Department General Order 93-3 Complaint and Disciplinary Procedures (effective January 15, 1993) (Bates CITY BG 59022), and Chicago Police Department Special Order S08-01-01 (see Bates CITY BG 59085-59132).

also prone to insulting personnel in Inspections Unit 126 (Echeverria deposition, 106: 10-24; 107: 1). Mr. Echeverria also testified at deposition that Commander O'Grady informed Echeverria and Spaulding's Fugitive Apprehension Division supervisors that they were "rats" and should be "treated accordingly" (Echeverria deposition, 152: 19-24; 153: 1-11; 154: 21-24; 155: 3). This culture of labeling and stigmatizing individuals who report misconduct as "rats" is counter to the protection from retaliation expected from a properly functioning internal affairs element. Mr. Echeverria's experience is detrimental to police accountability and the Department's overall integrity, does not engender positive interpersonal relations, and is contrary to all CPD supervisors' responsibilities to motivate employees as defined by CPD Rules and Regulations.[92] In a similar case (see *Klipfel & Casali v. Gonzalez et al.,* 2006), CPD Officer Joseph Miedzianowski "…told other CPD gang crimes officers not to work with ATF, and especially not to work with Klipfel because she was a rat and may be wearing a wire" (p. 3). This same stigmatizing and retaliatory culture existed in 1993 involving CPD Officer Miedzianowski, long before Echeverria encountered it in his work unit. Mr. Baker, Ms. Glenn, and Mr. Gipson also alleged retaliation by Sergeant Watts, and Gipson in particular alleges that Watts started targeting him after he complained against Watts. There is no evidence in discovery that the Chicago Police Department took any measures to protect complainants or whistleblowers against retaliation.

4. **Timeliness:** Police officers and the public deserve and expect that the internal affairs process is efficient and timely. Delays in investigations can lead to prolonged stress and uncertainty for officers involved, and for victims/complainants. Prolonged investigations send a tacit message to those involved that the complaint is not necessarily important. Chicago Chief Barbara West testified at deposition that one complaint against Sergeant Watts occurred in April 2008, it was subsequently assigned to Joseph Barnes in September 2009, and then assigned to Sergeant Chester June 2013. There is no explanation in discovery for the investigative delay (West deposition, 91: 23-24; 92-93: 2). The COPA investigations initiated after Sgt. Watts was arrested also demonstrate the extreme delay in fully investigating allegations of misconduct.

---

[92] See CPD Rules and Regulations, p. 9, Bates CITY18796. The CPD defines a "supervisory member" as "a member responsible for the performance of duty and the conduct of other members," CPD Rules and Regulations, p. 12, Bates CITY18809.

5. **Address Systemic Issues:** When the internal affairs system fails to address underlying systemic issues contributing to misconduct, officers and the public will likely view the internal affairs and supervisory process as arbitrary and ineffective.[93] The data reveal repeated instances of internal allegations being sustained at higher rates than allegations from external sources, and repeated instances of incomplete internal investigations. The evidence in discovery also indicates that all supervisory ranks in CPD have ignored these systemic issues between at least 1994 and 2018. There is an abundance of legacy information shown in this report that these issues persist despite adequate notice to the CPD that their internal investigative processes and supervisory practices are flawed.[94] Of the discovery that I reviewed, there is no evidence of any managerial action from CPD supervisors to mitigate personnel allegations against the officers involved in Plaintiffs' arrests.

Notwithstanding the accumulated allegation histories of the officers that were involved in Plaintiffs' arrest, the discovery that I reviewed indicated that the CPD failed to monitor, or track the officers for patterns of allegations, or initiate and ensure any corrective action. A clear pattern of allegations emerged among the officers involved in Plaintiffs' arrests between 1994 and 2018. As the Pareto Analysis shows, the CPD could have and should have directed its preventive effort where most allegations emanated from, which would have given them the ability to prioritize those issues and develop a personnel improvement plan and/or other adverse employment action for the officers. This does not mean that the remaining allegations should be ignored. Pareto analysis is simply a method to uncover the relative spread of allegations among categories. There is nothing in the discovery that I reviewed to indicate the CPD developed any personnel plans to address chronic allegations

---

[93] Evidence of this sentiment is documented throughout several pieces of literature cited in this report: **1)** Commission on Police Integrity. (November 1997). Report of the Commission on Police Integrity. Chicago, IL, p. 9, for a chronology of significant cases between 1960 and 1997; **2)** Police Accountability Task Force Report. (April 2016). Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve, pp. 23-24, for a discussion of previous corruption task forces (Bates BAKER GLENN 6794-6983); **3)** Futterman, C. B., Mather, H. M., & Miles, M. (2007). The Use of Statistical Evidence to Address Police Supervisory and Disciplinary Practices: The Chicago Police Department's Broken System. *DePaul Journal for Social Justice*, *1*, 251 329 (documenting a litany of police corruption cases, and the CPD's internal disciplinary data that reveal a substandard accountability system); **4)** A Report and Recommendations based on hearings before the Blue Ribbon Panel convened by the Honorable Ralph H. Metcalfe. (1972). Misuse of Police Authority in Chicago; **5)** Shielded from Justice: Police Brutality and Accountability in the United States. Chicago: Office of Professional Standards. Retrieved on July 7, 2023 from https://www.hrw.org/legacy/reports98/police/uspo55.htm.

[94] See tables 45 to 48 for various investigative dimensions known to the CPD across various years that indicate the investigations were incomplete.

particularly those involving a physical confrontation between the officer and the victim/complainant such as excessive force. There is also nothing in the discovery that I reviewed that the Superintendent directed any commanding officers to take any corrective or that the Superintendent held any commanding officers responsible for their subordinates' repeated adverse behavior.

Empirical analysis of personnel allegation data provides feedback and evidence for police administrators regarding whether the internal investigation process works to promote fairness and equity for both citizens and the accused officers. In the absence of such evidence, police administrators do not have a mechanism to determine whether an internal investigation's outcome is reliable. The failure to collect, analyze and act on the available personnel allegation data in the Chicago Police Department is tantamount to managerial indifference, including an abrogation of the Superintendent's responsibility to direct the organization.[95] The failure to act also implicates the supervisory chain of command at the CPD during the period in question. Ultimately, Ronald Watts and Kallatt Mohammed were arrested for their criminal conduct, which was allowed to continue because of supervisory failures.[96]

Collectively, the evidence suggests a combination of a lack of institutionalized oversight, willful blindness, and the abrogation of responsibility at each supervisory level. The CPD's supervisory failures allowed reasonable police officers to believe the CPD condoned their adverse behavior[97] ■

---

[95] See City of Chicago Superintendent of Police Class Title, Code 9957, Police Job Specifications (retrieved on June 24, 2023 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

[96] See Bates CITY BG 056533, FBI 1181 to 1183, FBI 1196 to 1197, FBI 1165 to 1197.

[97] See *Klipfel & Casali v. Gonzalez et al.,* 2006; see also *Obrycka v. City of Chicago; Anthony Abate,* 2012 for issues concerning both a code of silence within the CPD and a widespread custom or practice of failing to adequately investigate and/or discipline officers. Also see Bates CITY BG 12064, where Sgt. Watts believed he had little to concern himself with regarding the Office of Professional Standards (OPS). One complainant (Pamela Nooner) gave a statement to OPS that when she threatened to call OPS about Watts and his unlawful search, Watts replied "Fuck OPS, they aint going to do shit. Don't you see I keep beating my cases." This indicates that a reasonable officer in Watts' position would believe that the CPD condoned his behavior.

## EXHIBITS

I have consulted/been provided with the following documents related to my opinions:

1. FOP contracts: 1999-2003, 2003-2007, 2007-2012, and 2012-2017
2. Statutes on the Illinois affidavit requirement and the supersedure of those provisions by collective bargaining agreements, as cited in my report
3. 2023.02.27 In re Watts – City's Response to Coordinated Plaintiffs' 1-27-2023 RFP
4. Special Order S09-05-01 (Information Management); 63.450 (Field Reporting Manual – General Reporting Instructions); 63.464 (Vice Case Report – General Instructions); CITY-BG-062855 (Form Preparation Instructions); Special Order S08-01-05 (SPARs/Summary Punishment); General Order G08-01 (Complaint & Disciplinary Process); General Order 83-3 and subsequent revisions (GO 97-10; ASO 05-02; E06-05); General Order 86-14; Special Order S03-03-05; Special Order S03-03-01; General Order 93-3 and subsequent subsections; Special Order S08-01 and subsequent subsections.
5. Bureau of Internal Affairs Standard Operating Procedures
6. COPA Reports and Administrative Closure Memos # 1085254, 1087717, 1087742, 1089229, 1092530.
7. Complaint History of Numerous Defendant Officers, including SPARs, at CITY-BG-033690-33902
8. Deposition Transcripts Cline, Philip 12-8-2023
9. Deposition Transcripts Noble, Jeffrey
10. Deposition Transcripts Coleman, Bobby
11. Deposition Transcripts Glenn, Clarissa - Continued
12. Deposition Transcripts Spaaregaren, Michael 03-7-2022
13. Deposition Transcripts Beckneck, Anthony 02-10-2023
14. Deposition Transcripts Obolsky, Alexander 11-20-2023
15. Deposition Transcripts Marvin, CLPE, Matthew J.
16. Deposition Transcripts Redlich, Ph.D., Allison
17. Deposition Transcripts Gist, Donnell
18. Deposition Transcripts Noble, Jeffrey10-10-23
19. Deposition Transcripts Stack, Celeste10-19-2023
20. Deposition Transcripts Mohammed, Kallatt 11-15-2023
21. Deposition Transcripts Wasilewski, John 9-26-2023 full
22. Deposition Transcripts Lomax, Larry - Confidential
23. Deposition Transcripts Glenn, Clarissa - Continued
24. Deposition Transcripts Green, Kimberly
25. Deposition Transcripts Herron, Tyrone
26. Deposition Transcripts Gaddy, Willie J.
27. Deposition Transcripts Kirksey, Arthur Lewis - Continued
28. Deposition Transcripts Brown, Michael 11-1-2023

29. Deposition Transcripts Mohammed, Kallatt 2021.03.19
30. Deposition Transcripts Tepfer, Josh
31. Deposition Transcripts Johnson, Eddie 8-31-2022
32. Deposition Transcripts Byrson, Roscoe 9-15-2023
33. Deposition Transcripts Skahill, Tina
34. Deposition Transcripts Baker, Ben - Continued 08.10.2023
35. Deposition Transcripts Willis, Deon 04.28.2022
36. Deposition Transcripts Weekly, Sr., Isaac
37. Deposition Transcripts Smith, Taurus
38. Deposition Transcripts Saunders, Frank
39. Deposition Transcripts Johnson, Zarice
40. Deposition Transcripts Jefferson, Sr., Thomas W.
41. Deposition Transcripts Colvin, Craig
42. Deposition Transcripts Hunt, Brian
43. Deposition Transcripts Carter, Raynard
44. Deposition Transcripts Lewis, Jamar - Continued
45. Deposition Transcripts Lewis, Jamar
46. Deposition Transcripts Rivera, Juan 9-6-2023
47. Deposition Transcripts Walker, Jennifer
48. Deposition Transcripts Jones, Alvin 7-19-2023
49. Deposition Transcripts Smith, Elsworth 7-21-2023
50. Deposition Transcripts Mohammed, Kallatt 7-11-23
51. Deposition Transcripts Leano, Manuel VOL. 1 01-26-2022
52. Deposition Transcripts Lewis, Lamonica 07-25-2023 full
53. Deposition Transcripts Leano, Manuel 07-25-2023 full
54. Deposition Transcripts Watts, Ronald 6-27-2023
55. Deposition Transcripts Gonzalez, Robert 6-20-2023
56. Deposition Transcripts Kenneth Mann in Portfolio
57. Deposition Transcripts Shane, Ph.D., Jon
58. Deposition Transcripts Farrell, John 7-14-2023 condtranscript N indx ORIGINAL
59. Deposition Transcripts Baker, Ben 08.09.2023
60. Gipson, Leonard Deposition Transcript
61. Deposition Transcripts Skahill, Tina 7-19-2023
62. Deposition Transcripts Navarro, David 7-18-2023
63. Deposition Transcripts McCarthy, Garry 6-14-2023
64. Deposition Transcripts Spalding, Shannon 06-06-23
65. Deposition Transcripts Dotts, Sharika
66. Deposition Transcripts Waddy, Winona
67. Deposition Transcripts Waddy, Alvin
68. Deposition Transcripts Gonzalez, Robert 2019.10.16-17

69. Deposition Transcripts Echeverria, Daniel 5-30-2023
70. Deposition Transcripts Kirby, Debra 10-13-2022
71. Deposition Transcripts Moore, Louis 11.12.19 Full Size without Word Index
72. Deposition Transcripts Gonzalez, Robert 3-10-22 cond (1)
73. Deposition Transcripts Harrison, Stefon CT
74. Deposition Transcripts Summers, Gerome 2.13.2020 Full Size
75. Deposition Transcripts Summers, Gerome 2.11.2020Full Size
76. Deposition Transcripts Young, Kenneth 12.12.21
77. Deposition Transcripts Edwards, Darryl 10-28-2021
78. Deposition Transcripts Hronek, Daniel 12.07.2017
79. Deposition Transcripts Laskaris, Bill 12.07.2017
80. Deposition Transcripts Mohammed, Kallatt 2019.11.18
81. Deposition Transcripts Thomas, Henry
82. Deposition Transcripts CALVIN HOLLIDAY 11-14-2022
83. Deposition Transcripts Gonzalez, Robert 2019.10.16-17
84. Deposition Transcripts Watts, Ronald 12-02-2022
85. Deposition Transcripts Delaney, Milton
86. Deposition Transcripts Kirskey, Arthur 10.27.2022
87. Deposition Transcripts Watts, Ronald 2022.10.14
88. Deposition Transcripts Blair, Harvey
89. Deposition Transcripts Watts, Ronald 2022.10.07
90. Deposition Transcripts Watts, Ronald 2022.10.14
91. Deposition Transcripts Jones, Alvin 02.26.2020
92. Deposition Transcripts Cabrales, Miguel 10.18.17
93. Dep Tx - Spaulding
94. Deposition Transcripts Nichols, Douglas 2019.12.20
95. Deposition Transcripts Bolton, Brian 2022.03.15
96. Deposition Transcripts Bolton, Brian 2022.03.14
97. Deposition Transcripts Bolton, Brian 2020.05.18
98. Deposition Transcripts Bolton, Brian 2020.05.21
99. Deposition Transcripts Nichols, Douglas 2019.12.19
100. Deposition Transcripts McNairy, Andre Day 2
101. Deposition Transcripts McNairy, Andre Day 1
102. Deposition Transcripts Leano, Manuel 2019.09.27
103. Deposition Transcripts Watts, Ronald 2022.10.07
104. Deposition Transcripts Mahoney, Matthew 2022.09.28
105. Deposition Transcripts Watts, Ronald 02.25.2022
106. Deposition Transcripts Young, Kenneth 2020.01.07
107. Deposition Transcripts Wise, Martez
108. Deposition Transcripts Allen, Landon

109.     Deposition Transcripts Lewis, Lamonica 02.17.2021
110.     Deposition Transcripts Lewis, Lamonica 02.24.2021
111.     Deposition Transcripts Sanders, Jamell
112.     Deposition Transcripts Nichols, Douglas 2022.04.18
113.     Deposition Transcripts Rowan, Karen
114.     Deposition Transcripts Saunders, Aleka
115.     Deposition Transcripts James, Shaun
116.     Deposition Transcripts Thomas, Phillip
117.     Deposition Transcripts Jones, Alvin 02.26.20 Full Size (No Index)
118.     Deposition Transcripts Smith, Elsworth 02.17.20 Full Size (No Index)
119.     Deposition Transcripts Smith, Elsworth 03.05.2020 Full Size (No Index)
120.     Deposition Transcripts Watson, Sergeant Roddrick
121.     Deposition Transcripts Mohammed, Kallatt 2019.11.21
122.     Deposition Transcripts Soltis, David 2017.08.21
123.     Deposition Transcripts 2019.08.21 Blaul, Christine Errata Sheet
124.     Deposition Transcripts West, Barbara 2019.09.17
125.     Deposition Transcripts Blaul, Christine 2019.08.21
126.     Deposition Transcripts Calloway, Keith 2019.05.06
127.     Deposition Transcripts MICHAEL FITZGERALD 30(b)(6) 3-6-2024
128.     Deposition Transcripts Timothy Moore 30(b)(6) 3-19-2024
129.     Complaints from the Plaintiffs' Lawsuits in the above-captioned matters
130.     Police Use Of Force: Official Reports, Citizen Complaints, And Legal Consequences
         Volume 1. Antony Pate & Lorie Fridell.
131.     2001 New York City Civilian Complaint Review Board – Status Report.
132.     PL JOINT 069860 -069869 Rahm Emanuel - Chicago City Council Address 12-09-15
133.     Cops disband elite unit – Chicago Tribune
134.     Chicago Police Torture Scandal A Legal and Political History
135.     Use of Statistical Evidence to Address Police Supervisory and Dis
136.     PL JOINT 006794-006983 Police Accountability Task Force - Report - April 2016
137.     PL JOINT 005134-005297 - DOJ Report - January 2017
138.     Report of the Commission on Police Integrity (1997)
139.     FOIA Response 294 (Stecklow), and accompanying spreadsheet
140.     FOIA Request Letter 2018-03-07
141.     Kalven appellate decision and settlement document, and accompanying spreadsheet
142.     Watts-BG-000001-000004 Watts, Ronald CR 5 yr. History
143.     FBI response RE motion to compel deposition
144.     Depositions from Shannon Spalding and Daniel Echeverria's lawsuit:
         a.   Mills Dep
         b.   Koconis Dep
         c.   Hanna Dep

**Page | 121**

      d.  Dougan Dep
      e.  Skahill Dep
      f.  Rivera Dep
      g.  Reiter Dep (Expert)
      h.  Padar Dep
      i.  O'Grady Dep

145. All of the CRs provided by the City of Chicago in this case, including but not limited to the 127 I sampled and reviewed in detail for quality control; the specific CRs that I identified from my review of the spreadsheet provided to me and discussed in detail in my report; and CRs pertaining to the Defendant Officers involved in Plaintiffs' arrests.

