# EXHIBIT D



# REPORT OF THE

# COMMISSION ON

# POLICE

# INTEGRITY

PRESENTED TO THE

## CITY OF CHICAGO

## RICHARD M. DALEY

## MAYOR

### NOVEMBER 1997

0000448

PL JOINT 083612

# TABLE OF CONTENTS

Executive Summary ......... 2

Commission Appointments and Mission ......... 4

Commission Staff: Office of International Criminal Justice ......... 5

Sources of Information ......... 6

History of Police Corruption in the United States ......... 7

History of Police Corruption in Chicago ......... 9

The Austin District Case ......... 11

The Gresham District Case ......... 12

The Chicago Police Department Today ......... 13

The Chicago Police Department Disciplinary Process ......... 14

Commission Findings and Recommendations ......... 17

Appendices
    A - Summary of Site Visits ......... 25
    B - Summary of Survey Results ......... 29
    C - Bibliography ......... 31
    D - Curriculum for Basic Recruit Training Program ......... 36

0000449

1

PL JOINT 083613



# EXECUTIVE SUMMARY

On February 7, 1997, Mayor Richard M. Daley appointed the Commission on Police Integrity. This Commission was formed in response to the indictment of seven members of the Chicago Police Department on charges of conspiracy, racketeering and extortion in the 15th police district in Austin on the city's west side. The Mayor appointed Dan K. Webb to chair the Commission and asked Sharon Gist Gilliam, Fred Rice and Anita Alvarez to serve as Commission members.

The Commission's charge was to examine the root causes of police corruption, to review how other urban police departments approach the issue, and to propose possible changes to department policies and procedures.

The Commission retained the University of Illinois at Chicago's Office of International Criminal Justice to serve as staff for this effort. The Commission gathered information in a variety of ways:

- The Commission met with dozens of police officials and experts from Chicago and around the country to hear their views on police corruption;

- Commission representatives visited ten U.S. cities to confer with high-ranking police commanders about their anti-corruption efforts and tools;

- Commission staff conducted nearly 100 confidential interviews with members of the Chicago Police Department; and

- Staff compiled an in-depth review of the extensive literature on police misconduct.

The broad scope of information gathered by the Commission led to the recommendations in this report.

The Commission's study of police integrity in Chicago reveals a department confronting the same challenges that face other large cities. Street-level narcotics enforcement, in particular, tests the integrity of the law enforcement profession. But recognition of this problem is not enough. Any act of corruption is a breach of the public trust. This is especially important to the Chicago Police Department, as it sets national standards for community-based policing, relying more than ever on a partnership with citizens.

The Chicago Police Department deserves credit for initiating the investigations in Austin and elsewhere. But more must be done to restore the public's trust in the department. The Commission concludes that changes should be made in the standards for entry into the department, in the field training that takes place during the critical early period of an officer's career, and in how the department deals with potential trouble-makers within its ranks.

Recommendations summarized here reflect the reality that there is no simple strategy for preventing potential police corruption:

### ► HIRING STANDARDS

The Commission recommends increasing the minimum requirements to a bachelors degree and a minimum of one year of work history before a candidate is accepted for employment as a Chicago police officer. A pool of more mature and educated officers with verifiable work histories will improve the quality of the police force, making them better equipped to handle today's problems and perhaps less likely to engage in misconduct

0000450

2

PL JOINT 083614

## ▶ NEW POLICE OFFICERS

The Commission recommends completely overhauling the field training officer program to improve training during the new officer's critical first few months. It also recommends extending the probationary period for new officers from 12 months to a full 18 months.

## ▶ MONITORING POTENTIAL PROBLEMS

The Commission recommends establishing an "early warning" system to alert command personnel when an officer may be involved in a pattern of misconduct. The goal would be to stop small problems from becoming larger ones and to help officers who might be experiencing personal problems.

## ▶ MANAGEMENT ISSUES

The Commission recommends a range of management process improvements, including revising the system the Department uses for performance evaluations; establishing department-wide standards for selection of tactical officers; emphasizing supervisor accountability; and expanding training for new sergeants.

## ▶ MANDATORY CONTINUING EDUCATION

The Commission recommends mandatory continuing education or in-service training for officers of all ranks, to reflect the view that policing is a profession.

The Commission is encouraged by the fact that the City and the Police Department are willing to take a hard look at what works and what does not. The policing profession is a rapidly changing one, and enlightened leadership will always be looking for new ideas. Chicago is recognized throughout the country as an innovative leader in the field of community policing. Now it must be a national leader in maintaining the highest possible level of integrity among its police force.

0000451

3

PL JOINT 083615



# COMMISSION APPOINTMENTS AND MISSION

On February 7, 1997, Mayor Richard M. Daley appointed a Commission on Police Integrity to study police corruption in Chicago and to make recommendations for change.

The Mayor directed the Commission to recommend strategies to minimize potential for the kind of misconduct discovered last year in the Austin and Gresham police districts (see Chapters 8-9). Possible solutions to be considered included improving the Department's selection and hiring practices and enhancing management and monitoring procedures.

"[W]hat happened in Austin was a violation of public trust," said Mayor Daley when announcing the formation of the Commission. "The people of Austin deserve better. All Chicagoans expect more of our police—and none of us will tolerate this kind of corruption." The corruption incidents were particularly disturbing because the Chicago Police Department is considered a national leader in innovative policing.

The Mayor appointed the following persons to the Commission:

**Dan K. Webb**, Chair, former U.S. Attorney for the Northern District in Illinois and partner at the Chicago law firm of Winston & Strawn. Mr. Webb has extensive experience in litigation and in the prosecution of civil and criminal cases. He also has a history of service to the community of Chicago and is well versed in the administrative and management functions of law enforcement agencies.

**Sharon Gist Gilliam**, Chief Operating Officer of Unison Consulting Group, has extensive experience in strategic planning and organizational development. Ms. Gilliam is the former budget director for the City of Chicago where she was responsible for the planning and implementation of the City's $2.8 billion operating budget. She is actively involved in public policy research and civic affairs, serving as a trustee on the Chicago School Reform Board and as a committee member at the Graduate School of Public Policy Studies at the University of Chicago.

**Fred Rice** is the former Superintendent of the Chicago Police Department. During his tenure as Superintendent, Rice was known as an outspoken agent of change and reform. He now serves as an internationally recognized expert on law enforcement and criminal justice issues and teaches as an adjunct faculty member at local area colleges and universities.

**Anita Alvarez** of the Cook County State's Attorney's Office currently serves as the head of the State's Attorney's Public Integrity Unit. Ms. Alvarez has a demonstrated commitment to civic affairs and has proven her ability to analyze integrity issues through her professional career and her work as vice-chairperson of the Chicago Bar Association's Judicial Evaluation Committee.

**Brian L. Crowe**, a Chicago attorney and former judge of the Circuit Court of Cook County, was appointed to the Commission at its inception. Mr. Crowe resigned from the Commission when he was appointed Corporation Counsel for the City of Chicago.

Taken together, the members of the Commission represent a well-rounded and civic-minded group of individuals with the requisite skills and experience and an intimate knowledge of the challenges and opportunities facing law enforcement in Chicago.

The Commission met regularly from February 1997 through November 1997. They interviewed Chicago Police personnel, City Council members, police organization representatives and law enforcement experts, reviewed police corruption research and documents, and studied "best practices" from other cities before formulating their recommendations.

**4**

PL JOINT 083616

## UNIVERSITY OF ILLINOIS AT CHICAGO
## OFFICE OF INTERNATIONAL CRIMINAL JUSTICE

The Commission recognized the need for a multi-faceted police corruption study upon which Commission findings and recommendations would be based and for staff support to handle administrative functions. After reviewing several proposals, the Commission selected the Office of International Criminal Justice at the University of Illinois at Chicago to conduct the study and to serve as staff support.

The Office of International Criminal Justice (OICJ) is dedicated to improving the administration of criminal justice through cooperation, research and training. OICJ brings together academics and practitioners on issues such as police training, community policing, comparative criminal justice systems, terrorism, and organized crime. It works with law enforcement agencies across the United States and throughout the world. To disseminate the vast amount of information collected through its research and exchange programs, OICJ publishes and distributes 56 books and monographs and four widely-recognized trade periodicals, and maintains Internet websites for several local and international police and criminal justice organizations.

OICJ assigned several top staff to the project. Dr. Richard H. Ward is the Associate Chancellor for Special Programs and Professor of Criminal Justice at the University of Illinois at Chicago (UIC), where he founded OICJ in 1984. A former New York City Police Detective, Ward earned his Doctorate in Criminology from the University of California, Berkeley, and was one of the original consultants to the groundbreaking Kansas City Police Department project. He has advised the heads of 21 foreign countries, 50 state and local police departments, and numerous international organizations including the United Nations on innovative policing strategies, police corruption, law enforcement training, and other issues of justice. Dr. Ward has authored two books on police corruption, published extensively on criminal justice issues and founded two widely acclaimed law enforcement journals. His close personal ties with top law enforcement officials nationwide proved invaluable as the Commission developed and executed this research project.

Sean W. Malinowski of OICJ served as executive director for the Commission. His background includes a B.S. from Boston University and a Master's degree in criminal justice from the University of Illinois at Chicago. He is currently director of OICJ and is pursuing a doctorate in Public Administration at UIC. Malinowski is a sworn officer on leave from the Los Angeles Police Department. As a 1994 Fulbright Scholar, Malinowski conducted research on police training at the Egyptian National Police Academy in Cairo. He has lectured on criminal justice issues in China, Vietnam, Cuba, Hungary, and Great Britain.

Dr. William L. Tafoya, a 20 year veteran of the Federal Bureau of Investigation, served as principal researcher for the study. For most of his career, he was a senior faculty member at the FBI Academy's Behavioral Science Unit. Now retired from the FBI, Dr. Tafoya is director of research and training at OICJ. He is an internationally recognized authority on law enforcement and the future of policing and has published extensively on criminal justice issues including corruption management. He also researched and authored *Corruption in the Criminal Justice System* and other training materials for the International Association of Chiefs of Police. Tafoya holds three academic degrees: Bachelors degree, San Jose State University (1973); Masters degree, University of Southern California (1974); and Ph.D. degree, University of Maryland (1986).

James E. Moran is director of financial operations for OICJ. He served for 13 years as an investigative auditor for the University of Illinois at Chicago. Prior to that, Mr. Moran spent 10 years as an internal security inspector for the Internal Revenue Service where his duties included investigating allegations of wrongdoing by IRS agents.

5

PL JOINT 083617



# SOURCES OF INFORMATION

To understand the scope of the problem and develop innovative, responsive recommendations, the Commission gathered information from many sources. The majority of its information came from four sources: witness statements before the Commission; site visits in ten cities throughout the United States; an exhaustive literature and document review; and one-on-one interviews with Chicago police officers.