146. PL JOINT 082730-PL JOINT 082734 Brady Giglio do not call

147. PL JOINT 082735-PL JOINT 082750 June 23 2001 Omar Miedzianowski

148. PL JOINT 083651-PL JOINT 083685 Bond Utreras Complaint

149. PL JOINT 083612-PL JOINT 083650 Chicago Commission on Police Integrity Nov 1997

150. PL JOINT 083570-PL JOINT 083611 General Orders

151. PL JOINT 083511-PL JOINT 083569 OIG affidavit override

152. PL JOINT 083501-PL JOINT 083510 Newsome opinion

153. PL JOINT 083468-PL JOINT 083500 Newsome brief

154. PL JOINT 083446-PL JOINT 083467 Newsome opinion

155. PL JOINT 083434-PL JOINT 083445 Klipfel v Gonzales

156. PL JOINT 083381-PL JOINT 083433 Kicking the Pigeon

157. PL JOINT 083371-PL JOINT 083380 Garcia v Chicago

158. PL JOINT 083207-PL JOINT 083370 FOP 2007-2012

159. PL JOINT 083198-PL JOINT 083206 Tribune CPD disbands elite unit (SOS)

160. CITY-BG-058240-058284 Lewis, Lamonica Personnel File

161. The FBI file describing the investigation into Watts and Mohammed's misconduct

162. Documents from CPD's Internal Affairs Confidential Investigation into Watts and Mohammed's misconduct, as discussed in my report in *Waddy*

163. Baker - City's Second Amended Answer to Pltf Glenn's 6.7.17 Interrogatories (2022.11.23) (1)

164. Koconis Affidavit

165. Spaargaren Deposition

166. Spaargaren Affidavit

167. P860101 General Orders 83-3 86-4 and Subsequent Revisions

168. OIG-Evaluation-of-the-Use-of-the-Affidavit-Override-in-Disciplinary-Investigations-of-CPD-Members

169. CITY-BG-059198-059217 CPD Rules and Regulations 01.12.2011

170. CITY-BG-059169-059197 CPD Rules and Regulations

171. CITY-BG-059166-059168 CPD General Order Responsibilities of Sergeants S03-03-01

172. CITY-BG-059150-059165 CPD General Order Preliminary Investigations 09.07.2004 04-03

173. CITY-BG-059138-059149 CPD General Order Preliminary Investigations 02.28.1989 89-3
174. CITY-BG-059133-059137 CPD General Order Felony Review By CCSAO 99-03 03.30.1999
175. CITY-BG-059085-059132 CPD General Order Complaint and Disciplinary Procedures 12.14.2010 S08-01
176. CITY-BG-059076-059084 CPD General Order Complaint and Disciplinary Procedures 01.15.1993 93-3
177. CITY-BG-059013-059075 CPD General Order Complaint and Disciplinary 01.13.1993 93-3
178. CITY-BG-058926-059012 CPD General Order Processing Persons Under Department Control 06.07.2002 GO6-01(2)
179. CITY-BG-058907-058925 CPD General Order Processing Persons Under Department Control 06.07.2002 GO6-01
180. CITY-BG-058851-058906 CPD General Order Processing Persons Under Department Control 06.07.2002
181. CITY-BG-058804-058850 CPD General Order Processing Persons Under Department Control 09.09.1992
182. CITY-BG-058798-058803 CPD General Order Interrogations Field & Custodial 03.15.2011
183. CITY-BG-058793-058797 CPD General Order Interrogations 10.30.1987
184. Jamar Lewis Arrest Report 04CR17855
185. Ben Baker Arrest Report 06CR00810
186. Rickey Henderson Arrest Report 06CR18229
187. Clarissa Glenn Arrest Report 06CR00810
188. Leonard Gipson Arrest Report 07CR20496
189. COPA-WATTS 006712-006717 CPD Arrest Report, Lionel White 04.24.06
190. CITY-BG-058746-058749 Jones, Alvin Unit Personnel Files
191. CITY-BG-058697-058745 Jones, Alvin HR Personnel Files
192. CITY-BG-056963-057006 Bolton, Brian Personnel File 2
193. CITY-BG-056915-056962 Bolton, Brian Personnel File 1
194. CITY-BG-056963-057006 Bolton, Brian Personnel File 3
195. CITY-BG-056116-056170 Smith, Elsworth Personnel Files Documents 1
196. CITY-BG-056171-056232 Smith, Elsworth Personnel File Documents 2
197. CITY-BG-023807-CITY-BG-023830 - Watts personnel (1)
198. COPA-WATTS 000760-000764 CPD Arrest Report, Willie Robinson 12.11.2005
199. COPA-WATTS 000755-000759 CPD Arrest Report, Larry Pulley 12.11.2005
200. COPA-WATTS 000745-000749 CPD Arrest Report, Louis Moore 12.11.2005
201. COPA-WATTS 000740-000744 CPD Arrest Report, Laurence Little 12.11.2005
202. CITY-BG-056517-056532 Jones, Alvin Personnel File 3
203. CITY-BG-056487-056516 Jones, Alvin Personnel File 2

204. CITY-BG-056442-056486 Jones, Alvin Personnel File 1
205. CITY-BG-056116-056170 Smith, Elsworth Personnel Files Documents
206. CITY-BG-023788-CITY-BG-023806 - Mohammed personnel
207. All materials reviewed in connection with my work in *Waddy v. City of Chicago*
208. Any document cited in my report

**ACKNOWLEDGEMENT**

This report provides my opinion based on the available information at this time. I presume the information provided to me is accurate and correct. If additional information becomes available at a later time, then I may submit a supplemental report. Depending on the new information, my opinion in this report may or may not change. My opinion is based upon a reasonable degree of professional certainty.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Dated: April 1, 2024*                                   _____*/s/ Jon M. Shane*_____

Jon Shane

### Appendices

1. **Appendix A** is a copy of the codebook that was used to code the CR data analyzed in this report.

2. **Appendix B** is an electronic file containing the CR data coded for my analysis.

3. **Appendix C** describes the data I relied on for the list of unique CRs with complaint dates between 1999 and 2011 and lists the CRs I randomly sampled to conduct quality control of the dataset.

4. **Appendix D** describes the CRs listing allegations against the Defendant Officers similar to the allegations in Plaintiff's cases (highlighted) which I have reviewed in forming my opinion.

5. **Appendix E** is my CV.

6. **Appendix F** is my report from the state-court case *Waddy v. City of Chicago*.

**APPENDIX A**

Attached as a separate file is the codebook that was used to record information contained in the CR files I was provided for analysis.

**APPENDIX B**

Attached as Appendix B is a spreadsheet reflecting the data provided to me to analyze.

# APPENDIX C

The below describes my process for identifying a random sample of all CRs from 1999-2011. CRs were gathered from three sources. The first source was a Freedom of Information (FOIA) request issued by Invisible Institute reporter Sam Stecklow to the Civilian Office of Police Accountability (COPA) on March 7, 2018. The request asked for all available CR data from CPD's CLEAR system, the database management system used by the CPD after 2000, regardless of which agency investigated the CR. Specifically, the request sought: "every CR that COPA has access to in CLEAR, regardless of which agency investigated the CR." Stecklow 3/7/18 FOIA Request. COPA responded by producing a spreadsheet of all such CR files. COPA 6/5/18 FOIA Response; Spreadsheet ("case_info_export.xlsx"). The second source was a set of CR data produced by the City of Chicago in response to litigation, namely, the *Kalven v. Chicago Police Department* lawsuit in which plaintiff Jamie Kalven sought CR data from the City of Chicago. That dataset included CPD CR files from complaints initiated between 1967 and 2001, with a few additional complaints from 2005. Kalven Settlement Agreement; Kalven Appellate Court Order; spreadsheet (MAINFRAME_COMPLAINTS_REVISED_30NOV2016.CSV). Finally, I obtained a list of 896 additional CRs that had been identified through Freedom of Information Act requests and other publicly available information regarding CRs, such as the Citizens Police Data Project (https://invisible.institute/police-data). Spreadsheet (missing_crs_by_complaint_date.csv).

I relied on a spreadsheet that combined the unique CR numbers from each of those spreadsheets for CRs with complaint dates from 1999-2011. Appendix C-2 (All_CRIDs_1999-2011.xlsx). Using that spreadsheet and the methodology described above, I identified 1,265 CRs to analyze. Appendix C-1 – Research Randomization.

These data represent the best data available to me to create a random sample of CRs for the 1999-2011 time period. Notably, the Plaintiffs who have sued the City of Chicago, Ronald Watts, and other officers who worked under Watts's supervision requested documents sufficient to identify all of the CRs during this time period and the data associated with those CRs in discovery. City of Chicago's Response to the Coordinated Plaintiffs' January 27, 2023 Request for the Production of Documents to Defendant City of Chicago. The City refused to produce **any** documents or data responsive to that request. *Id.* Instead, the City said that Plaintiffs should rely on other available CR data. *Id.* Although I would have preferred to have direct access to the City's own data, it is common

in my field to rely on the best available data when municipalities cannot or will not provide direct access to their own data.

I also created a random sample of the sample of 1,265 CRs to identify 127 CRs to review in detail as a quality control measure. A list of those 127 CRs is below:

1000094
274122
1030125
1035919
1022602
1023657
1040541
1013791
275296
1002523
1049035
262784
273478
1024751
270602
1044716
1048559
298390
1012718
1049085
268984
279033
307768
280635
279678
1003568
1021838
268091
279951
286064
1001488
254321
312705
1026762
1003345
1013114
1006506
1037911
301558

1014071
285660
310962
1004981
1049779
298951
1029796
288002
279927
310745
1013040
280380
1022370
1048035
1012519
1033162
1026074
285405
264490
1024942
1045100
260055
309601
1036588
1050687
275642
1023717
259084
300076
305537
1042276
1027607
1011434
301882
288313
275538
295072
259067
306762
1042453
306022
259248
1009752
1021971
307408
289511

277612
313133
1004051
263183
303412
311603
1029429
1018118
303803
1008247
252704
1045374
276186
1032011
1009395
264118
315378
305586
297198
271871
291884
287996
1040120
1041093
256743
276672
264484
1041102
278633
1017741
266095
309181
1009827
277553
263552
1045272
1024603
254164
280539
282783
311881
1030608

# APPENDIX D

I reviewed the coding of all CRs naming Defendant Officers from my report in *Waddy v. City of Chicago*, and highlighted the allegations of similar categories or nature to those made by the plaintiffs in regards to this report. I am not including CRs initiated after Sgt. Watts was arrested for stealing funds during the FBI sting operation in 2012. A table of those CRs is included below.