## Commission Meetings

Dozens of outside experts, city government officials, CPD command staff, and members of police organizations appeared before the Commission to share their views and to provide their opinions on possible strategies to combat police corruption. Twelve meetings were held between February and October, 1997. The setting was private and informal to facilitate an open exchange of ideas.

## Site Visits

Commission representatives interviewed top police officials in ten cities to learn from their experiences and collect information on innovative approaches used elsewhere. The cities visited were Los Angeles, New York City, Philadelphia, New Orleans, Miami, Detroit, Minneapolis, Pittsburgh, San Diego, and San Francisco. Cities were selected based upon population, demographics, and the size and operation of the city's police department as well as the city's experience and success confronting police corruption. Interviews with command staff officers resulted in an audit of best practices for dealing with the problem of police corruption and provided insight into possible corruption control strategies. A summary of site visit findings is found in Appendix A.

## Interviews

Nearly one hundred Chicago Police Department personnel representing a cross section of CPD sworn officers were interviewed one-on-one for this study. The interview questionnaire reflected information gathered during research and site visits. To ensure department representativeness, interviewee selection criteria included demographics (age, ethnicity, gender, etc.) and experience (total service, time in-rank, and nature of assignments). The interviews were conducted confidentially, and interviewees were assured that their observations and comments would not be attributed to them by name. The interviews were conducted in September and October, 1997 at the offices of OICJ on the UIC campus. A summary of interview findings is found in Appendix B.

## Literature Review

The Office of International Criminal Justice conducted a literature review to identify the most current research on police corruption issues and to develop a theoretical knowledge base for Commission members. The results provided background for formulating questions and constructing a framework for the Commission's work. A bibliography of the literature can be found in Appendix C.

OC90454

PL JOINT 083618

# HISTORY OF POLICE CORRUPTION IN THE UNITED STATES

The challenges facing the Chicago Police Department today are not new, nor are they unique to this city. The problem reaches back as far as the establishment of the first organized police forces in the United States. Corruption has taken many forms and has continued to plague the police departments of nearly every major city.

Police corruption may change form over time, but its roots are firmly planted in American history. In *The Development of the American Police: An Historical Overview*, Uchida notes that "if there is a common theme that can be used to characterize the police in the 19th Century, it is the large-scale corruption that occurred in most police departments across the United States" (Uchida, 1993). In *Forces of Deviance: Understanding the Dark Side of Policing*, Kappeler, Sluder, and Alpert point out that corruption among police is not new or peculiar to the late 20th century. "To study the history of police is to study police deviance, corruption and misconduct." (Kappeler et al., 1994.)

While corruption has been a consistent and pervasive problem in law enforcement, the nature of corrupt activity has changed dramatically over the years. The trend to "professionalize" police forces through improved recruitment, training, salaries, and working conditions has resulted in fewer corrupt officers who, unfortunately, are now involved in more serious criminal activities. Low-level passive forms of corruption (i.e., systemic bribery schemes, non-enforcement of the law, collusion) have been replaced by more aggressive forms of corruption. Today's police corruption is most likely to involve drugs, organized crime, and relatively sophisticated but small groups of officers engaged in felonious criminal activities.

The cycle of police scandals in New York City provide a clear example of this trend. In the 1970s, New York's Knapp Commission on Police Corruption identified two general forms of corruption -- police officers involved in relatively low level forms of corruption and misconduct, and those officers involved in large scale corruption. Twenty years later, New York's Mollen Commission revisited the issue and found the face of corruption had changed. Their primary problem was "crew corruption," wherein groups of officers protect and assist each others' criminal activities. The Mollen Commission identified the predominant patterns of corruption in New York City as police officers committing outright theft from street dealers, from radio runs, from warrantless searches, from legitimate raids, from car stops, from drug couriers, and from off-duty robberies. They also discovered cops protecting and assisting narcotics traffickers as well as cops dealing and using illicit drugs themselves. A pattern of perjured police testimony and false crime reports was also identified in New York.

New York is not the only city to experience a drug-related police corruption scandal. Virtually every major U.S. police department has confronted similar problems. Cities visited by Commission representatives have grappled with the following problems:

## Miami

Miami has been rocked with a series of drug-related corruption cases. In its most notorious case, the "Miami River Cops Scandal," seventeen police officers stole cash and millions of dollars in drugs from drug dealers, sold the drugs, and caused at least three deaths. The scandal resulted in the arrest, suspension or punishment of more than 100 police officers.

## New Orleans

For six months in 1994, as many as 29 New Orleans police officers protected a cocaine supply warehouse containing 286 pounds of cocaine. The FBI indicted ten officers who had been paid nearly $100,000 by undercover agents. The investigation ended abruptly after one officer successfully orchestrated the execution of a witness.

7

0000455

PL JOINT 083619

**Philadelphia**

Since 1995, ten police officers from Philadelphia's 39th District have been charged with planting drugs on suspects, shaking down drug dealers for hundreds of thousands of dollars, and breaking into homes to steal drugs and cash.

**Los Angeles**

By 1994, 27 Los Angeles County sheriff's deputies and one Los Angeles police officer had been convicted of skimming millions of dollars of drug money while they were members of an elite anti-narcotics unit. A convicted deputy stated that they stole $60 million seized in drug raids in one two-year period alone.

**Detroit**

In 1991, nine officers were charged with conspiracy to abet the distribution of cocaine, attempted money laundering and other charges. The officers served as escorts for shipments of what they believed to be drug money and cocaine.

0000456

PL JOINT 083620

# HISTORY OF POLICE CORRUPTION IN CHICAGO



The City of Chicago's history of dealing with police corruption has been well-documented in both scholarly literature and popular culture. The Chicago Police Department was founded in 1837 when the voters elected a high constable, making him the first police officer of the city and marking the formation of the department. From its inception it battled a certain unshakable reputation of being in the midst of the crime capital of the world. (Price, P.30) "Corrupt alliances between politicians, police and gangsters had been exploiting this immense market for illegal goods and services for decades before Prohibition but the 18ᵗʰ Amendment provided an important accelerant to Chicago's institutionalized illegal commerce in bootleg liquor." (Woodiwiss 1988)

Following the end of Prohibition, the nature of police corruption in Chicago was cyclical and limited to isolated incidents involving neglect of duty, bribery and graft. By 1960, however, the Chicago Police Department was in need of significant change.

Following a series of corruption investigations, Mayor Richard J. Daley established a five person civilian police board with oversight responsibilities over the Police Department. Mayor Daley also appointed Orlando W. Wilson, a professor of criminology from the University of California-Berkeley, to the superintendent's post in 1960 to oversee reform efforts. One of Wilson's most important contributions, known as General Order 16, was the implementation of formal procedures to handle complaints against police and to control corruption.

Although Wilson instituted a number of major reforms which had a lasting impact on the Department, the problem of corruption has continued to flare up over the years. The following chronology illustrates the significant cases between 1960 and the present.

**1960** - Eight police officers in the old Summerdale District were found guilty of setting up burglaries and helping to remove the proceeds in their squad cars.

**1973** - Sgt. Stanley Robinson was sentenced to life imprisonment for his part in a murder for hire scheme in which two men were killed.

**1973** - Captain Mark Thanasouras of the Austin District and 13 of his officers were charged with extorting more than $275,000 from tavern owners. Thanasouras pled guilty and served 42 months in prison. After his release in 1977 he was gunned down "gangland style."

**1973** - Captain Clarence Braasch of the East Chicago District and 18 officers were convicted of shaking down club owners. He was sentenced to six years in prison and is the highest ranking police officer to serve time.

**1973** - Anthony C. Kovic, the former head of the motor pool, was convicted with six others for taking kickbacks from the Motorola Company in a phony billing scheme which defrauded the City of more than $600,000.

**1983** - Ten police officers from the 10th District tactical team went to federal prison for accepting sexual favors, weapons, cash and video recorders to protect two West Side drug rings.

**1984** - Eight police officers were arrested in connection with the "Operation Greylord" investigation of court corruption. They were convicted on charges that they took bribes to help fix cases or to steer underrepresented clients to favored defense lawyers.

**1989** - Ten Wentworth District officers were convicted of taking thousands of dollars in protection money from gamblers and drug dealers. Two officers received ten year sentences and the others were sentenced to between three and a half to five years in prison. (Source: Chicago Sun-Times, 12/21/96).

9

0000457

The scandals that have unfolded in Chicago and around the country in recent years reveal an indisputable fact: the corruption problem in law enforcement today is inextricably linked to the flourishing narcotics trade. It is no coincidence that the ten Chicago officers under indictment today were assigned to two of the police districts with the highest incidence of narcotics arrests, nor that they all worked on tactical teams whose primary function was narcotics enforcement. One expert has noted that the illegal drug trade is "testing the integrity of American law enforcement as never before." (Morganthau, 1994) No single phenomenon, with the possible exception of prohibition, has had such a harmful impact on law enforcement's efforts to maintain high standards for integrity. Fighting police corruption will remain a challenge as long as the demand for illegal drugs continues to pump vast sums of money into this underground economy.

10

0C00458

PL JOINT 083622



# THE AUSTIN DISTRICT CASE

Recent scandals in the Austin and Gresham police districts have drawn attention once again to the issue of police corruption.

The 15th District, also known as the Austin District, is located on the western edge of Chicago south of Division Street, north of Roosevelt Road between Cicero Avenue and Austin Boulevard. Occupying 3.8 square miles, the District is one of the smallest of Chicago's police districts in land area. The district is home to nearly 64,000 residents. The density of the population and the intensity of the illegal drug trade in the area resulted in 43 murders, 500 shootings, and 850 armed robberies in 1996. Drug arrests in the District for 1996 reached 3,823 or more than 6% of the City's total 57,551 drug arrests.

The District station located at Chicago and Lorel is headed by a District Commander with eight Lieutenants, 29 Sergeants, and 288 police officers. Nine primary beat cars are augmented by response cars, squadrols, foot patrols, and a 52 member tactical team. The tactical teams are plain clothes officers responsible for crime suppression and proactive enforcement of violent crime and narcotics and vice offenses.

The majority of the district's police officers are dedicated police professionals serving and protecting local residents under adverse conditions. However, on December 21, 1996, seven officers of the Tactical Unit of the 15th District were indicted on federal charges for allegedly using their positions, skills, and experience as Chicago police officers to rob and extort money and narcotics from drug dealers on the City's west side.

The 21 count indictment was the result of a two year investigation of police corruption in the 15th District initiated by the Chicago Police Department's Internal Affairs Division. More than 20 members of the CPD's Confidential and Corrupt Practices Unit teamed with federal investigators and conducted undercover sting operations to net evidence in support of the indictments. The Department allocated significant resources in personnel time, financial support and investigative surveillance equipment to uncover the ongoing criminal enterprise operated by members of the District's tactical unit.