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 210850 | Ronald Watts | 08/04/1994 | Operation or Personnel Violations | It is alleged that the accused officer failed to provide proper police service to arrest the complainant/victim's ex-boyfriend when the accused officers stopped him on the street and released him. |
| 211066 | Ronald Watts | 08/12/1994 | Theft / Improper Inventory Procedure | It is alleged that the accused entered and searched the victim's apartment and that after the search a techno phone was missing. |
| 230377 | Ronald Watts | 09/11/1996 | Demeanor | It is alleged that the accused officer, during issuance of traffic citations, ridiculed the victim about her back pain, and was degrading and unprofessional toward her. |
| 236506 | Ronald Watts | 05/02/1997 | Excessive Force | It is alleged that the accused officer grabbed the victim's right arm and twisted it behind her back and started to sling her around, causing her to fall to the ground. |
| 236506 | Ronald Watts | 05/02/1997 | Excessive Force | It is alleged that the accused officer pushed the victim to the ground. |
| 236506 | Ronald Watts | 05/02/1997 | Demeanor | It is alleged that the accused officer called the victim "bitches" and "motherfuckers" |
| 236506 | Ronald Watts | 05/02/1997 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer filed a false report. |
| 241746 | Ronald Watts | 11/28/1997 | Excessive Force | It is alleged that the accused struck the victim (an unknown Black male approximately 12 years of age) on the side of his head with an open hand. |
| 242379 | Ronald Watts | 12/28/1997 | Operation or Personnel Violations | It is alleged that the accused officer did not allow the victim to file a complaint against an unknown off duty security guard. |
| 251267 | Ronald Watts | 01/27/1999 | Unlawful Search, Entry, or Arrest | It is alleged that the accused entered and searched the victim's apartment without a warrant or permission. |
| 251267 | Ronald Watts | 01/27/1999 | Demeanor | it is alleged that the accuser directed profanities towards the victims. |
| 251267 | Ronald Watts | 01/27/1999 | Excessive Force | It is alleged that the accuser brandished his weapon and pointed his gun at the victim's. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 254205 | Ronald Watts | 06/15/1999 | Theft / Improper Inventory Procedure | Complainant alleges two male Black plainclothes officers took $250.00 USC and failed to return or inventory the same. |
| 259249 | Ronald Watts | 01/13/2000 | Demeanor | It is alleged that the accused officer called the victim a "bitch" and also said "I'll lock your ass up." |
| 259249 | Ronald Watts | 01/13/2000 | Excessive Force | It is alleged that the accused officer squeezed the handcuffs tighter on the wrists of the victim. |
| 259249 | Ronald Watts | 01/13/2000 | Operation or Personnel Violations | It is alleged that the accused officer ignored the victim's complaint that the handcuffs were too tight. |
| 260658 | Ronald Watts | 03/13/2000 | Unlawful Search, Entry, or Arrest | it is alleged that the accused stopped the victim(s) for no reason. |
| 260658 | Ronald Watts | 03/13/2000 | Demeanor | It is alleged that the accused verbally abused the victim(s). |
| 260658 | Ronald Watts | 03/13/2000 | Theft / Improper Inventory Procedure | It is alleged that the accused stole $250 USD from the victim and that the accused did not properly inventory the victim's jacket. |
| 263095 | Ronald Watts | 06/18/2000 | Demeanor | It is alleged that the accused officer verbally abused the victim and called him a "punk ass bitch." |
| 263095 | Ronald Watts | 06/18/2000 | Excessive Force | It is alleged that the accused officer grabbed the victim by the genitals. |
| 263095 | Ronald Watts | 06/18/2000 | Excessive Force | It is alleged that the accused officer hung the victim upside down over a banister and threatened to drop him |
| 263095 | Ronald Watts | 06/18/2000 | Excessive Force | It is alleged that the accused officer slammed the victim's face into a security gate. |
| 284536 | Ronald Watts | 10/03/2002 | Demeanor | It is alleged that the accused has repeatedly been harassing the complainant/victim since he arrested her sister. |
| 284536 | Ronald Watts | 10/03/2002 | Demeanor | It is alleged that the accused calls the complainant/victim obscene names such as "bitch" and "motherfucker." |
| 284536 | Ronald Watts | 10/03/2002 | Demeanor | It is alleged that the accused told the complainant/victim that she would be arrested if seen in the area of 574 East 35th Street, Chicago, IL 60616 (her aunt's address) or 575 East Browning Avenue, Chicago, IL 60653 (her grandmother's address). |
| 284536 | Ronald Watts | 10/03/2002 | Demeanor | It is alleged that the accused harassed and verbally abused the complainant/victim, stating, "There goes that little smart motherfucker. You better live in this building, or I'm going to arrest you." |
| 284602 | Ronald Watts | 11/03/2002 | Unlawful Search, Entry, or Arrest | It is alleged that the accused and two other officers stopped the complainant/victim in her vehicle, searched her without probable cause, and told her after searching her to get against the car while refusing to tell her what she was being stopped for. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 287011 | Ronald Watts | 01/15/2003 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer planted heroin on the victim and then charged him with delivery of a controlled substance. |
| 287000 | Ronald Watts | 01/17/2003 | Property Damage | It is alleged that the accused and several other officers entered the location of the incident, damaged the property, and left the scene. |
| 287000 | Ronald Watts | 01/17/2003 | Demeanor | It is alleged that the accused and several other officers stated, "If we see you again, we will plant drugs on you." |
| 290641 | Ronald Watts | 07/14/2003 | Operation or Personnel Violations | It is alleged that the complainant/victim pointed out offenders on the street who had threatened to kill her, and that the accused failed to arrest the offenders or to take any police action. |
| 295454 | Ronald Watts | 01/30/2004 | Excessive Force | It is alleged that the accused pushed the complainant/victim continuously to gain entrance into her apartment, resulting in a scratch on her right foot. |
| 295454 | Ronald Watts | 01/30/2004 | Demeanor | It is alleged that the accused verbally abused the complainant/victim by stating, "You bitch, I would not fuck you because you live in the projects anyway." |
| 295454 | Ronald Watts | 01/30/2004 | Unlawful Search, Entry, or Arrest | It is alleged that the accused entered the apartment of the complainant/victim without permission or a warrant. |
| 296428 | Ronald Watts | 03/22/2004 | Operation or Personnel Violations | It is alleged that the accused refused to identify themselves when they arrived at the residence of the complainant/victim and questioned her. |
| 296428 | Ronald Watts | 03/22/2004 | Operation or Personnel Violations | It is alleged that after the complainant/victim called "911" to request a Supervisor, the Supervisor failed to respond. |
| 300175 | Ronald Watts | 08/23/2004 | Excessive Force | It is alleged that the accused officer grabbed the victim by the neck and choked her. |
| 300175 | Ronald Watts | 08/23/2004 | Excessive Force | It is alleged that the accused officer verbally abused the victim when he said, "When your little ass start getting smart, I'll drop your little ass." |
| 300778 | Ronald Watts | 09/17/2004 | Theft / Improper Inventory Procedure | Redacted. Noted that incident is being investigated by the FBI. |
| 301221 | Ronald Watts | 10/11/2004 | Excessive Force | It is alleged that the accused officer kicked, punched, and stomped the victim about his body. |
| 301221 | Ronald Watts | 10/11/2004 | Excessive Force | It is alleged that the accused officer struck the victim about his body with an object. |
| 303646 | Ronald Watts | 02/10/2005 | Excessive Force | It is alleged that the accused officer punched the victim in several times about the body. |
| 303646 | Ronald Watts | 02/10/2005 | Excessive Force | It is alleged that the accused officer threatened the victim with a gun. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 305849 | Ronald Watts | 05/26/2005 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer entered the victim's apartment without a warrant or permission. |
| 305849 | Ronald Watts | 05/26/2005 | Demeanor | It is alleged that the accused officer directed profanities at the complainant, saying "We don't need no motherfucking search warrant and fuck OPS they ain't going to do shit." |
| 305849 | Ronald Watts | 05/26/2005 | Excessive Force | It is alleged that the accused officer pushed the complainant down stairs while handcuffed. |
| 305849 | Ronald Watts | 05/26/2005 | Excessive Force | It is alleged that the accused officer pushed the complainant down on a step while outside. |
| 305849 | Ronald Watts | 05/26/2005 | Demeanor | It is alleged that the accused officer verbally abused the complainant and victim by referring to them as "bitches." |
| 305849 | Ronald Watts | 05/26/2005 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer falsely arrested the complainant. |
| 305849 | Ronald Watts | 05/26/2005 | Excessive Force | It is alleged that the accused officer pushed the complainant on the back of the head while escorting her to lockup. |
| 309085 | Ronald Watts | 10/19/2005 | Operation or Personnel Violations | It is alleged that the accused officer interfered with a police investigation. |
| 309085 | Ronald Watts | 10/19/2005 | Operation or Personnel Violations | It is alleged that the accused officer failed to identify himself as a Sgt. of police. |
| 309085 | Ronald Watts | 10/19/2005 | Operation or Personnel Violations | It is alleged that the accused officer grabbed P.O. Piwnicki by the chest and shook him. |
| 309282 | Ronald Watts | 11/02/2005 | Unlawful Search, Entry, or Arrest | It is alleged that the accused and a co-officer searched the complainant/victim's residence without a warrant or her permission. |
| 309282 | Ronald Watts | 11/02/2005 | Demeanor | It is alleged that the accused had the witness tell the complainant/victim that the accused would cause the complainant/victim bodily harm. |
| 309282 | Ronald Watts | 11/02/2005 | Demeanor | It is alleged that the accused had the witness tell the complainant/victim that the accused would arrest the complainant/victim for no reason. |
| 309359 | Ronald Watts | 11/03/2005 | Unlawful Search, Entry, or Arrest | It is alleged that the accused searched the victim's residence without permission or a warrant. |
| 309359 | Ronald Watts | 11/03/2005 | Demeanor | It is alleged that the accused was harassing the victim. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 309359 | Ronald Watts | 11/03/2005 | Demeanor | It is alleged that the accused threatened to take the victim to jail |
| 309372 | Ronald Watts | 11/05/2005 | Operation or Personnel Violations | It is alleged that the accused failed to arrest an offender, who then followed the complainant home and battered her with a baseball bat. |
| 311300 | Ronald Watts | 02/21/2006 | Excessive Force | It is alleged that the accused officer pointed a gun at the victim. |
| 311300 | Ronald Watts | 02/21/2006 | Excessive Force | It is alleged that the accused officer struck the victim on the hand with a gun, causing injury to a finger. |
| 311300 | Ronald Watts | 02/21/2006 | Excessive Force | It is alleged that the accused officer kicked and stomped the victim about the body several times while he was handcuffed. |
| 311300 | Ronald Watts | 02/21/2006 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer falsely arrested the victim. |
| 311300 | Ronald Watts | 02/21/2006 | Excessive Force | It is alleged that the accused officer struck the victim about the body with a cane several times. |
| 312047 | Ronald Watts | 04/03/2006 | Unlawful Search, Entry, or Arrest | Clarice WOODS alleges that on 31 March 2006, at 511 E. Browning, at 1645 hours, she was stopped without justification by officer "Alvin JONES" and "Sergeant Ronald WATTS" in retaliation for her testimony against "Officer JONES" in court. |
| 314992 | Ronald Watts | 08/19/2006 | Excessive Force | It is alleged that the accused officer kicked and stomped the victim about his body as he lay on the floor. |
| 314992 | Ronald Watts | 08/19/2006 | Demeanor | It is alleged that the accused officer repeatedly called the victim, "motherfucker" and "nigger." |
| 314992 | Ronald Watts | 08/19/2006 | Property Damage | It is alleged that the accused officer ransacked the victim's residence and caused damage to the property. |
| 1003057 | Ronald Watts | 01/30/2007 | Demeanor | It is alleged that the accused threatened to have the complainant/victim's company vehicles (i.e., tow trucks) ticketed and towed after her friend's vehicle was towed. |
| 1003057 | Ronald Watts | 01/30/2007 | Demeanor | It is alleged that the accused refused to provide his name and star number to the complainant/victim upon request. |
| 1002984 | Ronald Watts | 01/31/2007 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer falsified the circumstances of the victim's arrest |
| 1004698 | Ronald Watts | 04/10/2007 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer entered and searched the victim's house without justification. |
| 1004698 | Ronald Watts | 04/10/2007 | Demeanor | It is alleged that the accused officer questioned the victim in a threatening manner about where drugs or guns could be located. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 1004698 | Ronald Watts | 04/10/2007 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer falsely arrested the victim because he could not provide information on where drugs or guns could be located. |
| 1005766 | Ronald Watts | 05/12/2007 | Property Damage | It is alleged that the accused officer entered the victim's residence without permission or warrant and ransacked it. |
| 1005766 | Ronald Watts | 05/12/2007 | Excessive Force | It is alleged that the accused officer pushed the victim without justification. |
| 1005766 | Ronald Watts | 05/12/2007 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer handcuffed the victim and everyone else in her apartment. |
| 1005766 | Ronald Watts | 05/12/2007 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer threatened to plant drugs on the victim's cousin, Thomas. |
| 1005766 | Ronald Watts | 05/12/2007 | Excessive Force | It is alleged that the accused officer placed his foot on the victim's head without justification. |
| 1006646 | Ronald Watts | 06/17/2007 | Excessive Force | It is alleged that Sgt Ronald Watts refused to loosen Mayfields handcuffs upon request. |
| 1006646 | Ronald Watts | 06/17/2007 | Demeanor | It is alleged that Sgt Ronald Watts refused to take any action. |
| 1011478 | Ronald Watts | 12/07/2007 | Demeanor | It is alleged that the accused officer told the victim that filing a complaint would not do any good because the matter is only verbal. |
| 1013134 | Ronald Watts | 01/04/2008 | Demeanor | It is alleged that the accused officer laughed at the victim and made fun of the victim. |
| 1015698 | Ronald Watts | 04/14/2008 | Unlawful Search, Entry, or Arrest | It is alleged that the accused conducted an unlawful search without justification. |
| 1015698 | Ronald Watts | 04/14/2008 | Excessive Force | It is alleged that the accused repeatedly struck the second victim, Deangelo Campbell, about the face. |
| 1017012 | Ronald Watts | 06/03/2008 | Theft / Improper Inventory Procedure | It is alleged that the accused officer took $304.00 United States currency from the victim and failed to properly inventory or return the money. |
| 1028854 | Ronald Watts | 08/13/2009 | Unlawful Search, Entry, or Arrest | It is alleged that the accused arrested the victim without justification. |
| 1029569 | Ronald Watts | 08/28/2009 | Excessive Force | It is alleged that the accused officer punched the victim in the face. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 1029240 | Ronald Watts | 09/11/2009 | Demeanor | It is alleged that the accused officer directed profanities at the victim, calling her a "smart bitch." |
| 1029240 | Ronald Watts | 09/11/2009 | Demeanor | It is alleged that the accused officer threatened the victim when he stated, "I'm going to bust your head" and also directed profanities at her. |
| 1029240 | Ronald Watts | 09/11/2009 | Demeanor | It is alleged that the accused officer, a Sergeant, allowed other officers to direct profanities at the victim, to be rude to the victim, and to be disrespectful when they told her, "get the fuck out of here." |
| 1029240 | Ronald Watts | 09/11/2009 | Demeanor | It is alleged that the accused officer cancelled all of the victim's requests for a Captain to come to the scene and issued her a citation. |
| 1029240 | Ronald Watts | 09/11/2009 | Demeanor | It is alleged that the accused officer forced the complainant to sign the citation, even though she was threatened and scared. |
| 1030009 | Ronald Watts | 09/15/2009 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer entered and searched the house without justification or a warrant. |
| 1030009 | Ronald Watts | 09/15/2009 | Demeanor | It is alleged that the accused officer stated, "Where is the stuff or I'm going to whip your ass." |
| 1024334 | Ronald Watts | 05/14/2010 | Demeanor | It is alleged that the accused officer directed profanity at the victim by calling him: "sorry ass motherfucker;" "bitch ass nigger;" and a "dope fiend." |
| 1024334 | Ronald Watts | 05/14/2010 | Demeanor | It is alleged that the accused officer told the victim he was "dope sick and just trying to get out of jail." |
| 1030958 | Ronald Watts | 10/21/2010 | Demeanor | It is alleged that the accused officer verbally abused the victim by stating, "I know your mother fucking ass." |
| 1030958 | Ronald Watts | 10/21/2010 | Operation or Personnel Violations | It is alleged that the accused officer stated he would call for a "white shirt," but he called for Sgt. Watts instead. |
| 1030958 | Ronald Watts | 10/21/2010 | Demeanor | It is alleged that the accused officer verbally abused the victim by stating, "What's your problem? Get the fuck out of my office for being too loud." |
| 1024008 | Ronald Watts | 02/07/2011 | Demeanor | It is alleged that the accused acted in a combative and disrespectful manner while talking to the complainant/victim. |
| 1024008 | Ronald Watts | 02/07/2011 | Demeanor | It is alleged that the accused ordered an officer to issue traffic citations to the complainant/victim after having a verbal altercation with her (complainant/victim does not protest these citations). |
| 1044999 | Ronald Watts | 05/10/2011 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer planted drugs on the victim, and then arrested him, leading to his incarceration. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 258817 | Kallatt Mohammed | 01/19/2000 | Theft / Improper Inventory Procedure | It is alleged that the accused took the wallet of the complainant/victim containing several identification cards and credit cards and failed to return or inventory it. |
| 264319 | Kallatt Mohammed | 07/31/2000 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer stopped the victims for no reason. |
| 264319 | Kallatt Mohammed | 07/31/2000 | Demeanor | It is alleged that the accused officer used profanity when he said, "get your happy ass out the car." |
| 264319 | Kallatt Mohammed | 07/31/2000 | Demeanor | It is alleged that the accused officer never told the victim's the reason why they had been stopped. |
| 265128 | Kallatt Mohammed | 08/28/2000 | Domestic Violence | It is alleged that while he was off duty, the accused slapped the victim in the face with an open hand. |
| 265128 | Kallatt Mohammed | 08/28/2000 | Domestic Violence | It is alleged that while he was off duty, the accused physically abused the victim by twisting her arm, and also threatened to break her arm. |
| 265128 | Kallatt Mohammed | 08/28/2000 | Domestic Violence | It is alleged that while he was off duty, the accused physically abused the victim in that he pushed/shoved her, and he also grabbed her by the neck, and struck her body several times. |
| 274779 | Kallatt Mohammed | 09/24/2001 | Operation or Personnel Violations | The complainant alleged that the officers were inattentive to duty in that they failed to secure recovered property (rock cocaine) that the arrestee/witness (Conway, Gregory) obtained and swallowed. |
| 288573 | Kallatt Mohammed | 04/26/2003 | Excessive Force | The complainant alleges that a male Black uniformed officer, who was standing in line purchasing lottery tickets, shoved her son to the side. |
| 288573 | Kallatt Mohammed | 04/26/2003 | Demeanor | The complainant alleges that a male Black uniformed officer, who was standing in line purchasing lottery tickets, was rude and unprofessional. |
| 288573 | Kallatt Mohammed | 04/26/2003 | Demeanor | The complainant alleges that a male Black uniformed officer, who was standing in line purchasing lottery tickets, threatened to push the complainant. |