0C00459

PL JOINT 083623

# THE GRESHAM DISTRICT CASE

The 6th District, also known as the Gresham District, is located on the south side of Chicago south of 75th Street, north of 95th Street on the east side and north of 87th on the west side between Leavitt Avenue on the West and the railroad tracks on the east. Occupying eight square miles, the District ranks ninth among Chicago's 25 police districts in land area. The Gresham District is home to more than 114,000 residents. Last year the Gresham District was the site of 38 homicides and 1,800 robberies.

The district station located at 839 West 85th Street is headed by a District Commander with eight lieutenants, 25 sergeants, and 281 police officers. Twelve primary beat cars are augmented by 14 rapid response cars, 2 squadrols, 12 foot patrols, and a 42 member tactical team. As in the Austin District, the tactical teams are staffed with plain clothes officers whose primary activities include crime suppression and proactive enforcement of violent crime and narcotics offenses. The District continues to struggle with a large scale narcotics problem and has utilized its tactical teams to proactively investigate reports of gang activity and associated drug sales. In 1996, officers investigated 1,394 narcotics incidents and arrested 1,779 narcotics suspects.

In an operation unrelated to the Austin District arrests of tactical officers, members of the Chicago Police Department's Internal Affairs Division and FBI agents conducted several sting operations over an eight month period leading to the March 18, 1997 arrests of three Gresham District tactical officers for conspiracy to commit robbery and sales of illegally confiscated narcotics. The seven count indictment details the officers' activities as they allegedly sold heroin and on two separate occasions robbed undercover agents of more than $23,000 of suspected narcotics money. The Chicago Police Department initiated the investigation, secured the FBI's assistance, and allocated the necessary resources to conduct undercover operations, develop informants and uncover an ongoing criminal enterprise within its ranks.

0000460

PL JOINT 083624

# THE CHICAGO POLICE DEPARTMENT TODAY

Chicago has the second largest police department in the nation with just over 17,000 employees, including 13,400 sworn officers. (New York City's police department is the largest at 39,000 officers.) Chicago is divided into 25 police districts, organized into five police areas. Each district has between 9 and 15 beats, for a total of 279 beats throughout the city.

The Superintendent of Police manages five bureaus, each of which is commanded by a Deputy Superintendent. Within each bureau there are various units that carry out the Department's many and varied activities. The Superintendent personally manages functions such as legal affairs, internal investigations and media relations.

Chicagoans make an average of 3.4 million calls per year to its 911 system. These calls result in 2 million patrol dispatches, an average of 5,500 per day. In 1996, the Chicago Police Department's members made over 59,000 arrests for index crimes (murder, criminal sexual assault, aggravated assault, robbery, burglary, theft, arson, and motor vehicle theft). In addition, Chicago police made 57,551 arrests for drug offenses in 1996. Chicago police officers have an estimated 6,000 contacts with citizens during an average day.

In 1993, the Superintendent of Police officially adopted the Chicago Alternative Policing Strategy (C.A.P.S.), Chicago's version of community policing. Initiated on an experimental basis in five police districts (including the Austin District), C.A.P.S. has since become the basic policing strategy of the entire Department. The concept of "community policing" embodies a number of different ideas and has taken various forms throughout the country. The basic tenet, however, is simple: Crime and disorder problems can best be addressed when the police and other government agencies attack them together in a partnership with citizens and community-based organizations like block clubs.

For community policing to work, there must be a healthy level of trust between the police and the residents of the community. The Commission believes that a successful community policing effort built on mutual respect and trust offers one of the best deterrents to future incidents of police misconduct. The city of Boston recognized a similar link several years ago when it moved to a community policing strategy in response to widespread problems of mismanagement in their police department. A commission appointed in 1992 by Boston's mayor to study that city's police department stated that "we anticipate that community and problem-solving policing will lead to a ... Police Department that is more tolerant, more accessible, and more understanding."

The Commission agrees with this statement, and encourages both the City and its citizens to do everything possible to make community policing a success. In the long run this will foster better relations between the police officers and the community they serve and should lead to fewer incidents of corruption.

13

0000461

# THE CHICAGO POLICE DEPARTMENT'S DISCIPLINARY PROCESS

As a general rule, law enforcement agencies spend a greater percentage of their energy and resources on the task of monitoring, investigating and disciplining their work force than similarly-sized organizations in either the public or private sectors. Because members of the police profession are granted a wider range of authority and responsibilities than any other segment of our society, it correctly should have little tolerance for acts of corruption or other misconduct.

Any analysis of the Chicago Police Department's effectiveness at maintaining the highest standards of conduct among its members requires a look at the process by which the Department investigates and disciplines alleged acts of misconduct. That process is summarized here.

The disciplinary process in the Chicago Police Department begins with the filing of a complaint which is given a Complaint Register (CR) Number. A complaint from any source (citizen, supervisor, or fellow officer) against a department member of any rank or a civilian employee is initially registered with the Office of Professional Standards (OPS). OPS assigns each complaint a CR number regardless of the nature of the allegation or the source of the complaint.

OPS is staffed by civilian investigators who are employees of the Police Department. The office is run by an administrator who reports directly to the Superintendent of Police. If the complaint alleges that an officer used excessive force or was involved in an act of domestic violence, then OPS conducts the investigation. All other allegations (drug use or intoxication, corruption, insubordination, accepting gratuities, residency law violations, medical roll abuse, other operational or personnel violations etc...) are referred to the Department's Internal Affairs Division (IAD) for investigation. The IAD investigations are conducted by sworn members of the Department. It is headed by an Assistant Deputy Superintendent who reports directly to the Superintendent of Police.

The following table shows the pattern of complaints filed during this decade:

## COMPLAINTS FILED: 1990 - 1996

|      | TOTAL COMPLAINTS | RETAINED BY OPS | REFERRED TO IAD |
|------|------------------|-----------------|-----------------|
| 1990 | 8,367            | 2,476           | 5,891           |
| 1991 | 8,178            | 2,727           | 5,451           |
| 1992 | 8,039            | 2,553           | 5,486           |
| 1993 | 8,299            | 2,681           | 5,618           |
| 1994 | 8,699            | 2,820           | 5,879           |
| 1995 | 9,029            | 3,119           | 5,910           |
| 1996 | 9,598            | 3,138           | 6,460           |

It should be noted that the majority of the cases (traditionally 60% to 70%) referred to IAD are actually investigated by supervisors in the unit where the accused officer is assigned. This is the procedure in cases where the allegations are for relatively minor violations such as "lack of courtesy" or failure to properly handle a call for service.

14

00000462

Once the investigation has been conducted by OPS or IAD, one of four possible findings is made:

- **Sustained** - a Department rule was violated by the accused officer.

- **Not sustained** - the facts available to the investigator did not allow the allegation to be either proven or disproven.

- **Unfounded** - the alleged act did not occur.

- **Exonerated** - the alleged act did occur, but the accused officer's conduct was proper under the circumstances.

If the OPS or IAD investigator sustains the allegation, they will recommend a disciplinary penalty. This penalty could range from a reprimand through separation from the Department.

In cases where the investigator makes a finding of "sustained" and the recommended penalty is less than separation, the Department then conducts an internal review process known as Command Channel Review. During this process, the accused officer's supervisors review the file and either endorse or recommend changes in the findings of the investigators. For patrol officers, the channel of review includes the district commander, the deputy chief of patrol, the chief of patrol and the First Deputy Superintendent. Any one of these persons has the option of returning the file to the investigator for additional work. At the end of this review process, the head of the OPS or IAD will review the file and may make a change in the recommended finding or the penalty.

The accused officer is then sent a notice informing him of the finding and the penalty. If the penalty that is recommended is either a suspension of more than 30 days or separation from the Department, the matter goes to the Superintendent's office for his determination. In cases where the recommended penalty is less than 30 days, the officer has the right to demand a Complaint Review Panel Hearing. This step is a peer review process. Three sworn members (usually a patrol officer, sergeant and lieutenant) review the case. They listen to an oral presentation by the officer and the staff of either IAD or OPS. This panel can then either concur with the findings and the recommended penalty or recommend changes.

At the end of this process, the Superintendent of Police reviews the entire file and makes a decision as to what disciplinary action is appropriate. The officer's options to appeal the decision of the Superintendent vary according to the extent of the penalty imposed. If the suspension is for a period of five days or less, the officer can file a grievance under the terms of the City's contract with the Fraternal Order of Police.

In more serious cases, the Chicago Police Board becomes involved. The Police Board is a civilian oversight panel created by state law. There are nine members appointed by the Mayor. There are two ways in which the Police Board participates in the Department's disciplinary process:

1. If the Superintendent orders a suspension of six through 30 days, the officer can either file a grievance under the terms of the F.O.P. contract or he can appeal to the Police Board. In the latter case, the Board acts in an appellate capacity and conducts a review of all the documents in the C.R. file. No live testimony is heard. The Board meets privately to discuss the case and renders a decision. The Police Board has three options:

   a.  to reverse the "sustained" finding;
   b.  to uphold the Superintendent's disciplinary action in full; or
   c.  to uphold the sustained finding but lower the penalty.

If the officer is dissatisfied with the decision of the Police Board's review, he still retains the right to file a grievance.

2. If the Superintendent is seeking the officer's termination or a suspension of more than 30 days, the case goes to the Police Board for an adversarial administrative hearing. Charges are

**15**

0000463

filed before the Board by the City's Law Department. The police officer is suspended without pay. The Executive Director of the Police Board assigns the case to a hearing officer who presides over the case. An assistant corporation counsel prosecutes the case and the officer is also generally represented by counsel. Hearsay testimony is not allowed. The Police Board is then provided with a transcript of the hearing and they meet in private with the hearing officer to discuss the case. The Board has three options:

a.     the officer is not guilty and is reinstated with back pay;
b.     the officer is guilty and suspended for a period of days; or
c.     the officer is guilty and discharged from the Department.

Sometimes the Board will impose a suspension with reinstatement conditioned on the officer meeting certain requirements (e.g. participating in domestic violence counseling).

An officer who is found guilty by the Police Board and discharged from the Department can challenge this action by filing suit in the Circuit Court of Cook County. The Superintendent also has the right to challenge the Police Board in court on a finding of not guilty.

16

0000464

PL JOINT 083628

# FINDINGS AND RECOMMENDATIONS

The information gathered by this Commission indicates that a number of steps can be taken to substantially reduce the chances of experiencing another scandal like the ones in the Austin and Gresham Districts. Some of the recommendations will require changes in either current statutes or ordinances; others may require additional resources and personnel, and still others require the concurrence and cooperation of the Fraternal Order of Police. These facts did not, however, deter the Commission from proposing ideas which offer potentially valid ways to tackle this complex problem.

The Commission's findings pointed again and again to an important tenet that ultimately shaped its recommendations. The framework in which the issue of police corruption is discussed is based too often on the concept of "getting rid of the few bad apples." In our view this approach is incomplete.