| 299786 | Kallatt Mohammed | 08/05/2004 | Domestic Violence | It is alleged that the accused initiated and engaged in an altercation with the complainant/victim in that he grabbed her by the neck. |
| 299786 | Kallatt Mohammed | 08/05/2004 | Domestic Violence | It is alleged that the accused initiated and engaged in an altercation with the complainant/victim in that he poked her on the head. |
| 299786 | Kallatt Mohammed | 08/05/2004 | Domestic Violence | It is alleged that the accused initiated and engaged in an altercation with the complainant/victim in that he pushed her down. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 299786 | Kallatt Mohammed | 08/05/2004 | Domestic Violence | It is alleged that the accused snatched the telephone from the complainant/victim and threw it against the wall. |
| 299786 | Kallatt Mohammed | 08/05/2004 | Domestic Violence | It is alleged that the accused verbally abused the complainant/victim. |
| 299786 | Kallatt Mohammed | 08/05/2004 | Demeanor | It is alleged that the accused threatened the victim with bodily harm. |
| 299786 | Kallatt Mohammed | 08/05/2004 | Demeanor | It is alleged that the accused verbally abused the victim. |
| 305723 | Kallatt Mohammed | 05/23/2005 | Excessive Force | It is alleged that the accused kicked the victim in the back and the chest. |
| 300778 | Kallatt Mohammed | 09/17/2004 | Theft / Improper Inventory Procedure | Redacted. Noted that incident is being investigated by the FBI. |
| 314642 | Kallatt Mohammed | 08/03/2006 | Domestic Violence | The complainant alleged that her former husband, Officer Kallatt Mohammed, threatened to kill her, stating he would do it right now, except he did not want to do it in front of their children. |
| 314992 | Kallatt Mohammed | 08/19/2006 | Excessive Force | It is alleged that the accused officer kicked and stomped the victim about his body as he lay on the floor. |
| 314992 | Kallatt Mohammed | 08/19/2006 | Demeanor | It is alleged that the accused officer repeatedly called the victim, "motherfucker" and "nigger." |
| 314992 | Kallatt Mohammed | 08/19/2006 | Excessive Force | It is alleged that the accused officer ransacked the victim's residence and caused damage to the property. |
| 1002984 | Kallatt Mohammed | 01/31/2007 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer falsified the circumstances of the victim's arrest |
| 1005766 | Kallatt Mohammed | 05/12/2007 | Excessive Force | It is alleged that the accused officer slapped the victim about the body |
| 1005766 | Kallatt Mohammed | 05/12/2007 | Excessive Force | It is alleged that the accused officer punched the victim about the body without justification. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 1005855 | Kallatt Mohammed | 05/21/2007 | Theft / Improper Inventory Procedure | It is alleged that the accused officer failed to inventory $916.00 of United States currency. |
| 1005855 | Kallatt Mohammed | 05/21/2007 | Excessive Force | It is alleged that the accused officer pushed the victim to the ground. |
| 1005855 | Kallatt Mohammed | 05/21/2007 | Excessive Force | It is alleged that the accused officer placed their feet on the victim's neck. |
| 1005855 | Kallatt Mohammed | 05/21/2007 | Excessive Force | It is alleged that the accused officer attempted to coerce the victim to admit to a crime by hitting and kicking him. |
| 1005855 | Kallatt Mohammed | 05/21/2007 | Demeanor | It is alleged that the accused officer demanded money and information. |
| 1005855 | Kallatt Mohammed | 05/21/2007 | Excessive Force | It is alleged that the accused officer handcuffed the victim too tightly. |
| 1005855 | Kallatt Mohammed | 05/21/2007 | Excessive Force | It is alleged that the accused officer beat the victim. |
| 1006646 | Kallatt Mohammed | 06/17/2007 | Demeanor | It is alleged that Kallat Mohammed verbally abused complainant. |
| 1006646 | Kallatt Mohammed | 06/17/2007 | Excessive Force | It is alleged that Kallat Mohammed placed his hand on complainant's neck and forced her to the ground. |
| 1006646 | Kallatt Mohammed | 06/17/2007 | Excessive Force | It is alleged that Kallat Mohammed out his forearm around complainant's neck and pulled her up to her feet. |
| 1006646 | Kallatt Mohammed | 06/17/2007 | Excessive Force | It is alleged that Kallat Mohammed refused to loosen complainant's handcuffs upon request. |
| 1008321 | Kallatt Mohammed | 08/11/2007 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer searched the victim without justification. |
| 1014553 | Kallatt Mohammed | 03/05/2008 | Excessive Force | It is alleged that the accused officer beat the victim. |
| 1014553 | Kallatt Mohammed | 03/05/2008 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer falsely arrested the victim. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 1026056 | Kallatt Mohammed | 05/06/2009 | Theft / Improper Inventory Procedure | It is alleged that the complainant/victim gave the accused $3,400 and told the accused to give him back $2,900 upon his release from the lock-up, but the accused failed to return any of the $3,400 to him. |
| 1044999 | Kallatt Mohammed | 05/10/2011 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer planted drugs on the victim, and then arrested him, leading to his incarceration. |
| 261324 | Brian Bolton | 04/05/2000 | Excessive Force | It is alleged that the accused punched the victim in the face stomach and back while the victim was handcuffed to the wall in the police station. |
| 271117 | Brian Bolton | 05/10/2001 | Operation or Personnel Violations | The complainant alleged that the accused officers wrote 11 citations that were never given to motorists |
| 275132 | Brian Bolton | 10/09/2001 | Demeanor | It is alleged that the accused threw his star on the hood of the victim's car and yelled, "Come on, let's fight." |
| 275132 | Brian Bolton | 10/09/2001 | Demeanor | It is alleged that the accused told the victim that the only reason a white person would be in that area would be to buy drugs. |
| 294821 | Brian Bolton | 01/21/2004 | Operation or Personnel Violations | The complainant alleged that the witnesses found 14 small bags of suspect crack cocaine in Beat 4512, Vehicle #267, and that the accused were previously assigned to the vehicle. |
| 294969 | Brian Bolton | 01/25/2004 | Unlawful Search, Entry, or Arrest | It is alleged that the accused stopped and searched the complainant/victim without justification. |
| 307094 | Brian Bolton | 07/19/2005 | Excessive Force | It is alleged that the accused officer struck the victim on the stomach. |
| 307094 | Brian Bolton | 07/19/2005 | Excessive Force | It is alleged that the accused officer pushed the victim onto a garbage can. |
| 307094 | Brian Bolton | 07/19/2005 | Excessive Force | It is alleged that the accused officer struck the victim on the stomach. |
| 1008322 | Brian Bolton | 08/13/2007 | Demeanor | It is alleged that the accused officer jokingly talked about the size of the victim's penis. |
| 1008322 | Brian Bolton | 08/13/2007 | Demeanor | It is alleged that the accused officer jokingly talked about the size of the victim's penis. |
| 1008322 | Brian Bolton | 08/13/2007 | Demeanor | It is alleged that the accused officer jokingly talked about the size of the victim's penis. |
| 1012897 | Brian Bolton | 01/04/2008 | Theft / Improper Inventory Procedure | It is alleged that the accused took $350.00 in coins from the residence of the complainant/victim, but failed to inventory or return same. |
| 1014553 | Brian Bolton | 03/05/2008 | Excessive Force | It is alleged that the accused officer beat the victim. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 1014553 | Brian Bolton | 03/05/2008 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer falsely arrested the victim. |
| 1037238 | Brian Bolton | 06/24/2010 | Unlawful Search, Entry, or Arrest | It is alleged that the accused falsely arrested the complainant/victim for drinking on a public way. |
| 1044999 | Brian Bolton | 05/10/2011 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer planted drugs on the victim, and then arrested him, leading to his incarceration. |
| 254396 | Robert Gonzalez | 06/22/1999 | Operation or Personnel Violations | It is alleged that the accused officer failed to charge an offender with attempting to break into complainant's house and causing damage to a door. |
| 254396 | Robert Gonzalez | 06/22/1999 | Operation or Personnel Violations | It is alleged that the accused officer failed to indicate that an offender was a member of the Chicago Fire Department. |
| 254396 | Robert Gonzalez | 06/22/1999 | Operation or Personnel Violations | It is alleged that the accused officer charged an offender with disorderly conduct instead of public indecency. |
| 257808 | Robert Gonzalez | 11/11/1999 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer stopped and searched the victim for no reason. |
| 268248 | Robert Gonzalez | 01/10/2001 | Theft / Improper Inventory Procedure | It is alleged that during the course of the arrest of the complainant/victim, the accused removed $150.00 from the complainant/victim's wallet and that the accused failed to inventory or return same. |
| 268496 | Robert Gonzalez | 01/18/2001 | Excessive Force | It is alleged that the accused officer choked the victim during his arrest. |
| 268496 | Robert Gonzalez | 01/18/2001 | Excessive Force | It is alleged that the accused officer pushed the victim against a wall, causing him to bump the back of his head. |
| 275132 | Robert Gonzalez | 10/09/2001 | Demeanor | It is alleged that the accused told the victim that the only reason a white person would be in that area would be to buy drugs. |
| 275132 | Robert Gonzalez | 10/09/2001 | Demeanor | It is alleged that the accused repeatedly called the victim a "faggot." |
| 277959 | Robert Gonzalez | 02/06/2002 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer kicked in the hallway door, ripped the boards of the vacant apartments, and entered the victim's apartment without a warrant or permission. |
| 277959 | Robert Gonzalez | 02/06/2002 | Demeanor | It is alleged that the accused officer refused to give his name or star number upon request. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 290015 | Robert Gonzalez | 06/11/2003 | Excessive Force | It is alleged that the accused officer slapped the victim several times on the head and punched him on the chest. |
| 290015 | Robert Gonzalez | 06/11/2003 | Theft / Improper Inventory Procedure | It is alleged that the accused officer took $54.00 of United States currency from the victim, and only returned $4.00. |
| 294821 | Robert Gonzalez | 01/21/2004 | Operation or Personnel Violations | The complainant alleged that the witnesses found 14 small bags of suspect crack cocaine in Beat 4512, Vehicle #267, and that the accused were previously assigned to the vehicle. |
| 294969 | Robert Gonzalez | 01/25/2004 | Unlawful Search, Entry, or Arrest | It is alleged that the accused stopped and searched the complainant/victim without justification. |
| 296250 | Robert Gonzalez | 03/03/2004 | Excessive Force | It is alleged that the accused officer grabbed the victim around his throat and pushed him backwards. |
| 296250 | Robert Gonzalez | 03/03/2004 | Excessive Force | It is alleged that the accused officer kicked the victim in the groin. |
| 296250 | Robert Gonzalez | 03/03/2004 | Excessive Force | It is alleged that the accused officer slapped the victim in the face. |
| 307094 | Robert Gonzalez | 07/19/2005 | Excessive Force | It is alleged that the accused officer struck the victim on the stomach. |
| 307094 | Robert Gonzalez | 07/19/2005 | Excessive Force | It is alleged that the accused officer pushed the victim onto a garbage can. |
| 307094 | Robert Gonzalez | 07/19/2005 | Demeanor | It is alleged that the accused officer threatened the victim by saying he would "mess him up." |
| 1003952 | Robert Gonzalez | 03/12/2007 | Unlawful Search, Entry, or Arrest | It is alleged that the accused entered the apartment of the complainant/victim. |
| 1003952 | Robert Gonzalez | 03/12/2007 | Theft / Improper Inventory Procedure | It is alleged that the accused took $500.000 from the complainant/victim's apartment and failed to inventory or return same. |
| 1008322 | Robert Gonzalez | 08/13/2007 | Demeanor | It is alleged that the accused officer was rude and unprofessional. |
| 1008322 | Robert Gonzalez | 08/13/2007 | Demeanor | It is alleged that the accused officer was rude and unprofessional. |
| 1008322 | Robert Gonzalez | 08/13/2007 | Demeanor | It is alleged that the accused officer was rude and unprofessional. |
| 1010041 | Robert Gonzalez | 10/15/2007 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused planted drugs on the complainant/victim's person. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 1014553 | Robert Gonzalez | 03/05/2008 | Excessive Force | It is alleged that the accused officer beat the victim. |
| 1014553 | Robert Gonzalez | 03/05/2008 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer falsely arrested the victim. |
| 1033128 | Robert Gonzalez | 01/25/2010 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused provided false testimony in court. Specifically, it is alleged that while court was in session, the complainant observed a female white Assistant State's Attorney coax the accused to give false oral statements in court regarding the victim, such as "I saw him hold a 1/4 size plastic Ziploc bag between his forefinger and his thumb."). |
| 1033128 | Robert Gonzalez | 01/25/2010 | Unlawful Search, Entry, or Arrest | It is alleged that the accused and his co-officer falsely arrested the victim for possession of heroin. |
| 1037238 | Robert Gonzalez | 06/24/2010 | Unlawful Search, Entry, or Arrest | It is alleged that the accused falsely arrested the complainant/victim for drinking on a public way. |
| 1038605 | Robert Gonzalez | 08/13/2010 | Unlawful Search, Entry, or Arrest | It is alleged that the accused falsely arrested the complainant/victim for drinking on the public way. |
| 1044999 | Robert Gonzalez | 05/10/2011 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer planted drugs on the victim, and then arrested him, leading to his incarceration. |
| 282935 | Manuel Leano | 08/10/2002 | Demeanor | It is alleged that the accused officer told the victim not to "bullshit" him. |
| 282935 | Manuel Leano | 08/10/2002 | Excessive Force | It is alleged that the accused officer made the victim slap himself on the face approximately 6 times. |
| 305180 | Manuel Leano | 04/29/2005 | Operation or Personnel Violations | It is alleged that the accused was inattentive to duty in that 45 bags of suspected crack cocaine were found in the back seat of department vehicle. |
| 313683 | Manuel Leano | 06/19/2006 | Excessive Force | It is alleged that the accused officer repeatedly kicked the victim about the body. |
| 313683 | Manuel Leano | 06/19/2006 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer planted drugs on the victim. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 1003952 | Manuel Leano | 03/12/2007 | Unlawful Search, Entry, or Arrest | It is alleged that the accused entered the apartment of the complainant/victim. |
| 1003952 | Manuel Leano | 03/12/2007 | Theft / Improper Inventory Procedure | It is alleged that the accused took $500.000 from the complainant/victim's apartment and failed to inventory or return same. |
| 1005855 | Manuel Leano | 05/21/2007 | Theft / Improper Inventory Procedure | It is alleged that the accused officer failed to inventory $916.00 of United States currency. |
| 1005855 | Manuel Leano | 05/21/2007 | Excessive Force | It is alleged that the accused officer pushed the victim to the ground. |
| 1005855 | Manuel Leano | 05/21/2007 | Excessive Force | It is alleged that the accused officer placed their feet on the victim's neck. |
| 1005855 | Manuel Leano | 05/21/2007 | Excessive Force | It is alleged that the accused officer attempted to coerce the victim to admit to a crime by hitting and kicking him. |
| 1005855 | Manuel Leano | 05/21/2007 | Demeanor | It is alleged that the accused officer demanded money and information. |
| 1005855 | Manuel Leano | 05/21/2007 | Excessive Force | It is alleged that the accused officer handcuffed the victim too tightly. |
| 1005855 | Manuel Leano | 05/21/2007 | Excessive Force | It is alleged that the accused officer beat the victim. |
| 1019794 | Manuel Leano | 09/17/2008 | Unlawful Search, Entry, or Arrest | It is alleged that the accused illegally entered the victim's grandmother's residence without justification/probable cause/a warrant. |
| 1019794 | Manuel Leano | 09/17/2008 | Unlawful Search, Entry, or Arrest | It is alleged that the accused ordered the victim to the ground and illegally searched him. |
| 1029004 | Manuel Leano | 08/13/2009 | Excessive Force | It is alleged that the accused officer intentionally struck the victim on the back with an ATV (PAPV) causing him to fall to the ground. |
| 1029004 | Manuel Leano | 08/13/2009 | Excessive Force | It is alleged that the accused officer intentionally rode over the victim's back and head with an ATV (PAPV). |
| 1029004 | Manuel Leano | 08/13/2009 | Excessive Force | It is alleged that the accused officer drove his ATV (PAPV) carelessly during the incident. |
| 1029223 | Manuel Leano | 08/26/2009 | Unlawful Search, Entry, or Arrest | It is alleged by complainant that he was falsely arrested. |
| 1029223 | Manuel Leano | 08/26/2009 | Unlawful Search, | It is alleged by complainant the officer unbuttoned his jeans during a search of his person, pulled his clothing away from his body, exposing his genital area while on the street. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| | | | Entry, or Arrest | |
| 1028321 | Manuel Leano | 08/28/2009 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer inappropriately conducted a cavity search three times looking for drugs |
| 1028321 | Manuel Leano | 08/28/2009 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer inappropriately conducted a cavity search three times looking for drugs |
| 1028321 | Manuel Leano | 08/28/2009 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer inappropriately conducted a cavity search three times looking for drugs |
| 1043138 | Manuel Leano | 02/04/2011 | Theft / Improper Inventory Procedure | It is alleged that when the complainant/victim entered a residential building and left his vehicle unsecured, the accused officers removed an unknown amount of money from his vehicle. |
| 1044250 | Manuel Leano | 03/30/2011 | Demeanor | It is alleged by complainant that the accused officer harasses him unjustly. |
| 1044250 | Manuel Leano | 03/30/2011 | Unlawful Search, Entry, or Arrest | It is alleged by complainant that the accused officer stops him and searches him every time the officer sees him and says, "give us someone." |
| 1044250 | Manuel Leano | 03/30/2011 | Unlawful Search, Entry, or Arrest | It is alleged by complainant that the accused officer searches his underwear in public view on the street. |
| 1044250 | Manuel Leano | 03/30/2011 | Unlawful Search, Entry, or Arrest | It is alleged by complainant that the accused officer falsely arrested him on March 24, 2011. |
| 1044250 | Manuel Leano | 03/30/2011 | Unlawful Search, Entry, or Arrest | It is alleged by complainant that the accused officer has stopped and searched him approximately 10 times without justification since 2/1/2011. |
| 1044999 | Manuel Leano | 05/10/2011 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer planted drugs on the victim, and then arrested him, leading to his incarceration. |
| 1046046 | Manuel Leano | 06/10/2011 | Excessive Force | It is alleged that the accused placed an unknown object in the complainant/victim's rectum. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|------|---------------------|-------------------|---------------------|------------------------------|
| 240704 | Alvin M. Jones | 10/10/1997 | Unlawful Search, Entry, or Arrest | It is alleged that the accused falsely/illegally arrested/seized the victim. |
| 240704 | Alvin M. Jones | 10/10/1997 | Unlawful Search, Entry, or Arrest | It is alleged that the accused illegally searched the victim. |
| 247116 | Alvin M. Jones | 06/28/1998 | Excessive Force | It is alleged that the accused and an unknown Sergeant grabbed the complainant/victim, causing him to fall down to the ground and reinjuring his left knee. |
| 247116 | Alvin M. Jones | 06/28/1998 | Demeanor | It is alleged that the accused officers and an unknown Sergeant verbally abused the complainant/victim (specifically when the accused's co-officer stated, "Shut the fuck up."). |
| 246658 | Alvin M. Jones | 07/06/1998 | Property Damage | It is alleged that following the arrest of the complainant/victim, the inside paneling of his 1993 Chevy Astro Van was damaged either by the accused officers or the tow truck driver. |
| 246800 | Alvin M. Jones | 07/12/1998 | Operation or Personnel Violations | It is alleged that after handcuffing the complainant/victim, the accused allowed her street fight opponent (Tracy Gills) to strike her in the eye. |