Clearly, the Chicago Police Department needs to do everything possible to identify and discipline officers engaged in illegal or unethical behavior. The Department's challenge is greater, however. The long term goal should be to develop a healthy organizational environment that reinforces the good character of its members through positive peer pressure and high morale.

The Police Department does not attract large numbers of people who want the job so they can commit acts of brutality and corruption. The reality is that the police profession generally attracts young men and women with a high level of idealism -- people who want to make a positive contribution to their community and who are willing to risk their lives to do it. It is the responsibility of police leadership to capitalize on this situation and foster an atmosphere where these young officers can thrive.

With this in mind, the Mayor's Commission on Police Integrity makes the following recommendations:

## Hiring Standards, Recruiting and Screening

**Education:** On January 29, 1997, Superintendent Rodriguez announced that applicants for the next police officer's examination (subsequently given on June 23 and 24, 1997) would be required to have a minimum of 60 hours of college credit before they would be accepted at the Training Academy. The minimum age for officers also was raised from 21 to 23 years. The Commission supports both of these steps.

By requiring some college background for its future police officers, Chicago is joining a growing trend among police departments across the country. Interviews with police officials in Chicago and around the country strongly supported the concept that more educated officers are less likely to commit acts of misconduct. In the few cities studied where college requirements have not been imposed, police officials generally supported such a requirement and indicated that opposition to the idea was more political than philosophical.

If the new educational standards had been in place years ago, seven of the ten officers currently under indictment would not have been eligible to be hired.

The sixty-hour minimum is a strong and positive step. The Commission recommends the City take it a step further by phasing in a requirement that all Police Department applicants possess a bachelor's degree. The higher standard could be phased in over several years.

Such a step would reinforce the philosophy that modern policing is a profession rather than a trade. Today, the police officer's job in a large, multi-racial urban area which has embraced community policing is vastly different and more demanding than it was in the past. Officers must have a broader set of communication, technological and problem-solving skills in order to effectively manage beat

**17**

PL JOINT 083629

meetings, process information and work with diverse populations as well as to prevent and solve crimes.

Critics might argue that the applicant pool would become too small if college degree requirements were imposed. However, the facts indicate otherwise. Approximately 19,000 persons took the 1993 police officer's examination when there was no college education requirement. When the 60 credit hour minimum was enacted in 1997, there were still over 9,000 applicants who took the examination.

The college degree requirement is being used successfully elsewhere. Virtually all federal law enforcement agencies including the Federal Bureau of Investigation and the Drug Enforcement Agency require their recruits to be college graduates. A college degree is required for members of the officer corps in all branches of the United States armed forces. Four year college degree requirements have also been put into place in other police departments, including the New York State Police, City of Irvine [California] Police Department, the Nassau County [New York] Police and the San Jose [California] Police Department. Closer to home, the Palatine Police Department requires a four year college degree.

**Work history:** Many police officials in Chicago and nationwide expressed to the Commission that a solid employment background was one of the best indicators of a potential officer's future performance. The Commission therefore strongly believes that a work history includes a minimum of one year's experience at a job should be a prerequisite to acceptance at the Department's Training Academy. The ability to hold a steady job for that period of time denotes a level of maturity and responsibility that meets the Department's needs. It would also provide investigators with a source of employers, supervisors and co-workers to contact as part of their background checks for new recruits.

**Polygraph testing:** The Commission recommends that the Chicago Police Department begin utilizing polygraph testing in its initial screening of candidates. This practice is widely used by many law enforcement agencies, including the U.S. Drug Enforcement Agency and the New York State Police. If the Department announces in advance a willingness to use polygraph tests, it should deter at least some questionable candidates from beginning the application process. This would save the Department money and resources in the long run.

### New Officer Training

**The Training Center:** The Chicago Police Department's Education and Training Center is one of the most important aspects of the Department's efforts to maintain the highest possible levels of integrity. It is here, more than in any other part of the Department, where substantial recent progress has been made:

- The Department's six-month basic recruit training program consists of 769 hours of instruction, which is almost double the minimum of 400 hours mandated by the Illinois Law Enforcement Training and Standards Board.

- The curriculum has moved away from a traditional lecture-based method of training to an approach known as competency-based training. This concept features interactive, "hands-on" exercises designed to teach actual skills. It is the approach currently accepted in the education field as being most effective for adult education.

- The training center recently sent some of its staff to the United States Naval Academy in Annapolis, Maryland to work with the faculty and administrators there. In response to scandals at the Naval Academy, their faculty and administration adopted an "Ethics Across the Curriculum" approach that infuses integrity issues into every aspect of the school's educational mission. The Chicago Training Center will be instituting the same type of program.

**18**

PL JOINT 083630

• The Training Center has developed relationships with local universities which will allow the Department to have access to professors from their faculties.

• Personnel from the Training Center are currently working on drafting an ethics manual that will be given to all recruits on their first day of class.

In summary, it seems to the Commission that the Chicago Police Department's Training Center is doing the best job possible in teaching ethics, particularly in light of the wide variety of other topics that must be covered in the curriculum. (See Appendix D for a complete list of the classes taught during the Basic Recruit Training Program.)

**Field Training Officers.** The real test of the effectiveness of the Department's training strategies comes when new police officers are assigned to districts and begin to face the challenges inherent in their work. It is in this crucial area where the Commission thinks the Department can do a better job. The CPD's Field Training Officer (FTO) program is currently understaffed and in need of a complete overhaul. Therefore this Commission makes the following recommendations:

• The number of FTOs should be expanded from its current level of 67 officers to at least 200 officers.

• The selection process for FTOs should include substantial input from the Assistant Deputy Superintendent and the staff at the Training Center. FTOs in the past were chosen solely by the district commander.

• The FTOs should be completely integrated into the life and mission of the Training Center. A supervisor from the Training Academy should be given the specific responsibility of reorganizing and managing the Department's new FTO program.

• The salaries for FTOs should be raised so the Department can attract a larger number of officers to this position. FTOs give up the advantage of working with a regular partner and also usually wind up on less desirable shift. They should be compensated appropriately to ensure that good patrol officers want the job.

The importance of the Field Training Officer was stressed to this Commission by numerous persons of all ranks. The Commission firmly believes that this aspect of a new officer's training should be paid the attention it deserves.

**Probation period.** The Commission recommends that the CPD extend the probationary period for new police officers. Under current rules, the probationary period for new officers is one year, which includes the six months spent in the Training Academy. In the Commission's opinion, the remaining six months is too short a time for the Department to fully assess whether that person possesses the qualities necessary to be a police officer. If the probationary term were extended to allow for a full year of on-the-street experience, Chicago would be closer to the practices used by other law enforcement agencies. Los Angeles, for example, has a probationary period of eighteen months for new officers which includes their first seven months in the training academy. The FBI requires a full year of probationary status after graduation from their training center.

**Continuing Education**

In keeping with the view that policing is a profession, the Commission believes that the Department should institute a mandatory continuing education program for its officers. The requirements of such a program could be met either through in-service training offered by the Department itself, or through a course of study that an officer pursues at his/her own initiative outside the Department. The City's

**19**

PL JOINT 083631

current contract with the Fraternal Order of Police includes tuition reimbursement for "extra-departmental education" as long as the course is college level and "job-related."

This Commission learned that some police departments around the country already have such a requirement for continuing education. For example, Pennsylvania has a state law which mandates two days of training per year for all police officers in that state. The Los Angeles Police Department requires its officers to complete 12 hours of retraining each year. Other professions require their members to participate in continuing education programs. Most states, for instance, now have a mandatory continuing education requirement for their lawyers. Accountants and doctors have similar rules requiring them to take continuing education classes.

History indicates that additional ethics training alone is an insufficient response to episodes of scandal. The Chicago Police Department should be constantly investing in the overall professionalism of its workforce. Individuals with integrity and decency should thrive in an organization that is always striving to improve.

### Monitoring, Investigating and Disciplining Problem Officers

The investigations which led to the indictments of officers in the Austin and Gresham Districts were begun by the Chicago Police Department. This fact was often overlooked in the press accounts following the indictment. The Department took a strong proactive role in exposing this scandal. The Commission believes that some credit should be given to the Department's leadership, particularly the Internal Affairs Division, for their stance in this situation. As an expert on police ethics recently remarked:

"Look at the history in this country of police leaders, precinct commanders and the like who look the other way when there is corruption or brutality on their own watch because they think it's better for their careers if it's not discovered while they're there. They place the perception of a clean operation above the truth and above fidelity to the public trust."

(Law Enforcement News, May 15, 1997, interview with Professor Edwin J. Delattre of Boston University, author of Character & Cops)

Nevertheless, the Commission did hear evidence that the problems in the Austin District festered for a substantial period of time. The Commission therefore makes these recommendations in order to minimize the chance of such delays happening again.

**"Early Warning" System.** Virtually every major city police department in the country has recognized the need for a mechanism which alerts command personnel that an officer may be involved in a pattern of misconduct. The premise is simple: small problems become big ones if left unattended. It was emphasized repeatedly to this Commission that, in almost all instances, police officers who get into serious trouble begin with relatively minor violations of department rules which evolve over time into the type of behavior alleged in the Austin and Gresham case. The pattern can continue if no one in a position of authority knows it exists.

The Chicago Police Department's early warning program is embodied in its Behavioral Alert and Personnel Concerns programs. The Department is currently working on revising its general orders on these programs. The Commission believes that these revisions will substantially enhance the Department's ability to identify and correct the behavior of officers at risk. Under the current guidelines, a supervisor is merely required to meet with any identified officer to warn him about his

20

OCC0468

behavior and advise him of the availability of counseling. The revised procedure will require the Department to devise an "Individualized Performance Plan" tailored to address the cause of an officer's misconduct. The new policy will also make the officer's chain of command more directly responsible for decisions made concerning an individual placed in the Behavioral Alert or Personnel Concerns programs.

The need for a sophisticated and thorough early warning system can be seen in the backgrounds of the ten officers currently under indictment from the Austin and Gresham districts. According to the information presented to the Commission, the seven indicted Austin officers had a total of 93 complaints ("CR numbers") lodged against them during their respective careers. In only two of the cases were the allegations sustained. The three indicted officers from the Gresham District had a combined 40 CR numbers during their careers, with only three being sustained.

It should be noted that a non-sustained complaint is not the same as one that is unfounded. It indicates that the evidence was such that the complaint could not be proven or disproven. In the judgment of the Commission, some system needs to be in place which allows the Department to take some appropriate action when a clear pattern of non-sustained complaints exists. Therefore, the Police Department is urged to implement the new Behavioral Alert and Personnel Concerns programs as soon as possible.

Furthermore, the Commission recommends that the Chicago Police Department look not just at the records of individual police officers but also at units within the Department. The ten officers now under indictment did not come from ten different units of assignment spread throughout the organization. Chicago's recent experience is consistent with the police scandals around the country and in our own history going back to Summerdale - corrupt police officers (like other groups of criminals) tend to bond together in groups. As the Chicago Police Department moves toward a comprehensive early-warning system, therefore, an effort should be made to identify specific units which have a higher that usual rate of allegations of misconduct.