| 246800 | Alvin M. Jones | 07/12/1998 | Operation or Personnel Violations | It is alleged that after handcuffing the complainant/victim, the accused allowed her street fight opponent (Tracy Gills) to rip her shirt. |
| 251495 | Alvin M. Jones | 02/08/1999 | Excessive Force | It is alleged that the accused officer grabbed the victim by the shirt. |
| 251495 | Alvin M. Jones | 02/08/1999 | Excessive Force | It is alleged that the accused officer struck the victim on the chest. |
| 251495 | Alvin M. Jones | 02/08/1999 | Excessive Force | It is alleged that the accused officer handcuffed the victim too tight. |
| 251975 | Alvin M. Jones | 03/05/1999 | Operation or Personnel Violations | Officer failed to search his squad car after transporting a prisoner who had sat in the back seat. As a result, narcotics were discovered in the back seat of the squad car. |
| 252594 | Alvin M. Jones | 04/01/1999 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer entered the victim's apartment without their permission or a warrant. |
| 252594 | Alvin M. Jones | 04/01/1999 | Excessive Force | It is alleged that the accused officer shoved the victim. |
| 259308 | Alvin M. Jones | 01/14/2000 | Excessive Force | It is alleged that the accuser pulled the victim(s) /witness down the stairs while handcuffed. |
| 259308 | Alvin M. Jones | 01/14/2000 | Excessive Force | It is alleged that the accused punched the victim while the victim was handcuffed to the witness. |
| 262457 | Alvin M. Jones | 06/01/2000 | Unlawful Search, | It is alleged that the accused entered the apartment of victim(s) and searched without a warrant or permission. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| | | | Entry, or Arrest | |
| 262457 | Alvin M. Jones | 06/01/2000 | Theft / Improper Inventory Procedure | It is alleged that the accused removed $510 and failed to return it. |
| 262457 | Alvin M. Jones | 06/01/2000 | Unlawful Search, Entry, or Arrest | It is alleged that the accused verbally abused the victim telling them to "shut the fuck up." |
| 263072 | Alvin M. Jones | 06/15/2000 | Excessive Force | It is alleged that the accused officers kicked the victim about the hands and body with their feet. |
| 263072 | Alvin M. Jones | 06/15/2000 | Excessive Force | It is alleged that the accused officers hit the victim on the left side of his face. |
| 263072 | Alvin M. Jones | 06/15/2000 | Excessive Force | It is alleged that the accused officers pushed the victim's arms upwards. |
| 263072 | Alvin M. Jones | 06/15/2000 | Excessive Force | It is alleged that the accused officers called the victim a "motherfucker" and other profanities. |
| 263459 | Alvin M. Jones | 07/12/2000 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer planted marijuana on the victim and then charged him with possession of 7 bags of marijuana. |
| 265893 | Alvin M. Jones | 09/28/2000 | Excessive Force | It is alleged that Accused physically abused Complainant. |
| 265893 | Alvin M. Jones | 09/28/2000 | Excessive Force | It is alleged that Accused physically abused Complainant. |
| 265893 | Alvin M. Jones | 09/28/2000 | Excessive Force | It is alleged that Accused physically abused Complainant. |
| 265893 | Alvin M. Jones | 09/28/2000 | Excessive Force | It is alleged that Accused physically abused Complainant. |
| 265893 | Alvin M. Jones | 09/28/2000 | Excessive Force | It is alleged that Accused physically abused Complainant. |
| 265893 | Alvin M. Jones | 09/28/2000 | Excessive Force | It is alleged that Accused physically abused Complainant. |
| 265893 | Alvin M. Jones | 09/28/2000 | Excessive Force | It is alleged that Accused physically abused Complainant. |
| 265893 | Alvin M. Jones | 09/28/2000 | Excessive Force | It is alleged that Accused physically abused Complainant. |
| 265893 | Alvin M. Jones | 09/28/2000 | Demeanor | It is alleged that Accused verbally abused Complainant. |
| 265893 | Alvin M. Jones | 09/28/2000 | Demeanor | It is alleged that Accused verbally abused Complainant. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 265893 | Alvin M. Jones | 09/28/2000 | Demeanor | It is alleged that Accused refused to give Complainant his name. |
| 268523 | Alvin M. Jones | 01/16/2001 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer entered the victim's residence without a warrant or permission. |
| 268694 | Alvin M. Jones | 01/23/2001 | Excessive Force | It is alleged that the accused officer pointed a gun at a vehicle that was being driven by the victim, in which the other victim was a passenger. |
| 268694 | Alvin M. Jones | 01/23/2001 | Operation or Personnel Violations | It is alleged that the accused officer failed to identify himself as a Chicago police officer. |
| 268694 | Alvin M. Jones | 01/23/2001 | Operation or Personnel Violations | It is alleged that the accused officer left the scene of an auto accident without rendering/summoning medical treatment. |
| 269252 | Alvin M. Jones | 02/16/2001 | Excessive Force | It is alleged that the accused officer punched the victim in her stomach. |
| 271250 | Alvin M. Jones | 05/09/2001 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer engaged in an unlawful search and seizure. |
| 271250 | Alvin M. Jones | 05/09/2001 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer unlawfully detained the victim(s). |
| 271250 | Alvin M. Jones | 05/09/2001 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer unlawfully arrested the victim(s). |
| 273228 | Alvin M. Jones | 08/07/2001 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer "planted" a gun on the victim. |
| 273228 | Alvin M. Jones | 08/07/2001 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer entered the apartment of the complainant/victim without a warrant or justification. |
| 273228 | Alvin M. Jones | 08/07/2001 | Demeanor | It is alleged that the accused officer had his weapon (i.e., gun) drawn without justification. |
| 273870 | Alvin M. Jones | 08/17/2001 | Demeanor | It is alleged that the accused officer used profanity when he said, "I don't know who the fuck you that you think you are talking to," and also said "I'll fuck you and anybody else up, you'd better recognize who you are talking to." |
| 274930 | Alvin M. Jones | 09/25/2001 | Excessive Force | It is alleged that the accused officer pointed his weapon at the victims without justification. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 299151 | Douglas Nichols, Jr. | 07/07/2004 | Demeanor | It is alleged that one of the accused cursed and used offensive language toward the complainant/victim and one of her co-workers working at the Power Test Gas Station by stating, "If I see that fucking truck, I'll ticket it every time you motherfuckers." |
| 299278 | Douglas Nichols, Jr. | 07/15/2004 | Excessive Force | It is alleged that the accused officer pushed the victim, causing him to strike his chest against the squad car. |
| 299278 | Douglas Nichols, Jr. | 07/15/2004 | Demeanor | It is alleged that the accused officer refused to give his name upon request. |
| 305180 | Douglas Nichols, Jr. | 04/29/2005 | Operation or Personnel Violations | It is alleged that the accused was inattentive to duty in that 45 bags of suspected crack cocaine were found in the back seat of department vehicle. |
| 313683 | Douglas Nichols, Jr. | 06/19/2006 | Excessive Force | It is alleged that the accused officer repeatedly kicked the victim about the body. |
| 313683 | Douglas Nichols, Jr. | 06/19/2006 | Excessive Force | It is alleged that the accused officer slapped the victim several times on the face. |
| 1005855 | Douglas Nichols, Jr. | 05/21/2007 | Theft / Improper Inventory Procedure | It is alleged that the accused officer failed to inventory $916.00 of United States currency. |
| 1005855 | Douglas Nichols, Jr. | 05/21/2007 | Excessive Force | It is alleged that the accused officer pushed the victim to the ground. |
| 1005855 | Douglas Nichols, Jr. | 05/21/2007 | Excessive Force | It is alleged that the accused officer placed their feet on the victim's neck. |
| 1005855 | Douglas Nichols, Jr. | 05/21/2007 | Excessive Force | It is alleged that the accused officer attempted to coerce the victim to admit to a crime by hitting and kicking him. |
| 1005855 | Douglas Nichols, Jr. | 05/21/2007 | Demeanor | It is alleged that the accused officer demanded money and information. |
| 1005855 | Douglas Nichols, Jr. | 05/21/2007 | Excessive Force | It is alleged that the accused officer handcuffed the victim too tightly. |
| 1005855 | Douglas Nichols, Jr. | 05/21/2007 | Excessive Force | It is alleged that the accused officer beat the victim. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 1010041 | Douglas Nichols, Jr. | 10/15/2007 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused planted drugs on the complainant/victim's person. |
| 1017012 | Douglas Nichols, Jr. | 06/03/2008 | Demeanor | It is alleged that the accused officer threatened to plant drugs on the victim. |
| 1019794 | Douglas Nichols, Jr. | 09/17/2008 | Unlawful Search, Entry, or Arrest | It is alleged that the accused illegally entered the victim's grandmother's residence without justification/probable cause/a warrant. |
| 1019794 | Douglas Nichols, Jr. | 09/17/2008 | Unlawful Search, Entry, or Arrest | It is alleged that the accused ordered the victim to the ground and illegally searched him. |
| 1026192 | Douglas Nichols, Jr. | 05/16/2009 | Operation or Personnel Violations | It is alleged that the accused officer failed to properly secure the victim's impounded vehicle. |
| 1026192 | Douglas Nichols, Jr. | 05/16/2009 | Operation or Personnel Violations | It is alleged that the accused officer failed to give the victim's nephew an impoundment slip for the vehicle. |
| 1028854 | Douglas Nichols, Jr. | 08/13/2009 | Unlawful Search, Entry, or Arrest | It is alleged that the accused arrested the victim without justification. |
| 1029223 | Douglas Nichols, Jr. | 08/26/2009 | Unlawful Search, Entry, or Arrest | It is alleged by complainant that he was falsely arrested. |
| 1029223 | Douglas Nichols, Jr. | 08/26/2009 | Unlawful Search, Entry, or Arrest | It is alleged by complainant the officer unbuttoned his jeans during a search of his person, pulled his clothing away from his body, exposing his genital area while on the street. |
| 1028321 | Douglas Nichols, Jr. | 08/28/2009 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer falsely arrested the victim. |
| 1028321 | Douglas Nichols, Jr. | 08/28/2009 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer falsely arrested the victim. |
| 1028321 | Douglas Nichols, Jr. | 08/28/2009 | Unlawful Search, | It is alleged that the accused officer falsely arrested the victim. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| | | | Entry, or Arrest | |
| 1043138 | Douglas Nichols, Jr. | 02/04/2011 | Theft / Improper Inventory Procedure | It is alleged that when the complainant/victim entered a residential building and left his vehicle unsecured, the accused officers removed an unknown amount of money from his vehicle. |
| 1044250 | Douglas Nichols, Jr. | 03/30/2011 | Demeanor | It is alleged by complainant that the accused officer harasses him unjustly. |
| 1044250 | Douglas Nichols, Jr. | 03/30/2011 | Unlawful Search, Entry, or Arrest | It is alleged by complainant that the accused officer stops him and searches him every time the officer sees him and says, "give us someone." |
| 1044250 | Douglas Nichols, Jr. | 03/30/2011 | Unlawful Search, Entry, or Arrest | It is alleged by complainant that the accused officer searches his underwear in public view on the street. |
| 1044250 | Douglas Nichols, Jr. | 03/30/2011 | Unlawful Search, Entry, or Arrest | It is alleged by complainant that the accused officer falsely arrested him on March 24, 2011. |
| 1044250 | Douglas Nichols, Jr. | 03/30/2011 | Unlawful Search, Entry, or Arrest | It is alleged by complainant that the accused officer has stopped and searched him approximately 10 times without justification since 2/1/2011. |
| 1044999 | Douglas Nichols, Jr. | 05/10/2011 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer planted drugs on the victim, and then arrested him, leading to his incarceration. |
| 1046046 | Douglas Nichols, Jr. | 06/10/2011 | Excessive Force | It is alleged that the accused placed an unknown object in the complainant/victim's rectum. |
| 274782 | Ellsworth Smith | 09/18/2001 | Excessive Force | It is alleged that the accused officer pointed his weapon at the victim without justification. |
| 274782 | Ellsworth Smith | 09/18/2001 | Excessive Force | It is alleged that the accused officer searched the victim without justification. |
| 274782 | Ellsworth Smith | 09/18/2001 | Demeanor | It is alleged that the accused officer refused to give the victim his rights. |
| 286184 | Ellsworth Smith | 12/10/2002 | Operation or Personnel Violations | It is alleged that when the complainant/victim called 911 to report a suspicious white van parked and occupied in the rear of her apartment building, no Chicago Police units responded to her request for service. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 286294 | Ellsworth Smith | 12/13/2002 | Theft / Improper Inventory Procedure | It is alleged that, while conducting a search of the victim, the accused officer stole $10.00 of United States currency. |
| 286680 | Ellsworth Smith | 01/07/2003 | Property Damage | It is alleged that the accused pried the complainant's locked brief case open causing damage because the complainant's license was locked in the briefcase/ |
| 287531 | Ellsworth Smith | 02/11/2003 | Excessive Force | It is alleged that the accused officer pushed the victim to the ground. |
| 287531 | Ellsworth Smith | 02/11/2003 | Excessive Force | It is alleged that the accused officer pushed the victim's face into the ground. |
| 287531 | Ellsworth Smith | 02/11/2003 | Excessive Force | It is alleged that the accused officer pulled the victim's leg backwards. |
| 288176 | Ellsworth Smith | 03/14/2003 | Excessive Force | It is alleged that the accused officer kicked the victim on the head and about the body while he was laying on the ground being handcuffed. |
| 292838 | Ellsworth Smith | 10/10/2003 | Demeanor | It is alleged that the accused became verbally abusive and stated, "Are you trying to fucking tell me my job?" and "Shut the fuck up." |
| 292838 | Ellsworth Smith | 10/10/2003 | Unlawful Search, Entry, or Arrest | It is alleged that the accused handcuffed the complainant/victim and placed him in the squad car for no apparent reason. |
| 293973 | Ellsworth Smith | 11/21/2003 | Excessive Force | It is alleged that the accused officer punched the victim about the head and body. |
| 293973 | Ellsworth Smith | 11/21/2003 | Excessive Force | It is alleged that the accused officer kicked the victim about the head and body. |
| 305648 | Elsworth Smith | 05/19/2005 | Theft / Improper Inventory Procedure | It is alleged that the accused removed $664 while conducting an arrest and did not return it or properly inventory it. |
| 313683 | Elsworth Smith | 06/19/2006 | Integrity Violations - Non-Inculpatory | It is alleged that the accused officer witnessed misconduct and failed to report it. |
| 1000820 | Elsworth Smith | 10/31/2006 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer fabricated information for the purpose of obtaining a warrant to search the victim's residence. |
| 1002984 | Elsworth Smith | 01/31/2007 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer falsified the circumstances of the victim's arrest |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|------|----------------------|-------------------|---------------------|------------------------------|
| 1004698 | Elsworth Smith | 04/10/2007 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer entered and searched the victim's house without justification. |
| 1004698 | Elsworth Smith | 04/10/2007 | Demeanor | It is alleged that the accused officer questioned the victim in a threatening manner about where drugs or guns could be located. |
| 1004698 | Elsworth Smith | 04/10/2007 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer falsely arrested the victim because he could not provide information on where drugs or guns could be located. |
| 1005855 | Elsworth Smith | 05/21/2007 | Theft / Improper Inventory Procedure | It is alleged that the accused officer failed to inventory $916.00 of United States currency. |
| 1005855 | Elsworth Smith | 05/21/2007 | Excessive Force | It is alleged that the accused officer pushed the victim to the ground. |
| 1005855 | Elsworth Smith | 05/21/2007 | Excessive Force | It is alleged that the accused officer placed their feet on the victim's neck. |
| 1005855 | Elsworth Smith | 05/21/2007 | Excessive Force | It is alleged that the accused officer attempted to coerce the victim to admit to a crime by hitting and kicking him. |
| 1005855 | Elsworth Smith | 05/21/2007 | Demeanor | It is alleged that the accused officer demanded money and information. |
| 1005855 | Elsworth Smith | 05/21/2007 | Excessive Force | It is alleged that the accused officer handcuffed the victim too tightly. |
| 1005855 | Elsworth Smith | 05/21/2007 | Excessive Force | It is alleged that the accused officer beat the victim. |
| 1006646 | Elsworth Smith | 06/17/2007 | Excessive Force | It is alleged that Elsworth Smith pointed his weapon at Mayfield while at 5914 South State. |
| 1006646 | Elsworth Smith | 06/17/2007 | Demeanor | It is alleged that Elsworth Smith pointed verbally abused Mayfield while at the 002nd District. |
| 1006646 | Elsworth Smith | 06/17/2007 | Demeanor | It is alleged that Elsworth Smith threatened to slap Mayfield while at the 002nd District. |
| 1010354 | Elsworth Smith | 10/22/2007 | Domestic Violence | It is alleged that the accused, who is the ex-boyfriend of the complainant/victim, had been verbally abusing her via telephone (such as calling her a "hoe"). |
| 1010354 | Elsworth Smith | 10/22/2007 | Domestic Violence | It is alleged that the accused, who is the ex-boyfriend of the complainant/victim, had been leaving her derogatory messages on her voicemail (such as, "You're a selfless cold hearted bitch. Fuck you."). |
| 1013134 | Elsworth Smith | 01/04/2008 | Demeanor | It is alleged that the accused officer laughed at the victim and made fun of the victim. |
| 1015698 | Elsworth Smith | 04/14/2008 | Unlawful Search, Entry, or Arrest | It is alleged that the accused conducted an unlawful search without justification. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|------|------|------|------|------|
| 1015698 | Elsworth Smith | 04/14/2008 | Excessive Force | It is alleged that the accused repeatedly struck the second victim, Deangelo Campbell, about the face. |
| 1017521 | Elsworth Smith | 06/30/2008 | Unlawful Search, Entry, or Arrest | It is alleged that the accused searched the property of the victim without a warrant. |
| 1017521 | Elsworth Smith | 06/30/2008 | Property Damage | It is alleged that the accused damaged the victim's property. |
| 1021639 | Elsworth Smith | 11/21/2008 | Demeanor | It is alleged that during a traffic stop, the accused officer failed to give his name or show identification upon request. |
| 1021639 | Elsworth Smith | 11/21/2008 | Demeanor | It is alleged that during a traffic stop, the accused officer spoke with a tone of voice that was rude and unprofessional. |
| 1031334 | Elsworth Smith | 10/28/2009 | Integrity Violations - Non-Inculpatory | It is alleged that the accused officer observed misconduct and failed to report it. |
| 1044999 | Elsworth Smith | 05/10/2011 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer planted drugs on the victim, and then arrested him, leading to his incarceration. |
| 1049094 | Elsworth Smith | 10/26/2011 | Unlawful Search, Entry, or Arrest | It is alleged that the accused officer falsely arrested the complainant for not having a Peddler's license, even though complainant produced his business license. |
| 1049094 | Elsworth Smith | 10/26/2011 | Property Damage | It is alleged that the accused officer took all of complainant's merchandise, which was worth $7,000. However, it was not all inventoried, he found one table which had been thrown away and he was unable to locate another one and twelve table signs. |
| 1049094 | Elsworth Smith | 10/26/2011 | Operation or Personnel Violations | It is alleged that the complainant alerted lock-up personnel that he needed medical attention because he was not feeling well. He was told an ambulance was arriving. However, it never came. |
| 1049094 | Elsworth Smith | 10/26/2011 | Demeanor | It is alleged that when complainant was hungry, he received a sandwich that smelled horrible from lock-up personnel and was told that he could not be served a drink or water with it. |
| 296428 | Kenneth Young, Jr. | 03/22/2004 | Operation or Personnel Violations | It is alleged that the accused refused to identify themselves when they arrived at the residence of the complainant/victim and questioned her. |
| 296428 | Kenneth Young, Jr. | 03/22/2004 | Operation or Personnel Violations | It is alleged that after the complainant/victim called "911" to request a Supervisor, the Supervisor failed to respond. |