Finally, when the Department does implement its enhanced Behavioral Alert and Personnel Concerns program, it should be backed by a level of resources sufficient to make it fully computerized. The program should also be broad enough to analyze not just CR numbers but any other data indicative of potential misconduct (e.g. civil liability judgments or excessive use of medical time.)

**Internal Affairs Division.** Every function of law enforcement has faced an increased demand for resources in recent years. A police department's responsibility to monitor and, when necessary, investigate the conduct of its own officers is no exception. The Commission recognizes the many demands that are placed on the Chicago Police Department's limited resources. Nevertheless, in this important and sensitive area, the Commission believes that the staff devoted to the Internal Affairs Division should match the increased workload.

For example, in 1992 there were 5,486 CR numbers referred to IAD, which had a staff of 93 sworn officers. By 1996, the number of complaints had grown 17% to 6,460. The actual number of investigations conducted by IAD has also risen: there were 924 through September of 1993, while the total for the same period of 1997 is 1,260. The IAD staff, however, has only added three investigators between 1993 and 1996 for a total of 96.

In addition to expanding the size of IAD, the Commission believes that the Department should make every effort to assign officers there who have extensive "street level" investigative experience. The Department was able to conduct the investigations in Austin and Gresham because they used the type of personnel and techniques that are typically used in investigating narcotics operations and other organized criminal enterprises. The Commission recommends, therefore, that the Internal Affairs Division should actively recruit detectives, gang crime specialists and other officers with solid investigative skills.

**21**

OCOO469

PL JOINT 083633

**The Disciplinary Process.** The procedure used by the Chicago Police Department to sanction officers engaged in misconduct is set forth in some detail in Chapter 10 of this report. The Chicago Police Board in its 1995-1996 Biannual Report made the following comments in reference to this process:

These many steps prolong final closure of these cases. By the time an arbitration convenes, it may be years since the incident took place. The Department must, in essence, prosecute the matter before an arbitrator while attempting to locate, and seek the cooperation of, witnesses who may have observed an incident years earlier. The Board strongly believes these multiple appeals unnecessarily prolong the disposition of these cases and place an unfair burden on The Department.

(Chicago Police Board 1995-1996 Report at page 19)

This Commission agrees with the Police Board's assessment. The disputes which are resolved during the disciplinary process generally involve fairly simple fact patterns. In spite of this, it may take years before an officer who is found to have engaged in misconduct is actually suspended.

There is some truth to the saying that justice delayed is justice denied. The Commission believes that the amount of time that passes between an infraction of the Department's rules and the imposition of a sanction sends a message that the misconduct is not being taken seriously. For this reason, the Commission feels that action should be taken to streamline this process. While this may require changes in current law or an effort to address this issue in the next collective bargaining agreement, the Commission is confident that a more efficient and less time-consuming disciplinary process will be better for all of the Department's members. In the meantime, the Commission suggests that the current system would be able to resolve cases more quickly if the Department scheduled complaint review panel hearings for evenings and Saturdays.

**Search for a Cause.** This Commission believes that the Department should make an effort to answer the question "What went wrong?" in each instance where a serious act of misconduct is uncovered. This effort might take the form of an informal meeting between the officer's immediate supervisor, the commander, and a representative of any other appropriate unit (for example, IAD, OPS, Personnel or the Training Academy). The focus would be to determine a cause for the misconduct and to identify steps that could have been taken to prevent the situation from occurring. Such meetings would allow the Department to discern a pattern or identify actions that can be taken which will address an underlying problem. By taking this type of proactive approach, the Department may prevent some future scandal.

**Police Department Management Issues.** The history of the American police profession is in large part a study of conflicting management concepts. On one hand, honest and competent police officers on the street are most effective if they are given wide discretion to deal with the problems they encounter. On the other hand, commanders need to know that their officers are actually doing what they are supposed to be doing. Police departments responding to scandals often choose bureaucratic control and centralized authority over crime fighting. New York City, for example, responded to their police scandals in the 1970's by taking drug and vice-law enforcement away from precinct patrol officers and turning them over to specialized units. Philadelphia took the same approach several years ago in response to a scandal very similar to the Austin and Gresham scandals. Their police department decided to centralize the responsibility for narcotics search warrant cases in a single city-wide unit.

The Commission recognizes the difficult task the Chicago Police Department faces in reconciling these two concepts. It should be noted, moreover, that the Department has embraced a comprehensive community policing strategy (featuring decentralized authority and greater discretion for officers) at a time when a flourishing narcotics trade poses greater temptation and opportunity for corruption. Mindful of this challenge, this Commission makes the following recommendations:

22

• <u>Arrest Statistics</u> - The Commission learned that there is an attitude within the Department which places an undue reliance on arrest numbers as a measurement of an officer's effectiveness. This situation could lead to an officer being tempted to cut corners. The Department is therefore encouraged to develop a more comprehensive outlook which considers factors like the crime rate on the officer's beat, the quantity of narcotics the officer seizes, the outcome of the officer's cases in court etc...

• <u>Performance evaluations</u> - The Commission recommends that the Chicago Police Department conduct an extensive review of its current system of performance evaluations for officers. It was reported to the Commission that almost no officer gets a bad evaluation. This includes some of the indicted officers from the Austin District, who received high ratings just a year before the scandal erupted, and at a time when (according to the indictment) they were engaged in a pattern of violent, corrupt behavior. One alternative would be for the Department to use a "forced choice" method of rating officers in a unit. In any event, the current system is in some ways worse than no system and should be changed.

• <u>Tactical Team</u> - These units should be "mission driven" and should focus on problem solving rather than just on generating arrest statistics. Each commander's district plan should identify how the tactical teams are going to be used to attack the priority problems in the district. The Commission supports the concept of mandatory rotations out of the tactical team after a specific period, to guard against burn-out and to give other officers a chance to do this important work. The Commission also believes that there should be some minimum department-wide standards for selection to a tactical unit, rather that allowing each commander to set their own. These standards should include a minimum number of years as a police officer.

• <u>Deputy chiefs</u> - Each of Chicago's five police areas has a deputy chief in charge who reports to the Chief of Patrol. The deputy chiefs work at police headquarters. While the Superintendent earlier this year ordered them to begin spending one day a week in their areas, the Commission believes that it would be better if they actually worked in the areas and had more daily contact with their commanders, and spent one day a week at headquarters.

• <u>Supervisor accountability</u> - The Commission believes that this principle needs to be stressed more than it currently is within the Chicago Police Department. Supervisors who know about wrongdoing in their command and do nothing to stop it should be disciplined. Supervisors who should know but do not because they are not paying sufficient attention should also be disciplined. Until the Department takes some meaningful steps in this direction, the chances of preventing a major scandal are remote.

• <u>The role of the sergeant</u> - Numerous persons whom the Commission consulted stressed the importance of the sergeant's position within the Police Department. The Commission agrees that quality first-line supervision is an essential component to any effective organization. The City is planning a new round of promotions to the rank of sergeant in 1998. The Commission urges that, to the extent possible, the City should try to identify candidates for sergeant who will be effective teachers and role models. The training for these new sergeants should also be expanded to include a meaningful ethics component. Finally, the Commission believes that there should be at least a six month probationary period for newly promoted supervisors so that the Department can evaluate the candidate's ability to perform the job.

The Commission would like to make a final recommendation. During the past several weeks, the Office of International Criminal Justice from the University of Illinois at Chicago has, on behalf of the Commission, conducted dozens of interviews with officers of all ranks from within the Department. Although these interviews were held on an anonymous basis and at the University, there was some concern at the outset that the officers invited to participate would be reluctant to do so. The opposite has been the case. Almost all of the officers who were interviewed freely shared their views on the topic of police integrity and were in fact eager to be included in this process. A summary of these interviews is included in an appendix to this report.

0000471

PL JOINT 083635

The Commission believes that it would be useful for the Department to arrange for surveys like this one to be conducted on a regular basis (annually or every other year). There are many thoughtful, dedicated police officers throughout the Department who care about the way the organization is run and who have ideas that might help. By regularly reaching out to its members in this manner, the Department will be able to take advantage of the collective idealism and wisdom which exists within the ranks.

24

0000472

PL JOINT 083636

# APPENDIX A: SUMMARY OF SITE VISIT FINDINGS

Throughout August and September 1997, members of the University of Illinois at Chicago Office of International Criminal Justice and Commission staff conducted site visits with police departments in the following ten cities: Detroit, Los Angeles, Miami, Minneapolis, New Orleans, New York, Philadelphia, Pittsburgh, San Diego and San Francisco. The site visit portion of the study was designed to collect uniform data on best practices relative to the control of police deviance and to provide background for commission members charged with making sound recommendations based on reliable data. Site visit data was supported by data from an extensive literature review. The following provides a summary of these findings.

Law enforcement agencies have employed a variety of strategic approaches to cope with police corruption over the years, ranging from the concept of eradication by fear of punishment or dismissal to relatively complex multivariate approaches used today. Unfortunately, no single solution or combination of approaches has been completely successful. The literature does support the notion that particular strategies have contributed to a reduction in what can be termed "low-level" corruption. The Mollen Commission report indicated that low level corruption was reduced significantly between the Knapp Commission Report in 1971 and the Mollen Commission investigation in 1994.

Overall findings based on a thorough literature review, site visit surveys, commission meetings, and one-on-one interviews were consistent across methods of data collection. The majority of command staff officers from the cities visited agreed that reform strategies must grow out of a synergistic effort aimed at examining and improving recruitment, selection, recruit training, field training, in-service training, management practices, and internal affairs operations. This section summarizes some of the common themes identified through site visits.

## Reinforcement of values

Preliminary findings suggest that any positive cultural change must be communicated from the top down. By including input from all levels of the police organization when writing or revising the department's code of ethics and value statement, the police administrator can begin to create an ethos that does not support corrupt practices. The instillation of pride and integrity in officers by their supervisors and the empowerment of line officers can have long lasting positive effects.

Supervisors must constantly reinforce the value statement and code of ethics through example and through a system of rewards for normative behavior. In addition to supervisory reinforcement of department values, the police executive must use the existing informal organization to exert positive peer pressure in discouraging aberrant behavior.

Study participants noted that public scrutiny of the police department has increased with the emergence of real-time video and satellite broadcasting of the news throughout the world. Police officers often are held to a higher standard of conduct in their professional and personal lives because of the profession's obligation to protect lives and property. Due to the recent attention to police operations given by newspapers, television and other media, police managers must realize that the example they set for their officers may play out on the evening news and could have lasting ramifications. Increased media scrutiny has led to heightened stress for officers and has created an even greater demand for enlightened managers capable of leading their officers toward an even more ethical police force.