| CR # | Accused Officer Name | Date CR Initiated | Allegation Category | Summary of Allegation in CR |
|---|---|---|---|---|
| 302560 | Kenneth Young, Jr. | 12/22/2004 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that both of the accused officers and an unknown Black female planted heroin upon the complainant/victim. |
| 302560 | Kenneth Young, Jr. | 12/22/2004 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that both of the accused officers and an unknown Black female planted heroin upon the victim (a second victim). |
| 1002984 | Kenneth Young, Jr. | 01/31/2007 | Fabricated Evidence and Integrity Violations (inculpatory) | It is alleged that the accused officer falsified the circumstances of the victim's arrest |
| 1017521 | Kenneth Young, Jr. | 06/30/2008 | Unlawful Search, Entry, or Arrest | It is alleged that the accused searched the property of the victim without a warrant. |
| 1017521 | Kenneth Young, Jr. | 06/30/2008 | Property Damage | It is alleged that the accused damaged the victim's property. |

# Appendix E
# Jon M. Shane

John Jay College of Criminal Justice
Department of Law, Police Science and Criminal Justice Administration
524 W. 59th Street
New York, NY 10019
jmsnpd@gmail.com
www.jmshane.com

## ACADEMIC QUALIFICATIONS

| | | | |
|---|---|---|---|
| 2008 | Ph.D. | Criminal Justice | School of Criminal Justice, Rutgers University, Newark, NJ |
| 2005 | MA | Criminal Justice | School of Criminal Justice, Rutgers University, Newark, NJ |
| 2002 | BS | Criminal Justice | School of Criminal Justice, Rutgers University, Newark, NJ |

## RESEARCH INTERESTS

Issues in police policy and practice; social disorganization theory; situational crime prevention; problem-oriented policing; secondary effects; violent crime; organizational accidents

## TEACHING POSITIONS AND INSTRUCTIONAL RESPONSIBILITIES

| | | | |
|---|---|---|---|
| 2020-Present | Professor | John Jay College of Criminal Justice | New York, NY |
| 2015-2017 | Director | New York City Police Department, Executive Master's Program | New York, NY |
| 2014-2020 | Associate Professor | John Jay College of Criminal Justice (tenured & promoted, September 2014) | New York, NY |
| 2011-2022 | Doctoral Faculty | CUNY Graduate Center, Ph.D. Program in Criminal Justice | New York, NY |
| 2009-2014 | Assistant Professor | John Jay College of Criminal Justice | New York, NY |
| 2005-2008 | Adjunct Lecturer | Rutgers University, Newark College of Arts and Sciences | Newark, NJ |
| 2005 | Adjunct Professor | Fairleigh Dickinson University-School of Administrative Science, Petrocelli College | Teaneck, NJ |

## HONORS, RECOGNITION AND AWARDS

| | | |
|---|---|---|
| 2024 Distinguished Teaching Prize | Nominated | Dec 2023 |
| 2023 Distinguished Teaching Prize | Nominated | Dec 2022 |
| Recognized as a widely cited scholar for "early onset" of influence[98] | Top 100 Cited Works 2010-2015 | Jan 2019 |
| The 2014 Academy of Criminal Justice Sciences Outstanding Mentor of the Year | Winner | Feb 21, 2014 |
| The 2012 Award for Outstanding Experimental Field Trial | Winner (research team member) | Nov 2012 |
| The 2011 American Society of Criminology Mentor of the Year | Winner | Aug 26, 2011 |
| The 2010 Emerald/European Foundation for Management Development (EFMD) Outstanding Doctoral Research Award (ODRA) | Highly Commended Award Winner | Jan 24, 2011 |
| Dean's List 2009-2010 | Certificate of appreciation for graduate student mentorship | Oct 28, 2010 |
| Dean's List 2008-2009 | | Oct 15, 2009 |

## COURSES TAUGHT

Advanced Issues in Policing (D)
Contemporary Problems in Community Policing (G)
Criminology (U)
Introduction to Criminal Justice (U)
Introduction to Law Enforcement (U)
Issues in Criminal Justice (Police & Corrections (G)
Police and the Community (U)
Police Ethics (G)
Problem-Oriented Policing (G)

---

[98] Graham, A., Pratt, T.C., Lee, H & Cullen, F. T. (2019). Contemporary classics? The early onset of influence of articles published in criminology and criminal justice journals, 2010-2015. *Journal of Criminal Justice Education, 30*(3), 348-375 (part of the top 4.1% of all articles published in 20 criminology and criminal justice journals from 2010 to 2015 [Organizational Stressors and Police Performance]. The articles in these journals represent an elite group of research…, p. 354).

Research Design and Methods (G)

Using Computers in Social Research (statistics) (G)

D=Doctoral; G=Graduate; U=Undergraduate

## DEPOSITION AND TRIAL EXPERIENCE

| Event | Venue | Date | Case Number and Attorney |
|---|---|---|---|
| Deposition testimony (use of force) | United States District Court, District of New Jersey—Newark | February 13, 2024 | 2:20-cv-20559-BRM-JRA (Adamo Ferreira, Esq.) |
| Deposition testimony (internal affairs) | United State District Court for the District of New Jersey | January 10, 2024 | 2:20-cv-20587 (Valerie Palma-Deluisi, Esq.) |
| Deposition testimony (internal affairs) | Circuit Court of Cook County, Illinois | August 29, 2023 | Docket 19-L-10035 (Wally Hilke, Esq.) |
| Deposition testimony (use of force) | United States District Court, District of New Jersey—Newark | July 3, 2023 | 18:cv:3241 (EP) (JSA) (Patrick Caserta, Esq.) |
| Deposition testimony (internal affairs) | United States District Court For The Northern District of Illinois Eastern Division | May 26, 2023 | (Jennifer Bonjean, Esq.) |
| Deposition testimony (problem-oriented policing) | United States District Court For The Middle District of Pennsylvania | April 28, 2023 | 3:l l-CV-0617 (Cletus Lyman, Megan Maguire Esq.) |
| Deposition testimony (internal affairs) | United States District Court For The Northern District of Illinois Eastern Division | March 10, 2023 | (Jennifer Bonjean, Esq.) |
| Deposition testimony (use of force; chemical munitions) | United States District Court, Western District of Missouri | October 12, 2022 | 4:21-CV-662-HFS (James Thompson, Esq.) |
| Trial testimony (adverse employment action; retaliation) | Superior Court of Washington For King County | September 29, 2022 | 20-2-09949-0-SEA (Sumeer Singla, Esq.) |
| Deposition testimony (general police policy and practice) | United States District Court For The Western District of Washington | August 11, 2022 | 2:200-cv-00983-TSZ (Tyler Weaver Esq). |
| Trial testimony (on-call overtime compensation) | State of Kentucky, Jefferson Circuit Court Division Seven (7)—Louisville, KY | July 22, 2021 | 16-CI-01500 (Ann Oldfather Esq.) |
| Deposition testimony (investigations policy and practice) | Circuit Court of The 17th Judicial Circuit in and for Broward County, Florida | October 5, 2021 | 1511533CF10A (Carl Lida, Esq). |
| Deposition testimony (adverse employment action; retaliation) | Superior Court of Washington For King County | August 17, 2021 | 20-2-09949-0-SEA (Sumeer Singla, Esq.) |
| Deposition testimony (internal affairs) | Superior Court, Bergen County, New Jersey | July 19, 2021 | BER-L-1051-19 (Kieran Dowling, Esq) |
| Deposition testimony (on-call overtime compensation) | State of Kentucky, Jefferson Circuit Court Division Seven (7)—Louisville, KY | July 14, 2021 | 16-CI-01500 (Ray Haley, Esq.) |

| | | | |
|---|---|---|---|
| Deposition testimony (use of force) | United States District Court, District of New Jersey—Newark | July 29, 2020 | 17-3604 (KM-MAH) (Aymen Aboushi, Esq.) |
| Deposition testimony (use of force) | United States District Court, District of New Jersey—Newark | May 14, 2020 | 2:15-cv-03215-ES-JAD (Brooke Barnett, Esq.) |
| Deposition testimony (on-call overtime compensation) | United States District Court, District of New Jersey—Newark | March 10, 2020 | 2:18-cv-10731 (Valerie Palma DeLuisi, Esq.) |
| Deposition testimony (use of force) | United States District Court Northern District of New York-Utica, New York | January 9, 2020 | 1:18-cv-00672-LEK-TWD (Ronald Rosenkranz, Esq). |
| Trial testimony (qualified as an expert in police internal affairs and discipline and police policy and practices) | Superior Court, Atlantic County, New Jersey | March 25-26, April 1, 2019 | ATL-L-2517-11 (David Castellani, Esq) |
| Deposition testimony (internal affairs) | Superior Court, Atlantic County, New Jersey | November 1, 2018 | ATL-L-2517-11 (David Castellani, Esq) |
| Deposition testimony (use of force) | United States District Court for the Middle District of Alabama, Northern Division | July 30, 2018 | 2:11-cv-370 (Michael Allsup, Esq) |
| Trial testimony (criminology/statistics) | Superior Court, Hudson County, New Jersey | June 5, 2018 | indictment no. 17-10-0716 (Raoul Bustillo, Esq) |
| Deposition testimony (general police policy/practices) | Superior Court, Monmouth County, New Jersey | March 9, 2018 | MON-L-1284-15 (David Schwartz, Esq) |
| Trial testimony (internal affairs) | United States District Court, District of New Jersey—Camden | March 6, 2018 | 1:13-CV-02741 (Jennifer Bonjean, Esq) |
| Deposition testimony (use of force) | United States District Court, District of New Jersey—Camden | February 23, 2018 | 3:13-CV-07374-JAP-DEA (Barry Pollack, Esq) |
| Qualified in federal court as an expert in criminal investigations (criminal investigations/internal affairs) | United States District Court, District of New Jersey—Camden | September 5, 2017 | 14-CV-05092 (Jennifer Bonjean, Esq) |
| Qualified in federal court as an expert in statistics (statistics) | United States District Court, District of New Jersey—Camden | December 2016 | 1:13-cv-06667-RBK-JS (Jennifer Bonjean, Esq) |
| Qualified in federal court as expert in criminal investigations (criminal investigations/confidential informants) | United States District Court, District of New Jersey—Camden | February 26, 2013 | 08-1873 (NLH) (JS) (Jennifer Bonjean, Esq) |
| Deposition testimony (show-up procedures) | Superior Court of New Jersey Law Division, Middlesex County | August 23, 2011 | MID L-005876-09 (Lawrence Lustberg, Esq) |
| Deposition testimony (use of force) | United States District Court, District of New Jersey—Newark | January 13, 2011 | 2:09-CV-4170 (KSH-DS) (David Schwartz, Esq) |

## PUBLICATIONS

*Peer-reviewed Journals*

Twerski, A. & **Shane, J.M.** (2018). Bringing the science of policing to liability for third-party crime at shopping malls. *Marquette Law Review, 101*(3): 776-802.