## Community policing

The Commission explored the role of community policing in anti-corruption efforts. Prior to the advent of community policing, many community residents did not have a cooperative relationship

25

0000473

with police officers. The new style of policing requires officers to meet with community residents to formulate solutions to local crime problems. There are numerous examples of cities which have successfully implemented community policing programs. Anecdotal data collected from these sites seems to suggest some connection between the building of community relations and a reduction in aggressive forms of police corruption. Once a community is exposed to positive reform and a reduction in drug and gang related violence, that community is no longer fertile ground for corrupt activity to flourish.

## Candidate screening

Many respondents stressed the need for complete and thorough screening of candidates. The site visit survey identified a possible link between lax backgrounds during periods of mass hiring in some departments and subsequent incidence of corruption. Police administrators in Miami, Pittsburgh, Los Angeles, and other jurisdictions commented that care should be given to assigning additional background investigation staff to handle an increase in recruitment and selection. They also favored implementation of comprehensive standardized selection and training to be used in staffing up for mass hiring situations. In Miami, in particular, police executives felt that adequate preparation and investment in background investigation procedures would result in fewer complaints of police deviance in the future.

Both the literature review and site visit data supported the Superintendent's proposal that juvenile records of applicants be available for the scrutiny of background investigators. Citing studies which indicate that past behavior is indicative of future performance, it is necessary for investigators to have access to all records which contain evidence of past marginal or deviant activity. Other selection process observations emphasized the importance of the polygraph as an investigative tool during background investigations. Nearly all respondents recommended constant improvement of the psychological screening protocols to include moral maturity measures.

## Minimum age standards

Respondents also favored imposition of a higher minimum age for police applicants. Again citing past behavior is an indicator of one's moral character, police executives interviewed noted that allowing 21 year old applicants entry into the police department limits the evaluation of an adult work or behavior record. It was generally accepted that raising the age for application was beneficial for adequate background screening without having a significant negative effect on the size of the applicant pool.

## Education standards

Departments seeking the best possible officers should seek those recruits with higher education and reward those who pursue education once they are employed. Evidence from the literature review suggests that higher education may have a leavening effect on recruits. Studies have also supported the notion that better educated officers operate at a higher level of moral development and maturity. Generally, both enhanced work performance and lower levels of misconduct are correlated with higher levels of education.

## Training

In addition to quality screening processes, there is consensus among police experts that internal professional training and education play a key role in influencing and maintaining employee integrity. Departments must go beyond satisfying proscribed or minimum training standards on ethics and concentrate on the quality of education. Most feel there is value in integrating overall ethics and integrity principles into tactics, law and other aspects of recruit training, including the use of realistic

26

PL JOINT 083638

scenarios and role playing techniques to emphasize departmental values across disparate situations. Preparing young officers to deal mentally and emotionally with situational applications of ethics policy will give recruits a set of alternatives to employ on the street in real world conditions.

A renewed emphasis on ethics training and education should involve not only recruit officers, but also probationers, veteran officers and supervisors. It is in the best interest of the police department and the city to minimize misconduct and reduce exposure to liability by allocating additional resources to these training efforts. Continued emphasis and follow up on ethics training for all officers at all levels is crucial to an effective anti-corruption policy. Police executives from throughout the country lamented that, with the many demands placed on academy staff to cover both state mandated and departmental prioritized officer safety and community policing teaching modules, the teaching of ethics, although recognized as important, gets insufficient attention. There needs to be more time for ethics training and discussion of moral dilemmas in the recruits' standardized training.

Field training is recognized as essential to maintenance of ethical behavior among properly trained recruits. Recognizing the often overriding effect of the critical relationship between the probationary officer and the field training officer (FTO), most experts support the institution of standardized selection and training of FTOs. It is generally recognized that effective recruit training shapes the behavior and attitudes of the new police officer. Every effort must be made to select and train FTOs who recognize the importance of reinforcing the skills and principles developed in the officer during new recruit academy training. In addition to teaching basic skills of policing, FTOs are responsible for imparting departmental values and for creating an environment in which the recruit can exercise sound judgment in ethically challenging situations. FTOs should be evaluated and rewarded based on their ability to instill departmental values which will likely sustain throughout an officer's career.

The department striving for the highest standards will address ethics on a regular basis and integrate ethics into all other appropriate in-service topics. The expanded use of role playing and an emphasis on recreating real world ethical conflict situations were also identified as crucial to success. Most departments now try to identify "problem" officers through an early warning system and then re-train the officer in complaint avoidance rather than focus on punishment. Recidivism amongst retrained officers has been remarkably low.

## Management and supervision

Departments with a solid reputation for integrity strive to set up policies and procedures to ensure quality selection and training of officers, but also place a great emphasis on management and supervision. By all accounts, the role of the first line supervisor and his or her ability to set an example and closely monitor the activities of officers was essential to the prevention of aggressive forms of corruption.

Some of the concerns discussed during site visits highlighted the need to tighten the span of control of first line supervisors, especially in narcotics enforcement and other specialized units. Respondents also favored standardized selection and training of officers assigned to tactical or high crime units.

Other cities favor frequent rotation and maximum tenure requirements for sensitive specialized units. The down side of rotation is that it runs counter to some of the theory behind community policing and that many aspects of narcotics investigation rely on maintenance of informant networks.

In order to act appropriately and foster modeling behavior for their officers, first line supervisors must be adequately prepared and given the tools to run their units efficiently. Internal auditing procedures must be strengthened to identify problems before they lead to misconduct. Officers must receive clear direction as to what constitutes acceptable and unacceptable behavior in carrying out their duties.

27

0000475

PL JOINT 083639

## Intervention

Many departments have constructed early warning systems to identify "at-risk" officers. These programs take many forms and are more akin to employee assistance programs than enforcement and disciplinary programs. As far as the operation and staffing of Internal Affairs, the value of shaping behavior through fear of sanctions still has relevance and adequate resources need to be applied in this area.

It was generally agreed that adequate manpower, equipment and other resources must be devoted to the investigation of police corruption in its various forms. Narcotics-type investigative methods utilizing informants and electronic surveillance were seen as necessary to combat the more aggressive forms of corruption emerging today. The development of a field associates program was also discussed with split results. Some favored the use of field associates to "keep tabs on other officers;" others felt that such a program would have a deleterious effect on morale.

0000476

PL JOINT 083640

# APPENDIX B: SUMMARY OF SURVEY RESULTS

During the months of September and October 1997, Commission staff and university researchers interviewed 70 active Chicago police officers. The interviews were conducted at the University of Illinois at Chicago. The interviews were designed to tap the organizational knowledge held by sworn police officers of varying ranks, age, assignments and experience. All participants were guaranteed anonymity to facilitate a more honest and forthright discussion of the issues surrounding corruption in the Chicago Police Department. The following statement was read to participants prior to the interview:

> In light of recent allegations of police misconduct by members of the Chicago Police Department, the Mayor's Office has convened a Commission on Police Integrity. The Office of International Criminal Justice (OICJ) at the University of Illinois at Chicago (UIC), on behalf of the Commission, has undertaken a research project to examine this issue. This study will assist Commission members to make their recommendations on how Chicago can best detect, adjudicate, and mitigate if not prevent, acts of police misconduct. The interview portion of the project has been designed to garner insight and to solicit advice on strategies for dealing with corruption from police officers and supervisors as organization incumbents.
>
> This study is not an investigation into any specific wrongdoing by members of the Chicago Police Department or any other police department. Rather, it is an attempt to accomplish two primary objectives: first, to validate the findings from earlier studies regarding the root causes of police misconduct; and second, to identify possible strategies to minimize police corruption.
>
> The following questions are intended to facilitate the uniform collection of data from members of the Chicago Police Department. This interview is expected to take from 45 minutes to one hour. Your cooperation is very much appreciated. Thank you.

While the number of officers interviewed and the nature of the sampling process prevents generalization to the entire population of 13,400 Chicago police officers, several themes emerged from these one-on-one interviews that are worth noting. These themes center on selection, supervision, training, and internal investigations.

## Selection

Many of the officers interviewed expressed dissatisfaction with the quality of recruits being hired and trained by the Department. Most favored more stringent background investigations and the raising of basic standards. The vast majority endorsed the review of juvenile records as a means of judging future performance based on past behavior. Officers with ten or more years on the Department felt that one basic reason why there is still a lingering corruption problem in most major police departments is that while raising salary levels and unionization have had a major positive impact on policing, it has also brought with it throngs of applicants who are less interested in serving and protecting and more interested in making money.

## Supervision

The number one concern among those interviewed of various ranks was that there are too few supervisors to effectively cover the number of police officers assigned to them. The perception of lax supervision was attributed, in part, to a shortage of first line supervisors on the street. Another problem identified by the interviews was the perception by officers that the new supervisors being promoted lacked the requisite skills, experience and training to be effective leaders. While the majority of respondents still ranked supervision as "good" or "very good," those who indicated that

29

0000477

**PL JOINT 083641**

supervision was "poor" commented that first line supervisors need to be more involved in their units' day to day operations. They also stated that sergeants need to focus on developing their officers and advising their officers on what constitutes appropriate behavior. Also, according to the officers interviewed, sergeants need to be more objective in the carrying out of internal investigations and disciplinary procedures.

## Training

The majority of respondents indicated that they felt new recruit ethics training was inadequate given the nature of urban policing today. Many suggested a more practical curriculum that would utilize real world scenarios to illustrate moral or ethical questions. Others favored reinforcement through more in-service training on the subject. It should be noted that the training division is already revising the ethics curriculum for recruits and in-service programs.

Another area that many of the respondents felt could benefit from restructuring was the FTO program. Officers commented that "no one wants to do that job anymore." There was an overall opinion that there should be more of an incentive for officers to become training officers. In addition to supplemental income, there should be a career track for FTOs who demonstrate their commitment to the Department by training new members. Most agreed that the FTO exerts a tremendous amount of influence on the new officer and that there should be strict standards and training for officers who choose to pursue this career track.

## Internal investigations

While the majority of officers interviewed regarded Internal Affairs as "a necessary evil," they stated that they believed internal affairs investigators did a fair and equitable job in investigating complaints against officers. Many indicated that they felt IAD was understaffed and that the investigations were slow and laborious. They stressed that a quicker turnaround of complaint investigations would be better for the Department and for the rank and file.

A number of officers perceived an unfair application of discipline above the rank of police officer. It was generally noted by some respondents that the higher a person's rank, the lesser the penalty. In general there was surprisingly little dissatisfaction or resentment expressed toward IAD. There is, however, strong criticism directed at the Office of Professional Standards by line officers and supervisors for being unprofessional and for lacking investigative and organizational skills.

The survey included interviews of several members of the Internal Affairs Division. These investigators felt that too much of their time was spent on matters like police officers' overdue parking tickets. It was felt that the burden of this type of work detracted from their ability to focus on more serious forms of misconduct.