**Shane, J.M.,** Piza, E. & Silva, J. R. (2017). Piracy for ransom: The implications for situational crime prevention. *Security Journal.* DOI 10.1057/s41284-017-0115-0.

**Shane, J.,** Lawton, B. & Swenson, Z. (2017). The prevalence of fatal police shootings by U.S. police, 2015-2016: Patterns and answers from a new data set. *Journal of Criminal Justice, 52,* 101-111.

**Shane, J.M.** (2016). Improving police use of force: A policy essay on national data collection. *Criminal Justice Policy Review.* 1-21.

**Shane, J.M.,** Piza, E. & Mandalla, M. (2015). Situational crime prevention and worldwide piracy: A cross-continent analysis. *Crime Science, 4*(21): 1-13.

**Shane, J.M.** & Magnuson, S. (2014). Successful and unsuccessful pirate attacks worldwide: A situational analysis. *Justice Quarterly.* http://dx.doi.org/10.1080/07418825.2014.958187.

**Shane, J.M.** (2012). The police disciplinary sentencing matrix: An emerging concept. *Police Quarterly, 15*(1): 62-91.

**Shane, J.M.** (2011). Daily work experiences and police performance. *Police Practice & Research, 13*(3): 1-19.

**Shane, J.M.** (2011). Deterrence or system overload? The effect of imprisonment and clearance rates on auto theft in the United States. *Law Enforcement Executive Forum Journal, 11*(1): 149-178.

**Shane, J.M.** (2010). The limits of auto parts marking as a situational crime prevention measure: A qualitative analysis. *Law Enforcement Executive Forum Journal, 10*(3): 109-140.

**Shane, J.M.** (2010). Organizational stressors and police performance. *Journal of Criminal Justice. 38*(4): 807-818. [Top 100 Cited Works 2010-2015].

**Shane, J.M.** (2010). Key administrative and operational differences in the police quasi-military model. *Law Enforcement Executive Forum Journal, 10*(2): 75-106.

**Shane, J.M.** (2010). Performance management in police agencies: A conceptual framework. *Policing: An International Journal of Police Strategies & Management, 33*(1): 6-29.

Sellers, C.L., Sullivan, C.J., Veysey, B.M., & **Shane, J.M.** (2004). Responding to persons with mental illnesses: Police perspectives on specialized and traditional practices. *Behavioral Sciences and the Law, 23*(5): 647-657.

*Books & Book Chapters*

**Shane, J.M.** (2020). Stress Inside Police Organizations: How the Organization Creates Stress and Performance Problems in Police Officers London: Routledge.

**Shane, J.M.** & Magnuson, S. (2019). Worldwide maritime piracy and the implications for situational crime prevention. In M. Natarajan (ed.) *International and Transnational Crime and Justice: An Anthology.* Cambridge University Press.

**Shane, J.** & Swenson, Z. (2018). Unarmed and Dangerous: Patterns of Threats by Citizens During Deadly Force Encounters with Police Officers. U.K: Routledge.

**Shane, J.** (2016). Confidential Informants: A Closer Look at Police Policy. Springer Briefs in Criminology Series. New York, NY: Springer.

**Shane, J.** (2013). Learning from Error in Policing: A Case Study in Organizational Accident Theory. Springer Briefs in Criminology Series. New York, NY: Springer.

Haq, Q. & **Shane, J.M.** (2012). The impact of work environment on police performance. In V. Sergevnin (ed.), *Critical Issues in American Criminal Justice System.* Russian Academy of National Economy and Public Administration under the President of Russian Federation. Moscow.

**Shane, J.M.** & Lieberman, C.A. (2009). Criminological theories and the problem of modern piracy. In M. Haberfeld and A. von Hassell (eds.), *Modern Piracy and Maritime Terrorism: The Challenge of Piracy for the 21st Century.* Dubuque, IA: Kendall-Hunt Publishing.

**Shane, J.M** (2009). September 11th terrorist attacks on the United States and the law enforcement response. In M. Haberfeld and A. von Hassell (Eds.), *A New Understanding of Terrorism—Case Studies, Analyses and Lessons Learned.* New York: Springer.

**Shane, J.M.** (2007). *What Every Chief Executive Should Know: Using Data to Measure Police Performance.* New York: Looseleaf Law Publications.

*Monographs & Monograph Chapters*

**Shane, J.M.** (2012). Abandoned Properties. Problem-Oriented Guides for Police, Washington, DC: U.S. Department of Justice, Office of Community Oriented Policing Services.

**Shane, J.M.** (2008). Go After Terrorism Grants. Brief # 20. In G. Newman and R.V. Clarke, *Policing Terrorism: An Executive's Guide.* Washington. D.C: U.S. Department of Justice.

**Shane, J.M.** (2008). Developing a Performance Management Model. New York: Looseleaf Law Publications.

*Professional Journals (Non peer reviewed)*

**Shane, J.M.** (2008, September). Developing a performance measurement model. *FBI Law Enforcement Bulletin,* Vol. 77, No. 9.

Delorenzi, D., **Shane, J.M.** & Amendola, K.L. (September 2006). The Compstat process: Managing performance on the pathway to leadership. *Police Chief*, Vol. 73, No. 9.

**Shane, J.M.** (June 2005). Activity-based budgeting: Creating a nexus between workload and costs. *FBI Law Enforcement Bulletin,* Vol. 74, No. 6.

**Shane, J.M.** (April, May, June 2004.). Compstat process. *FBI Law Enforcement Bulletin*. Vol. 73. No. 4, 5 and 6.

**Shane, J.M**. (May 2003). Writing a winning grant proposal. *FBI Law Enforcement Bulletin*. Vol. 72. No. 5.

*Government Publications*

**Shane, J.** (2014)**.** Reducing Failure: A View of Policing Through an Organizational Accident Lens. In "Mending Justice: Sentinel Event Reviews," *National Institute of Justice, Special Report,* pp. 50-52. Washington, D.C: National Institute of Justice.

**Shane, J.M.** (August 5, 2009). Report of the expert panel on parts-marking, professional theft, and other vehicle security; Auto body repair shops; Prosecution of parts cases. In. M. Maxfield and R.V. Clarke. *Parts Marking and Anti-theft Devices Technology Study*. For Maryn Consulting on behalf of National Highway Traffic and Safety Administration, Washington, D.C. (pp. 107-152).

Clarke, R.V., Zanin, N. & **Shane, J.M.** (August 2004). Reducing drug dealing in private apartment complexes: Final report to the U.S. Department of Justice Office of Community Oriented Police Services on a Project Undertaken in Newark, NJ to Test the Utility of the Problem-Oriented Guides for Police." Washington, D.C.: U.S. Department of Justice, COPS Office. Accessible at www.popcenter.org/library.

*Other Publications*

**Shane, J.M.** (July 5, 2023). Creating a nexus between workload and costs: A case study from Ocean View PD. *Police1.* https://police1.webstage.lexipol.com/chiefs-sheriffs/articles/creating-a-nexus-between-workload-and-costs-a-case-study-from-ocean-view-pd-tfQ6Vcx1tUNeNgh7/

**Shane, J.M.** (June 27, 2023). Survey results indicate urgent need for comprehensive workload analysis and service revamp. *Police1.* https://police1.webstage.lexipol.com/what-cops-want-2023/articles/survey-results-indicate-urgent-need-for-comprehensive-workload-analysis-and-service-delivery-revamp-F2ixCHtt8jZUmtZA/.

**Shane, J.M.** (July 2021). Situational crime prevention: Removing opportunity and improving defence to tackle violent crime. *Policinginsight.com*

Amendola, K.A., Weisburd, D. Hamilton, E., Jones, G., Slipka, M., **Shane, J.M** & Ortiz, C. (December 2011). The impact of law enforcement shift practices and extra-duty employment on various health, safety, performance, and quality of life measures. Washington, D.C: Police Foundation.

Jones-Brown, D. & **Shane, J.M.** (July 2011). An exploratory study of the use of informants in drug prosecutions in New Jersey. Newark, NJ: ACLU-NJ

**Shane, J.M.** (June 2010). Miranda's "clear-statement" requirement. New York City Police Department, *Executive Development Section Executive Newsletter*, *1*(2).

**Shane, J.M**. (Task force advisor and contributor). (2010). Reducing inherent danger: Report of the task force on police-on-police shootings. Albany, NY: New York State Task Force on Police-on-Police Shootings.

<u>CONFERENCE PRESENTATIONS AND INVITED LECTURES</u>

*Conference Presentations*

"Ohio Certified Law Enforcement Professional (CLEE)," Columbus, OH, creating a nexus between workload and costs, **November 3, 2023.**

"When Do Police Kill in Metropolitan America"? American Society of Criminology, Thematic Panel, Atlanta, GA, **November 2018.**

"Policing the Mentally Ill: A Problem-Oriented Approach," Seminar on Legal and Ethical Issues in Psychiatry and General Medicine, invited lecture Columbia University Medical Center, **October 13, 2015.**

"United States Commission on Civil Rights, Office of Civil Rights Evaluation, panel on Police Practices and Prosecution of Police Deadly Force," invited panelist. Panel presentation, **April 20, 2015.**

"Successful and unsuccessful pirate attacks worldwide: A situational analysis." Annual Meeting Academy of Criminal Justice Sciences, Orlando, FL. **March 6, 2015.**

"Columbia University, School of Public Health, guest lecture on American policing and the relationship between crime and public health. Hosted by Dr. Sara Albiola. **February 23, 2015.**

"Terrorist Threat Perceptions of Police Leaders from Small and Medium Police Departments." Feature Roundtable: Annual Meeting Academy of Criminal Justice Sciences, Philadelphia, PA, **February 19, 2014.**

"The Police Employee Disciplinary Sentencing Matrix: An Emerging Concept." Annual Meeting Academy of Criminal Justice Sciences, Dallas, TX, **March 21, 2013.**

"A Study on Police Sector Integrity." Annual Meeting Academy of Criminal Justice Sciences, Dallas, TX, **March 21, 2013.**

"Abandoned Buildings and Lots." Annual Problem-Oriented Policing Conference, Providence, RI, **October 22-23, 2012.**

"Deterrence or system overload? The Effect of Imprisonment and Clearance Rates on Auto Theft in the United States." Annual Meeting American Society of Criminology, Washington, D.C: **November 16, 2011.**

"Organizational Stressors and Police Performance." Annual Meeting American Society of Criminology, San Francisco, Ca: **November 19, 2010.**

"The Myth of The American Police Quasi Military Model," Presentation, Annual Meeting Academy of Criminal Justice Sciences, San Diego, CA: **February 26, 2010.**

"Rethinking Police Use of Confidential Informants," Presentation, Annual Meeting Academy of Criminal Justice Sciences, San Diego, CA: **February 23, 2010.**

"Performance Management in Police Agencies: A Conceptual Framework," Poster presentation, Annual Meeting American Society of Criminology, Philadelphia, PA: **November 5, 2009.**

"Confronting Gun Traffickers: Stopping the Interstate Flow of Illegal Guns through Tracing and Analysis." Roundtable presentation with Christopher Andreychak, 2008 Annual Meeting American Society of Criminology, St. Louis, MO: **November 15, 2008.**

*Invited Lectures*

"National Sheriff's Association (NSA)," Grand Rapids, MI, creating a nexus between workload and costs, **June 28, 2023.**

"Government Finance Officers Association (GFOA)," Chicago, IL, on activity-base budgeting, **February 10, 2023.**

"Inter-American Development Bank" on policing in democratic societies, Washington, D.C., **December 2, 2014.**

"Presentation to the Chinese People's Public Security University, Police Security Bureau, Beijing, China on creating a nexus between police workload and budget, police policy and practice issues." **November 29, 2011.**

"Developing a Performance Management Model," Leading Police Performance and Accountability Symposium 2010, Jamaica Constabulary Force, Kingston, Jamaica: **March 30 – April 2, 2010.**

"Tattletales and Victims: Rethinking Police Use of Confidential Informants," John Jay College Graduate Lecture Series: **November 30, 2009.**

"Key Administrative and Operational Differences in the Police Quasi Military Model," CUNY Hostos Community College, Bronx, NY: **October 13, 2009.**

"Eyewitness Identification: Improving Reliability and Preventing Wrongful Convictions," panel discussant providing a perspective on police policy and practice. American Judicature Society, Annual Meeting, New York City: **August 8, 2008.**

---

**TRAINING WORKSHOPS**

| 2018 | March 29 | Use of Force Investigations Guide–An ASCIA and Police Foundation Webinar, ***Washington, D.C.*** |
|------|----------|-------|
| 2018 | March 13 | Murder Book - A Profile of the Los Angeles Police Department's Homicide Case Management Framework, Police Foundation Webinar, ***Washington, D.C.*** |
| 2015 | April 4-17 | Uruguay National Police, Basic and Advanced Criminal Investigations, ***Montevideo, Uruguay.*** |
| 2014 | June 9-20 Sept 15-16 | Uruguay National Police, Basic and Advanced Criminal Investigations, ***Montevideo, Uruguay.*** |
| 2013 | July 9-11 | U.S. Army Senior Military Police Leaders Conference of Performance Management Process, ***Ft. Hood, TX.*** |
|  | September 18-20 | U.S. Army Senior Military Police Leaders Conference of Performance Management Process, ***Ft. Campbell, KY.*** |
| 2010 | November 9 | New Haven (CT) Police Department Investigative Training Course, ***West Haven, Connecticut.*** |

|  | March 30 to April 2 | Leading Police Performance and Accountability Symposium 2010, Jamaica Constabulary Force. Producers House Building, **Kingston, Jamaica.** |
|---|---|---|
| **2009** | September to November (Various dates) | Implementing and Institutionalizing CompStat in Maryland. Grant program with University of Maryland and Governor's Office of Crime Prevention, **Baltimore, MD.** |
| **2008** | April 22 | Developing a Performance Management Model. Ohio Association of Chiefs of Police. 2008 in-service training conference, **Deer Creek, Ohio.** |
|  | June 23 | Developing a Performance Management Model. Florida Police Chiefs Association 56th Annual Summer Training Conference, **Palm Beach Gardens, Florida.** |
|  | August 19 | Developing a Performance Management Model. Virginia Association of Chiefs of Police, Annual Conference, **Hot Springs, Virginia.** |
|  | October 28 | Developing a Performance Management Model. The Houston Area Police Chief's Association, Woodlands Public Safety Training Center, **Conroe, Texas.** |
| **2007** | May 5 | Developing a Performance Management Model. Ottawa Association of Law Enforcement Planners. Algonquin College, **Ottawa, Ontario, Canada.** |
|  | August 8 | Developing a Performance Management Model. Louisiana Attorney General's Command College, **Baton Rouge, Louisiana.** |
|  | October 16-17 | Developing a Performance Management Model. International Association of Law Enforcement Planners, **Calgary, Alberta, Canada.** |