## Incidence and Nature of Corruption

Officers were asked to define the nature and scope of corruption on the Chicago Police Department. The overwhelming majority of officers answered that corruption is isolated to small groups of officers "bent on making a lot of cash ... any way they can." The widespread low level forms of corruption have been replaced by what some officers described as "gang style, intimidating ... using the badge to get what you want on the street." In general nearly all of the respondents indicated that they felt the extent of corruption had decreased since they joined the Department and that "any organization with this many [guys] working that close to all that money and drugs is going to have a problem."

Many of the responses to the standardized questionnaire were affected by what the majority of interviewed officers perceived as a pervasive morale problem stemming from, among other things, the department's promotional system. Some officers linked the perceived lack of opportunity for career advancement with a criticism that, in some cases, it may cause officers to "get something for myself." The Police Promotion and Testing Task Force issued a report in January 1997 calling for changes in the promotions system.

30

PL JOINT 083642

# APPENDIX C: BIBLIOGRAPHY

A Systems Approach to Police Corruption: Defining its Nature and Causal Variables. (1979)
Vol. 1 (Aug.).(Washington, D.C.: National Institute of Law Enforcement and Criminal Justice).

Aaron, Titus (1991)
"Judicial Limitations of the Investigation of Officer Misconduct."
Law and Order. Vol. 39 (Oct.): 91-92.

Anderson, Dennis (1994)
"Performance Appraisal: A Different Approach." FBI Law Enforcement Bulletin.
Vol. 63 (April): 18-22.

Anechiarico, Frank & James B. Jacobs (1994)
"Visions of Corruption Control and the Evolution of American Public Administration."
Public Administration Review. Vol. 54(5), (Sept./Oct.): 465-473.

Anechiarico, Frank & James B. Jacobs (1992)
"The Continuing Saga of Municipal Reform: New York City and the Politics of Ethics Law."
Urban Affairs Quarterly. Vol. 27(4), (June): 580-603.

Applebaum, David (1983)
"Looking Down the Wrong Side of the Gun: The Problems of the Police Use Lethal Force."
The Police Chief. Vol. ? (May): 55-59.

Barker, Thomas (1996)
Police Ethics. (Illinois: Charles C. Thomas Pub.).

Barker, Thomas & Julian Roebuck (1973)
An Empirical Typology of Police Corruption. (Illinois: Charles C. Thomas Pub.).

Barker, Thomas & David L. Carter (1994)
Police Deviance. 3rd ed. ( Cincinnati, Ohio: Anderson Publishing Co.)

Beigel, Herbert (1978)
The Closed Fraternity of Police and The Development of The Corrupt Attitude.
(New York: John Jay Press) Criminal Justice Center.

Beigel, Herbert (1977)
Beneath the Badge: A Story of Police Corruption. (New York: Harper & Row Pub.).

Bok, Sissela (1983)
Secrets: On the Ethics of Concealment and Revelation. (New York: Pantheon Books).
(Selected chapters).

Braswell, Michael C., McCarthy, Belinda R. & Bernard J. McCarthy (1991)
Justice, Crime and Ethics. (Cinncinati, Ohio: Anderson Publishing Co.)

Braunstein, Susan & Mitchell Tyre (1992)
"Personal and Organizational Integrity: Building a More Ethical Police Department."
The Police Chief. Vol. 59 (Jan.): 30-35.

Brown, Lee P (1991)
"Values and Ethical Standards Must Flow from the Chief." The Police Chief. Vol. 58 (Jan.): 8.

0C00479

PL JOINT 083643

Carter, David L. (1990)
    "Drug-Related Corruption of Police Officers: A Contemporary Typology."
    Journal of Criminal Justice. Vol. 18: 85-98.

Castellanos, Andres (1996)
    International Seminar on Organized Crime, Corruption, in the Public Administration and the
    Criminal Justice System. United Nations Department of Development Support and Manage-
    ment Services (UNDDSMS).

Close, Daryl and Nicholas Meier (1995)
    Morality in Criminal Justice: An Introduction to Ethics. (California: Wadsworth Publishing Co.)

Cohen, Howard S. & Michael Feldberg (1991)
    Power and Restraint: The Moral Dimension of Police Work. (New York: Praeger).

Cooksey, Otis E. (1991)
    "Corruption: A Continuing Challenge for Law Enforcement." FBI Law Enforcement Bulletin.
    Vol. 60 (Sept.): 5-9.

Deakin, Thomas J. (1988)
    Police Professionalism: The Renaissance of American Law Enforcement.
    (Springfield, Illinois: Charles C. Thomas Publisher.)

Deutsch, Albert (1955)
    The Trouble with Cops. (New York: Crown Publishers Inc.)

Delattre, Edwin J. (1989)
    Character and Cops: Ethics in Policing. (London: University Press of American, Inc.).

Donahue, Michael (1993)
    "Police Ethics: A Critical Perspective." Journal of Criminal Justice. Vol. 21: 339-352.

Dugan, John R. & Daniel R. Breda (1991)
    "Complaints About Police Officers: A Comparison Among Types and Agencies."
    Journal of Criminal Justice. Vol. 19.2: 165-171.

"Ethics in American Public Service." (1995)
    The Annals of the American Academy of Political and Social Science. Vol. 537 (Jan.): 139-149.
    (Selected chapters).

Fishman, Janet E. (1978)
    Measuring Police Corruption. (New York: John Jay Press)
    Criminal Justice Center Monograph #10.

Flynt, Josiah (1901)
    The World of Graft. (New York: McClure, Phillips & Co.).

Freeman, Theodore F., Jr. (1990)
    "The Word is Integrity." Law and Order. Vol. 38 (Dec.): 66.

Fyfe, J.J. (1989)
    "Police/Citizen Violence Reduction Project." FBI Law Enforcement Bulletin.
    Vol. 58 (May): 18-23.

Gabor, Tom (1994)
    "The 1990's: The Time for Aggressive Police Officers." FBI Law Enforcement Bulletin.
    Vol. 63 (April): 15-17.

PL JOINT 083644

Geller, William & M.S. Scott (1992)
      Deadly Force: What We Know. (Washington, D.C.: Police Executive Research Forum).

Geller, William & Hans Toch (1995)
      And Justice For All: Understanding and Controlling Police Abuse of Force.
      (Washington, D.C.: Police Executive Research Forum, funded by NIJ).

Glazer, Sarah (1995)
      Police Corruption: Can Brutality and other Misconduct be Rooted Out."
      Congressional Quarterly Researcher. Vol. 5 (44), (Nov.): 1041-1064.

Grossman, Ira & Jack Doherty (1994)
      "On Troubled Waters:  Promotion and Advancement in the 1990's."
      FBI Law Enforcement Bulletin. Vol. 63 (April): 10-14

Harbaugh, Carl R. (1997)
      "Community Policing:  Ethics and Community Policing." Sheriff. May-June: 23.

Hefferman, William C. (1987)
      "Hard Choices for Law Enforcement Administrators." The Police Chief. Vol. 54 (Mar.): 77-79.

Hyams, Michael T. (1991)
      "Indoctrinating Police Recruits: Communicating the Ethical Standard."
      The Police Chief. Vol. 58 (Oct.): 127-133.

International Association of Chiefs of Police (1989)
      Building Integrity and Reducing Drug Corruption in Police Departments.
      (Washington, D.C.: U.S. Department of Justice, Office of Justice Programs).

Jacobs, James B. & Frank Anechiarico (1992)
      "Blacklisting Public Contractors as an Anti-corruption and Racketeering Strategy."
      Criminal Justice Ethics. Vol. 11 (Summer/Fall): 64-76.

Janik, James (1995)
      "Police Corruption: Taking the Medicine." ?????????. Vol. ? (Sept.): 27-31.

Jones, Tim R., Compton Owens, & Melissa A. Smith (1995)
      "Police Ethics Training: A Three-Tiered Approach."
      FBI Law Enforcement Bulletin. Vol. 64 (June): 22-26.

Kleinig, John (1996)
      The Ethics of Policing. (Cambrige: Cambridge University Press).

Kleinig, John (1990)
      "Teaching and Learning Police Ethics: Competing and Complementary Approaches."
      Journal of Criminal Justice. Vol. 18: 1-18.

"Knapp Commission." (1972)
      The Knapp Commission Report on Police Corruption. (New York: Braziller)

Kraska, Peter B., & Victor E. Kappeler (1995)
      "To Serve and Pursue: Exploring Police Sexual Violence Against Women."
      Justice Quarterly. Vol. 12.1 (Mar.): 85-111.

Maguire, Mike & Claire Corbett (1989)
      "Patterns and Profiles of Complaints Against the Police."
      Coming to Terms With Policing. Chapter 10 (London: Routledge).

Mangan, Terrence J. (1992)
      "Organizational Integrity Critical to Law Enforcement Success."
      The Police Chief. Vol. 59 (Mar.): 47-49.

0C00481

PL JOINT 083645

McCormack, Robert J. (1980)
"Police Corruption: A Guide To Agency Assessment and Program Development."
Anti-Corruption Management Project. Vol. II (June). (Washington, D.C.: National Institute of Law Enforcement and Criminal Justice).

McCormack, Robert J. & Richard Ward (1996)
"Police Perceptions and the Norming of Institutional Corruption."
Policing and Society. Vol. 6: 239-246.

McEwen, Tom (1996)
National Data Collection on Police Use of Force. (Bureau of Justice Statistics: U.S. Dept. of Justice Office of Justice Programs).

Meagher, Steven M. (1985)
"Organizational Integrity: The Role of the Police Executive in the Management Process."
Journal of Police Science. Vol. 13(3): 236-243.

Mosher, Frederick C. (1968)
Democracy and the Public Service. (New York: Oxford University Press).

"Models for Management." (1989)
The Police Chief. Vol. 56 (May): 60-62.

Mollen, Milton (1994)
"Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department." (New York City: July).

Moore, Mark H. (1995)
Creating Public Value: Strategic Management in Government.
(Massachusetts: Harvard University Press). (Selected chapters).

Niederhoffer, Arthur & Abraham S. Blumberg (1976)
The Ambivalent Force: Perspectives on the Police. 2nd ed. (Hinsdale, Illinois: The Dryden Press).

"Police Ethics: Building Integrity and Reducing Drug Corruption." (1991)
The Police Chief. Vol. 58 (Jan): 27-41.

Police Integrity: Public Service with Honor. (1997)
(U.S. Dept. of Justice: U.S. Government Printing Office) A partnership between the National Institute of Justice and the Office of Community Oriented Policing Services. (Jan).

Price, Barbara Raffel (1977)
Police Professionalism: Rhetoric and Action. (Lexington, Massachusetts: Lexington Books).

Punch, Maurice (1989)
"Researching Police Deviance: A Personal Encounter with the Limitations and Liabilities of field-work." The British Journal of Sociology. Vol. 40(2), (June): 177-204.