### PREVIOUS EMPLOYMENT AND RELATED EXPERIENCE

| March 2006 July 2006 | Consultant to Essex County College, Newark, NJ to assist with design and implementation of a geographic information system (GIS) training program for law enforcement and homeland security initiatives |
|---|---|
| February 2005 September 2005 | *Staff Member*, NJ Attorney General's Office - Camden Commission for Public Safety. Final report accessible at http://www.state.nj.us/lps/com-report-camden.pdf |
|  | *Research Associate, Rutgers Police Institute*. Conducted public safety research and a police management study in Camden, NJ as a staff member of the *Camden Commission for Public* Safety. Research included a management study on efficiency and recommendations on best practices for organizational change, deployment, and sustained crime control initiatives. |
| May 2004 Present | *Senior Research Associate, Police Foundation Washington, D.C. (currently National Policing Institute)*. Currently, serving as a senior research associate to the Police Foundation on a variety of topics related to policing. Most recently, assisted preparing a research grant to the National Institute of Justice entitled: *A National Assessment of the Risks and Benefits of Shift Practices and Related Policies in Law Enforcement: Impact on Officer and Organizational Performance*. |
| October 2003 May 2004 | *Research Team Member, Rutgers Center for Mental Health*. Conducted research on police interactions and responses to persons with mental health issues. Study included conducting on site interviews with police officers as well as calls for service data analysis. |
| September 2003 September 2004 | *Differential Police Response: Neighborhood Social Disorganization and Police Response Time to Domestic Violence Calls*. Principal investigator and author of explanatory research on police response time to domestic violence calls in Newark, New Jersey. The objective was to explain the relationship between indicators of social disorganization and police response time to domestic violence calls for service. |

| | | |
|---|---|---|
| March 1993<br>August 2003 | Successfully solicited by proposal over $50 million in state and federal grants for various police initiatives including community policing, personnel, equipment, and training as a member of the Newark Police Department, Research, Analysis and Planning Division | |
| June 2001 | Harvard University, John F. Kennedy School of Government and Police Executive Research Forum (PERF)—Senior Management Institute for Police, Session 25, Boston, MA | |
| February to June 1998 | Federal Bureau of Investigation, FBI National Academy—193rd Session Quantico, Virginia | |
| January to June 1996 | Police Foundation Washington, D.C. Visiting fellow, Police Fellowship Program | |
| March 1989<br>December 2005 | Newark (NJ) Police Department (Retired, Captain of police). See below for detailed law enforcement experience. | |
| December 1985<br>March 1989 | Clifton (NJ) Police Department | |

## GRANTS AND FUNDING

| | | | |
|---|---|---|---|
| March 24, 2023 (awarded) | National Safe Skies Alliance (in partnership with TransSolutions Aviation) | $225,000.00 | Airport Law Enforcement Staffing |
| October 18, 2013 (awarded) | Ministry of the Interior, Uruguay | $253,156.00 | Scholarship Program for Training in Advanced Criminal Investigations for Uruguay Police |
| October 18, 2012 (awarded) | PSC CUNY | $10,003.74 | Principal investigator to examine maritime piracy using situational crime prevention |
| April 15, 2010 (awarded) | PSC CUNY (Award # 63310-00 41) | $3,990 | Principal investigator, to examine the impact of organizational stressors on police performance |
| November 2008 (awarded) | State of Maryland Governor's Office of Crime Control Programs | $185,696 | Co-principal investigator with Dr. Rachel Boba, Dr. Jeanne Bilanin and Laura Wyckoff to develop and implement Compstat for police agencies throughout Maryland (University of Maryland—IGSR) |

## SERVICE
*Professional*

| | |
|---|---|
| • Book review: Speaking Truth to Power, *Criminal Law, and Criminal Justice Books* | 2017 |
| • Peer-review member, *Crime Science* | 2015 |
| • Peer-review member, *The Sociological Quarterly* | 2012 |
| • Editorial advisory board member, *International Journal of Emergency Services* | 2011 |
| • Peer-review member, *Police Quarterly* | 2011 |
| • ACJS 47th Annual Meeting, *Ethics in Policing, Modalities; Dynamics of Use of Force & The Police Command Structure,* Panel chair | 2010 |
| • Delphi Panel participant, Incentive Research Foundation; offered a police perspective to re-validate and update *The Master Measurement Model of Employee Performance* study conducted in 1992 | 2010 |
| • Peer-review member, *Journal of Criminal Justice* | 2010, 2017 |
| • Peer-review member, *Criminal Justice & Behavior* | 2010 |
| • Peer-review member, *International Journal of Comparative and Applied Criminal Justice* | 2010 |

| | |
|---|---|
| • Peer-review member, *Taylor Francis Publishing* | 2010 |
| • Peer-review member, *Police Practice & Research* | 2010 |
| • Peer-review member, *Policing: An International Journal of Police Strategies & Management* | 2009-2010 |
| • Book review member Thompson/Wadsworth publishing | 2009 |
| • Rutgers School of Criminal Justice Alumni Association, Treasurer | 2009-2010 |
| • Invited lecture, Benjamin Cardoza Law School | March 22, 2010 |
| • Invited lecture, U.S. Department of Justice COPS Office National Leadership Roundtable, *Leadership For Public Safety II,* with the Community Policing Leadership Institute (CPLI) at the John Jay College of Criminal Justice Office of Continuing and Professional Studies | April 29-30, 2010 |

*Department*
| | |
|---|---|
| • Grant development task force | 2011 |
| • Police Studies Coordinator | 2009-2013 |
| • LPS Faculty Research Salon Discussant | November 2009 |
| • LPS ad hoc Curriculum Committee member | 2010-2015 |

*College*
| | |
|---|---|
| • Doctoral faculty member | Jan 14, 2011 |
| • *Clinton Global Initiative,* faculty representative to student committee | 2009-2011 |
| • Council of Major Coordinators | 2009-2011 |
| • Council of Allied Major Coordinators (Dean Ann Lopes, Committee Chair) | 2010-2011 |
| • CUNY Faculty COACHE Survey | November 2009 |
| • Chair of the AA Degree Educational Partnerships Committee, CUNY Justice Academy (David Barnet, Director of Educational Partnerships) | 2010-2011 |
| • CRJ 101 student performance evaluation study participant | Sept-Dec 2009 |

*Community*
| | |
|---|---|
| • Bay Area Rapid Transit Police (BART) Police-Citizen Encounters (with Dr. Maki Haberfeld and Consortium for Police Leadership in Equity (CPLE) at UCLA. Research application was awarded in November and work began in January 2013. | Nov. 27, 2012 |
| • New York City Police Department, Executive Development Section Article Contributor | June 2010 |
| • Student outreach effort, Passaic County Technical Institute, Wayne, NJ (With Jeanette Taverez, Undergraduate Admission Counselor) | March 26, 2010 |
| • Paterson (NJ) Mayor's Task Force on Crime and Violence | October 2009 |

PROFESSIONAL AFFILIATION AND MEMBERSHIP

| | |
|---|---|
| Police Staffing Observatory, Michigan State University | 2023-Present |
| Academy of Criminal Justice Sciences | 2009-Present |
| Police Executive Research Forum | 2003-Present |
| American Society of Criminology | 2004-Present |
| Society for Police and Criminal Psychology | 2008-2009 |

LAW ENFORCEMENT EXPERIENCE

| Parent Command | Division/Unit | Date | |
|---|---|---|---|
| Office of the Chief of Police | Command Operations Center | August 2004 | December 2005 |

The Command Operations Center (COC) provides command rank supervision to the Department during non-business hours. The COC personnel monitor significant planned or spontaneous events, inspect Department-wide operations including field deployment, operational readiness, and administrative procedures. The COC also provides control of resources to address prevailing service demands, command

level presence and oversight at the scene of unusual incidents. Personnel assigned to COC also address citizen complaints to ensure departmental objectives are achieved.

| | | | |
|---|---|---|---|
| **Operations Bureau** | North District Police Station—District Commander | April 2004 | August 2004 |
| *See East District Station for responsibilities* | | | |
| **Office of the Police Director** | Office of Policy and Planning | August 2002 | April 2004 |
| *See Research, Analysis and Planning Division for responsibilities* | | January 2002 | June 2002 |
| **Operations Bureau** | East District Police Station— District Commander | June 2002 | August 2002 |

The East Police District is the largest geographical precinct in the city with a residential population of approximately 80,000 and a daytime population of more 200,000. Newark's most coveted areas are situated here, including Newark International Airport, Port Newark seaport, the New Jersey Performing Arts Center, University Heights, the campuses of Rutgers University, New Jersey Institute of Technology and Essex County College, and Restaurant Row in the Ironbound. Responsibilities include charge of district station performance, a complement of 160 police officers and detectives, property and evidence, fifty-vehicle fleet, crime analysis, ComStat, personnel assignments, internal affairs and integrity control, records management, and prisoner detention.

| | | | |
|---|---|---|---|
| **Office of the Police Director** | Office of Policy, Planning and Technology—Commanding Officer, Management Information Systems | April 2000 | January 2002 |

MIS exists to ensure the Department operates efficiently through the use of technology. Responsible for managing the Department's information systems which include hardware and software from Intergraph· Oracle, and Motorola. Also, GIS services (mapping), computer aided dispatching (CAD), records management system (RMS), researching new technologies, and administering a $5 million budget for personnel and equipment. Directed the following projects:

- Construction and implementation of a state-of-the-art Computer Learning Center
- Development of a multimillion dollar Oracle® records management system (RMS)
- Implementation of a wireless (CDPD) network
- Reorganization and management of the geographic information systems (GIS) program

| | | | |
|---|---|---|---|
| **Operations Bureau** | North District Police Station—Tour Commander | July 1999 | April 2000 |

During a tour of duty, responsible for the efficient operation of one of four geographical District police stations. Responsibilities include supervision of first line supervisors, motor patrol and foot patrol officers; conducting personnel inspections and performance evaluations; initiating disciplinary procedures and personnel investigations; monitoring and counseling subordinate personnel; conducting roll call training, recommending commendations. Also accountable for District desk operations and precinct activities, including charge determinations, reviewing, approving, and classifying reports, prisoner detention, assignments, and bail.

| | | | |
|---|---|---|---|
| **Office of the Police Director** | Policy and Planning Division—Executive Officer | July 1998 | July 1999 |

*Responsibilities same as listed under Research, Analysis & Planning*

| | | | |
|---|---|---|---|
| **Office of the Police Director** | Special Assistant to the Police Director | September 1997 | July 1998 |

The Police Director's Office is responsible for the policy position of the Police Department. Responsible for developing policy, implementing strategic crime control initiatives, responding to interagency correspondence and letters of complaint, acting as an intermediary among police executives, political and community leaders, representing the Police Director as directed, media relations and

public information—Police Department spokesperson—and overall tasks designed to direct the mission of the Newark Police Department.

- Coordinated and appeared in an ethics training video produced for the U.S. Department of Justice—COPS Office through a grant to the Police Foundation, Washington, D.C.
- Assigned to the Criminal Investigation Bureau—Fugitive Apprehension Section to design and implement a Fugitive Apprehension Program.
- Task force member to audit, reorganize and develop policy for the central property and evidence function.

**Criminal Investigation Bureau—Violent Crime Division**    Homicide Section—Detective Supervisor    May 1997    September 1997

The Homicide Section is responsible for all death investigations, officer-involved shootings, and kidnapping investigations. Responsible for monitoring all active investigations, reviewing "cold" cases, reviewing, classifying, and approving investigations, charge determinations, crime scene management, statistical analysis, and database management.

**Field Operations Bureau**    East & West District Police Station—Field Supervisor    June 1995    September 1995

Responsible for the supervision of motor patrol and foot patrol officers; conducting personnel inspections and performance evaluations; initiating disciplinary procedures and personnel investigations; monitoring and counseling subordinate personnel; conducting roll call training, recommending commendations. Also accountable for desk operations and precinct activities, including charge determinations, reviewing, approving, and classifying reports, prisoner detention, and bail.

**Office of the Police Director**    Research, Analysis & Planning Division—Detective    March 1993    May 1997

Responsible for the research and development of budgetary proposals, Department policies, tactical and strategic planning, comparative, statistical and crime analysis, State and Federal grant proposals, interagency surveys, and overall tasks designed to improve the efficiency and effectiveness of the Newark Police Department.

- Over a four-year period successfully solicited by proposal over $40 million in Federal and State funds for community policing initiatives, equipment, personnel, and construction projects.
- Cadre member of the Emergency Operations Center (E.O.C). E.O.C is responsible for activation during all mobilization exercises, demonstrations/protests, severe weather emergencies, civil disorder conditions, airport disasters and other similar critical incidents.
- Participated in a five month police fellowship at the Police Foundation Washington, D.C. Fellowship entailed writing proposals, designing training curricula, conducting research on policing, and participating in management studies on a national level. Also assisted in the development of the Police Foundation's segment of the *Community Policing Consortium Phase V* grant proposal, submitted to the U.S. Department of Justice, COPS Office.
- Participated in the development and implementation of the Newark Police Department's Emergency Response Team (E.R.T). Team member and supervisor August, 1994 - September, 1997.

**Special Investigation Bureau**    TARGET Team—Police Officer    November 1992    March 1993

Assigned to the Tactical Auto Recovery Group and Enforcement Team (T.A.R.G.E.T). This proactive anti-crime unit was designed to combat bank robberies, serial crimes, high-profile incidents, carjackings, and auto thefts on a citywide level. T.A.R.G.E.T. jointly participated with the F.B.I.'s Violent Crime Fugitive Task Force and the Joint Bank Robbery Task Force for combined operations.

**Field Operations Bureau**    South District Police Station—Police Officer    August 1989    November 1992

Appointed to the Newark Police Department and assigned to the South Police District one of four geographical police precincts in the City. The South District encompasses a residential population of more than 80,000 residents, including several public housing tracts with a

population in excess of 10,000 people. The South District also harnesses a sizeable industrial/commercial manufacturing area that raises the daytime population to more than 100,000 people.

- Responsible for service demands and response to calls for police service.
- Assigned to Special Enforcement 1990-1992; district level street-crime suppression unit designed to address local conditions. Responsible for plain clothes/anti-crime efforts, decoy, vice, robbery, prostitution, and narcotics operations.
- Participated in selective enforcement operations, including saturation patrol, and directed patrol operations in high crime neighborhoods.
- Participated in various community policing programs at the district level
- Field Training Officer 1990-1991

Communications Technician     December 1985     March 1989

**Communications Division (Clifton, NJ Police Department)**

Clifton city is one of the urban-15 communities in New Jersey serving a population of nearly 90,000. Responsible for managing police, fire, and EMS field assets through a computer aided dispatch system. Also responsible for processing incoming calls for public safety and using advanced crime information systems (CJIS, NCIC).

**DISTINCTION**

| | |
|---|---|
| Police Director's Special Recognition Award | 1997 |
| Department Award Excellent Police Duty | 1997, 1996, 1992, 1991, 1990 |
| New Jersey Exemplary Awards Program | 1996 |
| Webber Seavey Award for Quality in Law Enforcement (Finalist) | 1994 |

**PROMOTIONS**

| | |
|---|---|
| Captain | September 2000 |
| Lieutenant | July 1998 |
| Sergeant (rank) | July 1995 |
| Detective (status) | March 1993 |