Punch, Maurice (1985)
Conduct Unbecoming: the Social Construction of Police Deviance and Control.
(London and New York: Tavistock Publications).

Punch, Maurice (1983)
Control in the Police Organization. (Cambridge, Massachusetts: MIT Press).

Rainguet, Fred W. (1992)
"Personal and Organizational Integrity: No Excuses Management." The Police Chief.
Vol. 59 (Jan.):18-21.

Robinette, Hillary (1991)
"Police Ethics: Leadership and Ethics Training for Police Administrators." The Police Chief.
Vol. 58 (Jan.): 42-49.

0000482
PL JOINT 083646

Sample, John A. (1983)
"Police Performance Problems: Are they Training or Supervision Issues?" The Police Chief. Vol. 50 (October): 56-58.

Scrivner, Ellen M. (1994)
The Role of Police Psychology in Controlling Excessive Force. (A report presented to the National Institute of Justice: U.S. Dept. of Justice Office of Justice Programs).

Simpson, Antony E. (1977)
The Literature of Police Corruption: A Guide to Bibliography and Theory. Vol. 1 (New York: John Jay Press & McGraw - Hill Book Co.)

Smith, Ralph L. (1965)
The Tarnished Badge. (New York: Thomas Y. Cromwell Company).

Stadin, John (1993)
Behaviorism Mind, Mechanism and Society. (London: Gerald Duckworth & Co.)

Stephens, Darrel W. (1994)
"Point of View: Discipline Philosophy." FBI Law Enforcement Bulletin. Vol. 63 (Mar. 3): 20-22.

Tafoya, William (1995)
"Ethics and the Realities of Life: Surviving the Vortex". Morality on Criminal Justice. Chapter 2 (Belmont: Wadsworth Publishing Co.).

"The Evolution of the Law Enforcement Code of Ethics." (1992)
The Police Chief. Vol. 59 (Jan.): 14-17.

Thomas, B. (1991)
Police Accountability: A New Concern for Command Officers." Law and Order. Vol. 39 (Aug.): 75-76.

Trautman, Neal E. (1988)
Law Enforcement - The Making of a Profession. (Springfield, Illinois: Charles C. Thomas Publisher)

Tyre, Mitchell & Susan Braunstein (1992)
"Higher Education and Ethical Policing." FBI Law Enforcement Bulletin. Vol. 61 (June): 6-10.

Ware, Mitchell (1978)
Developing a Police Anti-Corruption Capability. (New York: John Jay Press) Criminal Justice Center.

Ward, Richard H. & Robert McCormack (1987)
Managing Police Corruption: International Perspectives. (Illinois: Office of International Criminal Justice, The University of Illinois at Chicago).

Ward, Richard H. & Robert McCormack (1979)
An Anti-Corruption Manual For Administrators in Law Enforcement. (New York: John Jay Press).

Woodiwiss, Michael (1988)
Crime, Crusades and Corruption: Prohibitions in the United States, 1900-1987. (London: Printer Publishers).

Worden, Robert E. (1989)
"Situational and Attitudinal Explanations of Police Behavior: A Theoretical Reappraisal and Empirical Assessment." Law and Society Review. Vol. 23(4): 667-711.

PL JOINT 083647

# CHICAGO BASIC RECRUIT PROGRAM
# STATE REQUIRED PROGRAM HOURS & CPD HOURS

| | | State | CPD |
|---|---|---|---|
| I. Administrative Units | | | |
| Administrative Time | | 3 | 6 |
| Course Orientation | | 2 | 4 |
| Examinations | | 13 | 18 |
| Critiques | | 10 | 10 |
| Graduation | | 2 | 2 |
| | **Subtotal** | **30** | **40** |
| **II. Learning Modules.** | | | |
| **A. Law** | | | |
| Case Preparation & Courtroom Testimony | | 2 | 3 |
| Civil Rights & Civil Liability | | 2 | 2 |
| Courtroom Demonstration | | 2 | 2 |
| Criminal Defense in Illinois | | 16 | 28 |
| Identification Procedures | | 1 | 1 |
| Illinois Vehicle Code/IVC Bail Rule | | 18 | 18 |
| Juvenile Processing | | 8 | 2 |
|     SEE: Juvenile Law | | | |
|     SEE: Patrol Decisions/Juvenile Matters | | | |
| Laws of Admissions | | 2 | 2 |
| Laws of Arrest, Search & Seizure | | 14 | 15 |
| Legal Aspects of Cannabis & Cont. Substances | | 2 | 2 |
| Legal Aspects of Drinking Driver Enforcement | | 2 | |
|     SEE: Driving Under the Influence | | | |
| Rights of the Accused | | 2 | 2 |
| Rules of Evidence | | 4 | 4 |
| Use of Force | | 2 | 5 |
| | **Subtotal** | **77** | **86** |
| **B. Police Function & Human Behavior** | | | |
| Battered Women | | 4 | |
|     (Domestic Violence) | | | 7 |
|     SEE: Crisis Intervention | | | |
| Child Abuse | | 2 | 3 |
| Communication in the Police Environment | | 17 | 17 |
| Crisis Intervention/Disturbance Calls | | 6 | 10 |
| Crowd Behavior | | 4 | 4 |
| Dealing with Variant Behavior | | 4 | 2 |
| Modern Police Role | | 2 | 2 |
| Patrol Decision Making-Juvenile Matters | | 6 | |
| Perception of Human Behavior | | 4 | 4 |
| Police Citizen Relations | | 6 | 6 |
| Police Morality | | 4 | 4 |
| Stress Behavior | | 4 | 4 |
| | **Subtotal** | **59** | **65** |
| **C. (1) Patrol** | | | |
| Cannabis & Controlled Substances | | 6 | 6 |
| Crimes in Progress | | 3 | 3 |
| Crimes in Progress Practicum | | 4 | 4 |
| Crime Prevention | | 1 | 1 |
| Fundamentals of Report Writing | | 12 | |
|     (Field Case Reporting) | | | 40 |
| Information Sources | | 2 | 2 |
| Patrol Procedures | | 8 | 8 |
| Police Communications | | 2 | 4 |
| Vehicle Stops/Occupant Control | | 8 | 8 |
| | **Subtotal** | **46** | **76** |

0000484

36

**(2) Patrol Investigations**

| | | |
|---|---|---|
| Crimes Against Persons | 4 | 7 |
| Crimes Against Property | 2 | 4 |
| Crime Scene Processing | 12 | 10 |
| Custodial Interviews | 4 | 4 |
| Custody, Arrest & Booking Procedures | 2 | 3 |
| Fingerprinting | 4 | 2 |
| Fundamentals of Investigations | 6 | 1 |
| SEE: Crimes Against Property | | |
| Crimes Against Persons | | |
| Information Sources | | |
| Motor Vehicle Theft | 4 | 4 |
| Service Calls | 2 | |
| SEE: Patrol Procedures | | |
| **Subtotal** | **40** | **35** |

**(3) Traffic**

| | | |
|---|---|---|
| Hazardous Materials | 8 | 6 |
| Traffic Crash Investigation Practical | 6 | 6 |
| Traffic Crash Investigation | 10 | 10 |
| Includes Occupant Restraint | 2 | |
| SEE: Law Enforcement Driving | | |
| Traffic Direction | 2 | 2 |
| Traffic Law Enforcement | 4 | 4 |
| Field Sobriety Testing | 12 | |
| (Driving Under the Influence) | | 12 |
| **Subtotal** | **44** | **40** |

**D. Police Proficiency**

| | | |
|---|---|---|
| Firearms: Orientation & Safety | 2 | |
| Weapons Care & Maintenance | 2 | |
| Training | 12 | |
| Night Shooting | 4 | |
| Shotgun Familiarization | 4 | |
| Record Firing | 4 | |
| Decision Making & Situational Shoot | 4 | |
| (Firearms Training) | | 54 |
| SEE: Revolver Familiarization | | |
| Shoot Don't Shoot Practical | 4 | |
| SEE: Incident Reporting Procedures | | |
| First Aid & CPR | 18 | |
| (Cardiopulmonary Resuscitation) | | 7 |
| (Emergency First Aid) | | 11 |
| Law Enforcement Driving | 12 | 35 |
| Physical Skills & Personal Defense | 40 | |
| (Physical Training) | | 40 |
| (Police Control Tactics) | | 50 |
| (Use of Force/Decision Making) | | 4 |
| (Verbal Control) | | 2 |
| (Physical Training Orientation) | | 2 |
| (Chemical Weapons) | | 2 |
| **Subtotal** | **106** | **207** |
| **TOTAL** | **400** | **549** |

0000485

PL JOINT 083649

| Additional CPD Courses | CPD |
|---|---|
| 235 ILCS Illinois Compiled Statutes | 1 |
| Bomb and Arson Section | 1 |
| Chicago Alternative Policing Strategy | 27 |
| Court Organization | 1 |
| Credit Union | 1 |
| Crowd Control | 14 |
| Deadly Force Policy | 2 |
| Department Automation Programs | 1 |
| Department Organization | 1 |
| Department Policy & Procedures | 1 |
| Desk, Lockup & Review Office Duties | 2 |
| Disaster Scenes | 1 |
| Disciplinary Rules & Regulations | 3 |
| Diversity Management | 21 |
| Effective Writing | 14 |
| Emergency Plans | 1 |
| Evidence & Recovered Property | 2 |
| First Amendment Procedures | 1 |
| Gays, Lesbians & the Police | 2 |
| Hostage/Barricade/Terrorist Incidents | 2 |
| Incident Reporting Procedures | 14 |
| Internal Affairs Division | 3 |
| Juvenile Law | 4 |
| Medical Roll Policy | 1 |
| Military Drill & Formations | 7 |
| Military Saluting | 1 |
| Mobile Computer Terminal | 2 |
| Municipal City Code | 3 |
| News Media & Police Operations | 1 |
| Occupational Exposure to Diseases | 3 |
| Office of Professional Standards | 2 |
| Officer Survival | 9 |
| Ordinance Complaint Forms | 1 |
| Patrol Specialist Panel | 3 |
| Pension Board | 1 |
| Personnel Division | 5 |
| Placement Testing/Remedial Classes | 3 |
| Police Jurisdiction | 1 |
| Problems in Human Behavior | 35 |
| Revolver Familiarization | 5 |
| Role Issues in Community Policing | 2 |
| Sexual Harassment | 3 |
| Soft Body Armor | 1 |
| Squadrol Duties | 1 |
| Street Gangs | 4 |
| To-From-Subject Reports | 2 |
| Traffic Direction Practical | 5 |
| Uniform Inspection | 4 |
| Vehicle Pursuits | 1 |
| Victim Assistance | 2 |
| Weapons Inspection Procedures | 2 |
| **Subtotal** | **220** |
| **TOTAL** | **769** |

0000486

38

PL JOINT 083650